William Breck, AK Bar #7705010
Adriana Dominguez, CA Bar #265502
Mikyla Miller, NV Bar #12042
THE PUBLIC INTEREST LAW FIRM, INC.
1575 DeLucchi Lane
Reno, NV 89502
Ph: 775-473-9555
Fx: 775-825-4361
EM: Info@TPILaw.org

**Filed**

MAR 1 8 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| IN RE: WACHOVIA CORP. "PICK-A-PAYMENT" MORTGAGE MARKETING AND SALES PRACTICES LITIGATION<br><br>AKA:<br><br>DELORES MANDRIGUES, JUANITA JONES, AL F. MINYEN and WILMA R. MINYEN, MARK CLAUSON and CHRISTINA CLAUSON, individually and on behalf of all others similarly situated,<br>       Plaintiffs<br><br>-vs-<br><br>WORLD SAVINGS, INC., WORLD SAVINGS BANK, FSB, WACHOVIA MORTGAGE CORPORATION, and DOES 1 through 10 inclusive,<br>       Defendants | LEAD CASE NO. M: 09-CV-2015-JF<br><br>CASE NO. C-07-04497 JF (RS)<br><br>The Honorable JEREMY D. FOGEL<br><br>**OBJECTION TO PROPOSED SETTLEMENT, PAYMENT OF FEES AND EXPENSES TO CLASS COUNSEL, and ENTRY OF JUDGMENT AND ORDER OF DISMISSAL**<br><br>**AND**<br><br>**MOTION TO POSTPONE APPROVAL OF PROPOSED SETTLEMENT TO PERMIT FURTHER EVALUATION OF NEWLY REVEALED/DISCOVERED EVIDENCE** |

COME NOW unnamed Plaintiffs, Nathaniel C. Dayton ("Dayton"), Chad Ryan ("Ryan") & Andy & Susan Nava ("Nava") (and collectively "Unnamed Plaintiffs"), through counsel, and hereby submit this OBJECTION to the Proposed Settlement, Payment of Fees and Expenses to Class Counsel and Entry of Judgment and Order of Dismissal (the "Objection") and MOTION to POSTPONE APPROVAL of Proposed Settlement to Permit Further Evaluation of Newly Revealed / Discovered Evidence, as follows:

1  SETTLEMENT with Defendants on behalf of themselves, each individually, and on behalf of all other

2  Unnamed Plaintiffs similarly situated.

3  <center>**OBJECTION TO CLASS ACTION SETTLEMENT**</center>

4  The Unnamed Plaintiffs hereby join in the OBJECTION filed herein by unnamed plaintiff, Michael

5  V. Hargett, on March 3, 2011, and concur in Mr. Hargett's conclusion that "The Settlement is neither

6  fair, reasonable, nor adequate, as required pursuant to Fed. R. Civ. Pro. 23(e)(2) (2010)." –

7  OBJECTION by Michael V. Hargett, filed as Doc. #199, at paragraph 16 on page 3.

8  Prior to discovering a copy of the OBJECTION filed by Michael V. Hargett, counsel to THE

9  PUBLIC INTEREST LAW FIRM, INC. (www.TPILaw.org) made the same calculation that Mr. Hargett

10 describes in his AFFIDAVIT (filed herein as Doc # 200) at paragraphs 28 and 29 on page 5, and

11 therefore concurs with Mr. Hargett's calculation, and represents to the Court that the proposed financial

12 settlement is totally inadequate to compensate the Class B and Class C Plaintiffs for any of the damages

13 they now, and in the future, will suffer as a result of the actions and misrepresentations of Defendants.

14 In addition, counsel for Unnamed Plaintiffs herein concurs with the statement in Mr. Hargett's

15 AFFIDAVIT at paragraphs 23 through 27, that the programs referenced in the Settlement are currently

16 available to all unnamed members of the Plaintiff Class, and that the Settlement as proposed contains no

17 new or additional benefit beyond the amount (calculated by Mr. Hargett at $100) that might be received

18 pursuant to the Common Fund.

19 And, counsel for Unnamed Plaintiffs herein also asserts that the purported programs described as

20 "Home Affordable Modification Program ('HAMP')", and the "Wells Fargo Mortgage Assistance

21 Program 2 ('MAP2R')" programs at paragraphs 1.32 and 1.38, respectively, on pages 18 and 19 of the

22 Agreement and Stipulation of Settlement of Class Action (Exhibit A to Doc #199), and the "Home

23 Affordable Foreclosure Alternatives ('HAFA')" are of limited assistance to homeowners who face

24 default, and foreclosure, since very few Homeowners qualify for these programs, and the promised

<center>3</center>

1  financial assistance is nominal at best, rarely exceeding $1,500 and never exceeding $3,000 (except in

2  the relatively rare case of a successful HAMP modification).

3  However, the more important point is that neither HAMP nor MAP2R are new to this Settlement,

4  since already available to all mortgagors, and the HAFA program merely offers a mortgagor in default a

5  nominal sum (normally $1,500, up to a maximum of $3,000) to move out of their home, so that the

6  mortgagee can foreclose, or receive a Deed-in-Lieu, without the protections provided to a mortgagor in

7  an actual foreclosure.

8  Therefore, there is virtually no new or additional benefit to any of the Unnamed Plaintiffs in Class B

9  or Class C, beyond the programs or procedures already offered by the Defendants, and no justification

10  for any award of substantial attorney fees to the Class Counsel for the Unnamed Plaintiffs.

11  In addition, the rights that the Unnamed Plaintiffs are required to waive are not explained in the

12  Settlement, and may be very substantial. For example:

13  In Nevada, it is/was illegal to make the type of loan known as a "No-Doc" or "Low-Doc" loan,

14  under **NRS §598D.100**, and/or to require the borrower to purchase insurance in an excessive amount:

15  **"NRS 598D.100 Unfair lending practices.**
1. It is an unfair lending practice for a lender to:
16  (a) Require a borrower, as a condition of obtaining or maintaining a home loan secured by home property, to provide property insurance on improvements to home property in an amount that
17  exceeds the reasonable replacement value of the improvements.
(b) Knowingly or intentionally make a home loan, other than a reverse mortgage, to a borrower,
18  including, without limitation, a low-document home loan, no-document home loan or stated-document home loan, without determining, using any commercially reasonable means or
19  mechanism, that the borrower has the ability to repay the home loan.
(c) Finance a prepayment fee or penalty in connection with the refinancing by the original
20  borrower of a home loan owned by the lender or an affiliate of the lender.
(d) Finance, directly or indirectly in connection with a home loan, any credit insurance.
21  2. As used in this section:
(a) 'Credit insurance' has the meaning ascribed to it in NRS 690A.015.
22  (b) 'Low-document home loan' means a home loan:
(1) Whose terms allow a borrower to establish his or her ability to repay the home loan by
23  providing only limited verification of his or her income and other assets; or
(2) Which is evidenced only by a deed transferring some or all of the interest of the borrower
24  in the home property to the creditor.

4

1       (c) 'No-document home loan' means a home loan whose terms allow a borrower to establish his
    or her ability to repay the home loan without providing any verification of his or her income and
2   other assets.
    (d) 'Prepayment fee or penalty' means any fee or penalty imposed by a lender if a borrower
3   repays the balance of a loan or otherwise makes a payment on a loan before the regularly scheduled
time for repayment.
4       (e) 'Stated-document home loan' means a home loan whose terms allow a borrower to establish
his or her ability to repay the home loan by providing only his or her own statement of verification
5   of his or her income and other assets." - (emphasis added)

6   During the period from 1998 through 2005, housing prices in Nevada, and many other localities,

7   increased unsustainably due almost entirely to the effects of the Mortgage Lenders repeated loosening of

8   lending standards, and increasing offerings of Option ARM type mortgage products. This increase, not

9   in response to any of the traditional factors which have driven housing prices in the past, is illustrated by

10  the study conducted by Dr. Robert Schiller, of Yale University, of 10 and 20 housing markets (both of

11  which housing markets included Law Vegas, Nevada), and compared the increase in housing prices to

12  the underlying factors that normally drive housing prices. The effect on housing prices and the

13  underlying factors normally driving housing prices is illustrated in the graph which is attached hereto as

14  **EXHIBIT 'B'**, which illustrates that the "bubble" in housing prices is not supported or driven by the

15  underlying factors, and the related graph in **EXHIBIT 'C'**, which was prepared by the University of

16  Nevada, Real Estate Department, at Reno, Nevada, which shows the change in housing prices in

17  Washoe County, and in Sparks, Nevada, over the same time period.

18      As appears painfully obvious in these graphic illustrations of the change in housing prices, and the

19  subsequent collapse in housing prices, the buyers during the period after 1998 were overpaying for the

20  housing they purchased by as much as double the true value, measured from the trend line to the actual

21  housing price line for Washoe County, and Sparks, Nevada.

22      The damages incurred as a result of over-paying the true "Fair Market Value" of a property can give

23  rise to an action for which the Mortgagee may be held liable for Triple Damages, under **NRS 598D.110**,

24  if the lender is held to have engaged in an "unfair lending practice" in violation of **NRS 598D.100**:

5

1  "**NRS 598D.110 Criminal and civil penalties; borrower's defense against unpaid obligation.**
   1. A lender who willfully engages in an unfair lending practice described in this chapter is guilty
2  of a misdemeanor.
   2. If a lender willfully engages in any unfair lending practice described in this chapter in connection
3  with a home loan, the lender is liable to the borrower in an amount equal to the sum of:
      (a) Three times the amount of any actual damages sustained by the borrower; and
4     (b) If the borrower brings an action and is successful in enforcing the liability imposed by
   paragraph (a) in the action, the costs of bringing the action and reasonable attorney's fees as
5  determined by the court.
   3. The borrower has a defense against the unpaid obligation of the home loan to the extent of any
6  amount awarded by a court pursuant to paragraph (a) of subsection 2, and the court, in addition to
   any other legal or equitable remedy, may cure any existing default of the home loan and cancel any
7  pending foreclosure sale, trustee's sale or other sale to enforce the home loan." - (emphasis added)

8  However, borrowers who are induced, without sufficient information about their rights, by the

9  Opt-Out ONLY Settlement proposed in this case, may lose the right to pursue their rights against the

10 Mortgage Lender or be foreclosed based on arguments about knowledge or notice, notwithstanding the

11 reality that most homeowners do not have any idea about their legal rights, or what defenses might be

12 available to protect themselves against the predatory lending practices illustrated in the "Pick-a-Pay"

13 mortgage market, as operated by Wachovia and Wells Fargo. Thus, the Plaintiffs Class who received

14 the undated Notice of Class Action Settlement in **EXHIBIT 'A'**, must be given much more information

15 in order for their rights to be explained and understandable in the context of this very one-sided

16 Settlement with the Defendants in this Class Action case. – ***Torrisi v. Tucson Elec. Power Co.***, 8 F.3d

17 1370 (9th Cir., 1993); ***Ficalora v. Lookheed Cal. Co.***, 751 F.2d 995 (9th Cir., 1985); ***Amchem Products***

18 ***Inc. v. Windsor***, 521 US 591 (1997);  ***Reynolds v. Beneficial Nat. Bank***, 288 F.3d 277 (7th Cir., 2002).

19
   ### MOTION TO POSTPONE APPROVAL OF PROPOSED SETTLEMENT TO PERMIT
20 ### FURTHER EVALUATION OF NEWLY REVEALED/DISCOVERED EVIDENCE

21 Unnamed Plaintiffs also MOVE THE COURT to Postpone the Approval of the Proposed Settlement,

22 to permit the further evaluation and analysis of the evidence NEWLY REVEALED or DISCOVERED

23 as a result of the recent release (on February 13, 2011) of the testimony of approximately 300 of the

24 "more than 700 witnesses" who testified before the Financial Crisis Inquiry Commission (the "FCIC").

6

1    In May, 2009, the U.S. Congress enacted the Fraud Enforcement and recovery Act (Public Law 111-

2  21), which created the FCIC. The FCIC was mandated to examine "22 specific topics" related to the

3  "collapse of major financial institutions that failed or would have failed if not for exceptional assistance

4  from the government" – Quoted from paragraph 3 on page *xi* of the PREFACE to the FCIC Report

5  released on January 27, 2011 – available at www.FCIC.gov.

6    As the FCIC described in the PREFACE to its REPORT:

7    "This report is not the sole repository of what the panel found. A website – www.fcic.gov – will
    host a wealth of information beyond what could be presented here. It will contain a stockpile of
8    materials – including documents and emails, video of the Commission's public hearings, testimony,
    and supporting research – that can be studied for years to come. Much of what is footnoted in this
9    report can be found on the website. In addition, more materials that cannot be released yet for
    various reasons will eventually be made public through the National Archives and Records
10    Administration." – PREFACE, at page *xii*, to FCIC Report Released January 27, 2011.

11    TPILaw.org has started the process of transcribing the statements of the witnesses who testified

12  under oath before the FCIC (which are not yet transcribed), but expects that it will be several months

13  before all of the statements are available for serious analysis.

14    Attached hereto as **EXHIBIT 'D'** and incorporated by this reference is the PRFACE to the official

15  Final FCIC Report on the Causes and Consequences of the Financial Crisis.

16    It also appears that the FCIC specifically addressed the "Pick-a-Payment" OPTION ARMs in its

17  Report released on January 27, 2011, as described on pages 106 – 113 of the Report, a true copy of

18  which pages are attached hereto as **EXHIBIT 'E'** and incorporated herein by this reference.

19    In its Report (including the Excerpt in **EXHIBIT 'E'**), the FCIC specifically mentions that it

20  received testimony from individuals associated with Wachovia and Wells Fargo, both Defendants in this

21  Class Action Suit, and from competitors of Wachovia and Wells Fargo, including Countrywide and

Washington Mutual, who offered "option ARM" products in competition with Wachovia and Wells

22  Fargo.

23    And, in its Press Release dated February 10, 2011, the FCIC identifies several individuals who

24  testified before the FCIC in relation to the Defendants named herein and their competitors, a true copy

of which Press Release is attached hereto as **EXHIBIT 'F'** and incorporated herein by this reference.

Because these documents contain testimony under oath, which may be material to the issue of whether the Proposed Settlement is 'in fact' fair and equitable to the Plaintiffs, and because these documents have only become available to the public after this Court issued its ORDER dated December 16, 2010, "PROVISIONALLY CERTIFYING A SETTLEMENT CLASS" and "PRELIMINARILY APPROVING CLASS ACTION SETTLEMENT", the Unnamed Plaintiffs in this MOTION request the Court to postpone its FINAL APPROVAL of the Proposed Settlement, to permit the Unnamed Plaintiffs and current counsel for the Class to obtain transcripts of the Testimony before the FCIC relevant to the issues in this case, and to have the opportunity to evaluate such recently released NEW EVIDENCE.

As evidence of the kinds of information contained in the statements submitted to the FCIC by the various witnesses, we have attached to this Objection and Motion, the written statements of Patricia Lindsay (an underwriter dealing with "subprime loans"), attached hereto as **EXHIBIT 'G'** and incorporate herein by this reference, and Richard Bowen (an senior underwriter for Citifinancial Mortgage), attached hereto as **EXHIBIT 'H'** and incorporated herein by this reference.

In addition, a brief summary of statements contained in the FCIC Report also includes the following:

"'Securitization could be seen as a factory line,' former Citigroup CEO Charles Prince told the FCIC. "As more and more and more of these subprime mortgages were created as raw material for the securitization process, not surprisingly in hindsight, more and more of it was of lower and lower quality. And at the end of that

at Page 102

" process, the raw material going into it was actually bad quality, it was toxic quality and that is what ended up coming out the other end of the pipeline. Wall Street obviously participated in that flow of activity." [3]

at Page 103 ... at Page 105

" In this new market, originators competed fiercely; Countrywide Financial Corporation took the crown. [18] It was the biggest mortgage originator from 2004 until the market collapsed in 2007 Even after Countrywide nearly failed, buckling under a mortgage portfolio with loans that its co-founder and CEO Angelo Mozilo once called "toxic," Mozilo would describe his 40-year-old company to the Commission as having helped 25 million people buy homes and prevented social unrest by extending loans to minorities, historically the victims of discrimination: "Countrywide was one of the greatest companies in the history of this country and probably made more difference to society, to the integrity of our society, than any company in the history of America." [19] Lending to home buyers was only part of the business. Countrywide's President and COO David Sambol told the Commission, as long as a loan did not harm the company from a financial or reputation standpoint, Countrywide was "a seller of securities to Wall Street." Countrywide's essential business strategy was "originating what was salable in the secondary market." [20] The company sold or **securitized**

8

87% of the 1.5 trillion in mortgages it originated between 2002 and 2005

" In 2004, Mozilo announced a very aggressive goal of gaining "market dominance" by capturing 30% of the origination market. [21] His share at the time was 12%. But Countrywide was not unique: Ameriquest, New Century, Washington Mutual, and others all pursued loans as aggressively. They competed by originating types of mortgages created years before as niche products, but now transformed into riskier, mass-market versions. **The definition of a good loan changed from 'one that pays' to 'one that could be sold,'" Patricia Lindsay, formerly a fraud specialist at New Century, told the FCIC. [22]**

at Page 107

" In 2002, Washington Mutual was the second-largest mortgage originator, just ahead of Countrywide. It had offered the option ARM since 1986, and in 2003, as cited by the Senate Permanent Subcommittee on Investigations; the originator conducted a study "to explore what Washington Mutual could do to increase sales of Option ARMs, our most profitable mortgage loan." **A focus group made clear that few customers were requesting option ARMs and that "this is not a product that sells itself. [29]** "The study found "the best selling point for the Option Arm" was to show consumers "how much lower their monthly payment would be by choosing the Option Arm versus a fixed-rate loan. [30] "**The study also revealed that many WaMu brokers "felt these loans were 'bad' for customers." [31]** One member of the focus group remarked, "A lot of (Loan) Consultants don't believe in it . . . and don't think [it's] good for the customer. **You're going to have to change the mindset." [32]**

" Despite these challenges, option ARM originations soared at Washington Mutual from 30 billion in 2003 to 68 billion in 2004, when they were more than half of WaMu's originations and had become the thrift's signature adjustable-rate home loan product. [33] The average FICO score was around 700 well into the range considered "prime," and about two-thirds were jumbo loans— mortgage loans exceeding the maximum Fannie Mae and Freddie Mac were allowed to purchase or guarantee. [34] More than half were in California.

" Countrywide's option ARM business peaked at 14.5 billion in originations in the second quarter of 2005, about 25% of all its loans originated that quarter. [36] But it had to relax underwriting standards to get there. In July 2004, Countrywide decided it would lend up to 90% of a home's appraised value, up from 80%, and reduced the minimum credit score to as low as 620. [37] In early 2005, Countrywide eased standards again, increasing the allowable combined loan-to-value ratio (including second liens) to 95%

at Page 108

" These changes worried the lenders even as they continued to make the loans. In September 2004 and August 2005, Mozilo emailed to senior management that these loans could bring **"financial and reputational catastrophe." [40] Countrywide should not market them to investors, he insisted. "Pay option loans being used by investors is a pure commercial spec[ulation] loan and not the traditional home loan that we have successfully managed throughout our history,"** Mozilo wrote to Carlos Garcia, CEO of Countrywide Bank. Speculative investors **"should go to Chase or Wells not us.** It is also important for you and your team to understand from my point of view that there is nothing intrinsically wrong with pay options loans themselves, the problem is **the quality of**

**borrowers who are being offered the product and the abuse by third party originators. . . .** [I]f you are unable to find sufficient product then slow down the growth of the Bank for the time being." [41]

" However, Countrywide's growth did not slow. Nor did the volume of option ARMs retained on its balance sheet, increasing from 5 billion in 2004 to 26 billion in 2005 and peaking in 2006 at 33 billion. Finding these loans very profitable, through 2006, WaMu also retained option ARMs—more than 60 billion with the bulk from California, followed by Florida. [43] But in the end, these loans would cause significant losses during the crisis.

" Across the market, the volume of option ARMs had risen nearly fourfold from 2003 to 2006 from approximately $65 billion to $255 billion. By then, WaMu and Countrywide had plenty of evidence that more borrowers were making only the minimum payments and that their mortgages were negatively amortizing—which meant their equity was being eaten away. The percentage of Countrywide's option ARMs that were negatively amortizing grew from just 1% in 2004 to 53% in in 2005 and then to more than 90% by 2007. [45] At WaMu, it was 2% in 2003, 28% in 2004, and 82% in 2007. [46] Declines in house prices added to borrowers' problems: any equity remaining after the negative amortization would simply be eroded. Increasingly, borrowers would owe more on their mortgages than their homes were worth on the market, giving them an incentive to walk away from both home and mortgage.

" Kevin Stein, from the California Reinvestment Coalition, testified to the FCIC that option ARMs were sold inappropriately: "Nowhere was this dynamic more clearly on display than in the summer of 2006 when the Federal Reserve convened

" HOEPA (Home Ownership and Equity Protection Act) hearings in San Francisco. At the hearing, consumers testified to being sold option ARM loans in their primary non-English language, only to be pressured to sign English-only documents with significantly worse terms. Some consumers testified to being unable to make even their initial payments because they had been lied to so completely by their brokers." [47] Mona Tawatao, a regional counsel with Legal Services of Northern California, described the borrowers she was assisting as "people who got steered or defrauded into entering option ARMs with teaser rates or **pick-a-pay loans forcing them to pay into—pay loans that they could never pay off. Prevalent among these clients are seniors, people of color, people with disabilities, and limited English speakers and seniors who are African American and Latino."** [48]

at Page 110

" As William Black, a former banking regulator, testified before the FCIC, the mortgage industry's own fraud specialists described stated income

at Page 111

" loans as "**an open 'invitation to fraud'** that justified the industry term 'liar's loans.'" [58] Speaking of lending up to 2005 at **Citigroup, Richard Bowen, a veteran banker in the consumer lending group, told the FCIC, "A decision was made that 'We're going to have to hold our nose and start buying the stated product if we want to stay in business.'"** [59] Jamie Dimon, the CEO of JP Morgan, told the Commission, "In mortgage underwriting, somehow we just missed, you know, that

1    home prices don't go up forever and that it's not sufficient to have stated income."

2    at Page 117

3    " The business of structuring, selling, and distributing this deal, and the thousands like it, was lucrative for the banks. The mortgage originators profited when they sold loans for securitization. [89]

4    Some of this profit flowed down to employees—particularly those generating mortgage volume.

5    " Part of the 24 million premium received by New Century for the deal we analyzed went to pay the many employees who participated. "The originators, the loan officers, account executives, basically

6    the salespeople [who] were the reason our loans came in ... were compensated very well," New Century's Patricia Lindsay told the FCIC. **And volume mattered more than quality. She noted,**

7    "Wall Street was very hungry for our product. We had our loans sold three months in advance, before they were even made at one point." [90]

8

9    " Similar incentives were at work at Long Beach Mortgage, the subprime division of Washington Mutual, which organized its 2004 Incentive Plan by volume. As WaMu showed in a 2007 plan,

10   "Home Loans Product Strategy", the goals were also product specific: to drive "growth in higher margin products (Option ARM, Alt A, Home Equity, Subprime)," "recruit and leverage seasoned

11   Option ARM sales force", and "maintain a compensation structure that supports the high margin product strategy." [91]  "   - **(emphasis** added)

12   **EXHIBIT 'I'** contains a copy of the cover pages for the different sections of the FCIC website,

13   **EXHIBIT 'J'** contains a listing of 54 of the Video Statements that have been released by the FCIC, and

14   **EXHIBIT 'K'** contains a listing of more than 471 hours of Audio Statements that have been released by

15   the FCIC. Over the last several days staff has compiled more than 1,500 pages of important and

     revealing statements by a variety of experts and participants in the mortgage markets during the critical

16   years leading up to the crisis in 2008, and many more thousands of pages of documents and testimony

17   remain to be transcribed. And finally, **EXHIBIT 'L'** contains the Conclusions of the FCIC.

18       It is anticipated that very substantial additional information to shed light on the activities of the

19   Defendants in this case, may become available from the study of the many documents released by the

     FCIC in connection with its final Report, on January 27, 2011, and February 10, 2011, and that the

20   information obtainable from these documents may have a substantial impact on the Rule 23 issues of

21   whether the Proposed Settlement is "fair, reasonable, and adequate".

22       Since it is likely that the release by the FCIC of this NEW EVIDENCE would likely be sufficient to

23   sustain a Motion under FRCP Rule 59(b) or Rule 60(b)(2), if the Court were to enter a final Judgment on

     the current record  approving the Settlement, we believe that it is also sufficient to permit the Court to

24   exercise its discretion to permit the parties an adequate opportunity to evaluate the NEW EVIDENCE

1  and present such additional facts as then appear for the Court's consideration. - ***United Nat. Ins. Co. v.***

2  ***Spectrum Worldwide, Inc.***, 555 F.3d 772 (9th Cir., 2009); Newly discovered evidence within this rule

3  refers to evidence of facts existing at time of trial, of which an aggrieved party was excusably ignorant.

4  ***Campbell v. American Foreign S.S. Corporation***, C.C.A.2 (N.Y.) 1941, 116 F.2d 926, certiorari denied

   61 S.Ct. 959, 313 U.S. 573, 85 L.Ed. 1530; See also, ***State of Wash. v. U.S.***, C.A.Wash.1954, 214 F.2d

5  33, certiorari denied 75 S.Ct. 86, 348 U.S. 862, 99 L.Ed. 679; ***U.S. v. Bransen*** , C.C.A.Wash.1944, 142

6  F.2d 232; ***Eastern Air Lines v. U.S.***, D.C.Del.1953, 110 F.Supp. 499.

7      For this purpose the Unnamed Plaintiffs in this Motion request that the Court grant the parties at

   least six (6) months time to evaluate and organize the evidence, in order to present it to the Court in

8  conjunction with the continued consideration of this Settlement proposal.

9      Respectfully submitted this 16th day of March, 2011.

10                              By:_____

                              **William Breck, AK Bar # 7705010**
11                            **Adriana Dominguez, CA Bar # 265502**
                              **Mikyla Miller, NV Bar # 12042**
12                            **THE PUBLIC INTEREST LAW FIRM, INC.** www.TPILaw.org
                              **Nevada Bar MJP Registration #35427**
13                            Phone: 775-473-9555
                              Fax: 775-825-4361
14                            EM: Info@TPILaw.org
                              Attorneys for Unnamed Plaintiffs: Nathanial C. Dayton;
15                            Andy & Susan Nava; & Chad Ryan

16

17

18

19

20

21

22

23

24

1

## LIST OF EXHIBITS

2

3

**EXHIBIT 'A'** – COPY OF UNDATED CLASS ACTION NOTICE

4

**EXHIBIT 'B'** – Robert Schiller GRAPH OF HOUSING PRICES vs. Underlying Factors

5

**EXHIBIT 'C'** – UNR Graph of Washoe County & Sparks Neighborhood Housing Prices

6

**EXHIBIT 'D'** – PREFACE to OFFICIAL FCIC FINAL REPORT

7

**EXHIBIT 'E'** – Pages 106 – 113 of FCIC FINAL REPORT

8

**EXHIBIT 'F'** – FCIC Press Release Dated February 10, 2011

9

**EXHIBIT 'G'** – Statement of PATRICIA LINDSAY to the FCIC

10

**EXHIBIT 'H'** – Statement of RICHARD BOWEN to the FCIC

11

**EXHIBIT 'I'** – Cover Pages of Main Pages of FCIC Website

12

**EXHIBIT 'J'** – List of 54 Video Statements Released by FCIC

13

**EXHIBIT 'K'** – List of over 471 Hours of Audio Statements Released by FCIC

14

**EXHIBIT 'L'** – Copy of Conclusions drawn by FCIC from REPORT on the Causes and
Consequences of the Financial Crisis engendered in the U.S. Housing Market

15

16

17

18

19

20

21

22

23

24

$EXHIBIT$ 'A'

*A. NAVA*

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

# If You Have a Pick-a-Payment Mortgage Loan with World Savings Bank or Wachovia Mortgage,

## You Could Receive Benefits from a Class Action Settlement.

> A Pick-a-Payment mortgage loan allows borrowers to make monthly payments in an amount lower than the monthly amount of interest due on the loan.

*A federal Court authorized this notice. This is not a solicitation from a lawyer.*

- A Settlement has been reached in a class action involving Pick-a-Payment mortgages. The Settlement resolves litigation over whether the Defendants failed to make complete and accurate disclosures with respect to their Pick-a-Payment mortgage loans.

- **The Defendants' records show that you obtained a Pick-a-Payment mortgage loan between August 1, 2003 and December 31, 2008.**

- You do not need to do anything to get a payment. Please call 1-877-546-8449 to apply for a loan modification.

- Please note that this Settlement does not change your obligation to continue to make payments on your mortgage loan. You should continue to make your payments.

- Your legal rights are affected whether you act, or don't act. Read this notice carefully.

| YOUR LEGAL RIGHTS AND OPTIONS IN THE SETTLEMENT | |
|---|---|
| **RECEIVE BENEFITS** | If the Court grants final approval to the Settlement, you will automatically receive benefits if you qualify. |
| **EXCLUDE YOURSELF FROM THE SETTLEMENT** | Get no money from the Settlement. This is the only option that allows you to ever be part of any other lawsuit against the Defendants about the legal claims in this case. |
| **OBJECT** | Write to the Court about why you don't like about the Settlement. |
| **GO TO A HEARING** | Ask to speak in Court about the fairness of the Settlement. |
| **DO NOTHING** | Obtain Settlement benefits and give up rights to ever sue the Defendants about the legal claims in this case. |

- These rights and options – and the deadlines to exercise them – are explained in this notice.

- The Court in charge of this case still has to decide whether to approve the Settlement. Loan modifications are being offered by the Defendants now to eligible Class Members. Payments will be made if the Court approves the Settlement and after any appeals are resolved. Please be patient.

For More Information: Call 1-866-886-7224 or Visit www.PickaPaySettlement.com

-1-

C-CR

## WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION** .................................................................................................**PAGE 3**
1. Why is there a notice?
2. What is this lawsuit about?
3. What is a Pick-a-Payment mortgage loan?
4. Why is this a class action?
5. Why is there a Settlement?

**WHO IS IN THE SETTLEMENT** .....................................................................................**PAGE 4**
6. How do I know if I am part of the Settlement?

**THE SETTLEMENT BENEFITS** ......................................................................................**PAGE 5**
7. What does the Settlement provide?
8. What about the Attorneys General Settlement with Wells Fargo?
9. What can I get from the Settlement?
10. What is a loan modification?
11. What is "Imminent Default"?
12. What is the other incentive program?
13. What am I giving up to stay in the Class?

**HOW TO GET BENEFITS** .............................................................................................**PAGE 8**
14. How can I get benefits?
15. When will I get my benefits?

**EXCLUDING YOURSELF FROM THE SETTLEMENT** ............................................................**PAGE 8**
16. How do I get out of the Settlement?
17. If I don't exclude myself, can I sue the Defendants for the same thing
    later?
18. If I exclude myself from the Settlement, can I still get a payment?

**THE LAWYERS REPRESENTING YOU** ............................................................................**PAGE 9**
19. Do I have a lawyer in the case?
20. How will the lawyers be paid?

**OBJECTING TO THE SETTLEMENT** ...............................................................................**PAGE 9**
21. How do I tell the Court that I don't like the Settlement?
22. What's the difference between objecting and excluding?

**THE COURT'S FAIRNESS HEARING** ...........................................................................**PAGE 10**
23. When and where will the Court decide whether to approve the
    Settlement?
24. Do I have to come to the hearing?
25. May I speak at the hearing?

**IF YOU DO NOTHING** ..............................................................................................**PAGE 11**
26. What happens if I do nothing at all?

**GETTING MORE INFORMATION** ..................................................................................**PAGE 12**
27. How do I get more information?

For More Information: Call 1-866-886-7224 or Visit www.PickaPaySettlement.com

-2-

## BASIC INFORMATION

### 1. Why is there a notice?

You have a right to know about a proposed Settlement of a class action lawsuit, and about your options, before the Court decides whether to approve the Settlement.

The Court in charge of the case is the United States District Court for the Northern District of California, and the case is called *In Re: Wachovia Corp. "Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015. The people who sued are called Plaintiffs, and the companies they sued, World Savings, Inc.; World Savings Bank, FSB; Wachovia Mortgage, FSB, now known as Wachovia Mortgage, a division of Wells Fargo Bank, N.A.; Wachovia Corporation; Golden West Financial Corporation; Wachovia Bank, FSB, formerly known as World Savings Bank, FSB-TX; Wachovia Mortgage Corporation; Wells Fargo Home Mortgage; and Wells Fargo Bank, N.A., are called the Defendants.

### 2. What is this lawsuit about?

The lawsuit claims that the Defendants violated various state and federal laws in connection with the Pick-a-Payment mortgage loan product (*see* Question 3 below). The Pick-a-Payment mortgage loan permitted the borrower to select and make a minimum payment amount for a limited time and subject to certain conditions. When a payment was insufficient to pay the interest owed, unpaid interest was added to the loan balance and the outstanding loan balance increased ("negative amortization"). The Plaintiffs claim that the Defendants did not adequately disclose the Pick-a-Payment loan's potential for negative amortization.

The Defendants deny all claims made against them, deny that their lending practices violated any laws, and deny that they financially harmed any of their customers.

### 3. What is a Pick-a-Payment mortgage loan?

The way the loans work is that borrowers choose one of up to four monthly payment options: a minimum payment, an interest only payment, a 15-year amortizing payment, or a 30-year amortizing payment. When a minimum payment was insufficient to pay the interest owed, unpaid interest was added to the loan balance and the outstanding loan balance increased.

### 4. Why is this a class action?

In a class action, one or more people, called "class representatives," sue on behalf of people who have similar claims. All these people are a "class" or "class members," except for those who exclude themselves from the class. U.S. District Judge Jeremy D. Fogel in the United States District Court for the Northern District of California is in charge of this class action.

## 5. Why is there a Settlement?

The Defendants are not admitting that they did anything wrong, but both sides want to avoid the cost of further litigation. The Court has not decided in favor of the Plaintiffs or the Defendants. The Class Representatives and their attorneys think the Settlement is best for everyone who is affected. The Settlement provides the opportunity for payments and other benefits to Class Members.

### WHO IS IN THE SETTLEMENT

## 6. How do I know if I am part of the Settlement?

There are three Settlement Classes. **If you received this notice in the mail, the Defendants' records show you are a member of Settlement Class C.** If you believe you are a member of Settlement Class A or Settlement Class B, you should call 1-866-886-7224. You can view the detailed Notices for each Settlement Class at www.PickaPaySettlement.com.

Each Class includes borrowers who obtained a Pick-a-Payment mortgage loan (for a primary residence) from World Savings Bank, FSB or Wachovia Mortgage, FSB (now known as Wachovia Mortgage, a division of Wells Fargo Bank, N.A.) anytime between August 1, 2003 and December 31, 2008.

Settlement Class A (no longer have a Pick-a-Payment mortgage)

- Includes borrowers who no longer have their Pick-a-Payment mortgage loan because they sold the property securing the loan, refinanced the loan, personally paid off the loan, or have already obtained a loan modification that converted the loan to a regular mortgage.

Settlement Class B (mortgage payments are not 60 or more days past due)

- Includes borrowers who still have their Pick-a-Payment mortgage loan and
- Whose mortgage payments, as of December 16, 2010, are not 60 or more days past due.

Settlement Class C (mortgage payments are 60 days or more past due)

- Includes borrowers who still have their Pick-a-Payment mortgage loan and
- Whose mortgage payments, as of December 16, 2010, are 60 or more days past due.

Please note that the Classes do not include any borrowers who have already released their claims involving their Pick-a-Payment mortgage loan in a prior case against any of the Defendants.

## THE SETTLEMENT BENEFITS

### 7. What does the Settlement provide?

The Settlement provides for a loan modification program valued at over $600 million and the establishment of a $50 million Settlement Fund. After deducting a payment of up to $125,000 for the Class Representatives (*see* Question 20), the net Settlement Fund will be distributed equally to members of Settlement Class A who submit a valid Claim Form and all members of Settlement Classes B and C. Borrowers who still have a Pick-a-Payment mortgage loan (Settlement Classes B and C) may also be eligible for loan modifications or another incentive program (*see* Questions 10 and 11 below). In addition to the Settlement Fund, the Defendants will pay up to $25 million in attorneys' fees and costs (*see* Question 19) and up to $1 million to administer the Settlement.

If there is any money remaining in the $50 million Settlement Fund after all claims are paid, the Defendants will be reimbursed for the administration expenses. Any remaining funds will be distributed to The National Consumer Law Center, a not-for-profit organization selected by the Class Representatives, and a not-for-profit organization selected by the Defendants.

A Settlement Agreement, available at the website, contains more details about the Settlement.

### 8. What about the Attorneys General Settlement with Wells Fargo?

If you live in Arizona, Florida, Colorado, New Jersey, Washington, Texas, Illinois, or Nevada, you may receive a separate notice relating to a 2010 Settlement between those states' Attorneys General and Wells Fargo Bank, N.A. (the "Attorneys General Settlement"), which acquired World Savings Bank, FSB/Wachovia Mortgage, FSB's Pick-a-Payment mortgage loan portfolio in 2008. In the Attorneys General Settlement, Wells Fargo Bank, N.A. is offering permanent loan modifications to eligible borrowers. You are allowed to participate in both the Attorneys General Settlement and this Settlement.

### 9. What can I get from the Settlement?

As a member of Settlement Class C, you are eligible to participate in the loan modification program, described below.

You are also eligible to receive a payment from the Settlement Fund after the Court grants final approval to the Settlement (*see* Question 15). Your exact payment cannot be calculated at this time. It will depend on the number of valid claims that are filed by members of Settlement Class A. Members of Settlement Class C do not have to file a claim form to receive a payment from the Settlement Fund. Please note that if you had a co-borrower on your Pick-a-Payment mortgage loan, or if you had more than one Pick-a-Payment mortgage loan, you and all other co-borrowers will only get one Settlement Payment.

## 10. What is a loan modification?

The Defendants will offer permanent loan modifications to eligible Settlement Class C Members who live in their homes and who are at least 60 days delinquent on their mortgage payments. Eligible Settlement Class C Members who become less than 60 days delinquent on their mortgage payments still will be eligible for the Loan Modification Program if they become in "Imminent Default" or if they again become at least 60 days delinquent on their mortgage payments. "Imminent Default" is described in section 11 below. The Loan Modification Program will operate through June 30, 2013. A loan modification is a change to your loan agreement and may include principal forgiveness, loan term extension, interest rate reduction, and principal forbearance (which gives the borrower additional time to pay off the loan principal). Please be aware that a loan modification may affect your credit rating.

Eligible Settlement Class C Members will first be considered for the federal Home Affordable Modification Program ("HAMP"). HAMP provides eligible homeowners the opportunity to modify their mortgages to make them more affordable. If the Settlement Class C Member does not qualify under HAMP or elects not to accept a HAMP loan modification, the Defendants will consider that Settlement Class C Member for their new modification program known as Mortgage Assistance Program 2 ("MAP2R").

Settlement Class C Members who remain current on their modified payments over three years may be able to earn additional principal forgiveness. More details on these programs are in the Settlement Agreement, which is available at www.PickaPaySettlement.com.

## What is "Imminent Default"?

Imminent Default describes a borrower who meets a test to show the borrower is reasonably likely to default on his or her Pick-a-Payment mortgage loan because of financial hardship or other changed circumstances. Generally, the current test for "Imminent Default" is as follows:

1. Long Term Hardship, meaning a borrower that is having difficulty making his or her mortgage payments and the duration of that difficulty is expected to be greater than 12 months; and

2. Financial Hardship, defined as one of the following that currently exists or occurs prior to June 30, 2013:

a.  Death of a borrower;

b.  Long-term or permanent disability or illness of a borrower or dependent family member;

c.  Legally-documented divorce or separation of the borrower and co-borrower;

d. Separation of borrowers unrelated by marriage, civil union, or similar civil domestic partnership under applicable law;

e. A combination of reduction of income and increase in housing expenses (principal and interest only) that exceeds 10% of current income. The comparison period shall be approximately 12 months prior to the date modification is sought; however, a greater period may be used if the condition has been consistent; **and**

3. Cash reserves of less than $25,000, excluding retirement accounts; **and**

4. The property is occupied by the borrower as his or her principal residence; **and**

5. The borrower's loan-to-value ratio must exceed 80%, or the loan must have a positive "Net Present Value."

### What is the other Incentive program?

Settlement Class C Members who are unable to qualify for modifications under the HAMP or MAP2R guidelines may qualify for incentive payments of at least $1,500 for a short-sale or deed-in-lieu of foreclosure. The Settlement Class C Member must qualify for these payments under the Home Affordable Foreclosure Alternatives ("HAFA") guidelines. HAFA guidelines are available at http://makinghomeaffordable.gov/hafa.html.

In a short sale, the bank allows the homeowner to list and sell the mortgaged property with the understanding that the net proceeds from the sale may be less than the total amount due on the first mortgage. Generally, if the borrower makes a good faith effort to sell the property but is not successful, a bank may consider a deed-in-lieu of foreclosure. With a deed-in-lieu of foreclosure, the borrower voluntarily transfers ownership of the property to the bank—provided the title is free and clear of other mortgages and liens.

These options will remain open through June 30, 2013.

### What am I giving up to stay in the Class?

Unless you exclude yourself from the Settlement, you can't sue the Defendants, continue to sue, or be part of any other lawsuit against the Defendants about the legal issues in this case. It also means that all of the decisions by the Court will bind you. The "Release of Claims" is described more fully in the Settlement Agreement and describes exactly the legal claims that you give up if you get benefits from the Settlement. The Settlement Agreement is available at www.PickaPaySettlement.com.

## How to Get Benefits

### 14. How can I get benefits?

You do not need to do anything to get a payment from the Settlement. If the Court grants final approval to the Settlement, you will automatically be mailed a payment. The Defendants are attempting to contact Settlement Class C Members who are eligible for loan modifications or the incentive program. If you would like to apply for a loan modification or the incentive program, you should contact the Defendants at 1-877-546-8449. If you move after you receive this Notice, please call 1-866-886-7224 to inform the administrator of your new address.

### 15. When will I get my benefits?

Modifications are now available, and the Defendants are attempting to contact Settlement Class C Members who are eligible for loan modifications or the incentive program. Payments will be distributed to Class Members after the Court grants "final approval" to the Settlement and after any appeals are resolved. If Judge Fogel approves the Settlement after a hearing on April 29, 2011 there may be appeals. It's always uncertain whether these appeals can be resolved, and resolving them can take time.

## Excluding Yourself From The Settlement

If you want to keep the right to sue or continue to sue the Defendants on your own about the legal issues in this case, then you must take steps to get out. This is called excluding yourself – or is sometimes referred to as opting out of the Class.

### 16. How do I get out of the Settlement?

To exclude yourself from the Settlement, you must send a letter that includes the following:

- Your name, address, and telephone number,
- The name of the case (*In Re: Wachovia Corp. "Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015),
- A statement that you want to be excluded from this Settlement, and
- Your signature.

You must mail your exclusion request, postmarked no later than **March 16, 2011**, to:

Pick-a-Payment Exclusions
PO Box 2448
Faribault, MN 55021-9148

---

For More Information: Call 1-866-886-7224 or Visit www.PickaPaySettlement.com

**17. If I don't exclude myself, can I sue the Defendants for the same thing later?**

No. Unless you exclude yourself, you give up the right to sue the Defendants for the claims that the Settlement resolves. If you have a pending lawsuit, speak to your lawyer in that lawsuit immediately. You must exclude yourself from this Class to continue your own lawsuit.

**18. If I exclude myself from the Settlement, can I still get a payment?**

No. You will not get any money if you exclude yourself from the Settlement. If you exclude yourself from the Settlement, do not send in a Claim Form asking for benefits.

## THE LAWYERS REPRESENTING YOU

**19. Do I have a lawyer in the case?**

Yes. The Court has appointed these lawyers and firms as "Class Counsel," meaning that they were appointed to represent you and all Class Members: Jeffrey K. Berns and David M. Arbogast of Arbogast & Berns LLP; Gerson Smoger of Smoger & Associates; Mark Cuker of Williams Cuker Berezofsky; Eric George of Browne Woods George, LLP; Christopher Seeger of Seeger Weiss LLP; Brian Kabateck of Kabateck Brown Kellner LLP; A. Hoyt Rowell of Richardson, Patrick, Westbrook & Brickman LLP; and Evan Buxner of The Buxner Law Firm.

Class Counsel has spent over three years working on this lawsuit, including over a year of mediation to get to this Settlement. You will not be charged for these lawyers. If you want to be represented by your own lawyer, you may hire one at your own expense.

**20. How will the lawyers be paid?**

Class Counsel intends to file a motion on or about February 23, 2011 seeking $25 million for attorneys' fees and costs. The fees awarded by the Court will be paid by Defendants and will not come from the Settlement Fund. The Court will determine the amount of fees to award. Class Counsel will also request that up to $125,000 be paid from the Settlement Fund to the 26 Class Representatives who helped the lawyers on behalf of the whole Class.

## OBJECTING TO THE SETTLEMENT

**21. How do I tell the Court that I don't like the Settlement?**

If you are a Class Member, you can object to the Settlement or to Class Counsel's requests for fees and expenses. To object, you must send a letter that includes the following:

- Your name, address, and telephone number,
- The name of the case (*In Re: Wachovia Corp. "Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015),
- The account number(s) of your loan(s),
- A sentence stating that "You confirm under penalty of perjury that you are a Settlement Class Member,"
- The reasons you object to the Settlement,
- A list of any witnesses you may call to testify at the Fairness Hearing (see Question 21),
- Copies of any exhibits you intend to present to the Court at the Fairness Hearing, and
- Your signature.

Your objection, along with any supporting material you wish to submit, must be mailed and postmarked no later than **March 16, 2011**, to the following four addresses:

| Court | Defense Counsel |
|---|---|
| The United States District Court for the Northern District of California<br>280 South First Street<br>San Jose, CA 95113 | T. Thomas Cottingham, III<br>WINSTON & STRAWN LLP<br>214 North Tryon Street, Suite 2200<br>Charlotte, NC 28202 |
| **Class Counsel** | **Defense Counsel** |
| Jeffrey K. Berns<br>David M. Arbogast<br>ARBOGAST & BERNS LLP<br>6303 Owensmouth Avenue, 10th Floor<br>Woodland Hills, CA 91367 | Jack R. Nelson<br>REED SMITH LLP<br>101 Second Street, Suite 1800<br>San Francisco, CA 94105 |

## 22. What's the difference between objecting and excluding?

Objecting is simply telling the Court that you don't like something about the Settlement. You can object to the Settlement only if you do not exclude yourself from the Settlement. Excluding yourself from the Settlement is telling the Court that you don't want to be part of the Settlement. If you exclude yourself from the Settlement, you have no basis to object to the Settlement because it no longer affects

## THE COURT'S FAIRNESS HEARING

The Court will hold a hearing to decide whether to approve the Settlement and any requests for fees and expenses. You may attend and you may ask to speak, but you don't have to.

For More Information: Call 1-866-886-7224 or Visit www.PickaPaySettlement.com

## 23: When and where will the Court decide whether to approve the Settlement?

The Court will hold a Fairness Hearing at 9:00 a.m. PST on **April 29, 2011**, at the United States District Court for the Northern District of California, located at 280 South First Street, San Jose, CA, 95113, in Courtroom #3. The hearings may be moved to a different date or time without additional notice, so it is a good idea to check www.PickaPaySettlement.com. At this hearing the Court will consider whether the Settlement is fair, reasonable, and adequate. The Court will also consider how much to pay Class Counsel and the Class Representatives. If there are objections, the Court will consider them at this time. After the hearing, the Court will decide whether to approve the Settlement. We do not know how long these decisions will take.

## 24. Do I have to come to the hearing?

No. Class Counsel will answer questions Judge Fogel may have. But, you may come at your own expense. If you send an objection, you don't have to come to Court to talk about it. As long as you mailed your written objection on time to the proper address, the Court will consider it. You may also pay your own lawyer to attend, but it's not necessary.

## 25. May I speak at the hearing?

Yes. You may ask the Court for permission to speak at the Fairness Hearing. To do so, you must send a letter saying that it is your "Notice of Intent to Appear." In your letter you must include the following:

- Your name, address, and telephone number,
- The name of the case (*In Re: Wachovia Corp. "Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015),
- The name, address, and telephone number of any attorney(s) who will be appearing on your behalf at the Fairness Hearing, and
- Your signature.

You must mail your Notice of Intention to Appear, postmarked no later than **March 16, 2011**, to the four addresses in Question 20.

### IF YOU DO NOTHING

## 26. What happens if I do nothing at all?

If you do nothing, you may still get benefits from the Settlement. However, unless you exclude yourself, you won't be able to start a lawsuit, continue with a lawsuit, or be part of any other lawsuit against the Defendants about the legal issues in this case, ever again.

## GETTING MORE INFORMATION

**27. How do I get more information?**

The notice summarizes the proposed Settlement.    More details are in a Settlement Agreement.   You can get a copy of the Settlement Agreement at www.PickaPaySettlement.com.  You may also write with questions to Pick-a-Payment Settlement, P.O. Box 2448,'Faribault, MN 55021-9148, and you can call the toll free number, 1-866-886-7224.

EXHIBIT '8'



Case Shiller Figure 2.1 - 1987 - 2010 - US Real Home Prices - Compared to Real Building Costs, Population, Long-Bond Interest Rates & Consumer Price Index

EXHIBIT 'C'



Median Single Family Home Resale Price: 1990-2009

—◇— Overall Reno-Sparks Median Resale Price

◆ Overall Reno-Sparks Target Price at 0.97% Growth/QTR

—■— Sparks #181 Median Resale Price

▲ Sparks #181 Target Price at 0.79% Growth/QTR

Center For Regional Studies
College of Business
University of Nevada, Reno

Source: NNRMLS, compiled by the Center for Regional Studies

EXHIBIT 'D'

# PREFACE

The Financial Crisis Inquiry Commission was created to "examine the causes of the current financial and economic crisis in the United States." In this report, the Commission presents to the President, the Congress, and the American people the results of its examination and its conclusions as to the causes of the crisis.

More than two years after the worst of the financial crisis, our economy, as well as communities and families across the country, continues to experience the aftershocks. Millions of Americans have lost their jobs and their homes, and the economy is still struggling to rebound. This report is intended to provide a historical accounting of what brought our financial system and economy to a precipice and to help policy makers and the public better understand how this calamity came to be.

The Commission was established as part of the Fraud Enforcement and Recovery Act (Public Law 111-21) passed by Congress and signed by the President in May 2009. This independent, 10-member panel was composed of private citizens with experience in areas such as housing, economics, finance, market regulation, banking, and consumer protection. Six members of the Commission were appointed by the Democratic leadership of Congress and four members by the Republican leadership.

The Commission's statutory instructions set out 22 specific topics for inquiry and called for the examination of the collapse of major financial institutions that failed or would have failed if not for exceptional assistance from the government. This report fulfills these mandates. In addition, the Commission was instructed to refer to the attorney general of the United States and any appropriate state attorney general any person that the Commission found may have violated the laws of the United States in relation to the crisis. Where the Commission found such potential violations, it referred those matters to the appropriate authorities. The Commission used the authority it was given to issue subpoenas to compel testimony and the production of documents, but in the vast majority of instances, companies and individuals voluntarily cooperated with this inquiry.

In the course of its research and investigation, the Commission reviewed millions of pages of documents, interviewed more than 700 witnesses, and held 19 days of public hearings in New York, Washington, D.C., and communities across the country

that were hard hit by the crisis. The Commission also drew from a large body of existing work about the crisis developed by congressional committees, government agencies, academics, journalists, legal investigators, and many others.

We have tried in this report to explain in clear, understandable terms how our complex financial system worked, how the pieces fit together, and how the crisis occurred. Doing so required research into broad and sometimes arcane subjects, such as mortgage lending and securitization, derivatives, corporate governance, and risk management. To bring these subjects out of the realm of the abstract, we conducted case study investigations of specific financial firms—and in many cases specific facets of these institutions—that played pivotal roles. Those institutions included American International Group (AIG), Bear Stearns, Citigroup, Countrywide Financial, Fannie Mae, Goldman Sachs, Lehman Brothers, Merrill Lynch, Moody's, and Wachovia. We looked more generally at the roles and actions of scores of other companies.

We also studied relevant policies put in place by successive Congresses and administrations. And importantly, we examined the roles of policy makers and regulators, including at the Federal Deposit Insurance Corporation, the Federal Reserve Board, the Federal Reserve Bank of New York, the Department of Housing and Urban Development, the Office of the Comptroller of the Currency, the Office of Federal Housing Enterprise Oversight (and its successor, the Federal Housing Finance Agency), the Office of Thrift Supervision, the Securities and Exchange Commission, and the Treasury Department.

Of course, there is much work the Commission did not undertake. Congress did not ask the Commission to offer policy recommendations, but required it to delve into what caused the crisis. In that sense, the Commission has functioned somewhat like the National Transportation Safety Board, which investigates aviation and other transportation accidents so that knowledge of the probable causes can help avoid future accidents. Nor were we tasked with evaluating the federal law (the Troubled Asset Relief Program, known as TARP) that provided financial assistance to major financial institutions. That duty was assigned to the Congressional Oversight Panel and the Special Inspector General for TARP.

This report is not the sole repository of what the panel found. A website—www.fcic.gov—will host a wealth of information beyond what could be presented here. It will contain a stockpile of materials—including documents and emails, video of the Commission's public hearings, testimony, and supporting research—that can be studied for years to come. Much of what is footnoted in this report can be found on the website. In addition, more materials that cannot be released yet for various reasons will eventually be made public through the National Archives and Records Administration.

Our work reflects the extraordinary commitment and knowledge of the members of the Commission who were accorded the honor of this public service. We also benefited immensely from the perspectives shared with commissioners by thousands of concerned Americans through their letters and emails. And we are grateful to the hundreds of individuals and organizations that offered expertise, information, and personal accounts in extensive interviews, testimony, and discussions with the Commission.

We want to thank the Commission staff, and in particular, Wendy Edelberg, our executive director, for the professionalism, passion, and long hours they brought to this mission in service of their country. This report would not have been possible without their extraordinary dedication.

With this report and our website, the Commission's work comes to a close. We present what we have found in the hope that readers can use this report to reach their own conclusions, even as the comprehensive historical record of this crisis continues to be written.

EXHIBIT 'E'

could double or even triple, leaving borrowers with few alternatives: if they had established their creditworthiness, they could refinance into a similar mortgage or one with a better interest rate, often even with the same lender;[23] if unable to refinance, the borrower was unlikely to be able to afford the new higher payments and would have to sell the home and repay the mortgage. If they could not sell or make the higher payments, they would have to default.

But as house prices rose after 2000, the 2/28s and 3/27s acquired a new role: helping to get people into homes or to move up to bigger homes. "As homes got less and less affordable, you would adjust for the affordability in the mortgage because you couldn't really adjust people's income," Andrew Davidson, the president of Andrew Davidson & Co. and a veteran of the mortgage markets, told the FCIC.[24] Lenders qualified borrowers at low teaser rates, with little thought to what might happen when rates reset. Hybrid ARMs became the workhorses of the subprime securitization market.

Consumer protection groups such as the Leadership Conference on Civil Rights railed against 2/28s and 3/27s, which, they said, neither rehabilitated credit nor turned renters into owners. David Berenbaum from the National Community Reinvestment Coalition testified to Congress in the summer of 2007: "The industry has flooded the market with exotic mortgage lending such as 2/28 and 3/27 ARMs. These exotic subprime mortgages overwhelm borrowers when interest rates shoot up after an introductory time period."[25] To their critics, they were simply a way for lenders to strip equity from low-income borrowers. The loans came with big fees that got rolled into the mortgage, increasing the chances that the mortgage could be larger than the home's value at the reset date. If the borrower could not refinance, the lender would foreclose—and then own the home in a rising real estate market.

## Option ARMs: "Our most profitable mortgage loan"

When they were originally introduced in the 1980s, option ARMs were niche products, too, but by 2004 they too became loans of choice because their payments were lower than more traditional mortgages. During the housing boom, many borrowers repeatedly made only the minimum payments required, adding to the principal balance of their loan every month.

An early seller of option ARMs was Golden West Savings, an Oakland, California–based thrift founded in 1929 and acquired in 1963 by Marion and Herbert Sandler. In 1975, the Sandlers merged Golden West with World Savings; Golden West Financial Corp., the parent company, operated branches under the name World Savings Bank. The thrift issued about $274 billion in option ARMs between 1981 and 2005.[26] Unlike other mortgage companies, Golden West held onto them.

Sandler told the FCIC that Golden West's option ARMs—marketed as "Pick-a-Pay" loans—had the lowest losses in the industry for that product. Even in 2005—the last year prior to its acquisition by Wachovia—when its portfolio was almost entirely in option ARMs, Golden West's losses were low by industry standards. Sandler attributed Golden West's performance to its diligence in running simulations about what

would happen to its loans under various scenarios—for example, if interest rates went up or down or if house prices dropped 5%, even 10%. "For a quarter of a century, it worked exactly as the simulations showed that it would," Sandler said. "And we have never been able to identify a single loan that was delinquent because of the structure of the loan, much less a loss or foreclosure."[27] But after Wachovia acquired Golden West in 2006 and the housing market soured, charge-offs on the Pick-a-Pay portfolio would suddenly jump from 0.04% to 2.69% by September 2008. And foreclosures would climb.

Early in the decade, banks and thrifts such as Countrywide and Washington Mutual increased their origination of option ARM loans, changing the product in ways that made payment shocks more likely. At Golden West, after 10 years, or if the principal balance grew to 125% of its original size, the Pick-a-Pay mortgage would recast into a new fixed-rate mortgage. At Countrywide and Washington Mutual, the new loans would recast in as little as five years, or when the balance hit just 110% of the original size. They also offered lower teaser rates—as low as 1%—and loan-to-value ratios as high as 100%. All of these features raised the chances that the borrower's required payment could rise more sharply, more quickly, and with less cushion.

In 2002, Washington Mutual was the second-largest mortgage originator, just ahead of Countrywide. It had offered the option ARM since 1986, and in 2003, as cited by the Senate Permanent Subcommittee on Investigations, the originator conducted a study "to explore what Washington Mutual could do to increase sales of Option ARMs, our most profitable mortgage loan."[28] A focus group made clear that few customers were requesting option ARMs and that "this is not a product that sells itself."[29] The study found "the best selling point for the Option Arm" was to show consumers "how much lower their monthly payment would be by choosing the Option Arm versus a fixed-rate loan."[30] The study also revealed that many WaMu brokers "felt these loans were 'bad' for customers."[31] One member of the focus group remarked, "A lot of (Loan) Consultants don't believe in it . . . and don't think [it's] good for the customer. You're going to have to change the mindset."[32]

Despite these challenges, option ARM originations soared at Washington Mutual from $30 billion in 2003 to $68 billion in 2004, when they were more than half of WaMu's originations and had become the thrift's signature adjustable-rate home loan product.[33] The average FICO score was around 700, well into the range considered "prime," and about two-thirds were jumbo loans—mortgage loans exceeding the maximum Fannie Mae and Freddie Mac were allowed to purchase or guarantee.[34] More than half were in California.[35]

Countrywide's option ARM business peaked at $14.5 billion in originations in the second quarter of 2005, about 25% of all its loans originated that quarter.[36] But it had to relax underwriting standards to get there. In July 2004, Countrywide decided it would lend up to 90% of a home's appraised value, up from 80%, and reduced the minimum credit score to as low as 620.[37] In early 2005, Countrywide eased standards again, increasing the allowable combined loan-to-value ratio (including second liens) to 95%.[38]

The risk in these loans was growing. From 2003 to 2005, the average loan-to-value ratio rose about 4%, the combined loan-to-value ratio rose about 6%, and debt-to-income ratios had risen from 34% to 38%: borrowers were pledging more of their income to their mortgage payments. Moreover, 68% of these two originators' option ARMs had low documentation in 2005.[39] The percentage of these loans made to investors and speculators—that is, borrowers with no plans to use the home as their primary residence—also rose.

These changes worried the lenders even as they continued to make the loans. In September 2004 and August 2005, Mozilo emailed to senior management that these loans could bring "financial and reputational catastrophe."[40] Countrywide should not market them to investors, he insisted. "Pay option loans being used by investors is a pure commercial spec[ulation] loan and not the traditional home loan that we have successfully managed throughout our history," Mozilo wrote to Carlos Garcia, CEO of Countrywide Bank. Speculative investors "should go to Chase or Wells not us. It is also important for you and your team to understand from my point of view that there is nothing intrinsically wrong with pay options loans themselves, the problem is the quality of borrowers who are being offered the product and the abuse by third party originators. . . . [I]f you are unable to find sufficient product then slow down the growth of the Bank for the time being."[41]

However, Countrywide's growth did not slow. Nor did the volume of option ARMs retained on its balance sheet, increasing from $5 billion in 2004 to $26 billion in 2005 and peaking in 2006 at $33 billion.[42] Finding these loans very profitable, through 2006, WaMu also retained option ARMs—more than $60 billion with the bulk from California, followed by Florida.[43] But in the end, these loans would cause significant losses during the crisis.

Mentioning Countrywide and WaMu as tough, "in our face" competitors, John Stumpf, the CEO, chairman, and president of Wells Fargo, recalled Wells's decision not to write option ARMs, even as it originated many other high-risk mortgages. These were "hard decisions to make at the time," he said, noting "we did lose revenue, and we did lose volume."[44]

Across the market, the volume of option ARMs had risen nearly fourfold from 2003 to 2006, from approximately $65 billion to $255 billion. By then, WaMu and Countrywide had plenty of evidence that more borrowers were making only the minimum payments and that their mortgages were negatively amortizing—which meant their equity was being eaten away. The percentage of Countrywide's option ARMs that were negatively amortizing grew from just 1% in 2004 to 53% in 2005 and then to more than 90% by 2007.[45] At WaMu, it was 2% in 2003, 28% in 2004, and 82% in 2007.[46] Declines in house prices added to borrowers' problems: any equity remaining after the negative amortization would simply be eroded. Increasingly, borrowers would owe more on their mortgages than their homes were worth on the market, giving them an incentive to walk away from both home and mortgage.

Kevin Stein, from the California Reinvestment Coalition, testified to the FCIC that option ARMs were sold inappropriately: "Nowhere was this dynamic more clearly on display than in the summer of 2006 when the Federal Reserve convened

HOEPA (Home Ownership and Equity Protection Act) hearings in San Francisco. At the hearing, consumers testified to being sold option ARM loans in their primary non-English language, only to be pressured to sign English-only documents with significantly worse terms. Some consumers testified to being unable to make even their initial payments because they had been lied to so completely by their brokers."[47] Mona Tawatao, a regional counsel with Legal Services of Northern California, described the borrowers she was assisting as "people who got steered or defrauded into entering option ARMs with teaser rates or pick-a-pay loans forcing them to pay into—pay loans that they could never pay off. Prevalent among these clients are seniors, people of color, people with disabilities, and limited English speakers and seniors who are African American and Latino."[48]

### Underwriting standards: "We're going to have to hold our nose"

Another shift would have serious consequences. For decades, the down payment for a prime mortgage had been 20% (in other words, the loan-to-value ratio (LTV) had been 80%). As prices continued to rise, finding the cash to put 20% down became harder, and from 2000 on, lenders began accepting smaller down payments.

There had always been a place for borrowers with down payments below 20%. Typically, lenders required such borrower to purchase private mortgage insurance for a monthly fee. If a mortgage ended in foreclosure, the mortgage insurance company would make the lender whole. Worried about defaults, the GSEs would not buy or guarantee mortgages with down payments below 20% unless the borrower bought the insurance. Unluckily for many homeowners, for the housing industry, and for the financial system, lenders devised a way to get rid of these monthly fees that had added to the cost of homeownership: lower down payments that did not require insurance.

Lenders had latitude in setting down payments. In 1991, Congress ordered federal regulators to prescribe standards for real estate lending that would apply to banks and thrifts. The goal was to "curtail abusive real estate lending practices in order to reduce risk to the deposit insurance funds and enhance the safety and soundness of insured depository institutions."[49] Congress had debated including explicit LTV standards, but chose not to, leaving that to the regulators. In the end, regulators declined to introduce standards for LTV ratios or for documentation for home mortgages.[50] The agencies explained: "A significant number of commenters expressed concern that rigid application of a regulation implementing LTV ratios would constrict credit, impose additional lending costs, reduce lending flexibility, impede economic growth, and cause other undesirable consequences."[51]

In 1999, regulators revisited the issue, as high LTV lending was increasing. They tightened reporting requirements and limited a bank's total holdings of loans with LTVs above 90% that lacked mortgage insurance or some other protection; they also reminded the banks and thrifts that they should establish internal guidelines to manage the risk of these loans.[52]

High LTV lending soon became even more common, thanks to the so-called

piggyback mortgage. The lender offered a first mortgage for perhaps 80% of the home's value and a second mortgage for another 10% or even 20%. Borrowers liked these because their monthly payments were often cheaper than a traditional mortgage plus the required mortgage insurance, and the interest payments were tax deductible. Lenders liked them because the smaller first mortgage—even without mortgage insurance—could potentially be sold to the GSEs.

At the same time, the piggybacks added risks. A borrower with a higher combined LTV had less equity in the home. In a rising market, should payments become unmanageable, the borrower could always sell the home and come out ahead. However, should the payments become unmanageable in a falling market, the borrower might owe more than the home was worth. Piggyback loans—which often required nothing down—guaranteed that many borrowers would end up with negative equity if house prices fell, especially if the appraisal had overstated the initial value.

But piggyback lending helped address a significant challenge for companies like New Century, which were big players in the market for mortgages. Meeting investor demand required finding new borrowers, and homebuyers without down payments were a relatively untapped source. Yet among borrowers with mortgages originated in 2004, by September 2005 those with piggybacks were four times as likely as other mortgage holders to be 60 or more days delinquent. When senior management at New Century heard these numbers, the head of the Secondary Marketing Department asked for "thoughts on what to do with this . . . pretty compelling" information. Nonetheless, New Century increased mortgages with piggybacks to 35% of loan production by the end of 2005, up from only 9% in 2003.[53] They were not alone. Across securitized subprime mortgages, the average combined LTV rose from 79% to 86% between 2001 and 2006.[54]

Another way to get people into mortgages—and quickly—was to require less information of the borrower. "Stated income" or "low-documentation" (or sometimes "no-documentation") loans had emerged years earlier for people with fluctuating or hard-to-verify incomes, such as the self-employed, or to serve longtime customers with strong credit. Or lenders might waive information requirements if the loan looked safe in other respects. "If I'm making a 65%, 75%, 70% loan-to-value, I'm not going to get all of the documentation," Sandler of Golden West told the FCIC. The process was too cumbersome and unnecessary. He already had a good idea how much money teachers, accountants, and engineers made—and if he didn't, he could easily find out. All he needed was to verify that his borrowers worked where they said they did. If he guessed wrong, the loan-to-value ratio still protected his investment.[55]

Around 2005, however, low- and no-documentation loans took on an entirely different character. Nonprime lenders now boasted they could offer borrowers the convenience of quicker decisions and not having to provide tons of paperwork. In return, they charged a higher interest rate. The idea caught on: from 2000 to 2007, low- and no-doc loans skyrocketed from less than 2% to roughly 9% of all outstanding loans.[56] Among Alt-A securitizations, 80% of loans issued in 2006 had limited or no documentation.[57] As William Black, a former banking regulator, testified before the FCIC, the mortgage industry's own fraud specialists described stated income

loans as "an open 'invitation to fraud' that justified the industry term 'liar's loans.'"[58] Speaking of lending up to 2005 at Citigroup, Richard Bowen, a veteran banker in the consumer lending group, told the FCIC, "A decision was made that 'We're going to have to hold our nose and start buying the stated product if we want to stay in business.'"[59] Jamie Dimon, the CEO of JP Morgan, told the Commission, "In mortgage underwriting, somehow we just missed, you know, that home prices don't go up forever and that it's not sufficient to have stated income."[60]

In the end, companies in subprime and Alt-A mortgages had, in essence, placed all their chips on black: they were betting that home prices would never stop rising. This was the only scenario that would keep the mortgage machine humming. The evidence is present in our case study mortgage-backed security, CMLTI 2006-NC2, whose loans have many of the characteristics just described.

The 4,499 loans bundled in this deal were adjustable-rate and fixed-rate residential mortgages originated by New Century. They had an average principal balance of $210,536—just under the median home price of $221,900 in 2006.[61] The vast majority had a 30-year maturity, and more than 90% were originated in May, June, and July 2006, just after national home prices had peaked. More than 90% were reportedly for primary residences, with 43% for home purchases and 48% for cash-out refinancings. The loans were from all 50 states and the District of Columbia, but more than a fifth came from California and more than a tenth from Florida.[62]

About 80% of the loans were ARMs, and most of these were 2/28s or 3/27s. In a twist, many of these hybrid ARMs had other "affordability features" as well. For example, more than 20% of the ARMs were interest-only—during the first two or three years, not only would borrowers pay a lower fixed rate, they would not have to pay any principal. In addition, more than 40% of the ARMs were "2/28 hybrid balloon" loans, in which the principal would amortize over 40 years—lowering the monthly payments even further, but as a result leaving the borrower with a final principal payment at the end of the 30-year term.

The great majority of the pool was secured by first mortgages; of these, 33% had a piggyback mortgage on the same property. As a result, more than one-third of the mortgages in this deal had a combined loan-to-value ratio between 95% and 100%. Raising the risk a bit more, 42% of the mortgages were no-doc loans. The rest were "full-doc," although their documentation was fuller in some cases than in others.[63] In sum, the loans bundled in this deal mirrored the market: complex products with high LTVs and little documentation. And even as many warned of this toxic mix, the regulators were not on the same page.

## FEDERAL REGULATORS: "IMMUNITY FROM MANY STATE LAWS IS A SIGNIFICANT BENEFIT"

For years, some states had tried to regulate the mortgage business, especially to clamp down on the predatory mortgages proliferating in the subprime market. The national thrifts and banks and their federal regulators—the Office of Thrift Supervision (OTS) and the Office of the Comptroller of the Currency (OCC), respectively—resisted the

states' efforts to regulate those national banks and thrifts. The companies claimed that without one uniform set of rules, they could not easily do business across the country, and the regulators agreed. In August 2003, as the market for riskier subprime and Alt-A loans grew, and as lenders piled on more risk with smaller down payments, reduced documentation requirements, interest-only loans, and payment-option loans, the OCC fired a salvo. The OCC proposed strong preemption rules for national banks, nearly identical to earlier OTS rules that empowered nationally chartered thrifts to disregard state consumer laws.[64]

Back in 1996 the OTS had issued rules saying federal law preempted state predatory lending laws for federally regulated thrifts.[65] In 2003, the OTS referred to these rules in issuing four opinion letters declaring that laws in Georgia, New York, New Jersey, and New Mexico did not apply to national thrifts. In the New Mexico opinion, the regulator pronounced invalid New Mexico's bans on balloon payments, negative amortization, prepayment penalties, loan flipping, and lending without regard to the borrower's ability to repay.

The Comptroller of the Currency took the same line on the national banks that it regulated, offering preemption as an inducement to use a national bank charter. In a 2002 speech, before the final OCC rules were passed, Comptroller John D. Hawke Jr. pointed to "national banks' immunity from many state laws" as "a significant benefit of the national charter—a benefit that the OCC has fought hard over the years to preserve."[66] In an interview that year, Hawke explained that the potential loss of regulatory market share for the OCC "was a matter of concern."[67]

In August 2003 the OCC issued its first preemptive order, aimed at Georgia's mini-HOEPA statute, and in January 2004 the OCC adopted a sweeping preemption rule applying to all state laws that interfered with or placed conditions on national banks' ability to lend. Shortly afterward, three large banks with combined assets of more than $1 trillion said they would convert from state charters to national charters, which increased OCC's annual budget 15%.[68]

State-chartered operating subsidiaries were another point of contention in the preemption battle. In 2001 the OCC had adopted a regulation preempting state law regarding state-chartered operating subsidiaries of national banks. In response, several large national banks moved their mortgage-lending operations into subsidiaries and asserted that the subsidiaries were exempt from state mortgage lending laws. Four states challenged the regulation, but the Supreme Court ruled against them in 2007.[69]

Once OCC and OTS preemption was in place, the two federal agencies were the only regulators with the power to prohibit abusive lending practices by national banks and thrifts and their direct subsidiaries. Comptroller John Dugan, who succeeded Hawke, defended preemption, noting that "72% of all nonprime mortgages were made by lenders that were subject to state law. Well over half were made by mortgage lenders that were exclusively subject to state law."[70] Lisa Madigan, the attorney general of Illinois, flipped the argument around, noting that national banks and thrifts, and their subsidiaries, were heavily involved in subprime lending. Using different data, she contended: "National banks and federal thrifts and . . . their sub-

sidiaries . . . were responsible for almost 32 percent of subprime mortgage loans, 40.1 percent of the Alt-A loans, and 51 percent of the pay-option and interest-only ARMs that were sold." Madigan told the FCIC:

> Even as the Fed was doing little to protect consumers and our financial system from the effects of predatory lending, the OCC and OTS were actively engaged in a campaign to thwart state efforts to avert the coming crisis. . . . In the wake of the federal regulators' push to curtail state authority, many of the largest mortgage-lenders shed their state licenses and sought shelter behind the shield of a national charter. And I think that it is no coincidence that the era of expanded federal preemption gave rise to the worst lending abuses in our nation's history.[71]

Comptroller Hawke offered the FCIC a different interpretation: "While some critics have suggested that the OCC's actions on preemption have been a grab for power, the fact is that the agency has simply responded to increasingly aggressive initiatives at the state level to control the banking activities of federally chartered institutions."[72]

### MORTGAGE SECURITIES PLAYERS:
### "WALL STREET WAS VERY HUNGRY FOR OUR PRODUCT"

Subprime and Alt-A mortgage–backed securities depended on a complex supply chain, largely funded through short-term lending in the commercial paper and repo market—which would become critical as the financial crisis began to unfold in 2007. These loans were increasingly collateralized not by Treasuries and GSE securities but by highly rated mortgage securities backed by increasingly risky loans. Independent mortgage originators such as Ameriquest and New Century—without access to deposits—typically relied on financing to originate mortgages from warehouse lines of credit extended by banks, from their own commercial paper programs, or from money borrowed in the repo market.

For commercial banks such as Citigroup, warehouse lending was a multibillion-dollar business. From 2000 to 2010, Citigroup made available at any one time as much as $7 billion in warehouse lines of credit to mortgage originators, including $950 million to New Century and more than $3.5 billion to Ameriquest.[73] Citigroup CEO Chuck Prince told the FCIC he would not have approved, had he known. "I found out at the end of my tenure, I did not know it before, that we had some warehouse lines out to some originators. And I think getting that close to the origination function—being that involved in the origination of some of these products—is something that I wasn't comfortable with and that I did not view as consistent with the prescription I had laid down for the company not to be involved in originating these products."[74]

As early as 1998, Moody's called the new asset-backed commercial paper (ABCP) programs "a whole new ball game."[75] As asset-backed commercial paper became a popular method to fund the mortgage business, it grew from about one-quarter to about one-half of commercial paper sold between 1997 and 2001.

EXHIBIT 'F'



**For Immediate Release**
February 10, 2011

**Contacts:**
Tucker Warren, 202-292-1346
twarren@fcic.gov

After February 11, 2011
Emily Lenzner, 202-464-6914
elenzner@skdknick.com
Susan Baltake, 856-354-9382
susan.baltake@verizon.net

# Financial Crisis Inquiry Commission
# Releases Additional Material and Concludes Work

(Washington, DC) – The Financial Crisis Inquiry Commission announced today the release of significant new material on its website (www.fcic.gov). As the Commission prepares to close its doors on February 13, 2011, it is making available to the public an unprecedented amount of information including nearly 2,000 documents and more than 300 witness interviews in audio, transcript or summary form (213 of these have been posted as of today with the balance to be placed on the website by February 13). Also included in the newly released content are data compiled by the Commission staff used to inform the Commission's inquiry and an interactive timeline of the crisis. These new materials along with the Commission's report create a written and oral history of this financial and economic crisis available for public review for years to come.

Since the release of the Commission's final report on January 27, 2011, the Commission's website – which offers a free downloadable version of the report and accompanying dissents as well as print and eBook versions offered by PublicAffairs and the Government Printing Office – has had more than 350,000 unique visitors and more than 750,000 page visits. The Commission's report, delivered to the President, Congress and the American people contains the data and evidence collected in the Commission's inquiry, the conclusions of the Commission based on that inquiry, and accompanying dissents. The report and accompanying dissents will continue to be available to the public on the Commission's website at FCIC.gov and as a paperback and an e-book published by the Government Printing Office and PublicAffairs wherever books are sold. The published report has been listed among *The Washington Post and The New York Times* best seller lists.

When the Commission closes pursuant to the Fraud Enforcement and Recovery Act (Public Law 111-21) the Commission's records will be transferred to the National Archives and Records Administration. Although Congressional records can be sealed from 20 to 50 years, the Commission determined that it was in the public's interest to open its records to public inspection after only 5 years.

After February 13, 2011, the Commission's website FCIC.gov will be hosted and maintained by the Rock Center for Corporate Governance at Stanford University. The National Archives and Records Administration will also host an archive copy of the Commission's site in its current form.

### ###

**Work of the Commission**

In the course of its research and investigation, the Commission reviewed millions of pages of documents, interviewed more than 700 witnesses, and held 19 days of public hearings in New York, Washington, D.C., and communities across the country that were hard hit by the crisis. The Commission also drew from a large body of existing work about the crisis developed by congressional committees, government agencies, academics, journalists, legal investigators, and many others.

The Commission conducted research into broad and sometimes arcane subjects, such as mortgage lending and securitization, derivatives, corporate governance, and risk management. To bring these subjects out of the realm of the abstract, it conducted case study investigations of specific financial firms—and in many cases specific facets of these institutions—that played pivotal roles. Those institutions included American International Group (AIG), Bear Stearns, Citigroup, Countrywide Financial, Fannie Mae, Goldman Sachs, Lehman Brothers, Merrill Lynch, Moody's, and Wachovia. The Commission also looked more generally at the roles and actions of scores of other companies.

The Commission studied relevant policies put in place by successive Congresses and administrations. It also examined the roles of policy makers and regulators, including at the Federal Deposit Insurance Corporation, the Federal Reserve, the Federal Reserve Bank of New York, the Department of Housing and Urban Development, the Office of the Comptroller of the Currency, the Office of Federal Housing Enterprise Oversight (and its successor, the Federal Housing Finance Agency), the Office of Thrift Supervision, the Securities and Exchange Commission, and the Treasury Department.

The Commission's statutory instructions set out 22 specific topics for inquiry and called for the examination of the collapse of major financial institutions that failed or would have failed if not for exceptional assistance from the government. The delivery of the Commission's report on January 27, 2011 fulfilled its mandate.

For more, visit FCIC.gov.

**Testimony and Interviews Posted by the Commission**

The following is a list of people interviewed by the Commission whose public testimony, audio recordings, interview transcripts or summaries will be on the Commission's website. The organizations may represent current or former affiliations and are listed for identification purposes only.

| First | Last | Organization |
|---|---|---|
| Viral | Acharya | New York University |
| Mark | Adelson | Standard & Poor's |
| Jeremy | Aguero | Applied Analysis |
| Orson | Aguilar | Greenlining Institute |
| Henry | Albulescu | Standard & Poor's |
| Antonio | Alvarez | Federal Reserve Bank of New York |
| Scott | Alvarez | Federal Reserve Board |
| Brenda | Amble | Ticor Title |
| Art | Angulo | Federal Reserve Bank of New York |
| Madelyn | Antoncic | Lehman Brothers |
| William | Apgar | Department of Housing and Urban Development |
| Deborah | Bailey | Federal Reserve Board |
| Sheila C. | Bair | U.S. Federal Deposit Insurance Corporation |
| Dean | Baker | Center for Economic & Policy Research |
| Mark S. | Barber | GE Capital |

| Norah | Barger | Federal Reserve Board |
|---|---|---|
| Murray C. | Barnes | Citigroup |
| J. Kyle | Bass | Hayman Advisors L.P. |
| Thomas C. | Baxter Jr. | Federal Reserve Bank of New York |
| Vicki | Beal | Clayton Holdings LLC |
| Jacqueline | Becker | Federal Reserve Board |
| Steven J. | Bensinger | American International Group Inc. |
| Ben S. | Bernanke | Board of Governors of the Federal Reserve System |
| Mickey | Bhatia | Citigroup |
| Susan | Bies | Federal Reserve Board |
| Donald J. | Bisenius | Freddie Mac |
| Richard | Bitner | Housingwire.com |
| Dennis J. | Black | D.J. Black & Co. |
| William (Bill) K. | Black | University of Missouri |
| Lloyd C. | Blankfein | Goldman Sachs |
| Alan | Blinder | Princeton University |
| Thomas | Boemio | Federal Reserve Board |
| Daniel G. | Bogden | United States Attorney, State of Nevada |
| Richard | Bowen | CitiMortgage |
| Sandra | Braunstein | Federal Reserve Board |
| Lanny A. | Breuer | U.S. Department of Justice |
| William H. | Brewster | Fannie Mae |
| Craig | Broderick | Goldman Sachs |
| Randolph | Brown | Federal Reserve Bank of New York |
| Markus | Brunnermeier | Princeton University |
| William | Buell | JPMorgan Chase |
| Warren E. | Buffett | Berkshire Hathaway |
| Gail | Burks | Nevada Fair Housing Center |
| Michael | Burry | Cornwall Capital |
| David | Bushnell | Citigroup |
| Gregory D. | Bynum | Gregory D. Bynum and Associates |
| Mike | Calhoun | Center for Responsible Lending |
| Jim | Callahan | PentAlpha |
| Charles | Calomiris | Columbia University |
| Pam | Canada | NeighborWorks Home Ownership Center - Sacramento Region |
| Sujit | CanagaRetna | Council of State Governments |
| Richard | Cantor | Moody's Corporation |
| J. Thomas | Cardwell | Office of State Regulation, State of Florida |
| Seth | Carpenter | Federal Reserve Board |
| Lawrence | Carter | Office of Thrift Supervision |
| Joe | Cassano | American International Group Inc. |
| John | Cassidy | Author |
| Anthony J. | Castaldo | Federal Reserve Board |
| Arnold | Cattani | Mission Bank |
| James E. | Cayne | Bear Stearns |
| Jim | Chanos | Kynikos Associates |
| Wing | Chau | Harding Advisory LLC |

| Edwin | Chow | Office of Thrift Supervision |
|-------|------|------------------------------|
| Ralph | Cioffi | Bear Stearns Asset Management |
| Henry | Cisneros | Department of Housing and Urban Development |
| Brian M. | Clarkson | Moody's Investor Services |
| Andrew | Clinger | Department of Administration, State of Nevada |
| C.R. "Rusty" | Cloutier | Independent Community Bankers Association |
| William | Cohan | Author |
| Rodgin | Cohen | Sullivan & Cromwell |
| Gary D. | Cohn | Goldman Sachs |
| Roger | Cole | Federal Reserve Board |
| Elizabeth | Coleman | Federal Reserve Board |
| Greg | Coleman | Federal Reserve Board |
| John H. | Corston | U.S. Federal Deposit Insurance Corporation |
| Daniel | Covitz | Federal Reserve Board |
| Christopher | Cox | U.S. Securities and Exchange Commission |
| Prentiss | Cox | Office of the State Attorney General, State of Minnesota |
| Gary | Crabtree | Affiliated Appraisers |
| Denise Voight | Crawford | North American Securities Administrators Association |
| Christopher | Cruise | Corporate Educator |
| Andrew | Cuomo | Department of Housing and Urban Development |
| Satyajit | Das | Consultant |
| Andrew | Davidson | Andrew Davidson & Co. |
| Andrew | Davilman | Goldman Sachs |
| Rich | Delmar | Department of the Treasury |
| Emanuel | Derman | Columbia University |
| Robert | Diamond | Barclays |
| James | Dimon | JPMorgan Chase |
| Eric R. | Dinallo | New York State Insurance Department |
| Dianne | Dobbeck | Federal Reserve Bank of New York |
| Darrell | Dochow | Office of Thrift Supervision |
| Rachel | Dollar | Mortgage Fraud Blog |
| Nestor | Dominguez | Citigroup |
| William H. | Donaldson | U.S. Securities and Exchange Commission |
| Bill | Dudley | Federal Reserve Bank of New York |
| John C. | Dugan | Office of the Comptroller of the Currency |
| Ellen | Duke | Citigroup |
| Kurt | Eggert | Chapman University |
| Jonathan | Egol | Goldman Sachs |
| Scott | Eichel | Bear Stearns |
| David M. | Einhorn | Greenlight Capital |
| Steven | Einhorn | Omega Advisors |
| Jim | Embersit | Federal Reserve Board |
| Bill | English | Federal Reserve Board |
| Sean | Fahey | Claren Road |
| Armando | Falcon Jr. | Office of Federal Housing Enterprise Oversight |
| Kieran | Fallon | Federal Reserve Board |
| Kenneth | Feinberg | Department of the Treasury |

| Mark | Feldman | JPMorgan Chase |
|------|---------|----------------|
| Wilfredo A. | Ferrer | United States Attorney, Southern District of Florida |
| Frank | Filipps | Clayton Holdings LLC |
| Michael E. | Finn | Office of Thrift Supervision |
| Mark | Fleming | CoreLogic |
| Jerome | Fons | Moody's Investors Service |
| Jeffrey | Fontaine | Nevada Association of Counties |
| Thomas | Fontana | Citigroup |
| Andrew | Forster | American International Group Financial Products |
| John M. "Neel" | Foster | FASB |
| David | Fraser | Nevada League of Cities |
| Paul | Friedman | Bear Stearns |
| Mark | Froeba | Moody's Investors Service Inc. |
| Alan | Frost | American International Group Inc. |
| Richard (Dick) S. | Fuld | Lehman Brothers |
| Ann | Fulmer | Interthinx |
| Kevin | Gaffney | Fidelity Investments |
| Edward | Gallagher | Miami-Dade Police Department |
| John | Geanakoplos | Yale University |
| Timothy F. | Geithner | U.S. Department of the Treasury |
| Michael | Gelband | Lehman Brothers |
| Gary | Gensler | Commodity Futures Trading Commission |
| Bob | Gnaizda | Greenlining Institute |
| Harvey | Goldschmid | U.S. Securities and Exchange Commission |
| Alberto | Gonzales | Attorney General, U.S. Department of Justice |
| Joseph | Gonzalez | Office of Thrift Supervision |
| Laurie | Goodman | Amherst Securities Group |
| Brian | Gordon | Applied Analysis |
| Julia | Gordon | Center for Responsible Lending |
| Gary | Gorton | Yale University |
| Pierre-Olivier | Gourinchas | University of California, Berkeley |
| David | Grais | Grais & Ellsworth LLP |
| James | Grant | Grant's Publishing |
| Maurice (Hank) | Greenberg | American International Group Inc. |
| Michael | Greenberger | University of Maryland |
| Alan | Greenspan | Board of Governors of the Federal Reserve System |
| Bill | Gross | PIMCO |
| Elias F. | Habayeb | American International Group Inc. |
| Mary | Haggerty | Bear Stearns |
| William | Hallacy | Federal Reserve Bank of New York |
| Mike | Harter | Wells Fargo |
| John D. | Hawke | Office of the Comptroller of the Currency |
| Steven | Hill | Silver State Materials Corporation |
| Eric H. | Holder Jr. | Attorney General, U.S. Department of Justice |
| Mark | Hutchings | American International Group Inc. |
| William (Bill) | Isaac | LECG |
| Alphonso | Jackson | Department of Housing and Urban Development |

| Dwight | Jaffee | University of California, Berkeley |
| Jay | Jeffries | Fremont Investment & Loan |
| D. Keith | Johnson | Clayton Holdings LLC |
| David S. | Jones | Federal Reserve Board |
| Michael | Kanef | Moody's Investors Service |
| Neel | Kashkari | Department of the Treasury |
| Anil | Kashyap | University of Chicago |
| Edward (Ned) | Kelly III | Citigroup |
| Mark | Kemp | Countrywide |
| Dow | Kim | Merrill Lynch |
| Alex | Kirk | Lehman Brothers |
| Arnold | Kling | Cato Institute |
| Steven | Kohlhagen | University of California, Berkeley |
| Donald | Kohn | Federal Reserve Board |
| Eric | Kolchinsky | Moody's Investors Service |
| H. David | Kotz | U.S. Securities and Exchange Commission |
| Richard | Kovacevich | Wells Fargo |
| James | Kroeker | U.S. Securities and Exchange Commission |
| Jeff | Kronthal | Merrill Lynch |
| Randall | Kroszner | University of Chicago |
| Paul | Krugman | Princeton University |
| Robert | Kuttner | The American Prospect |
| Albert Pete | Kyle | University of Maryland |
| Arthur B. | Laffer | Laffer Associates |
| Michael | Lamont | Deutsche Bank |
| Ed | Lazear | Council of Economic Advisors |
| Brian | Leach | Citigroup |
| Clarence K. | Lee | Office of Thrift Supervision |
| David | Lehman | Goldman Sachs |
| Robert J. | Levin | Fannie Mae |
| Adam | Levitin | Georgetown University |
| Arthur | Levitt | U.S. Securities and Exchange Commission |
| Richard | Levy | Wells Fargo |
| Ken | Lewis | Bank of America |
| Robert E. | Lewis | American International Group Inc. |
| Nellie | Liang | Federal Reserve Board |
| Norm | Lind | Fidelity Investments |
| Patricia | Lindsay | New Century Financial Corporation |
| Lawrence | Lindsey | Federal Reserve Board |
| Greg | Lippmann | Deutsche Bank |
| Robert (Bob) | Litan | Brookings Institution |
| James | Lockhart | Office of Federal Housing Enterprise Oversight |
| Glenn | Loney | Federal Reserve Board |
| Roger | Lowenstein | Author |
| Ian | Lowitt | Lehman Brothers |
| Eugene | Ludwig | Promontory Financial Group |
| Alex | Luk | Office of Thrift Supervision |

| Thomas | Lund | Fannie Mae |
|---|---|---|
| Annamaria | Lusardi | Dartmouth University |
| John | Lyons | Office of the Comptroller of the Currency |
| John J. | Mack | Morgan Stanley |
| Lisa | Madigan | Attorney General, State of Illinois |
| Jeff | Madrick | The Cooper Union |
| Thomas G. | Maheras | Citigroup |
| Greg | Mankiw | Harvard University |
| Karen J. | Mann | Mann and Associates Real Estate Appraisers & Consultants |
| Amy | Manning | CitiFinancial |
| Steve | Manzari | Federal Reserve Bank of New York |
| Ronald | Marcus | Office of Thrift Supervision |
| Albert | Marino | Claren Road |
| Harry | Markowitz | University of California San Diego |
| Donald | Marron | Council of Economic Advisors |
| William E. | Martin | Service 1st Bank of Nevada |
| Mel | Martinez | Department of Housing and Urban Development |
| Blythe | Masters | JPMorgan Chase |
| Michael | Masters | Masters Capital Management |
| William | May | Moody's Investors Service |
| Chris | Mayer | Columbia University |
| Martin | Mayer | Brookings Institution |
| Michael | Mayo | Calyon Securities |
| Angus | McBryde | Wachovia |
| Patrick | McCabe | Federal Reserve Board |
| Laurie | McCarty | Coldwell Banker |
| Scott | McCleskey | Moody's Investors Service |
| Paul A. | McCulley | PIMCO |
| Bart | McDade | Lehman Brothers |
| Raymond | McDaniel Jr. | Moody's Corporation |
| Jeannie | McDermott | Realtor |
| Duff | McDonald | Author |
| Mary | McDowell | CitiFinancial |
| Hugh (Skip) | McGee | Lehman Brothers |
| Kevin | McGinn | American International Group Inc. |
| Patrick | McKenna | Deutsche Bank |
| Bethany | McLean | Author |
| Steven R. | Meier | State Street |
| Jim | Michaels | Federal Reserve Board |
| Richard | Michalek | Moody's Investors Service |
| Pierre | Micottis | American International Group Financial Products |
| Harvey R. | Miller | Weil Gotshal & Manges LLP |
| Susan | Mills | Citigroup |
| Nell | Minow | The Corporate Library |
| Frederic | Mishkin | Federal Reserve Board |
| Samuel | Molinaro Jr. | Bear Stearns |
| John | Mongelluzzo | GMAC |

| Heath | Morrison | Washoe County School District |
|---|---|---|
| Brian T. | Moynihan | Bank of America |
| Angelo | Mozilo | Countrywide |
| Daniel H. | Mudd | Fannie Mae |
| Stephanie | Mudick | JPMorgan Chase |
| Robert | Mueller | Federal Bureau of Investigation |
| Michael | Mukasey | United States Attorney General |
| Wally | Murray | Greater Nevada Credit Union |
| Michael A. | Neal | GE Capital |
| Bill | Nelson | Federal Reserve Board |
| Mark | Olson | Federal Reserve Board |
| Mark | Oman | Wells Fargo |
| Chris | O'Meara | Lehman Brothers |
| Stanley | O'Neal | Merrill Lynch |
| Kerry | O'Neill | Clayton Holdings LLC |
| Dror | Oppenheimer | Fannie Mae |
| R. Scott | Palmer | Office of the Attorney General, State of Florida |
| Michael | Palumbo | Federal Reserve Board |
| Gene | Park | American International Group Inc. |
| Ed | Parker | Ameriquest |
| Patrick | Parkinson | Federal Reserve Board |
| Darcy | Parmer | Wells Fargo |
| Andrew | Patchan | Federal Reserve Board |
| Scott | Patterson | Author |
| John | Paulson | Paulson & Co. |
| Henry M. | Paulson Jr. | U.S. Department of the Treasury |
| Frank San | Pedro | Countrywide |
| Karen | Pence | Federal Reserve Board |
| Anton | Peterson | Morgan Stanley |
| Warren | Peterson | Warren Peterson Construction |
| Fred | Phillips-Patrick | Office of Thrift Supervision |
| Harvey | Pitt | U.S. Securities and Exchange Commission |
| Lloyd | Plank | Lloyd E. Plank Real Estate Consultants |
| Andrew | Plepler | Bank of America |
| Scott | Polakoff | Office of Thrift Supervision |
| Henry N. | Pontell | University of California, Irvine |
| Katherine | Porter | University of Iowa |
| Richard | Posner | United States Seventh Circuit Court of Appeals |
| Charles | Prince | Citigroup |
| Thomas C. | Putnam | Putnam Housing Finance Consulting |
| Raghuram | Rajan | University of Chicago |
| Lewis | Ranieri | Salomon Brothers |
| Michael | Raynes | Citigroup |
| John | Reed | Citigroup |
| Vincent | Reinhart | Federal Reserve Board |
| Steve | Renock | Kern Schools Federal Credit Union |
| Nicolas | Retsinas | Harvard University |

| | | |
|---|---|---|
| Chris | Ricciardi | Merrill Lynch |
| Doug | Roeder | Office of the Comptroller of the Currency |
| Jim | Rokakis | Treasurer Cuyahoga County |
| Ray | Romano | Freddie Mac |
| Alan | Roseman | ACA Capital Holdings Inc. |
| Kenneth T. | Rosen | University of California, Berkeley |
| Nouriel | Roubini | New York University Stern School of Business |
| Wendy | Ruberti | Claren Road |
| Jack | Rubin | JPMorgan Chase |
| Robert | Rubin | Citigroup |
| Thomas | Russo | Lehman Brothers |
| John | Rutherford | Moody's Corporation |
| Bill | Rutledge | Federal Reserve Bank of New York |
| Anurag | Saksena | Freddie Mac |
| Felix | Salmon | Journalist |
| David | Sambol | Countrywide |
| Anthony | Sanders | George Mason University |
| Herb | Sandler | Golden West Financial Corporation |
| Philip G. | Satre | International Game Technology and NV Energy |
| Margot | Saunders | National Consumer Law Center |
| Marc | Savitt | National Association of Independent Housing Professionals |
| Mary L. | Schapiro | U.S. Securities and Exchange Commission |
| Kim | Scherer | Office of the Comptroller of the Currency |
| Alan D. | Schwartz | Bear Stearns |
| Laura | Schwartz | ACA |
| Peter | Shapiro | Swap Financial Group |
| William (Bill) | Sharpe | Stanford University |
| Robert | Shiller | Yale University |
| Sihan | Shu | Paulson & Co. |
| Sabeth | Siddique | Federal Reserve Board |
| Jay | Siegel | Moody's Investors Service |
| Josh | Silver | National Community Reinvestment Coalition |
| Erik R. | Sirri | U.S. Securities and Exchange Commission |
| Yves | Smith | Aurora Advisors |
| Glen | Snajder | Federal Reserve Bank of New York |
| John | Snow | Department of Treasury |
| Michael | Solomon | Office of Thrift Supervision |
| Peter J. | Solomon | Peter J. Solomon Company |
| George | Soros | Soros Fund Management LLC |
| Dan | Sparks | Goldman Sachs |
| Warren | Spector | Bear Stearns |
| Stanley | Sporkin | Judge, United States District Court for the District of Columbia |
| Joseph | St. Denis | American International Group Inc. |
| Robert (Bob) K. | Steel | Wachovia |
| Kevin | Stein | California Reinvestment Coalition |
| Michael | Steinhardt | Steinhardt Management |
| Bard | Stermasi | Federal Reserve Bank of New York |

| Amy | Stroupe | BB&T |
|---|---|---|
| John | Stumpf | Wells Fargo |
| Martin J. | Sullivan | AIG |
| Jake | Sun | American International Group Financial Products |
| James | Surowiecki | Journalist |
| John W. | Suthers | Attorney General, State of Colorado |
| Joe | Swartz | Deutsche Bank |
| Joseph | Swartz | Deutche Bank |
| Chris | Swecker | Federal Bureau of Investigation |
| Michael | Swenson | Goldman Sachs |
| Richard | Syron | Freddie Mac |
| Henry | Tabe | Moody's Investors Service |
| Scott | Taub | U.S. Securities and Exchange Commission |
| Mona | Tawateo | Legal Services of Northern California |
| John | Taylor | National Community Reinvestment Coalition |
| John | Taylor | Stanford University |
| David | Teicher | Moody's Investors Service |
| Gillian | Tett | Author |
| John | Thain | Merrill Lynch |
| Glenn | Theobald | Miami-Dade County Police Department |
| Diane | Thompson | National Consumer Law Center |
| James | Tisch | Loews Corporation |
| Lord Adair | Turner | Financial Services Authority (UK) |
| Lynn | Turner | U.S. Securities and Exchange Commission |
| Chris | Vaeth | Greenlining Institute |
| Michael | Vardas | Northern Trust |
| David | Viniar | Goldman Sachs |
| Paul | Volcker | Chairman Federal Reserve Board |
| Susan | Wachter | University of Pennsylvania |
| Benjamin B. | Wagner | United States Attorney Eastern District of California |
| Bruce | Wagstaff | County of Sacramento, Countywide Services Agency |
| Brad | Waring | Office of Thrift Supervision |
| Elizabeth | Warren | Congressional Oversight Panel |
| Kevin M. | Warsh | Federal Reserve Board |
| Scott | Waterhouse | Office of the Comptroller of the Currency |
| Nicholas S. | Weill | Moody's Investors Service |
| Sandy | Weill | Citigroup |
| Richard | Westerkamp | Federal Reserve Board |
| Adam | White | White Knight Research & Trading LLC |
| Ellen | Wilcox | Florida Department fo Law Enforcement |
| D. Linn | Wiley | CVB Financial Corporation and Citizens Business Bank |
| Clarence | Williams | California Capital Financial Development Corporation |
| Robert | Willumstad | American International Group Inc. |
| David | Wilson | Office of the Comptroller of the Currency |
| Lela | Wingard | JPMorgan Chase |
| Henry W. | Wirz | SAFE Credit Union |
| Gary | Witt | Moody's Investors Service |

| David | Wong | Morgan Stanley |
|---|---|---|
| Jonathan | Wood | Whitebox Advisors |
| Eugene | Xu | Deutsche Bank |
| Janet | Yellen | Federal Reserve Board |
| Yuri | Yoshizawa | Moody's Investors Service |
| Mark | Zandi | Moody's Anayltics |
| Barry | Zubrow | JPMorgan Chase |

EXHIBIT '6'

**Testimony of**

**Patricia Lindsay**

**Presented to the Financial Crisis Inquiry Commission**

**Hearing on Subprime Lending And Securitization**

**And Government Sponsored Enterprises**

**April 7, 2010**

The following is the testimony of Patricia Lindsay for the Financial Crisis Inquiry Commission Hearing on April 7, 2010:

Thank you for inviting me to speak this afternoon. My hope for today's session is that I give you a unique perspective into Subprime lending. I know I was not alone in not understanding the steadily increasing risks taken in the years before my employer New Century Financial Corp. stopped making loans in March of 2007. I grew up in the real estate business where my father was a Broker and a hard money lender. A hard money loan is a short term loan to a borrower who has a significant amount of equity in the property and cannot qualify for a traditional bank loan. I became an Account Executive at Beneficial Mortgage the end of 1996. Beneficial was one of the original subprime lenders who held their loans in their portfolio rather than selling them. There were a lot of similarities between Beneficial and my experience with hard money lending, Beneficial and the various hard money lenders with whom I worked were very aligned in their thought process on how to evaluate a loan. We had three things that we used to evaluate a loan; Credit, Collateral and Capacity. We would look at these three C's and if any were lacking, like credit, a borrower better have some compensating factors, like great collateral. There was a fourth C, character, that went missing when the loan process became more impersonal and the prospective borrower never met face to face with the lender.

I joined New Century Mortgage as a Wholesale underwriter in June of 1997 and left New Century in December of 2007. I was part of a skeleton crew kept on to help unwind the corporation after they filed bankruptcy. I found the lending standards at New Century were much different than the hard money standards I had learned. I really didn't understand what it meant to securitize a loan, but thought they must have found the secret sauce, so to speak, on how to take already risky borrowers and give them more money than the traditional hard money or portfolio lenders could. I loved my job at New Century, and found my niche growing and developing fraud detection and prevention measures across all of the business channels in the company. New Century provided me with all of the training and tools I wanted and needed in order to be the best asset to the company. I attended numerous seminars, became proficient at my job then began speaking at the seminars and teaching. We talked about the three C's when I came to New Century and common sense lending. These were terms I stopped hearing in the last few years. There was no longer any common sense, the three C's had disappeared and the risk was layered rather than offset . The business became volume driven and automated. A broker could get a loan pre-approval in 12 seconds or less with our proprietary system. If we couldn't close a loan quickly, one of our many competitors would. With this increased speed, I was tasked with finding a way to automate fraud detection. With the support and backing of Executive management, in 2005 I brought in a company who used our known fraud loans to build a predictive analytics tool that ran in tandem with our loan origination system. High risk loans were identified and reviewed by a local risk manager who either cleared them or recommended further action.

**Key Points:**

❖ **The growth and evolution of the subprime mortgage industry:**

- The niche market of subprime lending grew and evolved into huge business when unlimited funding became available through Wall Street via securitizations. Before Wall Street came on to the scene, there were specialty finance lenders, like Beneficial Finance and Beneficial Mortgage, who filled this niche market. They catered to borrowers who could not qualify for a conventional loan because of poor credit, a high debt to income ratio ("DTI") or other mitigating factors. They would offset their risk by commanding a higher interest rate and providing a lower loan to value ("LTV") financing. The riskier the borrower (i.e.; unsteady income, poor payment history), the higher the probability of a default, thus the need to offset the risk by reducing the LTV.

❖ **The presence and impact of fraud in subprime origination:**

- People who may not have committed fraud before did so by making material misrepresentations to buy a property. The 100% financing products on purchase money transactions provided a vehicle for people to enter into buying a property without putting forth any money. The stated income product eliminated the ability to prove fraud without supporting documentation. When previous products required some supporting documentation in order to get a higher LTV, it was easier to identify the fraud and stop it. Straw buyers were recruited for their credit scores specifically to avoid having to provide income documentation. And they would also claim that the property was to be owner occupied, as 100% financing was not offered on non-owner occupied properties. The numbers that we (at New Century) were seeing and identifying as true fraud loans were a minuscule number compared to the number of loans we were funding every month, so I think the products offered had a bigger impact on losses and defaults than fraud did, at least as far as New Century's loans.

❖ **The funding of subprime originators through the use of warehouse lines of credit:**

- Many, if not all of New Century's competitors were only able to operate with the use of warehouse lines of credit. These warehouse lines were provided by large financial institutions, many of which were the same Wall Street investors who would buy our loans. They very helpful in the sense that they made sure we had enough money to close the loans that they were waiting in the wings to buy. It was a very efficient model from a productivity standpoint. New Century had several warehouse lines of credit with many different banks which enabled the funding of 20k+ loans (approximately $5B) per month, at the peak. New Century did not have the liquidity to make these loans without the use of warehouse lines of credit. When New Century's lines were shut down in March of 2007, business stopped. New Century's repurchase requests increased significantly as well. There became a need for a new department to be developed

in 2006 to centralize these requests and help my department out. In early 2007, our repurchase process slowed, indicating there may have been a cash flow problem.

❖ **The impact of so-called "originate-to-distribute" model for mortgage origination and any concerns with that model:**

- The Definition of a good loan changed from, "One that pays" to "One that can be sold". The loans were no longer held by portfolio lenders, but sold to investors, most of whom placed them into securities. We had lost the ability to follow and monitor the performance of any loans that we did not hold either on our servicing platform or in a security we had an interest in. We did monitor the performance of the loans to which we had access, but this was not the whole picture. Virtually all of New Century's loans were sold and or securitized and not held in a Portfolio.

❖ **The quality of underwriting in the years leading up to the financial crisis, including the exceptions to underwriting policies and procedures that I observed:**

- Loose guidelines allowed people to buy homes they couldn't afford. Loan terms started in the early years, when I came on the New Century in 1997, with the 2/28 ARM ("2/28"), this is a 30 year adjustable rate loan that has a fixed interest rate for the first two years then would go to an adjustable rate, usually adjusting every 6 months until the loan became fully indexed. Later on, somewhere around 2004, the fixed portion of the loan was just interest only and a 40 year term was added into the products being offered, although the 30 year term was still the most widely used. These loose guidelines included 100% financing to borrowers with low credit scores and no supporting proof of income.

❖ **Risk Management practices in subprime origination, including any changes in risk management leading up to the financial crisis:**

- Risk managers at New Century were viewed as a roadblock rather than a resource in many instances. We had Risk Managers placed in production groups all across the country, and they had daily tasks that they were to perform. They would have targeted audits in addition to helping the group with researching any items of concern. Things like brokers on watch, multiple social security numbers for a borrower, or other discrepancies that needed to be clarified. If the risk manager could get to the bottom of the discrepancy and clear it, the file would be stronger because what started off looking like a problem was shown to be an error or whatever the case maybe. The real problems arose when the initial issue may have been cleared, but something else was discovered. One of the biggest changes we made in Risk management was eliminating a document we had called the Purchase Money check list ("PMC"). In the late 90's we did a post mortem review of failed loans when New Century had taken a loss. An overwhelming number of those loans were purchase money transactions with certain

characteristics. To help mitigate any future losses, we required these transaction be reviewed by the local risk manager an fill out the PMC. During these reviews, many times the risk managers would find other issues that were not part of the PMC. The production groups were constantly complaining that the risk managers were finding other things when they were only suppose to be looking at the PMC. Around the middle to the end of 2005 at one of our Operations meetings it was announced that the PMC would no longer be used and we were "blowing it up", which received cheers by sales personnel. There was a lot of tension in many of the groups between the risk managers and production. I was called upon to help bridge the gap with a couple of groups. The sales mangers would complain that the risk managers were "killing" their deals and making their account executives anxious. But there were also groups where there was synergy between risk and production, where the risk managers were respected and utilized.

- For the most part, there was not an equality between production (front end before the loans close) and the back end. It was clear that the front end ruled because they were bringing in the revenue. The only time the back end, specifically Risk Management had any teeth was when fraud was proven. If fraud was proven, the loan was locked and declined. If there was no physical proof of fraud, it became a business decision whereby the sale managers had the final say whether the loan would proceed or not.

❖ **The compensation and incentive practices for persons involved in originating subprime mortgage:**

- Account executives, who were New Century employees who brought loans in from brokers, were primarily compensated on commission of closed loans that they brought in. I was compensated with salary plus bonus based on company performance with part of that being discretionary based on personal performance. The compensation was significant for the top producing salespeople, some of whom were making several million dollars a year. Many of the sales managers and account executives lacked any real estate or mortgage experience. They were missing the depth of experience necessary to make an informed lending decision. These same sales mangers had the ability to make exceptions to guidelines on loans, which would result in loans closing with these exceptions, at times over the objections of seasoned appraisers, underwriters or risk personnel. Some of the best sales managers had underwriting backgrounds and were more closely aligned with risk management and better at understanding potential problems, but this was the exception and not the rule.

❖ **The growth, prevalence, and impact of so-called "exotic" mortgage products such as low documentation and stated income loans, and teaser rate mortgages:**

- The stated income, high loan to values ("LTV"), coupled with the 2/28, interest only ("IO") loans impacted the market by making purchasing a home as easy as it has ever been. Property values were climbing due to the easy money and

excessively low interest rates. Any problems, including fraud or defaults were being masked by the rapid housing appreciation.

❖ **The role and practices of appraisers in subprime mortgage origination:**

- Properly valuing a property (one of our three C's, collateral) is one of the most important components in a loan. In my experience at New Century, fee appraisers hired to go to the properties were often times pressured into coming in "at value", fearing if they didn't, they would lose future business and their livelihoods. They would charge the same fees as usual, but would find properties that would help support the needed value rather than finding the best comparables to come up with the most accurate value. Some appraisers would take boards off boarded up windows, to take the needed photos, then board the properties back up once the shots were taken. Or they would omit certain important elements of a property by angling the camera a certain way or zooming close in to make the property look the best possible. This level of appraiser activism compromises their objectivity.

At the end of the day, we had a system that went into a downward spiral because of layering risk rather than offsetting the risk because there was such a huge demand for the products. Our loans were sold before we even made them, which put more pressure on the production groups to get loans closed. Wall Street packaged and sold the Residential Mortgage Backed Securities to unsophisticated bond buyers/ investors. By unsophisticated, I mean they did not understand the true risk of the underlying loan product. The process was so convoluted it was nearly impossible to get a fraud loan pulled out of the entanglement to repurchase it. I actually had a Wall Street investment banker chastise me for trying to buy a fraud loan back. This particular loan was back in 2002 or 2003 when there were hardly any loans coming back from investors. His comment was, " You want me to pull this *one* loan out of this security? Do you know what I have to do?" He proceeded to tell me that he had to find another loan to put in its place and asked if I really needed to pull it. To his credit, he did as I asked, pulled the loan and New Century repurchased it. It was at that point that I began to get a taste of the complexity of how securities worked.

The rating agencies improperly rated these securities, deeming them much safer than they actually were. It seems the lending process needs to return to the basics; true risk based pricing and transparency. We have to look at the kind of market we are in, do we have cheap money with increasing housing prices? If so, the loan to value ratios should be reduced to accommodate the increased risk. I just know if I am loaning my personal funds, which I have done on several occasions, I want to ensure I'm protecting my investment. By extension, the same common sense should apply in the marketplace. A return to our core guidance of the three C's, and offsetting the risk rather than layering it.

4832-5033-4981, v. 1

$EX H/B/T$ '$H$'

0

**Testimony of**

**Richard M. Bowen, III**

**Presented to the Financial Crisis Inquiry Commission**

**Hearing on Subprime Lending And Securitization
And Government Sponsored Enterprises**

**April 7, 2010**

## SUMMARY

I am pleased to provide this testimony to the FCIC in support of its important work. My testimony is based upon my best recollection. I have not had recent access to Citi documents, so there might be a detail or two that I might miss in this testimony. But I believe this is accurate in all material respects.

### Bowen Background

I have spent over thirty-five years in banking and have held executive positions in Finance, Credit and Information Technology. I am also licensed as a Certified Public Accountant in the State of Texas.

From 2002 through 2005 I was Senior Vice President and Chief Underwriter for Correspondent and Acquisitions for Citifinancial Mortgage. In early 2006 I was promoted to Business Chief Underwriter for Correspondent Lending in the Consumer Lending Group.

In this position I was responsible for over 220 professional underwriters. And I was charged with the underwriting responsibility for over $90 billion annually of residential mortgage production.

These mortgages were originally made by correspondent mortgage companies and were purchased through Correspondent channels from these third party originators. My underwriting function was responsible to ensure that these mortgages met the credit standards required by Citi credit policy.

Increasing volumes of mortgage loans and staffing constraints were part of a challenging underwriting environment.

### Delegated Flow – Prime. Warnings Issued

The delegated flow channel purchased approximately $50 billion of prime mortgages annually. These mortgages were not underwriten by us before they were purchased. My Quality Assurance area was responsible for underwriting a small sample of the files post-purchase to ensure credit quality was maintained.

These mortgages were sold to Fannie Mae, Freddie Mac and other investors. Although we did not underwrite these mortgages, Citi did rep and warrant to the investors that the mortgages were underwritten to Citi credit guidelines.

In mid-2006 I discovered that over 60% of these mortgages purchased and sold were defective. Because Citi had given reps and warrants to the investors that the mortgages were not defective, the investors could force Citi to repurchase many billions of dollars of these defective assets. This situation represented a large potential risk to the shareholders of Citigroup.

I started issuing warnings in June of 2006 and attempted to get management to address these critical risk issues. These warnings continued through 2007 and went to all levels of the Consumer Lending Group.

We continued to purchase and sell to investors even larger volumes of mortgages through 2007. And defective mortgages increased during 2007 to over 80% of production.

### Wall Street Bulk – Subprime. Warnings Issued.

The Correspondent Wall Street channel purchased pools of subprime mortgages from correspondent mortgage companies. My underwriters were responsible for underwriting the mortgages in those pools that were being evaluated for purchase. Underwriting worked closely with the Wall Street Chief Risk Officer in that process.

During 2006 and 2007 I witnessed many changes to the way the credit risk was being evaluated for these pools during the purchase processes. These changes included the Wall Street Chief Risk Officer's reversing of large numbers of underwriting decisions on mortgage loans from "turn down" to "approved." And variances from accepted Citi credit policy were made. Subprime mortgage pools, many over $300 million, were purchased even though the minimum credit-policy-required-criteria was not met.

Beginning in 2006 I issued many warnings to management concerning these practices, and specifically objected to the purchase of many identified pools. I believed that these practices exposed Citi to substantial risk of loss.

### Warning to Mr. Robert Rubin and Management

On November 3, 2007, I sent an email to Mr. Robert Rubin and three other members of Corporate Management (Exhibits I and I a).

In this email I outlined the business practices that I had witnessed and attempted to address. I specifically warned about the extreme risks that existed within the Consumer Lending Group. And I warned that there were "resulting significant but possibly unrecognized financial losses existing" within Citigroup.

I also requested an investigation, and asked that it be "conducted by officers of the company outside of the Consumer Lending Group."

Throughout this process, my goal has been to protect Citi and its shareholders. I hope that my testimony will guide the Commission in making recommendations. And hopefully these recommendations will prevent a recurrence of the problems that I witnessed and tried unsuccessfully to address.

# THE CONSUMER LENDING GROUP

## Background

In September of 2005 the Consumer Lending Group ("CLG") was formed to house all of the non-branch asset-backed consumer lending activities. This included prime and subprime mortgages, home equity, student loans and automobile lending.

The Consumer Lending Group was a part of the larger Global Consumer Group ("GCG"), with the CEO reporting to the co-head of the Global Consumer Group.

The CLG Chief Risk Officer was was responsible for all CLG operational and credit risk and underwriting. Business Risk and Control ("BRC") was a unit responsible for the internal controls and compliance.

The Internal Audit function ("ARR Audit") relied heavily upon the internal control and compliance reporting by BRC. ARR did not report to CLG, but reported into Corporate Audit.

All of the mortgage lending operations were considered to be a part of Real Estate Lending ("REL"), within the Consumer Lending Group. These included the following subsidiaries:

Citimortgage ("CMI")– prime mortgage lending, primarily first lien mortgages
Citifinancial Mortgage ("CFMC") – subprime mortgage lending, primarily first lien mortgages
Citi Home Equity ("CHE") – prime second lien mortgages

## Mandate for Growth and Efficiency

There was significant corporate emphasis placed upon the need for growth and market share for REL.

Every quarter there were memos distributed to all REL employees from management touting the increasing number of consecutive quarters of growth in mortgage originations. Employees were also told the quarterly improvement in market share, from #13 in the industry in 2001, to #6 in 2005, to #5 in 2nd Qtr 2006, to #3 in 3rd Qtr 2006.

Management and employees were praised for this remarkable achievement, in spite of very "challenging conditions" in the industry.

There were also a number of initiatives announced to become more efficient and dramatically reduce the number of employees.

## Real Estate Lending (REL)

Within Real Estate Lending there were four primary business channels involved with residential mortgage lending.

Direct – direct mortgage lending to the consumer.
Wholesale – mortgage lending through brokers, who dealt with the consumer.
Correspondent Flow – the mortgage loans were made by another mortgage company. The loans are then purchased individually by Citi.
Correspondent Wall Street – the mortgage loans were made by another mortgage company. The loans are grouped into "pools" and sold on a bulk basis to Citi.

Underwriting was responsible for the credit quality of the mortgages, with minimum credit standards defined in the CLG Credit Policy. REL Underwriting was led by the REL Chief Underwriter, reporting to the CLG Chief Risk Officer. The three Business Chief Underwriters responsible for each of the business channels outlined above reported to the REL Chief Underwriter. Each Business Chief Underwriter also had a dotted line reporting relationship to the Channel Business Head.

Prior to the creation of CLG in 2005, I was Chief Underwriter for the Correspondent and Acquisitions Channel in Citifinancial Mortgage Company. I was promoted to REL Business Chief Underwriter over the Correspondent channels in early 2006.

Within Correspondent Flow there were two channels:

Underwritten Flow – the mortgage loans are submitted individually to Citi for consideration. Each file is thoroughly reviewed by an underwriter to ensure it meets the minimum credit criteria established by Citi Credit Policy for the product involved. The underwriter also checks that each file contains all policy-required documents (e.g., employment verification, proof of income, etc.). The Citi underwriter must approve the file before it is purchased.

Delegated Flow – the mortgage loans also are submitted individually for purchase consideration. However, the authority to underwrite the file is "delegated" to the correspondent mortgage company (see further discussion below). Only prime mortgage loans are purchased in this channel.

## CORRESPONDENT DELEGATED FLOW CHANNEL – PRIME LENDING

### Background

Approximately $50 billion of mortgage loans were purchased annually in this channel. These were submitted from over 1,600 mortgage companies. As noted, a Citi underwriter does not underwrite these files before they are purchased. The selling mortgage company provides certification (reps and warrants) that the files are underwritten to Citi policy.

Testimony of Richard M. Bowen, III page 5

A mortgage file that is not underwritten to Citi policy, or it does not contain all policy-required documents, is considered a defective file. And the selling mortgage company can be forced to repurchase identified defective files from Citi.

An underwriting department called Quality Assurance ("QA") reported to me. This department was responsible to ensure the quality of the files being purchased through the delegated flow channel met the policy criteria set for the channel.

QA is staffed with Citi professional underwriters. The primary activity is to underwrite a sample of the loans that have already been purchased. The underwriters assigns an "agree" decision when they agree with the original mortgage company underwriter that the file meets Citi's credit policy criteria for the product. A "disagree" is assigned when the underwriter disagrees with the approving mortgage company underwriter. A "disagree" is an adverse decision meaning the file does not meet the minimum standards set by Citi policy.

These quality results are then reported monthly to the Third Party Origination Committee ("TPO"). TPO had overall responsibility for managing the selling mortgage company relationships.

I started participating in the TPO committee in early 2006, and it was explained to me that Citi policy requires that a minimum of 95% of the loans purchased through the delegated flow channel must be assigned the "agree" decision. The QA results reported to TPO in June of 2006 and earlier generally confirmed the 5% disagree, 95% agree thresholds.

**Defective Mortgages -- Missing Documents**

I spent time with the QA management and underwriters to better understand the QA processes. I learned that there were actually two categories of "agree" decision, with only the total of the two agree decisions being reported to TPO committee.

There was the "agree" decision, meaning the Citi underwriter agrees with the selling mortgage company underwriter that the file meets Citi policy criteria.

And there was an "agree contingent" decision, meaning that the Citi underwriter agrees with the original underwriting decision. But the decision is contingent upon receiving documents that are missing from the file, and those documents confirm the conditions underwritten.

An an example, the selling mortgage company underwriter may have approved a mortgage file showing a 45% debt to income ratio, which was within Citi policy criteria for the product. However, the required proof of income documentation confirming the borrower income used in the underwriting decision might be missing from the file. In this instance the Citi underwriter would assign an "agree contingent" decision to the file. The agree decision would be contingent upon receiving the income documentation proving the income utilized in the originating underwriter decision.

The total of the "agree" and "agree contingent" decisions would be reflected as the overall "agree" rate when reported to TPO Committee. This overall agree rate was the only agree rate reported to TPO through June 2006. And it was believed by the underwriters I interviewed that over half of the files had "agree contingent" decisions, meaning over half of the files were missing policy-required documents.

The QA process was very manual and lacked any automated reporting. The manager relied upon manual tally sheets, manually added, to produce the aggregate reporting given to TPO committee.

After significant effort, it was determined that the 5% disagree, 95% agree originally reported to June TPO was incorrect. It should have been 5% disagree, 55% agree contingent, and 40% agree. In other words, 5% were not underwritten to Citi policy and another 55% were missing policy-required documents.

### Sale of Mortgage Loans to Fannie Mae and Freddie Mac

Approximately 80% of the mortgage loans purchased through the delegated flow channel were sold to investors. The GSE's Fannie Mae and Freddie Mac were the largest purchasers of those mortgages. These mortgages were sold through the Citimortgage entity. Mortgage loans from other REL channels were also sold to the GSE's.

Citimortgage provided reps and warrants to the investor GSE's that the mortgages sold to them complied with Citi policy. If a mortgage loan was not underwritten to Citi policy guidelines ("disagree"), or if there was policy-required documentation missing from the file ("agree contingent") -- then it was a defective file. And under reps and warrants Citimortgage could be forced to repurchase identified defective files.

QA did not review a specific sample of files sold to the GSE's. However, the overall defect rate of all files purchased through the correspondent delegated flow channel was 60% in 2006.

Citi continued to purchase and sell to the GSE's through 2007, even as the defect rate increased to over 80% in the delegated flow channel.

[On March 1, 2010, Citigroup provided a "Representations and Warrants" disclosure in the 2009 10-K. This disclosure, beginning on page 130, reflects Citigroup took a charge to revenues of $493 million related to reps and warrants given to GSE's. This "Repurchase Reserve" was established for estimated losses to be taken on mortgage loans sold to the GSE's in 2006 - 2007.]

### Sale of FHA/VA Guaranteed Mortgages to Ginnie Mae Pools

Citimortgage also purchased and sold through the delegated flow channel approximately $8 billion annually of FHA/VA guaranteed mortgages. All FHA/VA guaranteed mortgages

purchased from correspondent mortgage companies were purchased through the delegated flow channel.

It was the responsibility of the selling correspondent mortgage company to obtain the FHA or VA insurance on the file. But it was explained to me that it was Citi's responsibility to ensure only FHA/VA eligible mortgages were sold into Ginnie Mae pools.

In early 2006, before QA reported to me, QA underwrote monthly a separate adverse sample of only FHA/VA mortgages. These mortgages had not yet been sold into the Ginnie Mae pools. The QA underwriters reviewing these mortgages were certified to underwrite FHA/VA mortgages (DE and LAPP designated). This sample was only for those mortgages with FICO's less than 550.

The original purpose of this pre-purchase sample was to withhold from the Ginnie Mae pools those files identified as being ineligible for the government insurance according to FHA/VA guidelines.

The correspondent mortgage companies had already obtained FHA/VA insurance on these mortgages. However, if the Citi identified variances from FHA/VA guidelines were known at the time the insurance was obtained by the granting agencies, the insurance probably would not have been given. And there was the possibility that the granting agencies might void the insurance for the defective files if the variances were later discovered.

It was reported to TPO in June 2006, when only total agrees were reported, that approximately 30% of the prepurchase FHA/VA files sampled were assigned the "disagree" decision. In July, 2006, the full scope of the "agree contingent" decisions was determined. And it was reported to TPO that 33% were "disagree" and 37% were "agree contingent" on a sample of only 4% of the FHA/VA files.

This represented a defect rate of 70% of the FHA/VA files reviewed, and those identified defective mortgages were withheld from the Ginnie Mae pool funding. However, the sample also indicated that 70% of the 96% which were not sampled were also defective, and these were funded through Ginnie Mae pools.

FHA/VA mortgages continued to be purchased and sold to Ginnie Mae pools through 2007. The QA identified defective rate, according to FHA/VA guidelines, increased to 80% during 2007.

**Warnings Distributed**

I warned extensively of the scope of the problems identified, beginning in June 2006. The risks of possibly being forced to repurchase large volumes of defective mortgages was outlined in great detail. The risks of the high FHA/VA defective rate were also distributed widely.

These warnings were reinforced in weekly reports, emails, and discussions with many levels of management and TPO committee. There was also a special sub-group of TPO committee formed

to discuss more fully the issues identified. These discussions were documented in their minutes. And there were concerns expressed that we were possibly not in compliance with self-reporting requirements to the investors.

My manager, the REL Chief Underwriter, also was alarmed by the issues I identified. The REL Chief Underwriter widely distributed his concerns and warnings through emails, weekly reports and individual meetings and conversations with management.

My manager always expressed the belief that he and I must continue to press for restrictions on the business to mitigate the identified risks. Our warnings went to all levels of REL's management, including the CLG Chief Risk Officer, who was the REL Chief Underwriter's manager.

One of the mid-2006 warnings noted ... "There will be serious long-term consequences for failing to take action." Another noted ... approximately 70% of the FHA/VA files are "unacceptable risk," ... with insurance at risk.

At the end of 2006 and early 2007 all of the REL Chief Underwriter's responsibilities were assigned to other managers. In 2007 my former manager retired.

I continued to warn management, through 2007, of these issues and risks to the shareholders posed by the increasing defective rate of mortgages purchased and sold through the correspondent delegated channel.

And REL continued to purchase and sell increasing volumes of defective mortgage product. The overall defective rate increased to over 80% in 2007, including the FHA/VA guaranteed mortgages.

## CORRESPONDENT WALL STREET CHANNEL – BULK SUBPRIME

### Background

Total Wall Street channel volumes grew 40% in 2006, and it was announced that greater growth was expected in 2007. Most of the growth was to be in the subprime mortgage business. The article "New Citimortgage Primed for Nonprime," American Banker, July 31, 2006, was distributed to REL mangement. In the article Mr. Bill Beckmann, President of CMI, was interviewed .. "... increased non prime production the bigger opportunity." The term "non-prime" was the preferred term to use instead of "subprime."

The Correspondent Wall Street Channel purchased prime mortgage pools and subprime mortgage pools. These were two different sets of products, governed by different policies and underwritten by different underwriters.

The underwriters who underwrote the prime mortgages, both first lien and second lien, were former Citimortgage and Citi Home Equity underwriters.

The subprime mortgage pools were underwritten by former Citifinancial Mortgage underwriters. This group had reported to me in CFMC before CLG and REL were formed. These underwriters would typically travel to the selling mortgage company location. There they would thoroughly review the physical credit files previously identified by Citi to be underwritten. They would assign "approve" or "turn down" decisions for each of the files reviewed.

For smaller subprime mortgage pools of under $20 million ("mini-bulks") it was required that 100% of the mortgages be underwritten. Only those mortgages approved by underwriters would be purchased.

For larger pools there was still an attempt to underwrite 100% of the mortgages. Many times limited resources required that only a sample of the loans in a pool were underwritten. Some pools evaluated for purchase were over $400 million.

For subprime pools requiring a sample the Wall Street Senior Risk Officer would identify the sample of loans to underwrite. It was required that there was a 95% statistical confidence level that the loans in the sample represented the loans in the unsampled portion of the pool.

The underwriters then underwrote all of the loans identified in the sample, and approved only those loans meeting Citi policy guidelines. It was standard procedure that those mortgages not meeting Citi guidelines were turned down and never purchased.

Citi policy dictated that sub-prime pools could only be purchased if a minimum of 90% of the loans in the sample were approved by the underwriters using Citi policy guidelines for subprime mortgages.

If the minimum approval rate (also called "execution rate") was not met, it was standard practice to "expand the sample" and underwrite an additional sample to determine if the larger sample approval rate met the minimum. In a worst case situation, where we could not meet the minimum approval rate, the sample was expanded to 100% due diligence. In this situation all of the mortgages in the pool were underwritten. And in this instance only those loans approved by the underwriters would be purchased.

## Changing Underwriting Decisions

In the third quarter of 2006 the Wall Street Chief Risk Officer started changing many of the underwriting decisions from "turn down" to "approve." This was done either personally or by direction to the underwriters. This artificially increased the approval rate on the sample. This higher approval rate was then used as justification to purchase these pools.

In the sample on one $300+ million Merrill Lynch subprime pool the underwriters turned down 716 mortgages as not meeting Citi policy guidelines. The Wall Street Chief Risk Officer personally changed 260 of these "turn downs" to "approved." The pool was purchased.

**Pools Purchased With Low Approval Rates**

Risk also started approving subprime pools for purchase with low approval rates, without an expanded sample.

Another large Merrill Lynch pool completed underwriting with a sample approval rate of 70%. The REL Chief Underwriter and I requested that the sample be expanded. I expressed my reservations about the quality of the pool. I stated that I expected to be able to express my concerns in any management discussion to purchase the pool. And I was assured that I would be included in any purchase decision discussions.

The pool was purchased while I was on vacation, without an expansion of the sample.

Still another $320 million Merrill Lynch pool was purchased with an approval rate of 72%. Citi policy required a minimum approval rate of 90%.

**Underwriting Against Seller Guidelines**

It was generally believed that Citi subprime credit policy was more restrictive than the policies followed by most of the industry. And many of the correspondent mortgage companies loudly complained about Citi's more restrictive policies. They complained that Citi was "cherry picking" according to Citi policy. And they noted that our competition was not as restrictive.

Underwriters were then many times instructed by Risk to underwrite according to the selling mortgage company guidelines, not Citi's.

In some instances I instructed the underwriters to keep a special log. They identified the numbers of mortgages approved according to the sellers guidelines but which would be turned down according to Citi guidelines. These informal logs generally showed only 80% of the approvals against seller guidelines would be approved under Citi guidelines.

A large New Century subprime pool was underwritten and purchased against their policy guidelines. The purchase approval rate under their guidelines was 93%. The approval rate under Citi guidelines would have been 83%.

**Purchase of Previous Turndowns**

Another standard practice followed by underwriting was that underwriters would not approve a mortgage which had previously been underwritten and turned down for purchase from that mortgage company.

Testimony of Richard M. Bowen, III   page 11

First NLC was a mortgage company that Citi had been regularly purchasing subprime mortgages from for two years. Citi guidelines were always followed in the underwriting and purchasing of their pools.

The Wall Street Chief Risk Officer then instructed the underwriters that they would begin underwriting against First NLC guidelines. The decision was made retroactively. First NLC was told that they could now sell to Citi the mortgages underwritten against their guidelines which had been turned down in previous months by Citi underwriters.

## Contract Underwriting in the Industry

CFMC and the other companies of REL had historically relied upon underwriters who were full time employees. However, some financial institutions in the industry did not have full time underwriters and chose to use contract underwriters. This practice was called outsourcing the underwriting. The use of outsourced underwriting allowed those financial institutions to maintain fewer employees, contracting for the needed underwriting manpower when due diligence was needed.

Many companies offered contract underwriting services to financial institutions wanting to purchase pools of mortgages. Clayton, Bohan, and 406 Partners were the names of some of the companies offering those services in the industry.

A financial institution wishing to utilize these services would contract for the underwriting services on a pool of mortgages to be purchased. The product types, including prime or subprime, would be specified. The credit policy to be utilized in making the underwriting decisions was also identified.

These companies would utilize a pool of individuals that were supposed to have been vetted as being experienced underwriters. These contract underwriters were considered independent contractors, who were paid an hourly fee. The number of files to be underwritten and planned days of due diligence determined the number of contract underwriters required for a due diligence. The company would also assign a lead contract underwriter to manage the other contract underwriters.

These underwriters would travel to the due diligence location. There they would be given a copy of the governing credit policy. The credit policy to be used might also be made available through the laptop PC's utilized to record the underwriting results. They would then spend whatever hours were needed to underwrite and record the results for every file underwritten.

At the conclusion of the due diligence the data file containing the individual mortgage underwriting results and decisions would be given to the purchasing financial institution. A decision to purchase or not to purchase the file would be made based upon these underwriting results.

It was strongly believed by both Citi Underwriting and Risk that full time employees were preferred as underwriters. Full time underwriters actually "lived" with the Citi credit policy and consistently underwrote to that policy. They therefore became experts in the nuances of the policy and the company guidelines for making policy "exceptions."

Exceptions were created when the underwriter determined that the overall decision was "approve" even though there might be one part of policy which was not be met. The underwriter judgement as to when to make an exception in light of "compensating factors" is particularly important in evaluating subprime loans.

Additionally, it was believed that full time employee underwriters have a greater "felt accountability" for the quality of their decisions over the long term. The REL Loan Review function continually evaluated the quality of underwriter decisions. Those employees identified as making poor decisions were then held accountable for their poor decisions.

Contract underwriters, however, continually worked for different ultimate employers and against a different credit policy for almost every engagement. So there is no real familiarity gained with any one policy. They are paid an hourly fee and there was not ongoing quality control assessment for determining the quality of their decisions.

The belief that full time employee underwriters make better quality decisions than contract underwriters was shared by other organizations within Citi.  Citigroup Capital Markets was a company that exclusively utilized contract underwriters. The Chief Underwriter of Citigroup Capital Markets spent a day at Citifinancial Mortgage in 2005 discussing underwriting. He visited extensively with some of our underwriters and managers regarding procedures and quality controls.

The Chief Underwriter was concerned about the quality of decisions made by their contract underwriters. We discussed the possibility that Citigroup Capital Markets might contract to utilize CFMC underwriters, under control of CFMC underwriting management. This would be for due diligence on some of the pools they were purchasing. Their Chief Underwriter felt this would give them a greater confidence in the quality of pools that they were considering purchasing.

CFMC volumes then started increasing and there was no longer excess underwriting capacity to possibly outsource to Citigroup Capital Markets. The proposed outsourcing agreement was not pursued.

**Dictated Use of Contract Underwriters**

As hiring freezes were announced and subprime volumes dramatically increased, REL Underwriting management was forced to utilize contract underwriters to underwrite an increasing number of the offered pools of mortgages. Contract underwriters were utilized in due diligence for a number of sellers, including First NLC, Equifirst, Decision One and New Century.

In March of 2007 the REL Loan Review Department issued a report on "first payment defaults." First payment defaults were mortgage loans which did not make their first scheduled payments. In this report Loan Review analyzed the quality of the underwriter decisions made on each of the purchased mortgages which did not make their first payments.

Loan Review concluded that those files which were underwritten by contract underwriters had significantly higher first payment default rates. Loan Review also concluded that a large percentage of those mortgages approved by contract underwriters should have been given "turn down" instead of the "approve" underwriting decisions.

**Warnings on Subprime Bulk Issues**

Beginning third quarter 2006 I sent many warnings and objections to credit decisions which were being made on specific pools of subprime mortgage loans. These were through email, conversations with the Wall Street Chief Risk Officer and other personnel, and weekly reports.

My manager, the REL Chief Underwriter, also joined me in objecting to some of the practices we witnessed. Some of the objections also went to the manager of the REL Chief Underwriter, the CLG Chief Risk Officer.

The warnings and objections continued into 2007.

## WARNING EMAIL TO MR. ROBERT RUBIN

In 2006 and 2007 management within the Consumer Lending Group had been repeatedly warned of the credit conditions and risks associated with Correspondent Delegated and Wall Street Bulk Subprime channels. And I witnessed many instances where existence of these credit circumstances and the loss risks represented by them were not discovered by ARR Audit and others.

In the Third Quarter 2007 earnings press release, Citigroup noted reduced earnings due to deterioration in the consumer credit environment. Then, in the last week of October, there were many articles in the press about additional potential losses in the Citi Securities and Banking areas.

There were also press reports the week of October 29th that there was going to be an emergency meeting of the Citigroup Board of Directors on Sunday, November 4th. And it was also speculated publicly that Charles Prince, CEO, may resign.

I made the decision that I had to warn Citigroup Executive Management and the Board of Directors. I had to warn them that there were many other circumstances and risks of loss to

Citigroup shareholders which had not yet been identified. These risks were centered in Real Estate Lending in the Consumer Lending Group.

On Saturday, November 3, 2007, I sent an email to
   Robert Rubin, Chairman of the Executive Committee
   David Bushnell, Senior Risk Officer
   Gary Crittenden, Chief Financial Officer
   Bonnie Howard, Chief Auditor

In this email I specifically warned about the risks of loss to the shareholders of Citigroup. I also requested "… an investigation of the above circumstances which will hopefully be conducted by officers of the company outside of the Consumer Lending Group." (See attached email to Mr. Robert Rubin, Exhibits I and I a).

## ADDITIONAL RISK COMMENTARY

### Delegated Flow #1. Out of Compliance with Policy

In July of 2006 a special TPO sub-group was formed to discuss the delegated flow issues. This group noted that QA was severely understaffed with underwriting personnel. They also determined that the manual reporting and processes must be automated. A new CMI policy must also be written to reflect new products and operations procedures.

The sub-group also concluded that we were operating significantly outside of existing CMI policy. We were not compliant with CMI policy requiring QA minimum sample sizes and thresholds by seller and product types. We were also not taking the policy-required enforcement actions for new sellers and sellers not meeting thresholds.

Additionally, this TPO sub-group identified that we were out of compliance with Global Consumer Group Credit Policy. That policy required minimum sampling standards that must be maintained by CMI in order to be eligible for delegated flow funding.

The TPO sub-group determined that an exception approval must be requested from the Global Consumer Group. A manager was assigned the responsibility to submit that request.

An exception approval request must disclose the current out-of-compliance sample sizes and the current rate of defective mortgages being funded. That request would have to be submitted to and approved by the Risk Committee of Global Consumer Group and ARR Audit.

It is my understanding that the exception approval request was not submitted to Global Consumer Group Risk or ARR Audit along with the disclosure of the high numbers of defective mortgages.

### Delegated Flow #2. BRC Investigation

In Mid-2006 I formally requested an investigation by Business Risk and Control. I wanted confirmation that the QA sampling and high reported defective rate on delegated flow mortgages purchased and sold were severe issues.

Two managers were assigned to conduct the investigation. Many Quality Assurance, Risk and Underwriting personnel were interviewed, including myself.

The BRC investigation determined that Correspondent Delegated Flow was out of compliance with many standards established by Risk Policies. We had been out of compliance since at least 2005.

The results of the BRC investigation were shared with of CLG Risk, BRC, and Human Resources. They were also shared with the CMI CEO, Head of Sales and the Senior Risk Officer.

It is my understanding that the results were not shared with ARR Audit.

## Delegated Flow Issue #3. MARS Priorities Tracking

Throughout Citigroup there was ongoing reporting to identify and minimize risks to the business processes. Managers were required to identify risks to their businesses, organizations or processes and reflect those risks in the MARS system.

BRC was responsible for the MARS system and internal controls compliance reporting.

Each of these identified risks were detailed in MARS. Each risk was also assigned two priorities -- a priority for "Severity of Risk" and a priority for "Risk Level."

In October of 2006 I directed the Chief Underwriter over Correspondent Flow to identify two risks in MARS.

QA risk #1 was the risk to the Delegated Flow business of inadequate QA staffing. We were currently out of compliance with credit policy and significant additional underwriting staff was required to comply with the required minimum sample size and enforcement efforts. This constituted a risk to the business because of the high rate of defective mortgages being purchased and sold.

QA risk #2 was the risk to the business if automated tools were not obtained and utilized in QA. Automation was required to comply with credit policy and monitor required enforcement efforts to reduce the high rate of defective mortgage loans.

I further directed the Chief Underwriter to assign in MARS the highest priorities to these risks. The highest priority, "Business Issue," was assigned to "Severity," The highest priority, "Important," was assigned to "Risk Level."

It was widely understood that ARR Audit, as a part of their audit processes, reviewed and assessed all risks which were assigned the highest priorities.

In December of 2006 the Chief Underwriter was instructed by BRC to lower the priorities given to the two risk issues. The Severity priority was reduced from "Business Issue" to "Workpaper." The Risk Level priority was reduced from "Important" to "Medium." These issues were then no longer assigned the highest priorities.

## Delegated Flow Issue #4. CLG Senior Risk Committee

The CLG Chief Risk Officer was Chairman of the Senior Risk Committee of the consumer Lending Group. This committee addressed risk issues important to CLG. Global Consumer Group Risk and ARR Audit participated in this committee.

My manager, the REL Chief Underwriter, attended several meetings of the Senior Risk Committee. He shared with me his frustration that the high level of delegated flow defective mortgages was not discussed in committee. To my knowledge the significant numbers of defective mortgages purchased and sold was not discussed in the CLG Senior Risk Committee.

## Delegated Flow Issue #5. Performance of Defective Mortgages

In June of 2006 I first identified the issue of the high numbers of mortgages purchased and sold with policy-required documents missing from the files (the "agree contingent" decisions).

In response to my expressed warnings, many managers told me that condition is only a "technical exception." They further stated that there is no reason to believe that the performance of those mortgages would be any different than those mortgages without missing documents (the "agree" decisions).

I noted to them my belief that the performance of those mortgages with missing documents would be substantially worse than "agree" decisions. I believed that many selling mortgage companies would sell a mortgage to Citi by assigning an underwriting decision "approve" and then omitting the documents which demonstrated that the decision should be "turn down."

Without automated reporting we could not identify and hold those sellers accountable. We also could not analyze the performance of those mortgages with different QA underwriting decisions.

I started requesting this required automated reporting in June 2006.

In November of 2007 new automated reporting was developed to analyze the performance of different QA decisions. The reporting "joined" the underwriting decision data with the mortgage performance data on the servicing system.

This new reporting confirmed the significantly worse mortgage loan performance of the files with missing documents ("agree contingent") at the end of October. The report also noted that 83% of the total mortgages purchased through delegated flow were sold to investors.

Mortgages purchased and sold to investors January 2006 through October 2007:

| Underwriting QA Decision | 30+ Days Delinquent |
|---|---|
| Agree | 5.7% |
| Agree Contingent | 9.4% |
| Disagree | 13.4% |

Testimony of Richard M. Bowen, III  page 18

## Delegated Flow Issue #6. Freddie Mac Underwriting Results

As noted above, most of the mortgages purchased through delegated flow were sold to investors. Those loans sold were therefore not reflected in the balance sheet portfolio. However, many of the mortgages were not sold and retained in the balance sheet portfolio.

At the end of 2007 there was a major Citi initiative announced to increase capital through the selling of balance sheet portfolio assets. A large pool of mortgage loans was offered for sale to Freddie Mac. This pool consisted of many billions of dollars of mortgages, both prime and subprime, originated through all of the REL channels. The pool included many prime mortgages originated through the delegated flow channel.

Freddie Mac then underwrote a sample of those mortgages offered for purchase.

For all the mortgages underwritten from the total pool by Freddie Mac, they identified over 40% that were missing documents required by policy. Only a small portion of the total pool consisted of delegated flow mortgages. But the files identified by Freddie Mac as missing documents were almost exclusively mortgages from the delegated flow channel.

Testimony of Richard M. Bowen, III   page 19

# Exhibit I
## Bowen Email to Mr. Robert Rubin

### Bowen, Dick [GCG-REO]

From:     Bowen, Dick [GCG-REO]
Sent:     Saturday, November 03, 2007 4:47 PM
To:       Rubin, Robert E [CCC]; Bushnell, David C [CCC]; Crittenden, Gary [CCC]; Howard, Bonnie [CCC]
Cc:       Bowen, Dick [GCG-REO]
Subject:  URGENT -- READ IMMEDIATELY -- FINANCIAL ISSUES

TO:  Robert Rubin, Chairman of Executive Committee
     David Bushnell, Senior Risk Officer
     Gary Crittenden, Chief Financial Officer
     Bonnie Howard, Chief Auditor

Gentlemen:

I am currently (since early 2006) the Business Chief Underwriter for the Real Estate Lending Correspondent channel, which is within the Consumer Lending Group  From 2002 to 2006 I was SVP and Chief Underwriter for the Correspondent and Acquisitions channel within Citifinancial Mortgage. I am also licensed as a Certified Public Accountant in the State of Texas.

The reason for this urgent email concerns breakdowns of internal controls and resulting significant but possibly unrecognized financial losses existing within our organization.

Since mid-2006, I have continually identified these breakdowns in processes and internal controls. The REL Chief Underwriter (my 2006 manager) and I have widely communicated these breakdowns, with possible ramifications, in weekly reports, emails, and discussions (which included the CLG Chief Risk Officer). There have also been two special investigations by CLG Business Risk and Control (the first initiated by me), with the findings confirming these breakdowns.

However, to my knowledge, these breakdowns have not been communicated to or recognized by either Audit or Finance.

I have been agonizing for some time over these issues, and in all good conscience feel I must now communicate these concerns outside of the Consumer Lending Group. I sincerely regret the delay.

CONCERN #1 -- CORRESPONDENT FUNDINGS THROUGH DELEGATED AUTHORITY

- We currently purchase from mortgage companies and sell to third party investors approximately $50 billion annually ($42 billion YTD 2007) of mortgage loans which have not been underwritten by us but which we rep and warrant to the investors (primarily Fannie/Freddie) that these files are complete and have been underwritten to our policy criteria.
- Our internal Quality Assurance function, which underwrites a small sample of these files post-purchase, has reflected since 2006 (when this function started reporting to me) that 40-60% of these files are either outside of policy criteria or have documentation missing from the files. QA for recent months indicate 80% of the files fall into this category.
- If any of the mortgages in this category default, the investor may require that Citi repurchase the defaulted files based upon our reps and warrants. Under seller reps and warrants Citi may then force the selling mortgage company to repurchase the files, if the seller mortgage company remains financially viable at that time. (As one example, QA results indicate that Citi may be responsible for in excess of 50% of the losses associated with files purchased from the failed Aegis Mortgage -- $2.5 billion purchased since Jan '06).
- A CLG BRC investigation, requested by me, confirmed the breakdowns associated with the QA process and the fact that the QA findings were significantly out of compliance with QA Risk Policy. The Chief Underwriter responsible for this function was terminated and a new QA Risk Policy was approved in 2006.

11/5/2007

Testimony of Richard M. Bowen, III   page 20

# Exhibit I a)

We continue to be significantly out of compliance with the new QA Risk Policy.
- I do not believe that our company has recognized the material financial losses inevitably associated with the above Citi liability.

CONCERN #2 – CORRESPONDENT FUNDINGS THROUGH WALL STREET BULK PURCHASES

- During 2006-7 there were pools of mortgage loans aggregating $10 billion which were purchased from large mortgage companies with significant numbers of files identified as "exceptions" (higher risk and substantially outside of our credit policy criteria). These exceptions were approved by the Wall Street Channel Chief Risk Officer, many times over underwriting objections and with the files having been turned down by underwriting. These pools involved files aggregated and originated by Merrill Lynch, Residential Funding Corp, New Century, First NLC and others.
- The purchase decisions on many of these pools were approved even though the execution rates and other criteria established by the CLG Bulk Acquisition Policy were not met.
- Because of the initial high losses associated with many of these pools, CLG BRC investigated and reviewed correspondence which documented underwriting objections to purchasing identified pools.
- BRC conducted an investigation of one Merrill Lynch pool, identifying generic breakdowns of process required by policy and recommended needed changes.
- Changes were made in the bulk purchase process, but I do not know if the expected material financial losses from these pools has been recognized.

I know that this will prompt an investigation of the above circumstances which will hopefully be conducted by officers of the company outside of the Consumer Lending Group, and I pledge my full cooperation.

As a professional, as well as a shareholder of this company, I am deeply distressed with having to report the above.

I will be in the office Monday, and can be available by cell phone, if needed, this weekend.

Dick Bowen
469-220-1151 office
214-497-       cell

11/5/2007