1   Amanda L. Groves (SBN: 187216)
    agroves@winston.com
2   WINSTON & STRAWN LLP
    101 California Street
3   San Francisco, CA  94111-5802
    Telephone:   (415) 591-1000
4   Facsimile:   (415) 591-1400

5   T. Thomas Cottingham, III *(admitted pro hac vice)*
    tcottingham@winston.com
6   Stacie C. Knight *(admitted pro hac vice)*
    sknight@winston.com
7   WINSTON & STRAWN LLP
    100 North Tryon Street, Suite 2900
8   Charlotte, NC 28202-1078
    Telephone:   +1 704 350 7700
9   Facsimile:   +1 704 350 7800

10  Mark T. Flewelling (SBN: 96465)
    mflewelling@afrct.com
11  Leigh O. Curran (SBN: 173322)
    lcurran@afrct.com
12  Yaw-Jiun (Gene) Wu (SBN: 228240)
    gwu@afrct.com
13  ANGLIN, FLEWELLING, RASMUSSEN, CAMPBELL, AND TRYTTEN
    199 So. Los Robles Ave., #600
14  Pasadena, CA  91101
    Telephone:   +1 626 535 1900
15  Facsimile:   +1 626 577 7764

16

17  Attorneys for Defendants
    WACHOVIA MORTGAGE, FSB,
    WACHOVIA BANK, FSB, AND GOLDEN
18  WEST FINANCIAL CORPORATION

19          **UNITED STATES DISTRICT COURT**
         **NORTHERN DISTRICT OF CALIFORNIA**
20              **SAN JOSE DIVISION**

| | |
|---|---|
| 21  IN RE: WACHOVIA CORP. "PICK-A-PAYMENT" MORTGAGE MARKETING AND SALES PRACTICES LITIGATION | Case No. M:09-cv-2015-JF |
| 22 | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' EX PARTE REQUEST FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION** |
| 23  This document relates to: | |
| 24 | |
| 25 | Judge:  Hon. Jeremy Fogel |
| 26 | |
| 27      *ALL CASES* | |

28

WINSTON & STRAWN LLP
A limited liability partnership

# **TABLE OF CONTENTS**

Page

1.   FACTUAL BACKGROUND ............................................................................. 3

     A.   The Settlement Agreement and the Parties' Efforts to Resolve Concerns ................. 3

     B.   No "Sample" Plaintiff Is Facing Foreclosure Due To An Improper Loan
          Modification Denial. ...................................................................................... 5

          1.   Borrowers who had already received loan modifications and therefore
               are not eligible for further modification pursuant to the express terms
               of the Settlement Agreement: ........................................................... 8

          2.   Borrowers expressing vague disagreement with their NPV
               calculations, income calculations, or evaluation in general:........................... 9

          3.   Borrowers challenging Defendants' imminent default determinations: .......... 9

     C.   Defendants Continuously Are Working With Borrowers To Prevent
          Foreclosure......................................................................................................... 9

     D.   Prohibiting All Foreclosures For An Indefinite Time Would Cause Defendants
          Irreparable Harm. .......................................................................................... 10

     E.   Plaintiffs Unsuccessfully Sought This Overly-Sweeping Relief Before. .................. 11

2.   LEGAL ARGUMENT ................................................................................... 11

     A.   Standard for Preliminary Injunction .................................................................. 11

     B.   Plaintiffs Cannot Show They Are Likely To Suffer Irreparable Harm. .................... 12

          1.   Plaintiffs Do Not Face Foreclosures Due to Improper Loan
               Modification Denials. ..................................................................... 13

          2.   Plaintiffs Do Not Face Irreparable Harm Because They Have Other
               Remedies....................................................................................... 13

          3.   Plaintiffs Cannot Show Irreparable Harm Because They Delayed
               Seeking Relief And Did Nothing While Defendants Foreclosed On A
               Named Plaintiff's Loan. ................................................................. 14

     C.   The Balance Of Hardships Does Not Favor Plaintiffs................................................. 15

     D.   Plaintiffs Have Not Shown A Probability Of Success On the Merits......................... 16

          1.   Plaintiffs Are Unlikely to Succeed on Their Breach of Contract Claim......... 16

               a.   "Imminent Default" is Not Tied to a 31% PITIA .............................. 17

               b.   Automated Appraisals Are Expressly Allowed in the
                    Settlement Agreement........................................................... 18

WINSTON & STRAWN LLP
A limited liability partnership

2. Plaintiffs Are Unlikely to Succeed on Their Breach of the Implied Covenant of Good Faith and Fair Dealing Claim. ........................................... 20

3. Plaintiffs Are Unlikely to Succeed on Their Unfair Competition Claim........ 21

4. Plaintiffs Do Not Show A Likelihood Of Prevailing Because Their Claims Are Preempted. ...................................................................... 22

a. Legal Standards For Preemption Under The Home Owner's Loan Act ("HOLA"). ................................................................. 22

b. The "Imminent Default" Claims Are Preempted Under § 560.2(b)(4) And (10)................................................................. 24

c. The Automated Appraisal Claims Are Also Preempted Under § 560.2(b). ........................................................................... 26

d. The Claims Predicated On Defendants' Handling Of Modification Requests Are Preempted Under § 560.2(b). ................. 27

e. 12 C.F.R. § 560.2(a) and (c) Also Preempt Plaintiffs' Claims. .......... 28

E. Public Interest Does Not Support The Injunction......................................... 30

F. Plaintiffs' Proposed Injunction Violates The Anti-Injunction Act and the *Rooker-Feldman* and *Younger* Abstention Doctrines. .................................. 30

3. CONCLUSION.......................................................................................... 32

TABLE OF CONTENTS

WINSTON & STRAWN LLP
A limited liability partnership

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Angotti v. Rexam, Inc.,*
 Case No. 06-CV-0657, 2006 U.S. Dist. LEXIS 78087 (D. Minn. Oct. 25, 2006)..................12

*Angotti v. Rexam, Inc.,*
 Case No. C 05-5264 CW, 2006 U.S. Dist. LEXIS 42104 (N.D. Cal. 2006) .........................12

*Appling v. Wachovia Mortg., FSB,*
 745 F. Supp. 2d 961 (N.D. Cal. 2010) ...........................................................................24, 26

*Baner v. Wells Fargo Bank,*
 2012 U.S. Dist. LEXIS 103737 (N.D. Cal. July 23, 2012)....................................................24

*Bank of America v. City and County of S.F.,*
 309 F.3d 551 (9th Cir. 2002) ...........................................................................................22, 23

*Bryant v. Citimortgage,*
 2010 U.S. Dist. LEXIS 92384 (M.D. Fla. Aug. 13, 2010) ....................................................32

*Cedeno v. IndyMac Bancorp, Inc.,*
 2008 U.S. Dist. LEXIS 65337 (S.D.N.Y. Aug. 25, 2008)......................................................26

*Clark v. U.S. Bank Nat'l Ass'n,*
 No. 03-5452, 2004 U.S. Dist. LEXIS 11264 (E.D. Pa. June 18, 2004)..................................31

*Communications Telesys. Int'l v. California Pub. Util. Comm'n,*
 196 F.3d 1011 (9th Cir. 1999) ...............................................................................................32

*Conference of Fed. Sav. & Loan Ass'ns v. Stein,*
 604 F.2d 1256 (9th Cir. 1979) ...............................................................................................22

*Crews v. Wachovia Mortg. Corp.,*
 2010 U.S. Dist. LEXIS 77660 (C.D. Cal. July 23, 2010)......................................................15

*Curcio v. Wachovia Mortg. Corp.,*
 2009 U.S. Dist. LEXIS 96155 (S.D. Cal. Oct. 14, 2009) ......................................................28

*Daniel v. Wells Fargo Bank,*
 2012 U.S. Dist. LEXIS 77200 (E.D. Cal. June 4, 2012).........................................................25

*Davenport v. Litton Loan Serv.,*
 725 F. Supp. 2d 862 (N.D. Cal. 2010) ...................................................................................18

*Delaney v. Onewest Bank, FSB,*
 2011 U.S. Dist. LEXIS 48515 (D. Or. May 5, 2011) ...........................................................32

WINSTON & STRAWN LLP

A limited liability partnership

*DeLeon v. Wells Fargo Bank, N.A.*,
    2010 U.S. Dist. LEXIS 62499 (N.D. Cal. June 9, 2010) ........................................................23

*DeLeon v. Wells Fargo Bank, N.A.*,
    729 F. Supp. 2d 1126 (N.D. Cal. 2010) (Fogel, J.) ..........................................................28

*District of Col. Ct. of App. v. Feldman*,
    460 U.S. 462, 103 S. Ct. 1303, 75 L. Ed. 2d 206 (1983) ..........................................................31

*Do v. Wells Fargo Bank, N.A.*,
    2012 U.S. Dist. LEXIS 126768 (C.D. Cal. Aug. 27, 2012) ........................................................24

*Doe v. Wal-Mart Stores, Inc.*,
    572 F.3d 677 (9th Cir. 2009) ..........................................................16

*Donohue v. Apple, Inc.*,
    2012 U.S. Dist. LEXIS 65860 (N.D. Cal. May 10, 2012) ........................................................18

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
    458 U.S. 141, 102 S. Ct. 3014, 73 L. Ed. 2d 664 (1982) ..........................................................22

*Flagg v. Yonkers Savings & Loan*,
    396 F.3d 178 (2nd Cir. 2005) ..........................................................27

*Flanagan v. Arnaiz*,
    143 F.3d 540 (9th Cir. 1998) ..........................................................31

*Giordano v. Wachovia Mortg., FSB*,
    2010 U.S. Dist. LEXIS 136284 (N.D. Cal. Dec. 14, 2010) (Fogel, J.) ..................23, 24, 29, 30

*Gonzalez v. Wells Fargo Bank*,
    2012 U.S. Dist. LEXIS 154851 (N.D. Cal. Oct. 29, 2012) (Davila, J.) ................................24

*Gorton v. Wells Fargo Bank NA*,
    2012 U.S. Dist. LEXIS 168158 (C.D. Cal. Nov. 27, 2012) ........................................................28

*Guancione v. Wachovia Mortg. Corp.*,
    2010 U.S. Dist. LEXIS 89927 (N.D. Cal. July 28, 2010) (Fogel, J.) ...............................31, 32

*Guerrero v. Wells Fargo Bank, N.A.*,
    2010 U.S. Dist. LEXIS 96261 (C.D. Cal. Sept. 14, 2010) ................................23, 25

*Haggarty v. Wells Fargo Bank, N.A.*,
    2012 U.S. Dist. LEXIS 143405 (N.D. Cal. Oct. 3, 2012) (Breyer, J.) ..................25, 26, 27, 30

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) ..........................................................30

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
    634 F.2d 1197 (9th Cir. 1980) ..........................................................11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

WINSTON & STRAWN LLP
A limited liability partnership

TABLE OF AUTHORITIES

*Lydo Ents., Inc. v. City of Las Vegas*,
    745 F.2d 1211 (9th Cir. 1984) ................................................................14

*Midgett v. Tri-County Metro Transp. Dist. of Oregon*,
    254 F.3d 846 (9th Cir. 2001) .................................................................12

*Mission Power Eng'g Co. v. Continental Cas. Co.*,
    883 F. Supp. 488 (C.D. Cal. 1995) .........................................................15

*Munoz v. Fin. Freedom Senior Funding Corp.*,
    573 F. Supp. 2d 1275 (C.D. Cal. 2008) ..................................................30

*Oakland Tribune, Inc. v. Chronicle Publishing Co.*,
    762 F.2d 1374 (9th Cir. 1985) ................................................................12

*Parker v. USDA*,
    879 F.2d 1362 (6th Cir. 1989) ................................................................13

*Poco v. Wachovia Mortg. Corp.*,
    2011 U.S. Dist. LEXIS 71655 (N.D. Cal. June 28, 2011) ......................25

*Rooker v. Fidelity Trust Co.*,
    263 U.S. 413, 44 S. Ct. 149, 68 L. Ed. 362 (1923) ...............................31

*Sato v. Wachovia Mortg. FSB*,
    2012 U.S. Dist. LEXIS 46554 (N.D. Cal., 2012) (Davila, J.)..................30

*Scherbenske v. Wachovia Mortg., FSB*,
    626 F. Supp. 2d 1052 (E.D. Cal. 2009).................................................31

*Schilke v. Wachovia Mortg., FSB*,
    758 F. Supp. 2d 549 (N.D. Ill. 2010) ....................................................25

*Settle v. World Sav. Bank, F.S.B.*,
    2012 U.S. Dist. LEXIS 4215 (C.D. Cal. Jan. 11, 2012) .....................27, 28

*Sierra Club v. Cal. Am. Water Co.*,
    2010 U.S. Dist. LEXIS 1478 (N.D. Cal. Jan. 8, 2010) (Fogel, J.)..........32

*Silvas v. E\*Trade Mortg. Corp.*,
    514 F.3d 1001 (9th Cir. 2008) ......................................................23, 29, 30

*Solomon v. Aurora Loan Servs., LLC*,
    2012 U.S. Dist. LEXIS 143502 (E.D. Cal. Oct. 3, 2012) .......................32

*Spears v. Wash. Mut., Inc.*,
    2009 U.S. Dist. LEXIS 21646 (N.D. Cal. Mar. 9, 2009).........................26

*Spears v. Washington Mut., Inc.*,
    2009 U.S. Dist. LEXIS 85251 (N.D. Cal. Aug. 30, 2009) (Whyte, J.)......25

WINSTON & STRAWN LLP
A limited liability partnership

-v-

WINSTON & STRAWN LLP
A limited liability partnership

*Standard Havens Prods. v. Gencor Indus.*,
    897 F.2d 511 (Fed. Cir. 1990)..........................................................................16

*Stefan v. Wachovia*,
    2009 U.S. Dist. LEXIS 113480 (N.D. Cal. Dec. 7, 2009) (Armstrong, J.) ...........25

*Stuhlbarg Intern. Sales Co. v. John D. Brush and Co.*,
    240 F.3d 832 (9th Cir. 2001) .......................................................................16

*Taguinod v. World Sav. Bank, FSB*,
    2010 U.S. Dist. LEXIS 127677 (C.D. Cal. Dec. 2, 2010) ......................................23

*Tuck v. Wells Fargo Home Mortg.*,
    2012 U.S. Dist. LEXIS 172204 (N.D. Cal. Dec. 4, 2012)......................................28

*Unlu v. Wells Fargo Bank NA*,
    2011 U.S. Dist. LEXIS 141992 (N.D. Cal. Dec. 9, 2011) (Davila, J.) ...................25

*Wadhwa v. Aurora Loan Servs., LLC*,
    2011 U.S. Dist. LEXIS 73949 (E.D. Cal. July 8, 2011) ......................................32

*Westlands Water Dist. v. United States*,
    337 F.3d 1092 (9th Cir. 2003) ................................................................18, 20

*Winter v. Natural Resources Def. Council*,
    129 S.Ct. 365 (2008)................................................................11, 16, 19, 30

*Wright v. Bank of Am., N.A.*,
    2010 U.S. Dist. LEXIS 73807 (N.D. Cal. 2010) ...........................................18, 20

*Zepeda v. Paypal, Inc.*,
    777 F.Supp.2d 1215 (N.D. Cal. 2011) ......................................17, 19, 20, 21

*Zepeda v. U.S. Immigration and Naturalization Service*,
    753 F.2d 719 (9th Cir. Cal. 1983)........................................................12

**STATE CASES**

*Byars v. SCME Mortg. Bankers*,
    109 Cal.App.4th 1134 (2003) ...................................................................22

*Carma Developers (Cal.), Inc. v. Marathon Development Cal., Inc.*,
    2 Cal.4th 342 (1992) ......................................................................18, 19

*County of San Diego v. Ace Pro. & Cas. Ins.*,
    37 Cal.4th 406 ................................................................................17

*First Commercial Mortgage Co. v. Reece*,
    89 C.A. 4th 731, 745 (2001) ...............................................................1, 16

*Guz v. Bechtel National, Inc.*,
   24 Cal. 4th 317 (2000) ..................................................................................21

*Nein v. Hostpro, Inc.*,
   174 Cal. App. 4th 833 (2009) ...................................................................21, 22

*Nymark v. Heart Fed. Savings & Loan Assn.*,
   231 Cal. App. 3d 1089 (1991) ......................................................................19

*Progressive West Ins. Co. v. Superior Court*,
   135 Cal. App. 4th 263 (2005) ......................................................................18

*Thrifty Payless v. Mariners Mile Gateway, LLC*,
   185 Cal. App. 4th 1050 (2010) ....................................................................20

**FEDERAL STATUTES**

28 U.S.C. § 2283 ..............................................................................................31

**STATE STATUTES**

Cal. Bus. & Prof. Code § 17200 .....................................................21, 25, 28

Cal. Civ. Code § 2923.5 ..................................................................................29

**RULES**

Fed. R. Civ. P. 65 .............................................................................................32

Fed. R. Civ. P. 65(c) .......................................................................................16

**REGULATIONS**

12 C.F.R. § 560.2 .......................................................................................23, 26

12 C.F.R. § 560.2(a) ...........................................................................23, 28, 29

12 C.F.R. § 560.2(b) ...........................................................................23, 26, 27

12 C.F.R. § 560.2(b)(9) ..............................................................................24, 28

12 C.F.R. § 560.2(b)(10) .........................................................24, 26, 27, 28

12 C.F.R. § 560.2(c) ...........................................................................28, 29, 30

61 Fed. Reg. 50951 (Sept. 30, 1996) ......................................................22, 23

61 Fed. Reg. 50954 ..........................................................................................27

61 Fed. Reg. 50965 (Sept. 30, 1996) ............................................................22

WINSTON & STRAWN LLP
A limited liability partnership

61 Fed. Reg. 50966-67 (Sept. 30, 1996) ........................................................................23

WINSTON & STRAWN LLP
A limited liability partnership

TABLE OF AUTHORITIES

1    Defendants, by and through their undersigned counsel, submit the following Opposition to

2  Plaintiffs' Ex Parte Request for a Temporary Restraining Order and Order to Show Cause Re:

3  Preliminary Injunction ("Plaintiffs' Motion").

4    In their motion, Plaintiffs make the remarkable claim that every single Settlement Class

5  Member who has not been given a loan modification is in that situation because Defendants refused

6  to provide Settlement Class Members with loan modifications to which they were entitled.

7  Plaintiffs, however, offer zero evidence to establish any breach of the MDL-SA; a Settlement Class

8  Member's mere belief that he should have been given a loan modification does not make it so.

9  Nonetheless, Plaintiffs ask this Court to issue a sweeping nationwide injunction that would permit

10  every Settlement Class Member with an active mortgage loan to stop making payments on his loan

11  "until Lead Counsel has had the opportunity to review loan modification denials."  Neither the

12  evidence nor the law supports such extraordinary relief, and in fact, such an injunction would upset

13  the status quo and cause irreparable harm.  The Court should deny Plaintiffs' Motion.

14    ***First***, the Plaintiffs bringing the instant motion cannot meet their burden of proving that they

15  face imminent irreparable harm, let alone that such harm arises from the conduct they challenge.

16  Plaintiffs identify two purported harms: (a) they assert "substantial numbers" of "Unmodified

17  Settlement Class Members" have been wrongfully denied loan modifications under the MDL-SA;

18  and (b) they contend that ***all*** foreclosures must cease.  Plaintiffs' broad assertions of wrongful loan

19  modification denials are false.  Indeed, of the 31 allegedly "representative" borrowers bringing the

20  instant motion (comprising 21 loans), not a single one has demonstrated any breach of the MDL-

21  SA—nor could they.  Plaintiffs' conclusory allegations aside, each borrower was properly reviewed,

22  and each denial was entirely proper.  In fact, several borrowers bringing the instant Motion have

23  already received loan modifications and thus are not eligible for any further modification relief under

24  the express terms of the MDL-SA.  These facts alone are fatal to Plaintiffs' Motion.  Further, the

25  "Unmodified Settlement Class Members" will lose no rights absent an across-the-board injunction.

26  In the appropriate forum, these Settlement Class Members can challenge Defendants' analysis and

27  decision, and, where appropriate, obtain relief.  Those individual actions, in fact, have the advantage

28

WINSTON & STRAWN LLP
A limited liability partnership

-1-

of limiting inquiry and relief to those "Unmodified Settlement Class Members" who can actually prove that they face foreclosure because of the conduct they challenge here.[1]

**Second**, both the need to preserve the status quo, and the balancing of hardships, tip decidedly against Plaintiffs and in Defendants' favor.  Defendants have followed the terms of the MDL-SA in working with Settlement Class Members to find an acceptable means of avoiding foreclosure.  Defendants properly have applied the steps comprising the loan modification program to each Unmodified Settlement Class Member eligible for review.  The proposed injunction would grant a moratorium on foreclosures or short sales of any home financed with a Pick-a-Payment loan, regardless of whether the Unmodified Settlement Class Member has any possibility of qualifying for a modification—or even plans to seek a modification.  This injunction would provide many of these non-qualifying Unmodified Settlement Class Members the boon of holding their home or investment property obligation-free for an indeterminate period, while depriving Defendants of ongoing revenue, filling their books with non-performing assets, requiring them to commit added capital reserves to those non-performing assets, forcing them to suffer ongoing devaluation of its security interests, and ultimately, preventing them from turning those security interests—worth hundreds of millions of dollars—into cash to ameliorate losses.  Further, because the injunction Plaintiffs seek would allow **all** borrowers to stop making loan payments, the resulting financial impact on Defendants and their employees, even in the short term, could be immediate and devastating in terms of more lost jobs, more reduced earnings and, in turn, more foreclosures or at least more personal economic loss.

**Third**, Plaintiffs cannot show a likelihood of success on the merits of their claims.  Since this Court gave final approval to the MDL-SA on May 17, 2011, Defendants have satisfied each term of the MDL-SA, including ensuring that each Settlement Class Member, including the putative class of "unmodified" loans, receives every opportunity to qualify for a loan modification and avoid foreclosure.  Plaintiffs' counsel is well aware that not every Settlement Class Member can or will

---

[1] Defendants do not believe even one Settlement Class Member improperly has been denied a loan modification.  As demonstrated herein, Plaintiffs have failed to present even a single instance of improper denial.

WINSTON & STRAWN LLP
A limited liability partnership

qualify for a loan modification, and that not every Settlement Class Member even wants a loan modification.  Global modification across the entire class was never intended by the parties.  Thus, in certain instances, an Unmodified Settlement Class Member's inability to qualify for a loan modification has entitled Defendants to pursue their rights to foreclose, or to find a mutually-acceptable means of avoiding foreclosure—a deed-in-lieu of foreclosure or negotiated short sale.  Nothing in the MDL-SA prohibits such conduct.  Moreover, even Plaintiffs' sample group of 21 "Unmodified Settlement Class Member" loans fails to demonstrate a likelihood of success of proving Defendants failed to abide by the terms of the MDL-SA.  Plaintiffs' broad and conclusory accusations aside, Defendants have analyzed the files for each of the 21 Unmodified Settlement Class Member loans that purportedly represent all "Unmodified Settlement Class Members" and have found ***not even a single instance of improper denial***.  Faced with these facts, Plaintiffs improperly read requirements into the MDL-SA that simply do not exist in a failed attempt to assert a claim against Defendants.

*Finally*, the public interest weighs heavily against an injunction.  As shown herein, an injunction without question would harm Defendants significantly, and the public also has a vested interest in aiding a struggling economy and preventing job loss.  Plaintiffs' injunction would defeat both of these important public interests.  Moreover, Plaintiffs' proposed injunction would violate the Anti-Injunction Act, impermissibly interfering with ongoing state court proceedings and judgments.

## 1.    FACTUAL BACKGROUND

### A.    The Settlement Agreement and the Parties' Efforts to Resolve Concerns

On December 10, 2010, Defendants and the named Plaintiffs in this action, on behalf of themselves and all settlement class members, executed the MDL-SA to fully resolve and compromise certain claims arising out of the origination of "Pick-a-Payment" mortgage loans.  *See* **Exhibit A** to Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement and Memorandum of Points and Authorities in Support Thereof filed December 10, 2010.  (Dkt. #112).  This Court finally approved the MDL-SA as fair and reasonable on May 17, 2011, and it became effective on September 1, 2011, when the Ninth Circuit Court of Appeals dismissed the final

WINSTON & STRAWN LLP
A limited liability partnership

remaining appeal of the May 17, 2011 Final Approval Order and the mandate was docketed in this Court.  (Dkt. #253).

Pursuant to the MDL-SA, Defendants paid $50 million for the benefit of all borrowers who, from August 1, 2003 to December 31, 2008, obtained a Pick-a-Payment loan from World Savings Bank, FSB that was secured by their primary residence.  Defendants also made a loan modification program available to qualifying settlement class members who still have their Pick-a-Payment mortgage loans.  As the Court found in its May 17, 2011 Order, this loan modification program, which will remain open until June 30, 2013, provides Settlement Class Members with substantial, non-monetary benefits.

At the May 17, 2011 Fairness Hearing, the Court raised the following inquiry regarding the loan modification program:

> If the loan modification process is not for real, if it's unduly burdensome, if it's not consumer friendly, if it doesn't give people a real meaningful opportunity to modify their loans, then that's the failure of a meaningful term of the settlement and the Court is very concerned about that.

May 17, 2011 Hearing Tr., 10:22-11:3.  Lead Counsel for the Settlement Class Members ("Lead Plaintiffs' Counsel") responded as follows:

> I wanted to address the Court's concern relating to the loan modifications and denials.  We have been monitoring when there's a denial and we have been getting involved when the information—the denial doesn't seem proper to us based on the information we have been given.  … ***And when we made aware of a problem, we do look at the file and they have worked with us consistently*** and I'm trying to resolve those issues.

*Id.*, 17:13-18:19 (emphasis added).

The parties followed this informal dispute resolution process for over a year.  Pursuant to that process, Lead Plaintiffs' Counsel would provide Defendants' counsel with a weekly list of Settlement Class Members for whom he had questions regarding their loan modification denials, and Defendants' counsel would respond with detailed information about why those Settlement Class Members did not qualify.  Defendants responded to almost 400 inquiries pursuant to this process. Lead Plaintiffs' Counsel never raised any issues with or questioned Defendants' explanations.

WINSTON & STRAWN LLP
A limited liability partnership

1    In April 2012, without explanation, Lead Plaintiffs' Counsel stopped sending his weekly lists

2    to Defendants' counsel.  Thereafter, without any specifics, Lead Plaintiffs' Counsel began

3    suggesting that Defendants were violating the MDL-SA.  On July 18, 2012, Lead Plaintiffs' Counsel

4    and Defendants' internal and external counsel for Defendants had a face-to-face meeting to discuss

5    Lead Plaintiffs' Counsel's concerns.  At that meeting, the parties reviewed the files of several

6    borrowers, and Lead Plaintiffs' Counsel seemed satisfied with the explanations provided.

7    Nonetheless, after the meeting, Lead Plaintiffs Counsel continued his suggestions that Defendants

8    were violating the MDL-SA, always without any specifics, despite multiple requests by Defendants

9    that they be provided.

10   **B.    No "Sample" Plaintiff Is Facing Foreclosure Due To An Improper Loan Modification**

11          **Denial.**

12          On December 7, Plaintiffs filed the instant motion, claiming that the factually inaccurate

13   allegations of 31 "sample" Unmodified Settlement Class Members—representing a mere ***.0060077%***

14   of the Settlement Class—require a wholesale moratorium on foreclosures and short-sales for ***all***

15   Settlement Class Members ***"who have applied for a loan modification but have not to date been***

16   ***given a loan modification***" (the 'Unmodified Settlement Class Members')."  Plaintiffs' Brief at 1

17   (emphasis added).  Importantly, as explained below, of these "sample" loans, only ***one*** is facing

18   imminent foreclosure, and none of them was improperly denied a loan modification.

19          Plaintiffs did not support their Motion with any specifics.  Rather, they claim, with a broad

20   brush and without citation to any actual figures, calculations, or documentary evidence, that

21   Defendants used improper values in NPV calculations, that their monthly mortgage payments and

22   expenses were 55% of their income and the like, and that they did not get denial letters.  An actual

23   examination of Plaintiffs' allegations reveals that not only were their denials entirely proper, most of

24   them have been reviewed ***multiple*** times—something not required by the MDL-SA but which

25   Defendants nonetheless do in order to allow their borrowers every effort to avoid foreclosure.

26          Because the facts do not support their claims, Plaintiffs resort to the argument that

27   Defendants failed to provide loan modifications to borrowers in "imminent default," equating

28   "imminent default" with any borrower having a monthly PITIA payment in excess of 31%.

WINSTON & STRAWN LLP
A limited liability partnership

-5-

Plaintiffs' Brief at 7.  However, *nowhere* does the MDL-SA define "imminent default" in this manner.  Indeed, the parties carefully negotiated the meaning of "imminent default," and the resulting definition in the MDL-SA is as follows:

> a Borrower … who the Defendants have determined, in accordance with applicable HAMP guidance, as necessary, that default by the Borrower in making *scheduled payments* on his or her Pick-a-Payment mortgage loan is reasonably foreseeable.   In assessing whether a Borrower is facing Imminent Default, the Defendants will not consider funds held in a 401K, 457, 401(a), or 503 retirement account, an IRA, SEP IRA, Simple IRA, or Roth IRA.  *Additionally, the fact that a Borrower is projected to Recast to a fully-amortizing payment under the terms of the Pick-a-Payment mortgage loan within the upcoming four (4) contractual Monthly Payments … using the current applicable interest rate as determined under the terms of the note, and the resulting increase, if any, to the respective Borrower's DTI …shall be considered as a factor in the determination of Imminent Default*.

MDL-SA, Paragraph 1.33 (emphasis added).  As this plain language indicates, the "imminent default" test is based on the Borrower's "*scheduled payments*"—the minimum, required payment on his/her Pick-a-Payment mortgage loan.  If it were not, the language directing Defendants to utilize the "*fully-amortizing payment*" for borrowers scheduled to recast within the next four months would be wholly superfluous.

Nor do the HAMP guidelines provide any support for Plaintiffs' 31% argument.  The Treasury Department's Making Home Affordable ("MHA") Handbook provides as follows with respect to imminent default:

> A borrower …that is current or has only one payment due and unpaid by the end of the month in which it is due …and who contacts the servicer to request HAMP consideration must be evaluated to determine if he or she is at risk of imminent default.  Each servicer must have written standards for determining imminent default that are consistent with applicable contractual agreements and accounting standards and must apply the standards equally to all borrowers… When making an imminent default determination, the servicer must evaluate the borrower's hardship as well as the condition of and circumstances affecting the property securing the mortgage loan. The servicer must consider the borrower's financial condition, liquid assets, liabilities, combined monthly income from wages and all other identified sources of income, monthly obligations (including personal debts, revolving accounts, and installment loans), and a reasonable allowance for living expenses such as food, utilities, etc.  The hardship and financial condition of the borrower must be verified through documentation."

WINSTON & STRAWN LLP
A limited liability partnership

DEFENDANTS' OPPOSITION TO PLAINTIFFS' EX PARTE REQUEST FOR A TEMPORARY RESTRAINING ORDER

(RJN Exh. 1 (Relevant Excerpts of the MHA Handbook v4.0) § 4.4).

Finally, the Settlement Class B Notice—another document the parties carefully negotiated—explains "imminent default" as follows:

> "Imminent Default" describes a borrower who meets a test to show the borrower is reasonably likely to default on his or her Pick-a-Payment mortgage loan because of financial hardship or other changed circumstances.  Generally, the current test for "Imminent Default" is as follows:
>
> 1.   Long Term Hardship, meaning a borrower that is having difficulty making his or her mortgage payments, and the duration of that difficulty is expected to be greater than 12 months; **and**
>
> 2.   Financial Hardship, defined as one of the following that currently exists or occurs prior to June 30, 2013:
>
>      a.   Death of a borrower;
>
>      b.   Long-term or permanent disability or illness of a borrower or dependent family member;
>
>      c.   Legally-documented divorce or separation of the borrower and co-borrower;
>
>      d.   Separation of borrowers unrelated by marriage, civil union, or similar domestic partnership under applicable law;
>
>      e.   A combination of reduction of income and increase in housing expenses (principal and interest only) that exceeds 10% of current income.   The comparison period shall be approximately 12 months prior to the date modification is sought; however, a greater period may be used if the condition has been consistent; **and**
>
> 3.   Cash reserves of less than $25,000, excluding retirement accounts; **and**
>
> 4.   The property is occupied by the borrower as his or her principal residence; **and**
>
> 5.   The borrower's loan-to-value ratio must exceed 80%, or the loan must have a positive "Net Present Value."

Settlement Class B Notice (emphasis in original).  Thus, "imminent default" is not defined by a determination of whether the borrower's PITIA ratio is greater than 31%.  Rather, it is analyzed by considering whether the borrower is reasonably likely to default on his/her "***scheduled payments***," as evidenced by proof of ***both*** a "Long Term Hardship"—difficulty making payments for more than

WINSTON & STRAWN LLP
A limited liability partnership

a year, and a "Financial Hardship" that meets the definitions above.  As explained below, using the proper test, Defendants' imminent default determinations were entirely proper.

Next, Plaintiffs argue that Defendants breached the MDL-SA by using automated valuation models instead of independent appraisals, resulting in erroneous NPV calculations for loan modification purposes.  Plaintiffs' Brief at 8, 27.  But, the plain language of the MDL-SA expressly allows the use of a "broker price opinion prepared not more than one hundred twenty (120) calendar days before the date of determination, or automated valuation model prepared not more than ninety (90) calendar days before the date of determination."  MDL-SA, Section 1.40.  Plaintiffs' argument to the contrary contradicts these express terms.  Again, under the proper interpretation of the MDL-SA, Defendants' loan modification decisions were proper.

In connection with this Opposition, Defendants have submitted the Declaration of Michael Dolan, which provides a loan-by-loan analysis of each Plaintiff and explains why his/her loan modification denials were entirely proper.  Because the Declaration contains financially-sensitive information, Defendants do not provide the details of that Declaration herein.  However, Plaintiffs generally can be grouped into three categories:

/ / /

/ / /

/ / /

1.     **Borrowers who had already received loan modifications and therefore are not eligible for further modification pursuant to the express terms of the Settlement Agreement:**

Sherri Goldfinch, Paul and Julie McDermed, and Nathan Ranger[2] all obtained loan modifications prior to the execution of the MDL-SA in this matter, and they all received substantial principal reductions in connection with those modifications.  Pursuant to Section Paragraph VI.E.4. of the MDL-SA, they are not eligible for further modifications under the MDL-SA:

---

[2] Nathan Ranger also claims Defendants used an automated valuation model in connection with his applications, but as outlined in the Declaration of Michael Dolan, that is false.  Although the MDL-SA plainly provides Defendants with discretion to determine which type of property valuation it will utilize, subject to certain timing requirements, Defendants did use full appraisals in connection with Mr. Ranger's requests.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' EX PARTE REQUEST FOR A TEMPORARY RESTRAINING ORDER

WINSTON & STRAWN LLP
A limited liability partnership

> ***Borrowers With Prior Modifications***. Settlement Class Members who have received earlier loan modifications not pursuant to this Agreement will not be eligible to be considered for new loan modifications under this Agreement.

(emphasis in original).

**2.      Borrowers expressing vague disagreement with their NPV calculations, income calculations, or evaluation in general:**

Richard D'Alessio, Mary and Greg Slade, and Michael and Kathy Lerner make vague complaints about their NPV calculations, income calculations, or their loan modification evaluations in general. As explained in the Declaration of Michael Dolan, however, each denial was proper.

**3.      Borrowers challenging Defendants' imminent default determinations:**

The remaining borrowers (Jennifer Murphy, Chan C. Pharn, Christina Zako, John and Diana Burkett, Thomas and Linda Geremia, Julie and David Young, Omar and Ruth Bishr, Jeff Cory, Jose Cruz, Jason Fisher, Catherine Marsh, Walter Falkowski, Joseph Midgette, and Carrie Rosillo) all claim, in non-specific terms, that Defendants did not properly evaluate their loan modification requests and that they were in imminent default.  They submit no income figures or payment information to support their disagreements.  As demonstrated in the Declaration of Michael Dolan, using the MDL-SA's definition of "imminent default," none of these borrowers met the test, because they did not prove both a "Long-Term Hardship" and a "Financial Hardship."  Plaintiffs' use of an improper test for imminent default—which does not evaluate the required "Long-Term Hardship" and "Financial Hardship" requirements—improperly reads requirements into the MDL-SA that simply do not exist.

**C.      Defendants Continuously Are Working With Borrowers To Prevent Foreclosure**

As this Court is well aware, Defendants hold the Settlement Class Members' loans on their books, and thus have a keen interest in helping borrowers to keep making payments and to retain their property.  Indeed, Defendants strongly prefer reaching loan modification agreements with borrowers to avoid foreclosure.  Defendants have modified almost 110,000 Pick-a-Payment loans, and they will continue reaching out to Settlement Class Members about possible loan modifications.  Declaration of Paula Chin, ¶ 4.  Foreclosure is a last resort, taken only after a borrower proves

WINSTON & STRAWN LLP
A limited liability partnership

1   unwilling or unable to continue making reasonable payments on his loan.  But, Defendants must

2   preserve their ultimate ability to foreclose in order to protect themselves from significant loss.

3   **D.   Prohibiting All Foreclosures For An Indefinite Time Would Cause Defendants**

4   **Irreparable Harm.**

5   Plaintiffs' proposed injunction—without regard to the particular circumstances of each

6   borrower—presents potentially crippling consequences for Defendants.  Mortgage payments

7   constitute Defendants' primary source of income and cash revenues.  Plaintiffs' proposed nationwide

8   injunction would remove a primary incentive for borrowers to continue making payments, placing in

9   jeopardy revenues of millions of dollars a month.  The injunction also would prevent Defendants

10  from selling foreclosed properties with a total fair market value of $451 million and creating cash

11  flow.  Declaration of Brian Kreitzer ("Kreitzer Decl."), ¶ 7.  It would also prohibit Defendants from

12  negotiating or closing on any short sales, which have proved to be mutually-agreeable alternatives to

13  helping borrowers avoid foreclosure.  All told, this lost revenue would have a substantial and

14  immediately harmful on Defendants' ability to fund their operations.

15  But the harm is not limited to loss of revenues.  As Defendants explained the last time

16  Plaintiffs tried to get such far-sweeping relief, Defendants are required to categorize loans in non-

17  accrual status once a borrower has missed four payments. (Dkt. # 118 (Hairr Decl.), ¶ 5).  Federal

18  regulations require Defendants to double their capital reserve for every non-accrual loan. (Id).  Thus,

19  those assets are no longer available to fund any of Defendants' other ongoing operations.  But, the

20  initial increase in capital reserves triggered by reclassifying a loan as non-accrual is the proverbial

21  "tip of the iceberg."  If a loan remains on the books in non-payment status, federal regulations

22  require that after the borrower has missed seven payments, Defendants must evaluate the property

23  and then set its reserves based on the difference between the loan's principal value and the market.

24  (Id., ¶6).  As property values continue to decline in some states, Defendants must continue adding to

25  their reserves to account for the growing difference.  (Id.).  Thus, unless a delinquent loan returns to

26  active status (such as when the borrower is able to begin making payments again after obtaining a

27  loan modification) or is placed in foreclosure and the secured property is sold, Defendants must hold

28  the loan on their books as a non-accrual loan—a nonperforming asset—and dedicate an ever-greater

WINSTON & STRAWN LLP
A limited liability partnership

1   level of their resources to capital loss reserves, causing Defendants' ability to fund operational

2   expenses and their general financial condition to deteriorate.  (See Id.).

3          Finally, the longer a foreclosed property is held, the greater the loss.  Over the past twelve

4   months, severity percentages (measuring Defendants' loss on foreclosed properties) have been 41%.

5   Kreitzer Decl., ¶ 7.  Preventing Defendants from foreclosing on secured properties where a borrower

6   is in default and/or from selling properties it has acquired through foreclosure will harm Defendants

7   quickly and irrevocably.

8   **E.     Plaintiffs Unsuccessfully Sought This Overly-Sweeping Relief Before.**

9          Notably, this is not the first time Plaintiffs have sought such sweeping relief without

10  adequate factual support.  On January 20, 2009, this Court denied Plaintiffs' motion for preliminary

11  injunction, finding Plaintiffs' request for an injunction preventing Defendants "from foreclosing

12  upon any of the 500,000 putative class members' loans" entirely unwarranted.  (Dkt. #157).  As this

13  Court reasoned, Plaintiffs' evidence in support of their request was "generalized" in nature and

14  failed to link the challenged conduct to the likelihood that any Plaintiff would suffer foreclosure.  *Id.*

15  at 6-7.   The Court also found that Plaintiffs were not likely to succeed on the merits, and that a

16  classwide injunction would "remove one of the few incentives for borrowers to make payments

17  where home values have fallen precipitously."  *Id.* at 10-12.

18  / / /

19  / / /

20  **2.     LEGAL ARGUMENT**

21  **A.     Standard for Preliminary Injunction**

22         A preliminary injunction is "an extraordinary remedy that may only be awarded upon a ***clear***

23  showing that the plaintiff is entitled to such relief."  *Winter v. Natural Resources Def. Council*, 129

24  S.Ct. 365, 374 (2008) (emphasis added).  A party seeking a preliminary injunction must show either

25  "(1) a combination of probable success on the merits and the possibility of irreparable injury, or (2)

26  that serious questions are raised and the balance of hardships tips sharply in its favor."  *Los Angeles*

27  *Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1201 (9th Cir. 1980). interest."

28  *Id.* at 261.  These "two formulations represent two points on a sliding scale in which the required

WINSTON & STRAWN LLP
A limited liability partnership

DEFENDANTS' OPPOSITION TO PLAINTIFFS' EX PARTE REQUEST FOR A TEMPORARY RESTRAINING
ORDER

WINSTON & STRAWN LLP
A limited liability partnership

degree of irreparable harm increases as the possibility of success decreases." *Oakland Tribune, Inc. v. Chronicle Publishing Co.*, 762 F.2d 1374, 1376 (9th Cir. 1985).

As this Court emphasized in its January 20, 2009 Order denying Plaintiffs' first request for a classwide preliminary injunction prohibiting foreclosure:

> Regardless of who the test for preliminary injunction is phrased, the moving party must demonstrate irreparable harm. It is not enough that the claimed harm be irreparable; it must also be imminent. A plaintiff must do more than merely allege imminent harm; a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief. This threat must be shown by probative evidence, *and conclusory affidavits are insufficient*. In addition, where injunctive relief is sought on a classwide basis, the moving party must *prove* that (1) *the named plaintiffs* face imminent, irreparable harm, and (2) there is reason to believe that the … class members face the same harm. Finally, *any preliminary injunction must be narrowly tailored to remedy only the specific harms shown by the plaintiffs, rather than to enjoin all possible breaches of the law*.

Order at 4 (quotations and citations omitted; emphasis added). Plaintiffs' Motion falls woefully short of meeting these strict requirements.

**B.  Plaintiffs Cannot Show They Are Likely To Suffer Irreparable Harm.**

The irreparable injury factor requires a plaintiff to show *imminent harm*, not simply a risk of harm in the indefinite future. *See Midgett v. Tri-County Metro Transp. Dist. of Oregon*, 254 F.3d 846, 850-51 (9th Cir. 2001). Moreover, in the class action context, the movant bears the burden of proving that *the named plaintiffs* face irreparable harm *and* that class members face the same harm. *Angotti v. Rexam, Inc.*, Case No. C 05-5264 CW, 2006 U.S. Dist. LEXIS 42104, *46 (N.D. Cal. 2006); *Angotti v. Rexam, Inc.*, Case No. 06-CV-0657 (PSJ/JJG), 2006 U.S. Dist. LEXIS 78087 (D. Minn. Oct. 25, 2006) (plaintiffs did not show irreparable injury because the alleged harm would not affect the majority of class members). Finally, a court may not issue an injunction unless it is narrowly tailored to remedy the harms alleged in the complaint. *Zepeda v. U.S. Immigration and Naturalization Service*, 753 F.2d 719, 728 n1 (9th Cir. Cal. 1983).

Here, Plaintiffs have not met their burden because (1) only *one* Plaintiff bringing the instant motion is facing foreclosure, and he is not facing foreclosure because of a wrongful loan

modification denial; (2) Plaintiffs have not shown that any Plaintiff bringing the instant motion was wrongfully denied a loan modification; and (3) there is no evidence any Settlement Class Member will lose any rights absent an injunction.

**1. Plaintiffs Do Not Face Foreclosures Due to Improper Loan Modification Denials.**

Plaintiffs cannot prove that Defendants' alleged conduct is likely to cause irreparable harm to the named Plaintiffs in the form of foreclosure—only *one* of Plaintiffs' 21 "sample" loans has a foreclosure sale scheduled. Declaration of Michael Dolan ("Dolan Decl."), ¶ 16. Nor have Plaintiffs shown that anyone in the Settlement Class has sustained foreclosure due to an improper loan modification denial. In fact, not a single one of the 21 "sample" loans—loans Plaintiffs claim are representative of the "Unmodified Settlement Class Members" as a whole—was improperly denied a loan modification. *See generally*, Dolan Decl. The non-specific declarations submitted by Plaintiffs—which contain no income figures, no property values, and no calculations—cannot justify the sweeping relief Plaintiffs seek. In short, the evidence illustrates precisely why Plaintiffs cannot show that Defendants' conduct has caused any foreclosures to date.

Plaintiffs' reliance on cases where courts found *individual* foreclosures to constitute irreparable harm is improper. Whether any foreclosure presents irreparable harm requires a case-by-case analysis of the borrower's default and the bank's response. *Parker v. USDA*, 879 F.2d 1362, 1367-68 (6th Cir. 1989) (foreclosure not irreparable harm because, inter alia, borrowers "rejected lenient plan recommended by Bank that would have allowed them to keep their home"). Here, Plaintiffs' requested injunction, in their own words, would apply to "*any* home financed with a Pick-a-Payment loan, Pick-a-Payment Equity Builder loan, or any other form of the Pay Option ARM Loan that was the subject of the parties' underlying MDL-SA." Plaintiffs' Brief at 22-23. In other words, the injunction would apply to Settlement Class Members who are not interested in pursuing loan modifications, no longer live in the properties securing their loans, have refused loan modifications offered to them under the MDL-SA, and who simply do not qualify for modification relief—all borrowers who cannot show irreparable injury. *Parker*, 879 F.2d at 1367-68.

**2. Plaintiffs Do Not Face Irreparable Harm Because They Have Other Remedies.**

No injunction is necessary because Settlement Class Members have the opportunity

WINSTON & STRAWN LLP
A limited liability partnership

-13-

(exercised by many) to move to enjoin any foreclosure based on the points Plaintiffs urge here but with facts that show **actual** imminent harm **caused** by Defendants' non-compliance with the MDL-SA.  Indeed, these individual actions are the only way to determine whether Defendants' conduct related to a particular Settlement Class Member's loan failed to comply with the terms of the MDL-SA.

### 3.       Plaintiffs Cannot Show Irreparable Harm Because They Delayed Seeking Relief And Did Nothing While Defendants Foreclosed On A Named Plaintiff's Loan.

"A delay in seeking a preliminary injunction is a factor to be considered in weighing the propriety of relief." *Lydo Ents., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984).

As Plaintiffs acknowledge in their Motion, Defendants foreclosed on the property securing the loan of Plaintiff Richard D'Alessio **over a year ago**.  Neither Mr. D'Alessio nor Plaintiffs' counsel attempted to prevent Defendants from foreclosing on Mr. D'Alessio's loan.  Moreover, the vast majority of Plaintiffs are complaining about modification denials that occurred well over a year ago, and they remain current on their payments.  Dolan Decl., ¶ 23 (explaining that Carrie Rosillo is complaining about a denial that occurred in January 2011 and she is current on her payments today), ¶¶ 26-27 (explaining that Joseph Midgette is complaining about a denial that occurred in May 2011, he is current on his payments today, and has not reapplied for a loan modification), ¶¶ 28-29 (explaining Mary and Greg Slade are complaining about a denial that occurred in July 2011, they are current on their payments, and they have not reapplied for a loan modification), ¶ 30 (explaining that Jason Fisher is complaining about a denial that occurred in February 2011, he is current, and he has not reapplied for a loan modification), ¶ 32 (explaining that Jose Cruz is complaining about a denial that occurred in January 2011 and that Mr. Cruz obtained a loan modification in March 2011), ¶¶ 33-35 (explaining that Jeff Cory is complaining about a denial that occurred in February 2011, he is current, and he has not reapplied for a loan modification), ¶ 36 (explaining that Omar and Ruth Bishr are complaining about a denial that occurred in July 2011, they are current, and they have not reapplied for a loan modification), ¶ 40 (explaining that Thomas and Linda Geremia are complaining about a denial that occurred in March 2011, they are current, and they have not reapplied for a loan modification), ¶ 42 (explaining that Catherine Marsh and Walter Falkowski are complaining about a

WINSTON & STRAWN LLP
A limited liability partnership

denial that occurred in February 2011, they are current, and they have not reapplied for a loan modification), ¶¶ 44-45 (explaining that Christina Zako is complaining about a denial that occurred in April 2011, she is current, and she has not reapplied for a loan modification),¶¶ 46-47 (explaining that Chan Pharn is complaining about a denial that occurred in December 2011, he is current, and he has not reapplied for a loan modification).  These facts belie Plaintiffs' claim of irreparable harm.

Additionally, plaintiffs' TRO was filed on an *ex parte* basis.  (See TRO).  Given the lack of immediate irreparable harm caused by plaintiffs' own delay, plaintiffs' requested *ex parte* relief should be denied on that basis alone.  *Crews v. Wachovia Mortg. Corp*., 2010 U.S. Dist. LEXIS 77660, * 15-16 (C.D. Cal. July 23, 2010)(denying ex parte request for injunction due to self-created delay); *Mission Power Eng'g Co. v. Continental Cas. Co*., 883 F. Supp. 488, 491-92 (C.D. Cal. 1995)("When an ex parte motion is filed… The judge drops everything except other urgent matters to study the papers.  It is assumed that … all will be lost unless immediate action is taken.  Other litigants are relegated to a secondary priority.")(denying request for *ex parte* relief).

## C.     The Balance Of Hardships Does Not Favor Plaintiffs.

In their Motion, Plaintiffs pay lip service to the balance of the hardships, claiming, in broad fashion, that their nationwide injunction would cause no harm to Defendants because "Defendants still would have the security interest they currently have in the property and thus would not suffer any permanent loss" and that "the Unmodified Settlement Class Plaintiffs and Class Members still would be required to make the scheduled payments under their existing unmodified mortgage loan agreements."  Plaintiffs' Brief at 33.  Plaintiffs made these same arguments before, and the Court roundly rejected them.  As this Court found, these arguments, while facially appealing, failed to address Defendants' factually-supported arguments that (1) "the threat of foreclosure is one of the few incentives for borrowers to make payments," (2) the injunction would jeopardize hundreds of millions in mortgage payment—"Defendants' primary source of income," (3) "pursuant to federal lending regulations, the loans' non-accrual status would trigger a series of increasingly severe accounting adjustments depriving Defendants of much of their operational revenue."  January 20, 2009 Order at 12.  The same is true here.  Prohibiting foreclosures would allow every Settlement Class Member—including those who simply do not want a loan modification, have refused loan

WINSTON & STRAWN LLP
A limited liability partnership

WINSTON & STRAWN LLP
A limited liability partnership

modifications offered to them, or are not entitled to any type of loan modification—to withhold all of their mortgage payments without penalty.  This would immediately undermine Defendants' finances and cause harm to all who depend on their ability to fund their operations.  Courts routinely find such facts constitute irreparable harm.  *See Stuhlbarg Intern. Sales Co. v. John D. Brush and Co.*, 240 F.3d 832, 838-840 (9th Cir. 2001) ("threatened loss of prospective customers or goodwill" supports finding irreparable harm); *Standard Havens Prods. v. Gencor Indus.*, 897 F.2d 511, 515 (Fed. Cir. 1990) (threat of layoffs and insolvency constituted irreparable injury).

Moreover, the harm to Defendants would be particularly grave because Plaintiffs cannot possibly post an adequate bond as Rule 65(c) requires.  Plaintiffs do not even acknowledge this substantial concern, aside from casting Defendants' injury as "purely financial."  Plaintiffs' Motion at 34.  By contrast, as shown, the misguided—and conclusory—allegations of the 31 Settlement Class Members bringing this Motion aside, there is no evidence of any systemic breach of the MDL-SA.  Settlement Class Members who are facing imminent foreclosure may seek judicial relief, on a case-by-case-basis.  That approach can address real issues and will avoid prescribing a "mass cure" for a problem that has not been shown to exist.

**D.     Plaintiffs Have Not Shown A Probability Of Success On the Merits.**

An injunction may not issue where there is no viable claim.  *Winter*, 129 S.Ct. at 374.  Plaintiffs have none here.

/ / /

**1.      Plaintiffs Are Unlikely to Succeed on Their Breach of Contract Claim.**

The elements of a breach of contract claim are: "the existence of the contract, performance by plaintiff or excuse for nonperformance, breach by defendant, and damages."  *First Commercial Mortgage Co. v. Reece*, 89 C.A. 4th 731, 745 (2001).  The Court's interpretation of a contract is purely a legal issue.  *Doe v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 681 (9th Cir. 2009) ("Contract interpretation is a question of law that we review de novo.")

Plaintiffs claim Defendants failed to provide loan modifications for borrowers in "imminent default," equating "imminent default" with a PITIA in excess of 31%.  (TRO, p. 7:14-28; 17:02-03 ("Defendants denied the Youngs' application because they were at a PITIA of 33.58%.")).

However, the HAMP guidelines do not define "imminent default" simply as a PITIA in excess of 31%; they instead use a multi-factored test. Second, plaintiffs claim that Defendants used automated valuation models instead of independent appraisals, resulting in erroneous determinations of the NPV Test. (Id., p. 8:01-05; 27:07). Yet the MDL-SA expressly allows automated appraisals less than 90 days old. (MDL-SA § I.1.40). Plaintiffs' claims, in other words, are not consistent with the express terms of the MDL-SA. None of the "sample" borrowers were improperly denied a loan modification. (§ I.B., *supra*).

But the claim fails as a matter of law as well. "[T]he goal of contract interpretation is to give effect to the mutual intention of the parties, which is to be inferred, if possible, solely from the written provisions of the contract. If contractual language is clear and explicit, it governs." *Zepeda v. Paypal, Inc.*, 777 F.Supp.2d 1215, 1219 (N.D. Cal. 2011)(J. Fogel)(citing *County of San Diego v. Ace Pro. & Cas. Ins.*, 37 Cal.4th 406, 415(2005).

### a. "Imminent Default" is Not Tied to a 31% PITIA

Plaintiffs' primary breach allegations are either not supported, or even contradicted, by the contract language. First, the MDL-SA does not support plaintiffs' apparent theory that a borrower is in "imminent default" if his or her PITIA exceeds the "affordable" goal of 31%. (TRO, p. 7:12-21).

As discussed above, notably absent from the definition in the MDL-SA and the Settlement Class B Notice is any mention of a 31% PITIA. (MDL-SA § I.1.33; Dolan Decl. ¶¶2, 4; Exh. 1 (Settlement Class B Notice) to Dolan Decl.).

The HAMP guidelines, in turn, do not set forth a bright-line test of "imminent default" but instead instruct the servicer to "consider the borrower's financial condition, liquid assets, liabilities, combined monthly income from wages and all other identified sources of income, monthly obligations (including personal debts, revolving accounts, and installment loans), and a reasonable allowance for living expenses such as food, utilities, etc." (RJN Exh. 1(MHA Handbook), § 4.4 ¶ 2). (Dolan decl. ¶3).

Without an express contractual provision on which to hinge their idea of "imminent default", plaintiffs are unlikely to succeed in establishing any of the elements of their contract claim. And if plaintiffs are instead challenging Defendants' adherence to the HAMP guidelines, they have no

WINSTON & STRAWN LLP
A limited liability partnership

-17-

standing to sue.  *See e.g. Wright v. Bank of Am., N.A.*, 2010 U.S. Dist. LEXIS 73807, *13-15 (N.D. Cal. 2010)(J. Fogel)(no third-party rights under HAMP contract); *Davenport v. Litton Loan Serv.*, 725 F. Supp. 2d 862, 883 (N.D. Cal. 2010)(J. Seeborg)(no due process rights under HAMP).

Plaintiffs' claim that Defendants breached the MDL-SA by failing to apply a simplistic 31% or higher PITIA test for "imminent default" - - a definition that is not in the contract - - would add words to the contract.  *Westlands Water Dist. v. United States*, 337 F.3d 1092, 1103 (9th Cir. 2003)(courts cannot add words to a contract).  Nor can plaintiffs "identify the specific provision of the contract allegedly breached by the defendant."  *Donohue v. Apple, Inc.*, 2012 U.S. Dist. LEXIS 65860, * 43 (N.D. Cal. May 10, 2012) (J. Whyte) citing *Progressive West Ins. Co. v. Superior Court*, 135 Cal. App. 4th 263, 281 (2005).

Instead, the MDL-SA and HAMP guidelines mandate the multi-factored approach that Defendants applied.  (*See e.g.* Dolan Decl. ¶ 36 (loan modification denial for non-PITIA reasons)). To show compliance with a contract's express term "it is enough that the conduct is either expressly permitted or at least not prohibited."  *Carma Developers (Cal.), Inc. v. Marathon Development Cal., Inc.*, 2 Cal.4th 342, 373 (1992).  Thus, plaintiffs are unlikely to succeed on their breach contract claim based on imminent default.

### b.  Automated Appraisals Are Expressly Allowed in the Settlement Agreement

Next, plaintiffs claim Defendants have improperly relied on automated appraisals, which lead to denials of loan modification applications due to an erroneous NPV determination.  (TRO, p. 8:01-05).  However, the plain language of the MDL-SA expressly allows Defendants to base property values on "automated valuation models" so long as the automated value is less than 90 days old. (MDL-SA § I.1.40 (allowing for appraisal reports (without an "independent" requirement), broker price opinions and automated value methods).[3]  Other than timeliness limitations, no exact method is mandated and "[n]otwithstanding the foregoing … Defendants may rely on the <u>most recent value</u>

---

[3] Plaintiffs try to avoid the plain language of the MDL-SA by selectively quoting from the Final Approval Hearing transcript about the use of appraisal reports.  (TRO, p.8:01; Comp. ¶ 47). Mischaracterizations aside, any such dialogue would not alter the terms of the MDL-SA.  (MDL-SA § XVII.A ("This Agreement may not be changed, modified or amended except in writing signed by all Parties, subject to Court approval.")).

WINSTON & STRAWN LLP
A limited liability partnership

DEFENDANTS' OPPOSITION TO PLAINTIFFS' EX PARTE REQUEST FOR A TEMPORARY RESTRAINING ORDER

1   available in its system of record for determining the value of the residential property."  (Id., §
2   I.1.40)(emph. added).

3          Given that the MDL-SA expressly authorizes Defendants to use the most recent value
4   available, including automated appraisals, Plaintiffs are unlikely to prevail on their breach of
5   contract claim.  *Carma*, 373 (to show compliance with a contract's express term "it is enough that
6   the conduct is either expressly permitted or at least not prohibited.").

7          Nor would a change in legal theory make plaintiffs' appraisal allegations viable.  See e.g.
8   *Nymark v. Heart Fed. Savings & Loan Assn.*, 231 Cal. App. 3d 1089, 1097 (1991)(lender owes "no
9   duty of care to plaintiff in the preparation of the property appraisal.").

10         What's more, plaintiffs offer no evidence that automated appraisals overstate property
11  values, causing loan modification denials.  Their only "basis" is the opinion of plaintiffs' counsel.
12  (Berns Decl. ¶ 11 (personal belief that "automated valuation models tend to inflate values over
13  those" of independent appraisals)).  As the Court has previously held in denying a classwide
14  preliminary injunction in this case, "conclusory affidavits are insufficient."  (Dkt. # 157, p. 4).  Nor
15  do plaintiffs submit, as is their burden under *Winter*, a single independent appraisal report actually
16  showing a lower property value.  (See TRO).

17         In summary, plaintiffs allege that Defendants cannot use automated values to evaluate a
18  borrower for a loan modification.  In fact, as detailed in the Dolan Declaration, Defendants have
19  used independent appraisals, contradicting plaintiffs' allegation.  (Dolan Decl. ¶¶ 7, 8, 14, 46)[4].
20  More importantly, the MDL-SA explicitly allows automated values so long as they are less than 90
21  days old.  (MDL-SA, § I.1.40).  Thus, plaintiffs are unlikely to succeed on this point.  "If contractual
22  language is clear and explicit, it governs."  *Zepeda*, 777 F.Supp.2d at 1219.

23             a.   Plaintiffs' Escrow Account  Theory is Also Flawed

24         Though apparently not a basis for plaintiffs' TRO application, plaintiffs' new allegations
25  about the initiation of escrow accounts before granting a loan modification - - allegedly in violation
26  of Section VI.E.3 of the MDL-SA and the HAMP guidelines (Comp. ¶ 217)  - - are also unlikely to

27  ────────────────
    [4] In the interest of borrower privacy, the appraisal reports are being submitted under seal.  Plaintiffs'
28  counsel will also receive the same materials submitted under seal.

WINSTON & STRAWN LLP
A limited liability partnership

succeed.  First, Section VI.E.3 of the MDL-SA does not even mention escrow accounts or escrow payments:  "***Waiver of Prepayment Penalties***.  The Defendants will waive all prepayment penalties and assess no fees in connection with a MAP2R Modification.  The Defendants shall not require a Borrower to make any up-front payment of arrears as part of the MAP2R Modification process." *Westlands*, 337 F.3d  at 1103 (2003)(courts cannot add words to a contract).

Second, the HAMP guidelines do not prohibit, and in fact mandate, the imposition of an escrow account before a loan is modified.  "If the mortgage loan being considered for HAMP is a non-escrowed mortgage loan, the servicer <u>must</u> establish an escrow deposit account <u>prior</u> to the beginning of the trial period."  (RJN Exh. 1 (MHA Handbook v4.0), § 9.3.7.4)(emph. added).

And absent a reference in the MDL-SA of a specific HAMP requirement, plaintiffs cannot sue generally under HAMP.  *Wright, supra*.

Finally, Plaintiffs' Deeds of Trust give Wells Fargo, as successor by merger to World Savings Bank, FSB, broad discretion to impose an escrow account:

> Subject to applicable law, no escrow shall be required except <u>upon written demand by Lender</u>, in which case, I shall pay to lender … [taxes, insurance etc…]  Lender <u>may, at any time, collect</u> and hold Funds in an amount not to exceed [the amount allowed by federal law]."

(RJN Exh. 2 (Pharn Deed of Trust) §2(B))(emph. added).  Where a contract grants broad discretion to one party, that party's discretionary act cannot constitute a breach of contract.  *Thrifty Payless v. Mariners Mile Gateway, LLC*, 185 Cal. App. 4th 1050, 1064 (2010) (holding that the "term [termination for] 'any reason' is plainly all-inclusive, encompassing all reasons of whatever kind, good, bad, or indifferent"); *Zepeda*, 777 F.Supp.2d at 1220 (granting motion to dismiss on breach of contract claim where contract allowed defendant sole discretion to place holds on account).  And as briefed in Section D.4, since plaintiffs' breach of contract theories add "additional contractual terms" or "gloss" to the plain language of the Settlement Agreement, they are also preempted under HOLA.

### 2.     Plaintiffs Are Unlikely to Succeed on Their Breach of the Implied Covenant of Good Faith and Fair Dealing Claim.

Plaintiffs allege that various administrative violations, such not receiving loan modification

WINSTON & STRAWN LLP
A limited liability partnership

denial letters [5], "in tandem with Defendants' widespread breaches in denying loan modifications based on misapplications of the MDL-SA's express requirements," deprived plaintiffs the benefits of the MDL-SA.  (TRO, p. 28:04-21)(emph. added).  Implicit in plaintiffs' argument is that the purported administrative violations do not establish a breach of contract but rather a breach of an implied covenant.  However:

> The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*. … It cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement.

*Guz v. Bechtel National, Inc.*, 24 Cal. 4th 317, 349-350 (2000)(internal citations and quotations omitted)(org. italics; underline added).

As noted earlier, the "benefits of the agreement actually made" do not include plaintiffs' theory that an "imminent default" is defined by a 31% or higher PITIA, or that automated valuation models are improper.  (§ II.D.1, *supra*).  Nor can plaintiffs, under the guise of the implied covenant, impose those requirements because the implied covenant cannot "impose substantive duties or limits" on Defendants' rights under the express terms of the MDL-SA.

And if plaintiffs' "allegations in a breach of implied covenant claim do not go beyond the statement of a mere contract breach…they may be disregarded as superfluous as no additional claim is actually stated."  *Zepeda*, 777 F.Supp.2d at 1221.

### 3.   Plaintiffs Are Unlikely to Succeed on Their Unfair Competition Claim.

Plaintiffs' third claim for unfair competition under Business and Professions Code § 17200 is that Defendants' breach of the contract is "unlawful" and "unfair".  (TRO, p. 29:22-3:16).

But where the contract was not breached, the corresponding UCL claim fails as well.  In *Nein v. Hostpro, Inc.*, 174 Cal. App. 4th 833, 850 (2009), the plaintiff alleged that the defendant breached the parties' employment contract by failing to pay him a commission.  The Court first found that the plaintiff was not entitled to commissions under the  express terms of the employment contract.  *Id*.  Based on the finding that there was no breach of contract, the Court also held that no UCL claim was

---

[5]  As discussed in the Dolan Declaration, plaintiffs were sent such letters.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' EX PARTE REQUEST FOR A TEMPORARY RESTRAINING ORDER

WINSTON & STRAWN LLP
A limited liability partnership

possible:

> "The fourth cause of action alleges that defendant engaged in unfair business practices in violation of section 17200.  Like the other causes of action, it too is based on defendant's conceded failure to pay him a commission in connection with the AT&T transaction.  Because we have concluded that no commission was owed as a matter of law, defendant's failure to pay a commission cannot constitute an unfair business practice. [citation]  'A business practice that might otherwise be considered unfair or deceptive cannot be the basis of a Section 17200 cause of action <u>if the conduct has been deemed lawful.</u>'"

*Nein*, at 854, quoting *Byars v. SCME Mortg. Bankers*, 109 Cal.App.4th 1134, 1147 (2003)(emph. added).  Since Defendants' conduct was consistent with the MDL-SA and was thus "lawful", it is not liable under a corresponding UCL claim.  *Nein*, at 854.

**4.**      **Plaintiffs Do Not Show A Likelihood Of Prevailing Because Their Claims Are Preempted.**

The common refrain throughout the TRO application - - that Defendants failed to provide loan modifications for borrowers in "imminent default" (TRO, p. 7:14-28), and that automated valuation models are improper  (*Id.*, p. 8:01-05) - - are preempted by federal law.

**a.**      **Legal Standards For Preemption Under The Home Owner's Loan Act ("HOLA").**

Congress enacted HOLA to charter savings associations under federal law.  *Bank of America v. City and County of S.F.*, 309 F.3d 551, 559 (9th Cir. 2002), *cert. denied*, 538 U.S. 1069, 123 S. Ct. 2220, 155 L. Ed. 2d 1127 (2003).  The goal of HOLA was to restore public confidence in federal savings and loan associations by creating a nationwide system that was centrally regulated according to "best practices."  *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 160-161, 102 S. Ct. 3014, 73 L. Ed. 2d 664 (1982).  To accomplish this objective, HOLA and its regulations were promulgated as a "radical and comprehensive response to the inadequacies of the existing state system," and have since been classified as "so pervasive as to leave no room for state regulatory control."  *Conference of Fed. Sav. & Loan Ass'ns v. Stein*, 604 F.2d 1256, 1257, 1260 (9th Cir. 1979), aff'd, 445 U.S. 921, 100 S. Ct. 1304, 63 L. Ed. 2d 754 (internal citations omitted); *see also* OTS, Final Rule, 61 Fed. Reg. 50951, 50965 (Sept. 30, 1996).  The typical presumption against preemption of state law does not apply "because there has been a history of significant federal

WINSTON & STRAWN LLP
A limited liability partnership

presence in national banking." *Bank of America*, 309 F.3d at 559.

Through HOLA, "Congress gave the Office of Thrift Supervision ("OTS") broad authority to issue regulations governing thrifts." *Silvas v. E*Trade Mortg. Corp.*, 514 F.3d 1001, 1005 (9th Cir. 2008) (*citing* 12 U.S.C. § 1464). Pursuant to this authority, OTS promulgated 12 C.F.R. § 560.2 as a preemption regulation, which "'has no less preemptive effect than federal statutes.'" *Silvas*, 514 F.3d at 1005 (quotation omitted).

12 C.F.R. § 560.2(b) provides an illustrative list of "the types of state laws preempted" by § 560.2(a). Pertinent here, § 560.2(b) preempts state laws that would impose requirements regarding:

> (3) Loan-to-value ratios; . . .
>
> (4) The terms of credit, including amortization of loans and the deferral and capitalization of interest and adjustments to the interest rate, balance, payments due, or term to maturity of the loan, including the circumstances under which a loan may be called due and payable upon the passage of time or a specified event external to the loan; . . .
>
> (6) Escrow accounts, impound accounts, and similar accounts.
>
> (10) Processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages; . . .

The Ninth Circuit adopted the following analysis to evaluate preemption under HOLA:

> When analyzing the status of state laws under § 560.2, the first step will be to determine whether the type of law in question is listed in paragraph (b). If so, the analysis ends there; the law is preempted. If the law is not covered by paragraph (b), the next question is whether the law affects lending. If it does, then, in accordance with paragraph (a), the presumption arises that the law is preempted. This presumption can be reversed only if the law can clearly be shown to fit within the confines of paragraph (c). For these purposes, paragraph (c) is intended to be interpreted narrowly. Any doubt should be resolved in favor of preemption.

514 F.3d at 1005 (*quoting* OTS, Final Rule, 61 Fed. Reg. 50951, 50966-67 (Sept. 30, 1996)); *Giordano v. Wachovia Mortg., FSB*, 2010 U.S. Dist. LEXIS 136284, *10 (N.D. Cal. Dec. 14, 2010) (Fogel, J.).

Since the lender that originated plaintiffs' loans, World Savings Bank, FSB, was a federal savings bank, it was organized and operated under HOLA.[6]

---

[6] Courts have held that HOLA still applies even though World Savings Bank, FSB was ultimately merged into Wells Fargo Bank, N.A., the current defendant. *DeLeon v. Wells Fargo Bank, N.A.*, 2010 U.S. Dist. LEXIS 62499, *17 (N.D. Cal. June 9, 2010); *Taguinod v. World Sav. Bank, FSB*, 2010 U.S. Dist. LEXIS 127677, *5 (C.D. Cal. Dec. 2, 2010); *Guerrero v. Wells Fargo Bank, N.A.*, 2010 U.S. Dist. LEXIS 96261, *8 (C.D. Cal. Sept. 14, 2010).

WINSTON & STRAWN LLP
A limited liability partnership

**b.  The "Imminent Default" Claims Are Preempted Under § 560.2(b)(4) And (10).**

Plaintiffs assert that Defendants violated the MDL-SA by "den[ying] modification requests for purported failure to show imminent threat of default."  (TRO, p. 7:21-22).  They assert that because each borrower "documented financial hardship and a monthly PITIA above 31%," the borrower did not have "affordable" PITIA and thus "demonstrat[ed] imminent threat of default."  (*Id.*, p. 7:18-22).  They contend Defendants wrongfully denied modifications based on a "purported failure to show imminent threat of default."  (*Id.*).

These claims, which fall outside the express terms of the MDL-SA, are preempted by the "loan to value" clause in §560.2(b)(4), by the "terms of credit" clause in § 560.2(b)(4), by the "disclosures" clause in § 560.2(b)(9), and by the "servicing" clause in § 560.2(b)(10).

Courts have held similar claims preempted.  In *Baner v. Wells Fargo Bank*, 2012 U.S. Dist. LEXIS 103737 (N.D. Cal. July 23, 2012) (LaPorte, M.J.), plaintiff asserted a breach of contract based on the lender's refusal to consider him for a loan modification.  *Id.* at *8-11, *29.  The court agreed with the lender that plaintiff was "seek[ing] to thwart [the lender's] ability to foreclose, which triggers section 560.2(b)(10) relating to the 'processing [and] servicing of mortgages,' because nothing relates to loan servicing more than a bank's right to collect payments and foreclose."  *Id.* at *27.  The court concluded that the claim was preempted and dismissed it with prejudice.  *Id.* at *28; *Gonzalez v. Wells Fargo Bank,* 2012 U.S. Dist. LEXIS 154851, 12-13 (N.D. Cal. Oct. 29, 2012) (Davila, J.) (HOLA preempted claim asserting that lender "induced Plaintiff's default in order to qualify her for a loan modification but then ultimately used this default to initiate foreclosure proceedings;" claim implicated "terms of credit" (subd. (b)(4)) and "processing, origination [and] servicing" (subd. (b)(10)); *Do v. Wells Fargo Bank, N.A.*, 2012 U.S. Dist. LEXIS 126768, 14-16 (C.D. Cal. Aug. 27, 2012) (HOLA preempted claims that the lender "agreed to modify Plaintiff's loan;" "HOLA regulation 12 C.F.R. § 560.2(b)(10) covers claims based on a loan's 'processing [or] servicing,' which would include a bank's consideration of a request for a loan modification").

Plaintiffs' "breach of contract" label does not preclude HOLA preemption.  *See Appling v. Wachovia Mortg., FSB*, 745 F. Supp. 2d 961, 972 (N.D. Cal. 2010) ("What matters for purposes of Defendant's preemption defense, however, is not the label Plaintiff affixed to his claim, but whether

WINSTON & STRAWN LLP
A limited liability partnership

Plaintiff's allegations, however styled, fall within the scope of the OTS preemption regulations."). And "where implied covenants or UCL are used to gloss or add a contract term and establish a breach or violation in the first place—often where Plaintiffs allege an abuse of some discretion afforded by the contract—the claims are preempted." *Haggarty v. Wells Fargo Bank, N.A.*, 2012 U.S. Dist. LEXIS 143405, *11-12 (N.D. Cal. Oct. 3, 2012) (Breyer, J.), (*citing, e.g., Schilke v. Wachovia Mortg., FSB*, 758 F. Supp. 2d 549, 556-57 (N.D. Ill. 2010) (HOLA preempted breach of contract claim that did not "allege an utter failure to honor the terms of the contract" and did "not point to any specific term of the contract that Wachovia allegedly breached") and *Unlu v. Wells Fargo Bank NA*, 2011 U.S. Dist. LEXIS 141992, *12-13 (N.D. Cal. Dec. 9, 2011) (Davila, J.)) (HOLA preempted breach of contract claim based on, among other allegations, lender's failure to "restructure the terms of the existing loan")).[7]

Plaintiffs do not claim breach of an *actual,* express contract term. Rather, they add "gloss" or new contract terms to the MDL-SA in an effort to create a breach. They are thus preempted. *Haggarty,* 2012 U.S. Dist. LEXIS 143405 at *11, 12. Plaintiffs assert, for example, that an "imminent threat of default" is established when a borrower "document[s] financial hardship and a monthly PITIA above 31%." (TRO, p. 7:18-22). But this purported standard appears nowhere in the MDL-SA. See § II.D.1, *supra*.

The HAMP guidelines also make no mention of an above-31% PITIA as the baseline for establishing an "Imminent Default." The guidelines state only that a lender, when making an "imminent default" determination, must engage in a multi-factored analysis. See § II.D.1, *supra*.

The only express term of the MDL-SA cited by Plaintiffs is § VI(E)(5). (TRO at 7:17-18). This clause, however, does not describe a test for determining "Imminent Default." Rather, it explains the waterfall for determining when a modification must be offered to Settlement Class C

---

[7]    *See also*, *Poco v. Wachovia Mortg. Corp.*, 2011 U.S. Dist. LEXIS 71655, 16-19 (N.D. Cal. June 28, 2011) (breach of contract, breach of implied covenant, § 17200) (LaPorte, M.J.); *Stefan v. Wachovia*, 2009 U.S. Dist. LEXIS 113480 (N.D. Cal. Dec. 7, 2009) (breach of contract) (Armstrong, J.); *Spears v. Washington Mut., Inc.*, 2009 U.S. Dist. LEXIS 85251, *17 (N.D. Cal. Aug. 30, 2009) (Whyte, J.) (breach of contract); *Daniel v. Wells Fargo Bank*, 2012 U.S. Dist. LEXIS 77200, *13-14 (E.D. Cal. June 4, 2012); *Guerrero v. Wells Fargo Bank, N.A.*, 2010 U.S. Dist. LEXIS 96261, *7-9 (C.D. Cal. Sept. 14, 2010).

DEFENDANTS' OPPOSITION TO PLAINTIFFS' EX PARTE REQUEST FOR A TEMPORARY RESTRAINING ORDER

WINSTON & STRAWN LLP
A limited liability partnership

WINSTON & STRAWN LLP
A limited liability partnership

members and Class B members who were **already** "in Imminent Default, who later became in Imminent Default, or who later became in Default."  MDL-SA, § VI(E).

Regardless of the labels plaintiffs attach to their claims, the issue is whether plaintiffs' claims, "fall within the scope of the OTS preemption regulations".  *Appling, supra,* at 972.  Since plaintiffs' claims fall within § 560.2(b)(3), (4), (9), and (10), they are preempted.

### c.  The Automated Appraisal Claims Are Also Preempted Under § 560.2(b).

Plaintiffs' appraisal based claims also fail as preempted.  First, as outlined in Section II.D.1., the MDL-SA actually allows, not prohibits, the use of automated appraisals.  Plaintiffs therefore go much farther than adding "gloss" to the plain language of the contract that Courts have found to be preempted.  *Haggarty,* 2012 U.S. Dist. LEXIS 143405 at *11-12.  They instead alter the obligations under the MDL-SA to suit their litigation purposes.

Courts in any event have not hesitated to hold, as preempted under § 560.2(b)(10), claims based on an inflated appraisal:

> Indeed, plaintiffs' theory of the case, that lenders and appraisers conspired to inflate appraisals in order to increase mortgage resale prices, demonstrates the importance and interrelationship of impartial appraisals to mortgage origination and servicing. See Compl. PP 1-7. The court therefore finds that plaintiffs' UCL and CLRA claims, as applied, relate to the processing and origination of, and participation in, mortgages, and are thus preempted under § 560.2(b)(10).

*Spears v. Wash. Mut., Inc.*, 2009 U.S. Dist. LEXIS 21646, * 17 (N.D. Cal. Mar. 9, 2009)(J. Whyte); *accord Cedeno v. IndyMac Bancorp, Inc.*, 2008 U.S. Dist. LEXIS 65337, * 25 (S.D.N.Y. Aug. 25, 2008)("The appraisal practices challenged by the plaintiff appear to relate directly to the processing or origination of mortgages, and thus the application of the law that the plaintiff seeks to impose falls within 12 C.F.R. § 560.2(b)(10).").  Plaintiffs' appraisal claims are thus preempted. Plaintiffs' escrow allegations, which seek to limit the circumstances under which Defendants can establish an escrow account, are likewise preempted under subsection (b)(6)'s provision covering "Escrow accounts, impound accounts, and similar accounts."

When the OTS promulgated Section 560.2, the establishment of escrow accounts was one of the few areas that the OTS called out particularly for preemption:

> "OTS believes that the authority to adjust, amortize, establish escrow accounts for, and charge fees for loans properly falls within the scope of a federal savings

WINSTON & STRAWN LLP
A limited liability partnership

association's statutory authority to originate loans pursuant to the HOLA, and these particular aspects of lending do <u>not need to be specifically identified or restricted</u> in the CFR. … one commenter raised the concern that if OTS removed specific regulatory language referring to the authority of federal thrifts to adjust terms, amortize, charge certain fees, and <u>establish escrow accounts</u> for real estate loans, states may challenge whether OTS continues to occupy the field of federal thrift lending regulation and may attempt to impose their own lending regulations on thrifts. However, by removing these paragraphs, OTS does not intend any narrowing of federal thrifts' authority to conduct these activities, but rather to enhance associations' flexibility in lending. <u>Each of these areas is specifically cited in the new § 560.2 as an area in which state law is preempted.</u>

61 Fed. Reg. at 50954 (emph. added). *See also Flagg v. Yonkers Savings & Loan*, 396 F.3d 178, 184 (2nd Cir. 2005)(HOLA preempts state law claims based on failure to pay interest on escrow accounts).

### d. The Claims Predicated On Defendants' Handling Of Modification Requests Are Preempted Under § 560.2(b).

Plaintiffs' claims for breach of the implied covenant are based on the contention that Defendants misstated the "relevant factors" for a modification, failed to respond to inquiries, failed to "provide Class Counsel with sufficient written explanations for the MAP2R denials," failed to "hire a sufficient number of qualified employees to administer the MAP2R program," and failed to train those employees. (TRO, p. 28:4-12). Plaintiffs do not identify specific contractual provisions that were frustrated by this alleged conduct, and it is again apparent that they are using an implied covenant claim as improper and inactionable "gloss" to the plain language of MDL-SA. *Haggarty*, 2012 U.S. Dist. LEXIS 143405 at *11-12.

In any event, Plaintiffs' attempt to use an implied covenant of good faith to impose requirements on how a federally chartered lender handles modification requests and hires and trains its modification personnel is likewise preempted. It is difficult to imagine a claim that more clearly implicates a lender's activities in "servicing" a mortgage loan. 12 C.F.R. § 560.2(b)(10)). In *Settle v. World Sav. Bank, F.S.B.*, 2012 U.S. Dist. LEXIS 4215 (C.D. Cal. Jan. 11, 2012), the plaintiff-borrower asserted claims strikingly similar to those asserted here. The alleged wrongdoing was the lender's:

"(1) having a "'policy' of **referring borrowers to various departments, providing inconsistent information**[; (2) ordering **numerous appraisals** only to stall and claim the previous appraisals [are] "too outdated"[; (3) providing **no justification or explanation [for] denying borrowers . . .**

**relief**"; (4) **making an "arbitrary decision" to deny plaintiffs a loan modification because "a modified mortgage payment of approximately 31% of their gross monthly income**, which is the industry standard, would result in a positive "net present value" when compared to foreclosure"; and (5) maintaining "guidelines [that] are not in line with applicable industry standards or that Wachovia's decision to deny plaintiffs relief was arbitrary and capricious."

*Id.* at \*37 (emphasis added).

The district court concluded that "all of the allegations supporting plaintiffs' [§ 17200] claim concern Wachovia's 'processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages'— i.e., matters that are explicitly listed in 12 C.F.R. § 560.2(b)(10).  As a result, the claim is preempted by HOLA and the OTS regulations."  *Id.*; *see also*, *DeLeon v. Wells Fargo Bank, N.A.*, 729 F. Supp. 2d 1126, 1127 (N.D. Cal. 2010) (Fogel, J.) (HOLA preempted claims alleging that plaintiffs "were given false assurances that their loan modification with Wells Fargo would be approved and that there would be no foreclosure while the loan modification process was pending"); *Gorton v. Wells Fargo Bank NA*, 2012 U.S. Dist. LEXIS 168158 (C.D. Cal. Nov. 27, 2012) (HOLA preempted claim based on plaintiff's attempt to secure a loan modification); *Tuck v. Wells Fargo Home Mortg.*, 2012 U.S. Dist. LEXIS 172204, 17-18 (N.D. Cal. Dec. 4, 2012) (Ryu, M.J.) (HOLA preempted claim based on allegation that lender "knowing[ly] miscalculat[ed] Plaintiffs' income" in making modification determination); *Curcio v. Wachovia Mortg. Corp.*, 2009 U.S. Dist. LEXIS 96155, 16-17 (S.D. Cal. Oct. 14, 2009) (HOLA preempted claims based on bank's refusal to modify loan).

What's more, Plaintiffs' allegation that Defendants failed to provide "sufficient written explanations for the MAP2R denials" is an attempt to impose requirements as to what loan-related "disclosure[s]" the bank proposed in connection with a proposed modification of a mortgage loan. That is preempted by the disclosure clause under 12 C.F.R. § 560.2(b)(9).

### e.   12 C.F.R. § 560.2(a) and (c) Also Preempt Plaintiffs' Claims.

If the court finds that plaintiffs' claims do not "impose requirements" over "loan to value ratios", "terms of credit," "escrow accounts," "disclosures" or "servicing" of the loan, the analysis proceeds to 12 C.F.R. § 560.2(c):

DEFENDANTS' OPPOSITION TO PLAINTIFFS' EX PARTE REQUEST FOR A TEMPORARY RESTRAINING ORDER

WINSTON & STRAWN LLP
A limited liability partnership

(c) State laws that are not preempted. State laws of the following types are not preempted to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) of this section:

(1) Contract and commercial law;

(2) Real property law;

(3) Homestead laws specified in 12 U.S.C. 1462a(f);

(4) Tort law;

(5) Criminal law; and

(6) Any other law that OTS, upon review, finds:

(i) Furthers a vital state interest; and

(ii) Either has only an incidental effect on lending operations or is not otherwise contrary to the purposes expressed in paragraph (a) of this section.

The Ninth Circuit held that under subsection (c), a presumption of preemption is triggered if the state law claim "affects lending." *Silvas* at 1005. That presumption is "reversed only if the law can clearly be shown" to affect lending operations only "incidentally" and is otherwise consistent with the purposes of subsection (a), which seeks to give federal savings banks "maximum flexibility to exercise their lending powers". *Id.* Under this analysis, "paragraph (c) is intended to be interpreted narrowly." *Id.* And "[a]ny doubt should be resolved in favor of preemption." *Id.*

Imposing extra-contractual "imminent default" definitions as well as new appraisal and escrow account requirements would affect "lending operations" far more than "incidentally" and would restrict the "maximum flexibility in lending operations" conferred by 12 C.F.R. § 560.2(a). The remedy plaintiffs seek - - a portfolio-wide injunction against foreclosure - - would likewise impact "lending operations" for more than just "incidentally". (Kreitzer Decl., ¶¶ 7-9).

In *Giordano*, this Court illustrated how the additional disclosure and communication requirements of Civil Code § 2923.5 affected lending operations more than incidentally and were thus preempted by § 560.2(c):

a state statute that imposes additional disclosure and communications obligations upon a lender prior to commencement of foreclosure proceedings is not 'incidental' to lending. Moreover, given the **[*14]** statements in *paragraph (a)* that 'OTS hereby occupies the entire field of lending regulation for federal savings associations,' and that 'OTS intends to give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation,' this Court cannot conclude that state laws that impose upon lenders additional obligations related to foreclosure fall within *paragraph (c)*.

WINSTON & STRAWN LLP
A limited liability partnership

1    *Giordano*, 2010 U.S. Dist. LEXIS 136284, at * 13-14.

2         Examples of other state law claims that affected lending operations more than incidentally

3    include: *Munoz v. Fin. Freedom Senior Funding Corp.*, 573 F. Supp. 2d 1275, 1281 (C.D. Cal. 2008)

4    ("dramatically affect the lending operations of federal savings associations by imposing an

5    obligation upon them to monitor its borrower's use of loan proceeds. … To ratify her legal theory

6    would be to change this most fundamental principle in the reverse mortgage industry.  It would

7    undoubtedly result in more than an 'incidental' effect on the industry. § 560.2(c)."); *Sato v.*

8    *Wachovia Mortg. FSB*, 2012 U.S. Dist. LEXIS 46554 (N.D. Cal., 2012) (Davila, J.) (promissory

9    estoppel claim that "would impose an affirmative duty on Wachovia to provide a loan modification

10   and postpone a foreclosure sale while doing so" had "more than an incidental effect on lending" and

11   was thus preempted under paragraph (c).  *Id.* at *9-10.).

12        In *Haggarty,* a putative class action that sought to "require Wells Fargo to exercise any

13   discretion it retains over evaluation and selection of ARM indices for the benefit of borrowers, and to

14   switch to more borrower-favorable indices upon the occurrence of a triggering event", the court held

15   that plaintiffs' contract claims were preempted by 12 C.F.R. § 560.2(c) because "…Plaintiffs' attempt

16   to use state law to require such a policy…cannot be said to be 'incidental' to lending under section

17   560.2(c)."  *Haggarty* at *12.

18        Plaintiffs' claims suffer the same fate under § 560.2(c) and are thus preempted.  Any doubt

19   must be resolved in favor of preemption.  *Silvas*, at 1005.

20   **E.    Public Interest Does Not Support The Injunction**

21        Plaintiffs must show the injunction they seek is in the public interest.  *Winter*, 129 S.Ct. at

22   374.  They have not.  As shown herein, an injunction without question would harm Defendants

23   significantly, and the public also has a vested interest in aiding a struggling economy and preventing

24   job loss.  *See Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008).  Plaintiffs' injunction

25   would defeat both of these important public interests.

26   **F.    Plaintiffs' Proposed Injunction Violates The Anti-Injunction Act and the *Rooker-***

27   ***Feldman* and *Younger* Abstention Doctrines.**

28        Even if Plaintiffs had carried their burden as to the elements required for an injunction, their

WINSTON & STRAWN LLP
A limited liability partnership

WINSTON & STRAWN LLP
A limited liability partnership

1  requested injunction would violate the Anti-Injunction Act, which prohibits federal courts from

2  granting injunctions to stay proceedings in state court.  28 U.S.C. § 2283.  *See also Clark v. U.S.*

3  *Bank Nat'l Ass'n*, No. 03-5452, 2004 U.S. Dist. LEXIS 11264 (E.D. Pa. June 18, 2004) (Act bars

4  TILA plaintiff from enjoining sheriff's sale enforcing state foreclosure judgment).  The statute

5  provides that a district court "may not grant an injunction to stay proceedings in a State court except

6  [1] as expressly authorized by Act of Congress, or [2] where necessary in aid of its jurisdiction, or

7  [3] to protect or effectuate its judgments." (Numbering added).

8  In *Guancione v. Wachovia Mortg. Corp.*, 2010 U.S. Dist. LEXIS 89927, *8-9 (N.D. Cal. July

9  28, 2010) (Fogel, J.), this Court denied the plaintiffs' requested TRO as barred by § 2283, *citing*

10  *Scherbenske v. Wachovia Mortg., FSB*, 626 F. Supp. 2d 1052, 1059 (E.D. Cal. 2009), which held

11  that there "'is no federal statute authorizing a district court to enjoin a state unlawful detainer action.

12  . . .").[8] As Plaintiffs admitted, some Settlement Class Members are in foreclosure now, thus, granting

13  them they relief they seek would illegally enjoin those state court proceedings.

14  Additionally, the TRO would interfere with judgments in violation of the *Rooker-Feldman*

15  doctrine, which "'bars cases brought by state-court losers complaining of injuries caused by state-

16  court judgments rendered before the district court proceedings commenced and inviting district court

17  review and rejection of those judgments.'" *Guancione*, *7-8; *District of Col. Ct. of App. v. Feldman*,

18  460 U.S. 462, 482, 103 S. Ct. 1303, 75 L. Ed. 2d 206 (1983) and *Rooker v. Fidelity Trust Co.*, 263

19  U.S. 413, 415-16, 44 S. Ct. 149, 68 L. Ed. 362 (1923)).  In *Guancione*, this Court declined to grant a

20  TRO to restrain a lender from evicting the plaintiff-borrower following the state court's entry of a

---

21  [8] This case does not fall within a line of authority in this circuit holding that the second and third

22  exceptions to § 2283 (*i.e.*, injunction where "necessary in aid of its jurisdiction" or to "protect or effectuate [the court's] judgments") are implicated when the district court reserves jurisdiction to

23  construe and enforce a settlement.  *See Flanagan v. Arnaiz*, 143 F.3d 540, 546 (9th Cir. 1998).  In this case, the Court did not reserve or retain jurisdiction over the *properties* of borrowers in default,

24  Defendants' purchase or sale of such properties in the ordinary course of its business, or their taking possession of such properties after foreclosure.  The reservation of jurisdiction in the MDL-SA is far

25  more narrow.  § XIV.B provides that "the Court shall retain exclusive and continuing jurisdiction over the Lawsuit, the Parties, Settlement Class Members, and the Settlement Administrator in order

26  to interpret and enforce the terms, conditions, and obligations under this Agreement." Conspicuously absent is any reference to the Court's retention of jurisdiction over "property"—and

27  for good reason.  This Court obviously did not intend to take jurisdiction over every judicial foreclosure filed against a Class Member, nor every unlawful detainer proceeding.  Those matters

28  are subject to the jurisdiction of the state courts.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' EX PARTE REQUEST FOR A TEMPORARY RESTRAINING ORDER

WINSTON & STRAWN LLP
A limited liability partnership

1  judgment of possession.  Citing *Rooker-Feldman,* this Court stated:  "if Plaintiffs wish to contest the

2  decision of the state court, they must seek relief from the state court of appeal."  *Id.* at *9.

3       Finally, an injunction would interfere with pending judicial foreclosure and eviction actions

4  in violation of the *Younger* abstention doctrine.  "'Abstention by a district court is required under

5  *Younger* [*v. Harris*, 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971)] when three criteria are

6  satisfied: (1) State judicial proceedings are ongoing; (2) The proceedings implicate important state

7  interests; and (3) The state proceedings provide an adequate opportunity to raise federal questions.'"

8  *Sierra Club v. Cal. Am. Water Co.*, 2010 U.S. Dist. LEXIS 1478 (N.D. Cal. Jan. 8, 2010) (Fogel, J.)

9  (*quoting Communications Telesys. Int'l v. California Pub. Util. Comm'n*, 196 F.3d 1011, 1015 (9th

10  Cir. 1999)).  Courts have held *Younger* abstention is appropriate when a district court is asked to

11  restrain state unlawful detainer proceedings and judicial foreclosure actions.  *Solomon v. Aurora*

12  *Loan Servs., LLC*, 2012 U.S. Dist. LEXIS 143502, 6-7 (E.D. Cal. Oct. 3, 2012) (unlawful detainer);

13  *Wadhwa v. Aurora Loan Servs., LLC*, 2011 U.S. Dist. LEXIS 73949, *6-7 (E.D. Cal. July 8, 2011)

14  (unlawful detainer, citing cases); *Bryant v. Citimortgage*, 2010 U.S. Dist. LEXIS 92384, *1-2 (M.D.

15  Fla. Aug. 13, 2010) (judicial foreclosure); *Delaney v. Onewest Bank, FSB,* 2011 U.S. Dist. LEXIS

16  48515, 6-7 (D. Or. May 5, 2011) (same).

17                          **3.    CONCLUSION**

18       Rule 65 requires Plaintiffs to make a strong showing in order to obtain the unprecedented

19  relief they seek.  Plaintiffs come nowhere near carrying their burden.  The Court should deny this

20  Motion, allow Defendants to proceed with foreclosures, sales, or short sales and allow individual

21  Settlement Class Members to pursue individual relief.

22                                   Respectfully submitted,

23  Dated:  December 12, 2012          WINSTON & STRAWN, LLP

24                                   By *T. Thomas Cottingham, III*
                                     T. Thomas Cottingham, III *(admitted pro hac vice)*
25                                   tcottingham@winston.com
                                     Stacie C. Knight *(admitted pro hac vice)*
26                                   sknight@winston.com
                                     100 North Tryon Street, Suite 2900
27                                   Charlotte, NC 28202-1078
                                     Telephone:     +1 704 350 7700
28                                   Facsimile:     +1 704 350 7800

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Amanda L. Groves (SBN: 187216)
agroves@winston.com
WINSTON & STRAWN, LLP
101 California Street
San Francisco, CA  94111-5802
Telephone:      (415) 591-1000
Facsimile:      (415) 591-1400

AND

ANGLIN, FLEWELLING, RASMUSSEN,
CAMPBELL, AND TRYTTEN, LLP


By: _/s/ Mark T. Flewelling____
Mark T. Flewelling (SBN 96465)
mflewelling@afrct.com
Leigh O. Curran (SBN: 173322)
lcurran@afrct.com
Yaw-Jiun (Gene) (SBN: 228240)
gwu@afrct.com
199 So. Los Robles Ave., #600
Pasadena, CA  91101
Telephone:      +1 626 535 1900
Facsimile:      +1 626 577 7764

Attorneys for Defendants
WACHOVIA MORTGAGE, FSB, WACHOVIA
BANK, FSB, AND GOLDEN WEST FINANCIAL
CORPORATION

DEFENDANTS' OPPOSITION TO PLAINTIFFS' EX PARTE REQUEST FOR A TEMPORARY RESTRAINING
ORDER

**CERTIFICATE OF SERVICE**

I, the undersigned, declare that I am over the age of 18 and am not a party to this action. I am employed in the City of Pasadena, California; my business address is Anglin, Flewelling, Rasmussen, Campbell & Trytten LLP, 199 S. Los Robles Avenue, Suite 600, Pasadena, California 91101-2459.

On the date below, I served a copy of the foregoing document entitled:

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' EX PARTE REQUEST FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**

on the interested parties in said case as follows:

**Served Electronically Via the Court's CM/ECF System**

*Attorneys for Plaintiffs and the Settlement Class*

| | |
|---|---|
| BERNS WEISS LLP | BERNS WEISS LLP |
| Jeffrey K. Berns | Lee A. Weiss |
| 20700 Ventura Blvd. Suite 140 | 626 RXR Plaza |
| Woodland Hills, CA 91364 | Uniondale, NY 11556 |
| | |
| jberns@bernsweiss.com | lweiss@bernsweiss.com |
| Tel: (818) 961-2000 | Tel: (516) 222-2900 |
| Fax: (818) 999-1500 | Fax: (818) 999-1500 |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made.  This declaration is executed in Pasadena, California on December 12, 2012.

Nancy J. Peters _____ /s/ Nancy J. Peters _____
(Type or Print Name)                                  (Signature of Declarant)

WINSTON & STRAWN LLP
A limited liability partnership