**BERNS WEISS LLP**
Jeffrey K. Berns (SBN 131351)
jberns@law111.com
20700 Ventura Blvd. Suite 140
Woodland Hills, CA 91364
Telephone: (818) 961-2000
Facsimile: (818) 999-1500

Lee A. Weiss (*pro hac vice* application pending)
lweiss@law111.com
626 RXR Plaza
Uniondale, NY 11556
Telephone: (516) 222-2900
Facsimile: (818) 999-1500

*Attorneys for Plaintiffs and the Settlement Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| IN RE:  WACHOVIA CORP. "PICK-A-PAYMENT" MORTGAGE MARKETING AND SALES PRACTICES LITIGATION<br><br>_____<br><br>*This Document Relates to*:<br><br>ALL INCLUDED ACTIONS | **CASE NO. 5:09-MD-02015-JF**<br><br>[*Assigned to the Hon. Jeremy Fogel*]<br><br><br>**PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**<br><br>Hearing Date: TBD<br>Time:            TBD<br>Place:          5th Fl. – Courtroom 3<br>Judge:         Hon. Jeremy Fogel |

# TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................................1

II.     ARGUMENT .......................................................................................................2

        A.      Plaintiffs Are Likely to Prevail on Their Breach of Contract Claim ................3

                1.      Wells Fargo Can No Longer be Solely Responsible for
                        Administering the MAP2R Program and Its Loan Modification
                        Determinations Need to be Reviewed before Foreclosure
                        Activity Can Recommence ..................................................................3

                2.      Defendants Have Willfully Ignored the Settlement Agreement's
                        "Imminent Default" Definition and HAMP Guidance
                        Incorporated Therein..........................................................................7

                        a.      Defendants' Imminent Default Arguments are Red
                                Herrings.................................................................................12

                3.      Defendants' Arguments on NPV and Appraisals Flout Their
                        Representations Made to the Court in Support of Final Approval ......12

        B.      Plaintiffs are Likely to Succeed on Their Implied Covenant Claim................14

        C.      Plaintiffs' Claims Are Not Preempted ............................................................15

                1.      The OTS Preemption Regulations Do Not Apply ..............................15

                2.      Even if Applicable, the OTS Regulations Do Not Preempt
                        Plaintiffs' Contract-Based Claims ......................................................17

        D.      Plaintiffs Have Amply Demonstrated That They and Other Settlement
                Class Members Will Likely Suffer Irreparable Harm.....................................20

        E.      The Balance of Hardships Strongly Favors Plaintiffs and the Class ..............23

        F.      The Anti-Injunction Act, *Rooker-Feldman* and *Younger* Abstention
                Doctrines Do Not Prohibit the Proposed Injunction .......................................25

III.    CONCLUSION ...................................................................................................29

Reply to Defendants' Opposition to Application for TRO and OSC RE: Preliminary Injunction
5:09-MD-02015-JF

## TABLE OF AUTHORITIES

**Cases**                                                                                        **Page**

*Agriesti v. MGM Grand Hotels, Inc.*, 53 F.3d 1000 (9th Cir. 1995) ...........................................28

*Angotti v. Rexam, Inc.*,
      No. C 05-5264 CW, 2006 WL 1646135 (N.D. Cal. June 14, 2006)............................21

*Bland v. Carone Family Trust*, 2007 WL 951344 (S.D. Cal. Mar. 19, 2007) ...........................24

*Chang v. Wachovia Mortg., FSB*,
      No. C-11-1951 SC, 2011 WL 2940717 (N.D. Cal. July 21, 2011).........................18, 20

*Copeland v. Wells Fargo Bank, N.A.*, 800 F. Supp. 2d 1132 (D. Or. 2011)...............................16

*Crews v. Wachovia Mortg. Corp.*,
      CV10-3894 SVW (AGRX), 2010 WL 3777049 (C.D. Cal. July 23, 2010) .................23

*DeLeon v. Wells Fargo Bank, N.A.*, 729 F. Supp. 2d 1119 (N.D. Cal. 2010) ...........................17

*DeLeon v. Wells Fargo Bank, N.A.*,
      No. 10-CV-01390-LHK, 2011 WL 311376 (N.D. Cal. Jan. 28, 2011) ........................17

*Digerati Holdings, LLC v. Young Money Entm't, LLC*, 194 Cal. App. 4th 873 (2011) .............19

*Dixon v. Wells Fargo Bank, N.A.*, 798 F. Supp. 2d 336 (D. Mass. 2011) ...........................18, 20

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005) ...................................27

*Flanagan v. Arnaiz*, 143 F.3d 540 (9th Cir. 1998) ..........................................................25, 26

*Guancione v. Wachovia Mortg. Corp.*,
      No. 5:10-CV-03166-JF-(HRL), 2010 WL 2991728 (N.D. Cal. July 28, 2010) .............27

*Kendall v. Russell*, 572 F.3d 126 (3d Cir. 2009).................................................................28

*Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008).....................................................25

*Lorillard Tobacco Co. v. Chester, Wilcox & Saxbe*, 589 F.3d 835 (6th Cir. 2009) .................26

*Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211 (9th Cir. 1984).......................23, 24

*Midgett v. Tri-County Metro. Transp. Dist. of Or.*, 254 F.3d 846 (9th Cir. 2001) ....................21

**TABLE OF AUTHORITIES**
(continued)

**Case**                                                                          **Page**

*Molosky v. Washington Mutual, Inc.*, 664 F.3d 109 (6th Cir. 2011) .........................................20

*New Hampshire v. Maine*, 532 U.S. 742 (2001)...............................................................13, 19

*Parker v. U.S.D.A.*, 879 F.2d 1362 (6th Cir. 1989) ....................................................22

*People v. Randtron*, 69 F. Supp. 2d 1264 (E.D. Cal. 1999).........................................26

*R. .R. Street & Co., Inc. v. Transport Ins. Co.*, 656 F.3d 966 (9th Cir. 2011) ...........................27

*Sharma v. Provident Funding Assoc's, LP*,
    No. C-09-5968-VRW, 2010 WL 143473 (N.D. Cal. Jan. 8, 2010) ....................................25

*Tamburri v. Suntrust Mortg., Inc.*, No. C-11-2899 EMC, 2012 WL 2367881
    (N.D. Cal. June 21, 2012) ..........................................................15

*Tamburri v. Suntrust Mortg., Inc.*,
    No. C-11-2899 EMC, 2011 WL 2654093 (N.D. Cal. July 6, 2011)..............................25

*Volt Info. Sciences v. Bd. of Trustees, Stanford Univ.*, 489 U.S. 468 (1989) ............................17

*Watkins v. Wells Fargo Bank*,
    No. 3:10-1004, 2011 WL 777895 (S.D. W. Va. Feb. 28, 2011).....................................16

*Younger v. Harris*, 401 U.S. 37 (1971).........................................................................27

*Zepeda v. Paypal, Inc.*, 777 F. Supp. 2d 1215 (N.D. Cal. 2011) ...............................................14

**Federal Statute**                                                                        **Page**

12 U.S.C. § 25b(b)(1)-(3) ..................................................................................15

12 U.S.C. § 1465(a) ..........................................................................................15

12 U.S.C. § 1465(b) ..........................................................................................15

28 U.S.C. § 2283 ..............................................................................................25

12 C.F.R. § 560.2(a) ....................................................................................15, 16

12 C.F.R. § 560.2(c) ..........................................................................................17

Reply to Defendants' Opposition to Application for TRO and OSC RE: Preliminary Injunction
5:09-MD-02015-JF

## I.   INTRODUCTION

In December 2010, Defendants entered into a Settlement Agreement, which was later approved by this Court with Defendants' full backing, wherein they agreed to immediately make a new loan modification program, "MAP2R," available to borrowers with Pick-a-Payment loans who were already in default or who would be likely to default over the next two and one half years.  At the Final Approval Hearing, the Court expressed its concern that Defendants had complete control over the MAP2R loan modification approval process, but approved the settlement based on the parties' assurances of fairness and the existence of certain safeguards, including Lead Class Counsel's ability to monitor Defendants' conduct.  Due to substantial evidence reflecting that Wells Fargo is improperly denying loan modifications, Lead Class Counsel took the initiative to obtain information from thousands of Settlement Class Members who believe that their loan modification applications have been denied improperly. Unfortunately, Defendants have failed to provide sufficient information to allow Lead Class Counsel to properly evaluate Wells Fargo's loan modification denials.  In July 2012, Lead Class Counsel met with Defendants to discuss the discrepancies and problems, and an agreement was reached that Defendants would respond with complete files on a sampling designated by Lead Class Counsel, but Defendants failed to do so.  (*See* Jeffrey K. Berns Declaration ("Berns Decl.") ¶ 4-5; Exs. B & AL thereto).  As set forth in the Plaintiffs' moving papers, there is substantial evidence reflecting that Defendants are not complying with the Settlement Agreement, such that there needs to be a procedure in place to evaluate loan modification denials before any more Settlement Class Members[1] lose their homes due to improper denials.  Defendants' opposition does nothing to disturb that conclusion.

A great law professor once said "When the facts are on your side, argue the facts.  When

---

[1] As used herein, "Settlement Class Members" refers to the Settlement Class Members on whose behalf the Unmodified Settlement Class Member Plaintiffs (referred to herein as "Plaintiffs") are seeking a temporary restraining order and preliminary injunction, which are all Settlement Class B or Settlement Class C Members who have applied for, but to date have not been given a loan modification pursuant to the Class Action Settlement Agreement in this action.  (*See* Plaintiffs' Memorandum in Support of *Ex Parte* Request for TRO ("Pls.' Mem."), at 1-3.)

Reply to Defendants' Opposition to Application for TRO and OSC RE: Preliminary Injunction
5:09-MD-02015-JF

the law is on your side, argue the law.  When neither is on your side, just argue."  Defendants'

Opposition to Plaintiffs' *Ex Parte* Request for a TRO and Order to Show Cause Re: Preliminary

Injunction ("Opposition") is nothing more than self-serving, unsupportable argument.  In the face

of overwhelming evidence that they are not complying with the Settlement Agreement,

Defendants barely address the facts.  Instead, their constant refrain is that the Court, Lead Class

Counsel and the Settlement Class Members should just trust them.  However, trusting them has

caused, and continues to cause, families to lose their homes without receiving the opportunity to

save them by making the affordable monthly payments that they were promised by Defendants in

exchange for their release of valuable mortgage fraud claims in the underlying litigation.

These Settlement Class Members, who were previously victimized because of the greed

of the Defendant-banks, were promised a settlement that included MAP2R loan modifications

for those who met certain criteria.  Yet now, they are being victimized by that very same greed.

Defendants' misconduct here is even worse than before, as they now are flouting the authority of

this Court and a binding contract into which they entered, and the consequences to many of the

Settlement Class Members is much more devastating—this time, they are not only losing their

equity, but their homes as well.

As set forth below, the Court should grant the TRO because Plaintiffs are likely to

succeed on the merits of their claims.  The evidence of Defendants' breach of the Settlement

Agreement is so unmistakable that their opposition brief fails to even address it directly and their

in-house expert's "fact" declaration concerning the moving Plaintiffs' loan modification

applications only serves to further confirm Defendants' misconduct.  Many Settlement Class

Members who are entitled to loan modifications, but whose applications have been wrongfully

denied, will suffer irreparable harm (the loss of their homes) if Defendants are permitted to

continue foreclosure activity while the Court is determining whether there should be a  procedure

for reviewing loan modification denials and what that procedure should be.  The balance of

hardships tilts heavily in favor of Plaintiffs, particularly because, as demonstrated below,

Defendants have mischaracterized the relief sought by Plaintiffs and vastly overstated its

potential impact on them, which pales in comparison to Settlement Class Members losing their homes instead of being given the chance to make the affordable monthly mortgage payments guaranteed to them under the Settlement.  In light of this irreparable harm to Settlement Class members, the Court should enter the TRO.

## II.     ARGUMENT

### A.  Plaintiffs Are Likely to Prevail on Their Breach of Contract Claim

Defendants' Opposition only challenges the breach element of Plaintiffs' breach of contract claims.  (Opp. at 16-20.)  However, Plaintiffs have readily demonstrated their likelihood of success in showing that Defendants breached the Settlement Agreement by improperly denying Plaintiffs' loan modification applications.[2]

#### 1.  Wells Fargo Can No Longer be Solely Responsible for Administering the MAP2R Program and Its Loan Modification Determinations Need to be Reviewed before Foreclosure Activity Can Recommence

Plaintiffs' moving papers were supported by the declarations of 20 Unmodified Settlement Class Members (Dkt. Nos. 365-5-365-24) and Lead Class Counsel[3] (Dkt. No. 365-2), which readily demonstrated Defendants' breaches of the Settlement Agreement.  (Pls.' Mem. 6-20, 27.)  In response, Defendants have provided the Declaration of Michael Dolan ("Dolan

---

[2] As Defendants acknowledge, Plaintiffs' breach of contract claim and Unfair Competition claims under Cal. Bus. & Prof. Code §§ 17200, *et seq*. stand together.  (Opp. at 21-22.)  Thus, for the same reasons that Plaintiffs and Settlement Class Members are likely to prevail on the merits of their breach of contract claims, so too are they likely to prevail on their UCL-unfair and unlawful prong.

[3] These Declarations only relied on materials submitted by the Unmodified Settlement Class Members to Wells Fargo, documents provided by Wells Fargo to the Unmodified Settlement Class Members, and reports provided by Defendants' counsel to Lead Class Counsel.  Even though all of this material is in Defendants' possession (a fact which Defendants do not dispute), two days after they filed their TRO Opposition for which the Court had given them permission, Defendants filed an Administrative Motion Re: Briefing and Hearing on Plaintiffs' Ex Parte Request for a TRO ("Administrative Motion"), without any permission from the Court, seeking to, among other things, file evidentiary objections that the Declarations are without foundation.  (*See* Dkt No. 373.)  While Plaintiffs had hoped to avoid burdening the Court with a large submission of documents that Defendants already have and about which there is no dispute, to avoid any issues, Plaintiffs will submit any documents that have not been submitted by either of the parties in connection with the TRO/PI application on Tuesday, December 18, 2012, as part of their opposition to Defendants' baseless Administrative Motion.

Decl."), in-house expert at Wells Fargo.  (Dkt. No. 371-4.)  Rather than demonstrating Wells Fargo's compliance with the Settlement Agreement, the Dolan Declaration provides further, stark evidence that Defendants believe that the Court and Lead Class Counsel should just blindly accept Wells Fargo's loan modification determinations.  Additionally, the Dolan Declaration is replete with factually inaccurate statements that are directly contradicted by the exhibits attached to the declaration and the documents provided to Plaintiffs.

Defendants have made determinations that Settlement Class Members are not in imminent threat of default by "forgetting" that taxes are taken out of their gross incomes, and by using income and expense figures that have no basis in reality.  Plaintiff Jennifer Murphy was behind on her payments, received a letter entitled Notice of Intent to Foreclose, (Berns Decl. ¶ 20; Ex. I thereto), and had less than ███ a month to feed and clothe her children after paying her expenses, (Berns Decl. ¶ 17), yet she was denied a loan modification.  Plaintiff Chan Pharn has income of ████ a month, and after expenses, has only ███ remaining, (*id.* at ¶ 9; Ex. D thereto), yet Defendants denied his modification request because he was not in imminent threat of default.  For Plaintiffs John and Diana Burkett, Defendants used income figures unrelated to the documentation provided by the Burketts and determined they were not in imminent threat because of the extra income that Defendants created.  (Berns Decl. ¶¶ 42-43; Exs. Y & Z thereto.)  For Plaintiffs Ruth and Omar Bishr, after deducting their housing expenses, taxes and bills, they would be forced to rely on ████ a month to feed and clothe themselves, (Berns Decl. ¶ 29), but Defendants denied their modification application for not being in imminent threat of default.  Plaintiffs Mary and Gregory Slade provided a self-employment income sheet and tax returns, (Berns Decl. ¶ 37; Exs. U & V thereto), but Defendants unilaterally halved their income and denied them a loan modification because an affordable payment could not be achieved.  Unfortunately, these denials are not unique; they are merely illustrative of what is being done to a multitude of other Settlement Class Members.  In fact, out of ████ Class B members for whom Wells Fargo provided detailed reasons for denying their modification applications, ████ were denied for not being at imminent threat of default.  (Berns Decl. ¶ 3; Ex. AN thereto.)

4

Defendants unilaterally changed the rules on how they evaluate Settlement Class Members modification applications, stating one thing in the Settlement Agreement and during the settlement approval process, and then changing course once the Settlement was approved. For Plaintiff Carrie Rosillo, whom Defendants admit is a Settlement Class C member, after they almost foreclosed on her home and she borrowed money to get current, (Rosillo Decl. (Dkt. No.365-5) ¶ 4), they reclassified her as a Settlement Class B Member and, when she applied for a modification, they denied her for not being in imminent threat of default.  (Dolan Decl. ¶ 24.) For Plaintiffs Julie and Paul McDermed, Nathan Ranger, and Sherri Goldfinch, Defendants listed them all as Settlement Class B Members, such that were provided with notice that they would be entitled to apply for the MAP2R modification, yet Defendants now claim that these Settlement Class Members were actually Settlement Class A Members who are not entitled to apply for a MAP2R loan modification.  (*See* McDermed Decl. (Dkt. No. 365-17) ¶ 2; Ranger Decl. (Dkt. No. 365-20) ¶ 2; Goldfinch Decl. (Dkt. No. 365-23) ¶ 2.)

Perhaps the most blatant proof of Defendants' misconduct is in how they determine the market values of Settlement Class Members' homes.  The market value of the home is the most important factor in the loan modification process.  It determines the Loan-to-Value (LTV) ratio and the amount of principal forgiveness that is available, which affects the ability of the MAP2R waterfall to reach the target HTI.  In the case of Richard D'Alessio, Wells Fargo did not conduct a full independent appraisal.  Instead, it used its computerized RVS appraisal, which in February 2011 determined the market value of his home to be ███.  (Dolan Decl. ¶ 7; Ex. 2 thereto.) Using that same proprietary RVS method five months later in July 2011, it determined the market value of the home to be ███.  (Dolan Decl. ¶ 8; Ex. 3 thereto.)  Three months later, Wells Fargo foreclosed and sold Mr. D'Alessio's home for ███.  (D'Alessio Decl. (Dkt. No. 365-22) ¶ 12.)  The Dolan Declaration states Wells Fargo's Net Present Value (NPV) calculation determined the value of not doing a modification to be ███, but Defendants' true no-modification value was ███.  (Berns Decl. ¶ 2; Ex. A thereto.)  More problematic though was that Defendants' counsel provided information to Lead Class Counsel stating that the

Reply to Defendants' Opposition to Application for TRO and OSC RE: Preliminary Injunction
5:09-MD-02015-JF

value of not doing a modification was ███, such that the correct figure still remains a mystery.

Plaintiffs Kathy and Michael Lerner also were denied a loan modification. The Dolan Declaration implies that, at the time of the loan modification denial, Wells Fargo valued the Lerners' home at ███. (Berns Decl. ¶ 52.) Because they owed ███, this valuation meant that there was no principal forgiveness available to lower the Lerners' monthly payment. However, according to the NPV form provided by Wells Fargo to the Lerners, the value of the property was only ███. (*Id.*; Ex. AG thereto.)

Plaintiff Jason Fisher was denied a loan modification because he had too much equity. Wells Fargo's valuation of Mr. Fisher's home at ███ was not substantiated by any proof. (Berns Decl. ¶ 13.) Mr. Fisher sought his own appraisal and the market value was ███. (*Id.*; Ex F thereto.) At the time of the denial, Mr. Fisher owed ███, so he had no equity and should have been entitled to obtain principal forgiveness.

Plaintiff Nathan Ranger was denied a loan modification without Wells Fargo conducting an appraisal. Instead, it used a computerized Automated Valuation Method (AVM) that determined the market value of Mr. Ranger's home to be ███. (Berns Decl. ¶ 62.) In the Dolan Declaration, Wells Fargo attempts to rebut the allegations that it only used the AVM method by submitting two computerized RVS "appraisals." (Dolan Decl. ¶ 14.) Both of these "appraisals," however, were unrelated to the loan modification request, as one of them was done two and a half years prior to the loan modification denial and the other was done six months after the denial. Mr. Ranger paid for his own full appraisal, which determined the market value to be ███. (Berns Decl. ¶ 62; Ex. AK thereto.)

In each one of these examples, the decision by Wells Fargo to use unsubstantiated income figures or property valuations, or neglecting to factor in necessary expenses such as income taxes, resulted in a denial of the loan modification request. The factual record before the Court overwhelmingly reflects that Wells Fargo is not complying with the Settlement Agreement and that its loan modification denials are improper.

The foregoing, compelling evidence demonstrates precisely why Wells Fargo cannot be permitted to continue foreclosure activity until its loan modification denials are properly reviewed.  To oppose the temporary restraining order and preliminary injunction application, Defendants have done everything they can to demonstrate why Wells Fargo's modification decisions were correct.  Yet, after examining Wells Fargo's factual submission, Plaintiffs have presented even more unmistakable facts that Wells Fargo did not comply with the Settlement Agreement for at least 19 of the 20 modification applications that support the application.  (*See* Berns Decl., ¶¶ 7-53, 55-62.)  The fox cannot be left in charge of the hen house any longer.

### 2.   Defendants Have Willfully Ignored the Settlement Agreement's "Imminent Default" Definition and HAMP Guidance Incorporated Therein

The vast majority of the Settlement Class Members (approximately 120,000 of 160,000) who would benefit from the loan modification portion of the Settlement were those in Settlement Class B.  Because Wells Fargo's previous proprietary loan modification program only provided relief for borrowers who were in already in default, Lead Class Counsel negotiated a Settlement Agreement that provided the ability for Settlement Class B Members in "imminent threat of default" to apply for loan modifications.

The definition of "Imminent Default" used in the Settlement Agreement, and by the federal government in HAMP, was based on general standards precisely so that it would be more inclusive.  A borrower needs to indicate that there was a non-temporary circumstance that was making it difficult to meet his or her monthly housing expense obligations.  Borrowers are required to send income documentation so that an analysis of their complete financial picture can be done to determine if they are having financial difficulties.  However, rather than significantly expanding the availability of loan modification relief, Wells Fargo has used its improper determinations of imminent default as the primary basis for denying MAP2R loan modifications to qualifying Settlement Class B Members suffering from financial hardship.

Wells Fargo acts as if its imminent default analysis is a necessary "gatekeeping" function designed to curtail the number of approved loan modifications and limit their financial exposure.

Yet, that was never its purpose.  Instead, the Settlement Agreement included the NPV calculation as the final step of the MAP2R waterfall as a safeguard to prevent Wells Fargo from having to enter into an individual loan modification if it was financially harmful.  Simply put, it is the NPV calculation, not unduly restrictive criteria for imminent default criteria, that allows Wells Fargo to reject a loan modification if it is clear that the bank will achieve a more favorable outcome by foreclosing than by modifying.

Defendants quote the Settlement Agreement's definition of imminent default, which provides, in pertinent part, that a borrower is in imminent default when "the Defendants have determined, in accordance with applicable HAMP guidance, as necessary, that default by the borrower in making scheduled payments on his or her Pick-a-Payment mortgage loan is reasonably foreseeable."  (Opp., at 6 citing Agreement § 1.33.)  They also acknowledge that the relevant HAMP guidance concerning imminent default set forth in the Treasury Department's Making Home Affordable Handbook ("MHAH"), Section 4.4, provides, in pertinent part:

> When making an imminent default determination, the servicer must evaluate the borrower's hardship as well as the condition of and circumstances affecting the property securing the mortgage loan. The servicer must consider the borrower's financial condition, liquid assets, liabilities, combined monthly income from wages and all other identified sources of income, monthly obligations (including personal debts, revolving accounts, and installment loans), and a reasonable allowance for living expenses such as food, utilities, etc. The hardship and financial condition of the borrower must be verified through documentation.

(*See* Opp. at 6.)  Despite quoting the foregoing language, Defendants proceed to disregard it by claiming that imminent default is solely based on certain illustrative examples that were set forth in the Settlement Class B Notice.  (*Id.*, at 7-8.)  This position is untenable, as it ignores both the Settlement Agreement and the HAMP guidance that the Settlement incorporates.

Defendants' factual submissions evidence their total disregard for the Settlement Agreement and HAMP guidance, as they confirm that Wells Fargo made no efforts whatsoever to review Settlement Class Members' financial condition to determine if default was reasonably foreseeable.  Instead, they only reviewed loan modification applications to the extent necessary to determine if a Settlement Class Member satisfied the examples set forth in the Settlement

Class B Notice.  For example, Wells Fargo denied loan modification applications of three Plaintiffs (Chan Pharn, Carrie Rosillo and Jason Fisher) because they were not in imminent default solely because Wells Fargo claimed their loan-to-value ratios were below ███.  (*See* Dolan Decl. ¶¶ 24, 30, 46.)  Even assuming Wells Fargo's property valuations were correct, a dubious proposition based on the evidence (or lack thereof) provided by Defendants (discussed below), the LTVs were not a legitimate basis for Wells Fargo's apparent failure to examine Plaintiffs' financial condition to determine if default was reasonably foreseeable, as the Settlement Agreement required.  Nothing in the Agreement or the incorporated HAMP guidance allows Wells Fargo to deny a MAP2R modification solely because a Settlement Class Member's LTV is below ███.

Similarly, Wells Fargo denied loan modifications to six other Plaintiffs (Jennifer Murphy, Jose Cruz, Jeff Cory, David and Julie Young, Thomas and Linda Geremia and Catherine Marsh and Walter Falkowski) solely because they did not fit into any of the examples of a hardship set forth in the Settlement Class B Notice.  (*See* Dolan Decl. ¶¶ 32, 33, 37, 40, 42.)  Again, nothing in the Settlement Agreement or the incorporated HAMP guidance permits Wells Fargo to deny a MAP2R modification solely because a Settlement Class Member cannot comply with any of the examples in the Settlement Class B Notice.

The fallacy of Defendants' position is easily shown by the examples of financial hardship set forth in the Settlement Class B Notice.  Other than death, disability, illness, divorce or separation, the only other example is a decrease in income of 10% or an increase in mortgage principal and interest payments of 10%, or some combination thereof.  (Opp. at 7.)  Thus, to adopt Defendants' position, the Court would have to conclude that, even though the Settlement Agreement provides a very broad definition of imminent default, the only way for most of the approximately 120,000 Settlement Class B Members to demonstrate imminent default is by showing a substantial decrease in income or a substantial increase in their monthly principal and interest payment.  That is patently absurd.

Wells Fargo's rigid adherence to the Settlement Class B Notice examples as exclusive rather than illustrative, along with its failure to conduct any meaningful evaluation of these Plaintiffs' financial condition, has led them to reach indefensible conclusions, and their belated attempt to justify these unsupportable imminent default determinations merely provides further evidence of their obstinacy.  For nine of the Plaintiffs, Wells Fargo purports to calculate their debt-to-income ratio for the purpose of deriving a figure for available funds to pay other living expenses.  (*See* Dolan Decl. ¶¶ 11, 16, 20, 33, 36, 37, 40, 42, 44.)  Incredibly, Wells Fargo's available funds figures are derived from gross monthly income, such that they are based on the assumption that the Plaintiffs pay no taxes.[4]  (*Id.*)  Using a reasonably conservative rate of 25% for all local, state and federal taxes yields a much different result.[5]  For example, after income taxes, if Plaintiffs Omar F. and Ruth M. Bishr were to pay all of their listed monthly expenses, they would have only ▮▮▮▮ left to cover clothing and food *for the entire month*.  (Berns Decl. ¶ 29.)  Similarly, Plaintiff Jennifer Murphy's monthly income after taxes, ▮▮▮▮▮, leaves her after paying her mortgage with ▮▮▮ to cover her additional monthly expenses of ▮▮▮▮ (▮ HOA dues, ▮▮ child care, ▮▮ for car insurance, gas, and maintenance, ▮▮ for medical insurance, and ▮▮ for utilities), such that she only has ▮▮ a month, or ▮▮ *a day*, to cover food and clothing for her and her two children, as well an installment debt she lists at ▮▮ a month.  (*Id.*, at ¶ 17.)  Despite the foregoing incontrovertible figures, Wells Fargo concluded (and continues to maintain that it was correct) that the foregoing Plaintiffs were not in imminent default.  (Dolan Decl. ¶¶ 20, 36.)

---

[4] Unlike Wells Fargo, Plaintiffs, who are individuals, are not eligible to take advantage of corporate tax loopholes like the one that permitted Wells Fargo to earn over $49 billion, pay no taxes, and receive a $681 million tax credit.  *See* Class Action Complaint ("Compl.") ¶¶ 2-4, *Murphy et al. v. Wells Fargo Home Mortgage*, Case No. C-12-6228 (N.D. Cal. Dec. 7, 2012) (Dkt. No. 365-4.)

[5] It cannot be ignored that Defendants are well familiar with the concept of income taxation when it permits them to increase a Settlement Class Member's income to conclude that he or she is not in imminent default, (*see* Dolan Decl. ¶ 26 (justifying an increase in Plaintiff Joseph Midgette's income from social security and VA payments, since they were net income amounts), but forget about it when using gross income figures to contend that Settlement Class Members are not in imminent default because they have significant available funds to pay their expenses.

Reply to Defendants' Opposition to Application for TRO and OSC RE: Preliminary Injunction
5:09-MD-02015-JF

As yet another example of their lack of accountability or concern for the very borrowers whom they have already victimized once, Defendants proudly justify many of their imminent default determinations by pointing out that many of the Plaintiffs have remained current even after Wells Fargo has denied their loan modification applications.  (*See, e.g.,* Dolan Decl. ¶¶ 22, 25, 27, 29, 31, 35, 36, 38, 41, 43, 45, 47.)  However, Defendants completely ignore that Wells Fargo's wrongful loan modification denials have forced Plaintiffs and other Settlement Class Members to take desperate short-term action, with potentially devastating long-term consequences, to avoid foreclosure.  These actions include depleting retirement accounts, racking up high-interest credit card debt and borrowing from relatives.  (*See, e.g.*, Slade Decl. (Dkt. No. 365-18) ¶ 5; Young Decl. (Dkt. No. 365-10) ¶ 5; Geremia Decl. (Dkt. No. 365-24) ¶ 6 (using credit cards to pay other bills); Bishr Decl. (Dkt. No. 365-21) ¶ 5; Zako Decl. (Dkt. No. 365-8) ¶ 8 (drawing down retirement savings); Rosillo Decl. (Dkt. No. 365-5) ¶ 4; Cory Decl. (Dkt. No. 365-12) ¶ 5 (borrowing from elderly relatives); Midgette Decl. (Dkt. No. 365-16) ¶ 6; Cory Decl. ¶ 5 (working excessive numbers of hours at the expense of their health and families); Murphy Decl. (Dkt. No. 365-13); ¶ 9Midgette Decl. ¶ 6; Fisher Decl. ¶ 7, Marsh/Falkowski Decl. (Dkt. No. 365-6) ¶ 6 (spending most of their monthly income on their unmodified mortgages).)

### a.  Defendants' Imminent Default Arguments are Red Herrings

Defendants' Opposition goes to great lengths to avoid focusing on any of the facts relevant to the moving Plaintiffs in the hopes of perpetuating their scheme to continue to violate the Settlement Agreement.  Conspicuous by its absence is any explanation as to why their imminent default determinations for Plaintiffs are correct (as discussed herein and in the Berns Reply Declaration, they are not).  Instead, Defendants present their version of Plaintiffs' facts in the Dolan Declaration that is only referenced generally in the brief, and focus their brief on arguments that have virtually nothing to do with their improper loan modification denials.

For example, Defendants stress that the imminent default determination is based on a Settlement Class B Member's minimum payment, rather than the fully amortizing payment for which the Settlement Class B Member is responsible.  (Opp. 5-6.)  However, nowhere do

11

Defendants contend that the difference between the two payments had any material impact on their imminent default determinations for any particular Plaintiff or Settlement Class B Member.[6]

Next, Defendants contend that Plaintiffs' imminent default contentions are premised solely on the fact that their monthly PITIA (principal, interest, taxes, insurance, and association dues) payments were greater than 31% of their gross monthly income. (Opp. 6-8.) This misstates and mischaracterizes Plaintiffs' arguments. In fact, Plaintiffs stated " . . . for many borrowers who have documented financial hardship *and* a monthly PITIA above 31%, thus demonstrating imminent threat of default because they do not have 'affordable' PITIAs, Defendants have nonetheless denied modification requests for purported failure to show imminent threat of default." (*Id.* at 7 (emphasis added).) As Plaintiffs also asserted, the goal of the MAP2R program is to bring borrowers' monthly PITIA payments down to 31% of their gross monthly income, which HAMP defines to be an "affordable" monthly payment, and which was the basis for using 31% in MAP2R. (*Id.*) Thus, at a minimum, HAMP implies that it is reasonable to foresee that a borrower with a PITIA in excess of 31% (*i.e.* in excess of the affordable threshold) would default on his or her mortgage.

In sum, Defendants' attempt to justify their improper loan modification denials based on supposed disputes concerning the relevant monthly payment amount and the import of the 31% monthly PITIA threshold are red herrings. As set forth herein, Defendants improperly applied, or willfully ignored, the imminent default standards for which they advocate in their Opposition.

**3. Defendants' Arguments on NPV and Appraisals Flout Their Representations Made to the Court in Support of Final Approval**

---

[6] Plaintiffs are dumbfounded as to why Defendants opted to focus the Court on their view that the Settlement Agreement was not designed to assist borrowers who could not afford to make the fully amortizing payment, and thus, continued to incur some of the very negative amortization that was the subject of the claims in the litigation (or, at a minimum, had already incurred substantial negative amortization and were (and are) continuing to accrue interest on that negative amortization, all of which will need to be repaid in the absence of a modification).

Defendants' arguments against finding likely success on Plaintiffs' NPV and appraisal-based claims both misconstrue Plaintiffs' claims and are directly contrary to Defendants' own promises made to the Court in support of final settlement approval.  Defendants mischaracterize Plaintiffs' claims as though they are based entirely on the fact that they use automated appraisals in making Net Present Value determinations.  (*See* Opp. 18.)  In fact, Plaintiffs allege and demonstrate that Defendants' reliance on automated appraisals has produced wildly varying and thus unreliable valuations that undermine the validity of their NPV calculations.  To take just one example, Plaintiff D'Alessio's home was appraised at ███████ in February 2011, (Dolan Decl. ¶ 2; Ex. 2 thereto), after which Mr. D'Alessio's persistence as to the erroneousness of this determination led Defendants to perform a drive-by appraisal five months later that yielded a valuation of ███████ in July 2011, (Dolan Decl. ¶ 8, Ex. 3), four months before his home was foreclosed and then sold for ███████.  (D'Alessio Decl. (Dkt. No. 365-22) ¶ 12.)  Defendants thus violated the Settlement Agreement's express terms and/or its implied covenant of good faith and fair dealing by using an appraisal methodology that yielded wildly varying and unreliable results to its own benefit and to Settlement Class Members' detriment.

Defendants' only retort to this evidence is that the Settlement Agreement expressly authorizes automated appraisals, (Opp., at 18 citing Agreement § I.1.40).  This answer does not respond to Plaintiffs' allegations and evidence of unreliable results favoring Defendants, and also conveniently ignores Defendants' own representations made to this Court in support of final settlement approval promising that "[w]e are using **full** appraisals from independent appraisers to obtain the value of the property."  Final Approval Hr'g Tr. 49:14-16, April 29, 2011.  Having obtained the Court's final approval of the Settlement Agreement's NPV provisions as fair and reliable by making this argument, Defendants cannot now turn tail and disavow it in enforcing these provisions.  *See*, *e.g.*, *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("[J]udicial estoppel generally prevents a party from prevailing in one phased of a case on an argument and then relying on a contrary argument to prevail in another phase.") (citation omitted).  The Settlement Agreement thus expressly and implicitly requires Defendants to use reliable

appraisals in assessing loan modifications, and the evidence showing that Defendants failed to do this means that Plaintiffs are likely to succeed on the merits of their breach claims.

### B.  Plaintiffs are Likely to Succeed on Their Implied Covenant Claim

As set forth in Plaintiffs' moving papers, their claim for breach of the implied covenant of good faith and fair dealing centers on:

> Defendants' numerous misstatements to the Unmodified Settlement Class Plaintiffs concerning the relevant factors for MAP2R modifications, repeatedly asked Unmodified Settlement Class Plaintiffs for multiple copies of the same documents, failed to respond to inquiries from Unmodified Settlement Class Plaintiffs in a timely basis or at all, and failed to provide Class Counsel with sufficient written explanations for the MAP2R denials . . . [which] demonstrate Defendants' frustration of the ability of the Unmodified Settlement Class Plaintiffs and Class Members to obtain the MAP2R loan modification to which they are entitled by intentionally not hiring a sufficient number of qualified employees to administer the MAP2R program and by willfully failing to properly train the Home Preservation Specialists that it has assigned to the MAP2R loan modification program.

(Pls.' Mem. 28; *see also* Compl., s*upra* n.4, at ¶¶ 31-37, 90, 124, 108, 115, 225, 232.)

Defendants generally ignore these allegations, and instead contend that the covenant of good faith and fair dealing cannot import a greater-than 31% PITIA standard for imminent default and a ban on automated appraisals into the Settlement Agreement.  (Opp., at 21.)  This is yet another red herring, as *none* of Plaintiffs' claims address these practices as stand-alone violations.

The only other argument Defendants offer is that the breach of implied covenant claim is superfluous, as it supposedly does not go beyond the breach of contract claim.  (*Id*.)  This contention—like their previous arguments—ignores the relevant allegations.  As discussed above, this claim focuses on, among other things, Defendants insufficient training and improper staffing, which has frustrated Settlement Class Members' ability to obtain the loan modification relief in the Settlement Agreement.  Thus, it is unquestionably distinct from the breach of contract claim.[7]

---

[7] The sole case cited by Defendants, *Zepeda v. Paypal, Inc*., 777 F. Supp. 2d 1215, 1221 (N.D. Cal. 2011) (Fogel, J.) (Opp., at 21) is clearly inapposite, as there, this Court dismissed the breach

### C.  Plaintiffs' Claims Are Not Preempted

Defendants' argument that federal law preempts Plaintiffs' claims seeking to enforce their rights under the Court-approved Settlement Agreement is astounding, and wrong. Defendants contends that Plaintiffs cannot show likely success on the merits because the Home Owners' Loan Act ("HOLA"), 12 U.S.C. §§ 1461 *et seq.*, and Office of Thrift Supervision (OTS) regulations preempt their state-law claims for breach of the Court-approved Settlement Agreement.[8]  In fact, the HOLA and OTS regulatory preemption standards Defendants invoke do not apply to Plaintiffs' claims, and would not preempt these claims grounded in breach of contract even if they did apply.

### 1.  The OTS Preemption Regulations Do Not Apply

First, the OTS regulations impose a dated "occupation of the field" preemption standard that Congress later rejected.  *Compare* 12 C.F.R. § 560.2(a) ("OTS hereby occupies the entire field of lending regulation for federal savings associations") *with* 12 U.S.C. § 1465(b) ("Notwithstanding the authorities granted under sections 1463 and 1464 of this title, this chapter does not occupy the field in any area of State law.").  In enacting the "Dodd-Frank Wall Street Reform and Consumer Protection Act" of 2010 ("Dodd-Frank Act"), Pub. L. No. 111-203, 124 Stat. 1376 (2010), Congress both abolished the OTS and rejected its regulatory field preemption standard in favor of the narrow, case-specific conflict preemption standard that the Act applies to national banks.  12 U.S.C. § 1465(a); *see also* 12 U.S.C. § 25b(b)(1)-(3) (National Bank Act preempts only state laws that discriminate against national banks, prevent or significantly interfere with a national banking power, or are preempted by another law, as determined on a "case-by-case basis").  This Court and others have held that the Dodd-Frank Act's preemption standard supersedes the OTS regulations for any transaction entered into after its July 21, 2010 enactment.  *See*, *e.g.*, *Tamburri v. Suntrust Mortg., Inc.*, No. C-11-2899 EMC, 2012 WL

---

of implied covenant claim because "Plaintiffs' allegations in support for their claim for breach of the implied covenant are the same as those supporting their breach of contract claim."
[8] Wells Fargo does not and cannot apply this preemption argument to Plaintiffs' claims for relief under the All Writs Act, 28 U.S.C. § 1651, and pursuant to the Court's equitable powers (*see* Pls.' Mem. 31-32), which would render this argument insufficient even if it had merit.

2367881, at *9 (N.D. Cal. June 21, 2012) ("Thus, not only is HOLA preemption inapplicable to NBA cases, it is no longer applicable at all to any post-Dodd-Frank transactions."); *Copeland v. Wells Fargo Bank, N.A.*, 800 F. Supp. 2d 1132, 1138 (D. Or. 2011) ("The [Dodd-Frank] Act . . . specifically and expressly stated that Title X and regulations, orders, etc. to be established under the Act were not to affect the applicability of any regulation regarding any contract entered into on or before July 21, 2010.").

The Settlement Agreement Plaintiffs seek to enforce was signed in December 2010 and became effective in September 2011, both after the Dodd-Frank Act took effect.  Since Defendants do not even mention the governing Dodd-Frank Act conflict preemption standard, their preemption arguments based on a defunct agency's superseded regulations fail and have no bearing on Plaintiffs' claims or their likelihood of success.

Second, even without the Dodd-Frank Act, the former OTS preemption regulations would not apply to Plaintiffs' claims seeking to enforce a court-approved settlement agreement. The OTS regulations purported to occupy the "field of lending regulation for federal savings associations."  12 C.F.R. § 560.2(a).  The OTS attempted to do this by providing that "federal savings associations may extend credit as authorized under federal law, including this part, without regard to state laws purporting to regulate or otherwise affect their credit activities, except to the extent provided in paragraph (c) of this section or § 560.110 of this part."  *Id.*  **The Settlement Agreement is not a loan agreement or an extension of credit.**  *See, e.g.*, *Watkins v. Wells Fargo Bank*, No. 3:10-1004, 2011 WL 777895, at *12 (S.D. W. Va. Feb. 28, 2011) ("Plaintiff's claims are not attempting to alter or change the manner in which Defendant exercises its powers under the NBA and OCC regulations.  Instead, Plaintiff is attempting to enforce her rights under the settlement agreement reached in *Watkins I*.").  Thus, OTS preemption regulations do not apply to it and do not preempt Plaintiffs' state-law claims.[9]

---

[9]  A third reason for finding the former OTS regulations inapplicable is that Wells Fargo agreed that the Settlement "shall be construed and governed by the laws of the State of California, applied without regard to laws applicable to choice of law."  Agreement § XVII(B).  A party's

Reply to Defendants' Opposition to Application for TRO and OSC RE: Preliminary Injunction
5:09-MD-02015-JF

**2.   Even if Applicable, the OTS Regulations Do Not Preempt Plaintiffs'
Contract-Based Claims**

At bottom, Defendants' HOLA preemption arguments would fail even if the OTS

regulations did apply because they do not allow federal savings associations to evade their

agreements with borrowers, not least one memorialized in a court-approved settlement

agreement.  On its face, 12 C.F.R. § 560.2(c) provides that "State laws of the following types are

not preempted to the extent that they only incidentally affect the lending operations of Federal

savings associations or are otherwise consistent with the purposes of paragraph (a) of this

section: (1) Contract and commercial law . . . ."

In light of this savings clause, this Court has held repeatedly that HOLA and the OTS

regulations do not preempt breach of contract claims, including claims alleging that Wells Fargo

breached an agreement to provide a mortgage modification.  *See, e.g., DeLeon v. Wells Fargo

Bank, N.A.*, 729 F. Supp. 2d 1119, 1127 (N.D. Cal. 2010) ("[T]he duties to comply with contracts

and the laws governing them and to refrain from misrepresentation are principles of general

application.  They are not designed to regulate lending and do not have a disproportionate or

otherwise substantial effect on lending.") (citation omitted); *DeLeon v. Wells Fargo Bank, N.A.*,

No. 10-CV-01390-LHK, 2011 WL 311376, at *5 (N.D. Cal. Jan. 28, 2011) ("Pursuant to this

analysis, courts have found that certain claims of express deception and breach of contract may

survive preemption under HOLA and a similar regulation under the National Bank Act.").

Another Judge of this Court explained why these claims are not preempted as follows:

> Several of Plaintiff's claims are based on alleged affirmative statements by the
> bank that Plaintiff allegedly relied upon.  These include Plaintiff's claims for
> promissory estoppel, fraud, IIED, and breach of the implied covenant of good
> faith and fair dealing.  ***The only "requirement" that these claims impose on
> lending institutions is that they be held responsible for the statements they make
> to their borrowers.  If these causes of action were preempted, federal savings
> associations would be free to lie to their customers with impunity.***  The Court
> finds these claims are not preempted by HOLA.

agreement to apply allegedly-preempted state law is binding.  *See, e.g., Volt Info. Sciences v. Bd.
of Trustees, Stanford Univ.*, 489 U.S. 468, 477 (1989) ("[E]ven if [9 U.S.C.] §§ 3 and 4 of the
[Federal Arbitration Act] are fully applicable in state-court proceedings, they do not prevent
application of Cal. Civ. Proc. Code § 1281.2(c) to stay arbitration where, as here, the parties have
agreed to arbitrate in accordance with California law.").

*Chang v. Wachovia Mortg., FSB*, No. C-11-1951 SC, 2011 WL 2940717, at *5 (N.D. Cal. July 21, 2011) (emphasis added).  HOLA and the OTS regulation thus do not preempt Plaintiffs' claims alleging breach of contract by Wells Fargo in failing to abide by agreements to provide loan modifications.

Perhaps recognizing this, Defendants try to recast Plaintiffs' claims as imposing requirements that "fall outside the express terms of the [Settlement Agreement]."  (Opp., at 24.)  Their arguments on this score fail.  First, Defendants contend that Plaintiffs' "imminent default" claims for failure to give modifications to borrowers with DTI ratios over 31% are not based on the terms of the Settlement Agreement.  This is wrong.  The Agreement requires "imminent default" to be determined "in accordance with applicable HAMP guidance."  Agreement § 1.33.  HAMP guidelines generally define imminent default as occurring when "default is reasonably foreseeable, (MHAH, § 1.1), and require loan servicers to have written standards for determining imminent default "that are consistent with applicable contractual agreements." *Id*. § 4.4.  Here, the applicable contractual agreement is the Settlement, which provides that the MAP2R modification process for borrowers in imminent default "shall commence upon receipt of the documents described in Section VI(E)(7) ***and subsequent verification that the Settlement Class Member's DTI is above thirty-one percent (31%).***"  Agreement § VI(E)(2) (emphasis added).  Indeed, the very purpose of the MAP2R modification is to get borrowers to a 31% DTI  ratio.  *Id*. § VI(E)(5).  Thus, Plaintiffs' imminent default claims, which are based in part on the 31% DTI ratio and also on other documented hardship factors that demonstrate imminent default, do not "fall outside the express terms" of the Settlement Agreement and HOLA does not preempt these claims.[10]

_____

[10] Since Plaintiffs' claims are based on the Settlement's terms, Wells Fargo's invocation of the OTS regulations addressing loan to value, terms of credit, and servicing is to no avail.  *Cf. Dixon v. Wells Fargo Bank, N.A.*, 798 F. Supp. 2d 336, 357 (D. Mass. 2011) ("Undoubtedly, the claim that Wells Fargo failed to uphold a promise to consider the Dixons for a loan modification related to Wells Fargo's 'servicing' of the mortgage.  But the standard for express preemption is more than 'relates to.'") (citation omitted).

Second, Defendants likewise err in arguing that Plaintiffs' claims that they utilized faulty and unreliable automated property appraisal valuations in making Net Present Value determinations are preempted by HOLA.  Defendants rely entirely on the Settlement Agreement's provision referencing property valuation based upon an "automated valuation model prepared not more than ninety (90) calendar days before the date of determination." Agreement § 1.40.  But, as discussed, this ignores Plaintiffs' allegations and evidence that the automated appraisals Wells Fargo used were unreliable and produced wildly varying results.  *See* Pls.' Mem., at 8; Compl., *supra* n. 4, ¶¶ 47-49.  Defendants also ignore and try to evade their promise to the Court in seeking final approval of the Settlement that "[w]e are using full appraisals from independent appraisers to obtain the value of the property."  Final Approval Hr'g Tr. 49:14-16, April 29, 2011.  Defendants do not cite a single case holding that HOLA preempts enforcement of a federal savings association's express representation made to a court in obtaining approval of a settlement agreement.  *Cf. New Hampshire v. Maine*, *supra*, 532 U.S. at 749 ("[J]udicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.") (citation omitted).  Defendants' attempt to distance the Settlement Agreement from use of reliable and independent appraisals in order to invoke HOLA preemption thus fails and should be rejected.

Finally, Defendants' argument that Plaintiffs' breach of duty of good faith and fair dealing claims based on their pervasive failure to properly administer loan modification applications and determinations are extra-contractual and thus preempted by HOLA again fails.  Plaintiffs allege that Wells Fargo so severely mis-managed the loan modification application and determination process that they were deprived of a benefit promised by the Settlement Agreement.  This claim is based on generally applicable contract law, under which "[e]very contract contains an implied covenant of good faith and fair dealing providing that no party to the contract will do anything that would deprive another party of the benefits of the contract." *Digerati Holdings, LLC v. Young Money Entm't, LLC*, 194 Cal. App. 4th 873, 885 (2011).  This is exactly what Plaintiffs allege and demonstrate that Wells Fargo did, and here again

19

Defendants' defense that these claims are based on "extra-contractual" obligations preempted by HOLA fails.  *See Chang*, *supra*, 2011 WL 2940717, at *5 ("These include Plaintiff's claims for . . . breach of the implied covenant of good faith and fair dealing.  The only 'requirement' these claims impose on lending institutions is that they be held responsible for the statements they make to borrowers."); *Dixon v. Wells Fargo*, *supra* fn. 10, 798 F. Supp. at 357 ("Requiring a bank to perform the obligations of its contract in good faith implicates none of the concerns embodied in HOLA.") (citation omitted); *cf. Molosky v. Washington Mutual, Inc.*, 664 F.3d 109, 116 (6th Cir. 2011) ("[A] breach of contract claim which, as here, does not purport to impose additional terms on a contract, but only to hold federal savings and loan associations to the basic norms that undergird commercial transactions, and only incidentally affects lending operations, is not preempted.") (citation omitted).

It is no coincidence that virtually every HOLA preemption case cited herein involves Wells Fargo's attempts to avoid its promises to give borrowers mortgage loan modifications.  Wells Fargo's business model appears to be to promise borrowers everything, deliver nothing, and then claim that its now-defunct federal regulator gave it a get-out-of-jail-free card when it is called to account.  The fact that this case involves promises memorialized in a *judicially approved nationwide class action settlement* appears to be of no moment to Defendants.  Fortunately for Settlement Class Members, the HOLA and OTS field preemption regulations do not apply to this post-Dodd-Frank Act Settlement Agreement, and even if they did apply, Plaintiffs' claims fall squarely within the regulations' savings clause for contract claims.  For all of these reasons, Defendants' HOLA preemption arguments resoundingly fail and do nothing to detract from Plaintiffs' likelihood of success on the merits of their claims.

### D.  Plaintiffs Have Amply Demonstrated That They and Other Settlement Class Members Will Likely Suffer Irreparable Harm.

Defendants' arguments against finding a likelihood of irreparable harm ignore critical facts Plaintiffs presented and also misapply the governing legal standards.  Defendants first argue that Plaintiffs fail to show that the harm of foreclosure (and threatened loss of home and loss of

rights under the Settlement Agreement) is sufficiently imminent because only one Plaintiff has a foreclosure sale scheduled.  (Opp., at 13.)  But this argument again ignores virtually all of Plaintiffs' evidence, which shows that those Plaintiffs who do not have foreclosure sales scheduled also face the same irreparable harm of losing their homes and their rights under the Settlement because they have a short-sale closing of their homes scheduled (Plaintiffs Biggs, Goldfinch), are subject to having a foreclosure scheduled (Plaintiffs Ranger, Lerner), or are fast-approaching this harm by exhausting desperate and additionally harmful measures to keep up on their unmodified mortgage payments.  These desperate measures include (1) using credit cards to pay other bills (Plaintiffs Slade, Young, Geremia); (2) drawing down retirement savings or insurance (Plaintiffs Slade, Bishr, Zako); (3) borrowing from elderly relatives (Plaintiffs Rosillo, Cruz, Cory); (4) working excessive hours at the expense of their health and families (Plaintiffs Midgette, Cory), and/or (5) spending most of their monthly income on their unmodified mortgages (Plaintiffs Murphy, Midgette, Fisher, Marsh/Falkowski).  (*See* Pls.' Mem. at 9-20.)  Plaintiffs thus more than satisfy the requirement that they "present facts showing a threat of immediate, irreparable harm before a federal court will intervene."  *Midgett v. Tri-County Metro. Transp. Dist. of Or.*, 254 F.3d 846, 850-51 (9th Cir. 2001).  Defendants ignore this overwhelming evidence of both present financial harms in Plaintiffs' lives and the imminent and irreparable harm of losing their homes and rights under the Settlement if relief is not granted, and thus their opposition fails.

Defendants next argue that Plaintiffs' evidence is insufficient because it purportedly only applies to themselves and thus does not warrant class-wide relief.  (Opp., at 13.)  This argument again is wrong on the law and the facts.  The very case authority on which Wells Fargo relies provides that for Plaintiffs to obtain class-wide relief, they must "show both particularized harm through their affidavits and reason to infer that the harms faced by the declarants are representative of prospective class members generally."  *Angotti v. Rexam, Inc.*, No. C 05-5264 CW, 2006 WL 1646135, at *15 (N.D. Cal. June 14, 2006) (citing *LaForest v. Clean Air Holding Co.*, 376 F.3d 48, 58 (2d Cir. 2004)).  This is exactly what Plaintiffs do here by showing through

their personal facts both the recurring present economic harms set forth above and the unifying

imminent and irreparable harm of loss of one's home and rights under the Settlement that is

imminent as Plaintiffs exhaust their desperate economic measures to keep up on their mortgages.

The recurrence of these present and imminent harms across 20 different loan modification

denials strongly supports an inference of class-wide harm, as does Plaintiffs' general evidence

showing that thousands of other Settlement Class Members have reported the same types of

wrongful denials of loan modifications in violation of the Settlement Agreement, which has

resulted in at least 1,000 other Class members facing foreclosure during the past six months

alone. (*See* Pls. Mem., at 2, 7.) Defendants' arguments on class-wide harm thus fail and should

be rejected.[11]

        Defendants' next argument against finding irreparable harm to Plaintiffs and Settlement

Class Members is at war with their first argument. Having just argued that Plaintiffs fail to show

that the harm of losing their homes and rights under the Settlement Agreement is sufficiently

imminent to warrant injunctive relief, Defendants turn tail and claim that Plaintiffs waited too

long in seeking relief because some of their applications for loan modifications were denied up

to a year ago. (Opp., at 14-15.) This argument fails for several reasons. First, Defendants do

not and cannot show that Plaintiffs learned that their loan modification denials were improper

long before they sought relief from the Court. This would require Defendants to show that Class

members all have a working detailed understanding of the MAP2R loan modification process.

Second, this argument also should be rejected because Plaintiffs' evidence overwhelmingly

---

[11] Despite the governing legal standard permitting an inference of class-wide harm based on the nature and strength of the Plaintiffs' evidence, Defendants separately argue that the required showing for an injunction against foreclosures must *always* be individualized, (Opp. at 13), presumably so that class-wide relief is never available. The primary case Defendants cite for this proposition, *Parker v. U.S.D.A.*, 879 F.2d 1362 (6th Cir. 1989), does not come close to supporting it, as there the Sixth Circuit simply affirmed the denial of an injunction against a foreclosure on an individual farm property where the evidence showed that the defendant had repeatedly offered the plaintiffs assistance, *including a loan modification with reduction of principle*, and the plaintiffs had failed to respond and refused to cooperate. *Id.* at 1367-68. The evidence presented here shows exactly the opposite occurring on such a repeated basis that class-wide relief is warranted.

demonstrates that, during the time between Wells Fargo's denials of loan modifications and the filing of the TRO application, Plaintiffs' circumstances have gone from bad to worse.  As set forth, after their applications for modifications were denied, every Plaintiff has tried and struggled to overcome their demonstrated hardships by draining other sources of cash and credit, working longer hours, and/or spending most or all of their incomes on keeping up with their unmodified mortgage payments.  These efforts to avoid default have resulted in significant economic harms to Plaintiffs, in order that they could avoid any purported economic harm to Wells Fargo, thus presenting a very different and far stronger claim for relief than in the "delay" cases cited by Wells Fargo.[12]

In sum, Defendants' "too late" argument against finding irreparable harm to Plaintiffs and Settlement Class Members fails for the same reasons that its "too soon" argument fails. Neither argument recognizes or accounts for the overwhelming evidence Plaintiffs present showing that they and Settlement Class Members are suffering present economic and personal harms and are fast-approaching the irreparable harm of losing their homes and rights under the Settlement Agreement as a result of Wells Fargo's wrongful denials of their loan modification applications.  Thus, a temporary restraining order and preliminary injunctive relief is necessary and appropriate to prevent this irreparable harm.

### E.  The Balance of Hardships Strongly Favors Plaintiffs and the Class

After ignoring virtually all of the evidence of present and imminent irreparable harm to Plaintiffs and Settlement Class Members, Defendants urge the Court to find that the balance of hardships favors denying relief because of economic harms to their business that purportedly would flow from a temporary restraining order or preliminary injunction.  Specifically, Defendants argue that the harms that tip the balance in their favor are that (1) the threat of

---

[12] *See Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) ("Lydo delayed *five years* before taking any action, which, if commenced sooner, might have avoided the threat of immediate closure.") (emphasis added); *Crews v. Wachovia Mortg. Corp.*, CV10-3894 SVW (AGRX), 2010 WL 3777049 (C.D. Cal. July 23, 2010) (finding that "Plaintiff's emergency is self-inflicted" where she learned of July 26 foreclosure sale on July 12, but waited to seek relief until July 22, thereby depriving defendant of fair opportunity to respond).

foreclosure is an incentive for borrowers to make their payments; (2) an injunction against foreclosure thus would jeopardize millions of dollars in Wells Fargo's income; and (3) Wells Fargo would suffer additional harm from accounting adjustments that would result if Settlement Class members' loans went into non-accrual status.  (Opp., at 15.)

Here again, Defendants' are wrong on the facts and wrong on the law.  Their supposition that an injunction against foreclosures would be some kind of game-changer that causes Settlement Class Members to stop making mortgage payments *they otherwise could afford* is contrary to the actual evidence presented.  Plaintiffs' evidence of the desperate economic measures they took to keep up on their mortgage payments after Wells Fargo denied their applications for loan modifications undercuts Defendants' assertions of harm in two ways.  First, it strongly demonstrates that Plaintiffs are anything but cavalier about making their monthly payments and keeping up on their mortgages.  Second, the indisputably finite nature of the resources from which Plaintiffs have drawn in order to keep up on their mortgage payments demonstrates that Defendants face a serious risk that Plaintiffs will not be able to make their future monthly payments *regardless of whether an injunction is issued*, so that the injunction cannot be deemed to be a cause of Wells Fargo's asserted economic harm.

Defendants' assertion of prospective economic harm from possible losses of income for a fixed time period also is legally insufficient to tip the balance of harms in their favor because this purely economic harm, even if proven, is not irreparable.  *See Lydo*, *supra*, 745 F.2d at 123 ("Purely monetary injuries are not normally considered irreparable."); *cf. Bland v. Carone Family Trust*, 2007 WL 951344, at *3 (S.D. Cal. Mar. 19, 2007) ("The Court finds irreparable harm if plaintiffs' residence is sold prior to determining the merits of plaintiffs' claims.").  The harms purported to flow from Wells Fargo's possible temporary revenue losses during temporary restraining order and preliminary injunction periods thus are speculative and are not irreparable.

Based on the foregoing, the Court should find that the balance of harms weighs strongly in favor of issuing the proposed injunction based on Plaintiffs' demonstration of recurring present economic and personal harms and imminent irreparable harms of the loss of their homes

and their rights under the Settlement if Defendants' breaches of the Settlement Agreement are not remedied before foreclosures proceed.[13]

### F. The Anti-Injunction Act, *Rooker-Feldman* and *Younger* Abstention Doctrines Do Not Prohibit the Proposed Injunction

Defendants conclude their Opposition by arguing that the proposed injunction against foreclosures pending a meaningful review of denied loan modifications for compliance with the Settlement Agreement would violate the Anti-Injunction Act and the *Rooker-Feldman* and *Younger* abstention doctrines. The proposed injunction does no such thing.

First, under the Anti-Injunction Act, a "court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. The second of these exceptions, for injunctions that are necessary in aid of the Court's jurisdiction, clearly applies here.

The aid-of-jurisdiction exception allows federal courts "to enjoin state courts in cases where some federal injunctive relief may be necessary to prevent a state court from so interfering with a federal court's jurisdiction or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case." *Flanagan v. Arnaiz*, 143 F.3d 540, 545 (9th Cir. 1998). This exception applies "to a district court's continuing authority to enforce a settlement agreement where the agreement is either incorporated into a court's final judgment or

---

[13] The foregoing also defeats Defendants' argument that the "Public Interest" consideration weighs against the proposed injunction. (Opp. at 30.) Defendants' argument that the public interest favors weighing their revenues over Class members' ownership of their homes is not supported by the single case they cite, which simply hold that economic harms must be weighed against alleged environmental harms in assessing the public interest. *See Lands Council v. McNair*, 537 F.3d 981, 1004-05 (9th Cir. 2008). This argument also is contrary to authority finding that "it is in the public interest to allow homeowners an opportunity to pursue what appear to be valid claims before being displaced from their homes." *Tamburri v. Suntrust Mortg., Inc.*, No. C-11-2899 EMC, 2011 WL 2654093, at *5 (N.D. Cal. July 6, 2011) (citations omitted); *see also Sharma v. Provident Funding Assoc's, LP*, No. C-09-5968-VRW, 2010 WL 143473, at *2 (N.D. Cal. Jan. 8, 2010) ("Lastly, the adverse impact foreclosures have on households and communities, as well as the societal benefits of home ownership, demonstrate the strong public interest in preventing unlawful foreclosures."). The public interest consideration thus weighs strongly in favor of the proposed injunction.

the court expressly retains jurisdiction over the agreement in such judgment." *Lorillard Tobacco Co. v. Chester, Wilcox & Saxbe*, 589 F.3d 835, 844 (6th Cir. 2009). In *Flanagan*, *supra*, the Ninth Circuit held that the aid-of-jurisdiction exception applied where a party to a federal court-approved settlement with continuing jurisdiction tried to evade the settlement through a state court proceeding. 143 F.3d at 546.

Although the Settlement Agreement does not prohibit Defendants from foreclosing through state courts, any attempt by Defendants to do so here in the face of a Settlement Class Member's pending breach of contract or related claim alleging improper denial of a loan modification in violation of the Settlement Agreement would effectively deprive this Court of its authority to interpret and enforce the Settlement. If Defendants complete a state-court foreclosure proceeding while a Class member's Settlement modification claim is pending, then this Court would lose the ability to order a modification in accordance with the Settlement Agreement because the Settlement Class Member's loan would be extinguished. Defendants' only answer on this score is that "the Court did not reserve or retain jurisdiction over the *properties* of borrowers in default, Defendants' purchase or sale of such properties in the ordinary course of its business, or their taking possession of such properties after foreclosure." (Opp., at 31 n. 8.)

This hyper-technical argument fails, however, because the Court did retain exclusive and continuing jurisdiction over "*the Parties*," including both Wells Fargo and Settlement Class Members, in order to "interpret and enforce the terms, conditions, and obligations under this Agreement." Agreement § XIV(B) (emphasis added); *cf. People v. Randtron*, 69 F. Supp. 2d 1264, 1272 n.9 (E.D. Cal. 1999) ("Although injunctions in aid of jurisdiction have generally been limited to cases in which a federal court's in rem jurisdiction is threatened by a state court action or where the state proceeding threatens the continuing superintendence by a federal court, such as in a school desegregation case, *the exception has also been applied when a state court action threatens to undermine federal court jurisdiction expressly provided in a settlement*

1    *agreement*.") (citations omitted) (emphasis added).  The Anti-Injunction Act thus does not bar

2    the proposed relief.[14]

3         Second, the *Rooker-Feldman* doctrine likewise does not bar the proposed relief.  *Rooker-*

4    *Feldman* bars lower federal courts from reviewing and rejecting state court judgments.  In one of

5    its most recent decisions explaining this doctrine, the Supreme Court held that it applies to "cases

6    brought by state-court losers complaining of injuries caused by state-court judgments rendered

7    before the district court proceedings commenced and inviting district court review and rejection

8    of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).

9    In light of this formulation, and pertinent to the instant case, the Ninth Circuit has held that the

10   *Rooker-Feldman* doctrine does not apply where "there is simply no state court *judgment* from

11   which" a party seeks relief.  *R.R. Street & Co., Inc. v. Transport Ins. Co.*, 656 F.3d 966, 974 (9th

12   Cir. 2011) (emphasis in original).  That is the case here.  Plaintiffs do not seek to reopen or

13   contest state-court judgments, or to enjoin foreclosures undertaken pursuant to an already-

14   obtained final state court judgment.  Rather, Plaintiffs seek to enjoin Defendants from initiating

15   new foreclosures, whether judicial or otherwise, against them or any Settlement Class Member

16   whose application for loan modification was denied pending a review of the denial for

17   compliance with the Settlement Agreement.  Since such an injunction would not reopen or

18   contest any final state court judgment, the *Rooker-Feldman* doctrine does not bar this relief.

19        Finally, the *Younger* abstention doctrine likewise does not bar the proposed injunction.

20   Under the doctrine first recognized in *Younger v. Harris*, 401 U.S. 37 (1971), a "federal district

21   court has discretion to abstain from exercising jurisdiction over a particular claim where

22

23

24   _____

     [14]  *Guancione v. Wachovia Mortg. Corp.*, No. 5:10-CV-03166-JF-(HRL) 2010 WL 2991728
25   (N.D. Cal. July 28, 2010) (Fogel, J.), is not to the contrary, as there the Court found claims to be
     barred by the Anti-Injunction Act based upon its specific finding that "there are no prior orders
26   of this court or the Bankruptcy Court that would be undermined by the unlawful detainer
     hearing, and an injunction against the unlawful detainer action is not necessary to aid this court's
27   jurisdiction" *Id.* at *3.  Here, the Court's final approval Order upholding the Settlement as fair,
     reasonable, and adequate to Class members and retaining jurisdiction over its enforcement would
28   be directly undermined by Wells Fargo's ability to evade decisions on wrongful medication
     denials by foreclosing in state court.

Reply to Defendants' Opposition to Application for TRO and OSC RE: Preliminary Injunction
5:09-MD-02015-JF

resolution of that claim in federal court would offend principles of comity by interfering with an ongoing state proceeding." *Kendall v. Russell*, 572 F.3d 126, 131 (3d Cir. 2009) (citation omitted). In applying this doctrine, the Ninth Circuit has held that:

> Before *Younger* abstention can be applied to dismiss a federal claim, three requirements must be met: (1) there must be ongoing state judicial proceedings, (2) the state judicial proceedings must implicate important state interests, and (3)the state judicial proceedings must afford the federal plaintiff an adequate Opportunity to raise [the federal court] claims.

*Agriesti v. MGM Grand Hotels, Inc.*, 53 F.3d 1000, 1001 (9th Cir. 1995). Here, for Plaintiffs and Settlement Class members in California and other states that do not require judicial foreclosure proceedings, the proposed injunction against new foreclosures would not implicate *any* of these requirements for invoking *Younger* abstention. *See id.* ("Abstention was improper in this case because there were no ongoing state judicial proceedings.").

Moreover, even if the injunction were to apply to a Settlement Class Member in a state where there is a pending judicial foreclosure proceeding, *Younger* abstention still would not apply because the Settlement Agreement vests this Court with "***exclusive*** and continuing jurisdiction over . . . the Parties [and] Settlement Class Members . . . in order to interpret and enforce the terms, conditions and obligations under this Agreement." Agreement § XIV(B) (emphasis added). This would likely deprive a state foreclosure court of authority to determine a Settlement Class Member's eligibility for HAMP or MAP2R modification relief under the Settlement Agreement as a possible defense to the foreclosure. Where a state court proceeding does not give a federal litigant a meaningful chance to raise his or her federal court claims, the *Younger* abstention doctrine does not apply. *See, e.g., Kendall, supra*, 572 F.3d at 134 ("One consequence of the lack of Opportunity for judicial review of Commission decisions is that there is not a meaningful chance for a judge under investigation to raise federal claims. Such an opportunity is a necessity under the third prong of the *Younger* test for abstention."). In light of the Court's exclusive jurisdiction to interpret and enforce the Settlement Agreement, the *Younger*

abstention doctrine does not apply to or bar the proposed injunction even to the extent it could possibly apply to a pending state court foreclosure proceeding.

## III.   <u>CONCLUSION</u>

For all of the reasons set forth herein, Defendants' arguments in opposition fail and, in light of Plaintiffs' probable success on the merits, the demonstrated threat of irreparable harm if foreclosures against Settlement Class members continue, the balance of hardships to the parties, and the strong public interest in preventing unwarranted home foreclosures, the Court should enter the proposed temporary restraining order.

DATED:  December 16, 2012          **BERNS WEISS LLP**


By:   __/s/ *Jeffrey K. Berns*___
      Jeffrey K. Berns (SBN 131351)
      jberns@law111.com
      20700 Ventura Blvd., Suite 140
      Woodland Hills, CA 91364
      Telephone: (818) 961-2000
      Facsimile: (818) 999-1500

      —and—

      Lee A. Weiss (*pro hac vice* application
      pending)
      lweiss@law111.com
      626 RXR Plaza
      Uniondale, NY 11556
      Telephone: (818) 961-2000
      Facsimile: (818) 999-1500

      *Attorneys for Plaintiffs and the Settlement
      Class*

Reply to Defendants' Opposition to Application for TRO and OSC RE: Preliminary Injunction
5:09-MD-02015-JF