**BERNS WEISS LLP**
Jeffrey K. Berns (SBN 131351)
jberns@law111.com
20700 Ventura Blvd. Suite 140
Woodland Hills, CA 91364
Telephone: (818) 961-2000
Facsimile: (818) 999-1500

Lee A. Weiss (admitted *pro hac vice*)
lweiss@law111.com
626 RXR Plaza
Uniondale, NY 11556
Telephone: (516) 222-2900
Facsimile: (818) 999-1500

*Attorneys for Plaintiffs and the Settlement Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| IN RE:  WACHOVIA CORP. "PICK-A-PAYMENT" MORTGAGE MARKETING AND SALES PRACTICES LITIGATION<br><br>_____<br><br>*This Document Relates to*:<br><br>ALL INCLUDED ACTIONS | **CASE NO. 5:09-MD-02015-JF**<br><br>[***Assigned to the Hon. Jeremy Fogel***]<br><br>**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date: January 31, 2012<br>Time:          3:00PM<br>Place:         5th Fl.—Courtroom 3<br>Judge:        Hon. Jeremy Fogel |

**TABLE OF CONTENTS**

**PAGE**

I.   INTRODUCTION ...................................................................................................1

II.  THE RELEVANT MODIFICATION STATISTICS .........................................2

III. ARGUMENT ........................................................................................................2

    A.  Preliminary Injunction Standard ................................................................3

    B.  Plaintiffs and Settlement Class Members Will Likely Succeed on the Merits of Their Claims for Breach of the Settlement Agreement ....................................3

        1.  Settlement Agreement § VI.E—Barriers to Settlement Class C Members ...............3

            a.  The Operative Standard ........................................................................3

            b.  Wells Fargo's Breach of the Settlement Agreement.............................4

            c.  The Impact of Wells Fargo's Breach of the Settlement Agreement ....................4

            d.  Settlement Class C Members Are Likely to Succeed on the Merits....................5

        2.  Settlement Agreement § VI.E—"Imminent Default" for Class B Members.............5

            a.  The Operative Standard ........................................................................5

            b.  Wells Fargo's Breach of the Settlement Agreement.............................6

            c.  The Impact of Wells Fargo's Breach of the Settlement Agreement ....................9

            d.  Settlement Class B Members Are Likely to Succeed on the Merits....................9

        3.  Settlement Agreement § VI.E.5 and 6—MAP2R Waterfall and NPV Test ...........11

            a.  The Operative Standard ......................................................................11

            b.  Wells Fargo's Breach of the Settlement Agreement...........................12

            c.  The Impact of Wells Fargo's Breach of the Settlement Agreement ..................13

            d.  Settlement Class Members Are Likely to Succeed on the Merits .....................13

        4.  Settlement Agreement § VI.E.1-2—"MAP2R Modifications" ...............................15

            a.  The Operative Standard ......................................................................15

b.   Wells Fargo's Breach of the Settlement Agreement............................................15

c.   The Impact of Wells Fargo's Breach of the Settlement Agreement.................17

d.   Settlement Class Members Are Likely to Succeed on the Merits ....................17

5.   Other Breaches Necessitating Review of Loan Modification Denials ...................18

6.   Wells Fargo's Breaches of the Settlement's Reporting Requirements....................19

7.   Federal Law Defenses to Settlement Class Members' Breach Claims....................21

C.  Plaintiffs and Settlement Class Members Face Irreparable Harm .................................22

D.  The Balance of Equities Favors Issuing the Proposed Injunction .................................24

E.  The Public Interest Favors Issuing the Proposed Injunction ..........................................25

IV. CONCLUSION...............................................................................................................25

Plaintiffs' Supplemental Memorandum of Points and Authorities in Support of
Motion for Preliminary Injunction, 5:09-MD-02015-JF

1

## TABLE OF AUTHORITIES

2

**CASES**                                                                   **PAGE**

3
*Agriesti v. MGM Grand Hotels, Inc.*, 53 F.3d 1000 (9th Cir. 1995) ..........................................22

4

5
*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ...................................3

6
*Angotti v. Rexam*, 2006 WL 1646135 (N.D. Cal. June 14, 2006)...............................................23

7
*Digerati Holdings, LLC v. Young Money Entm't, LLC*, 194 Cal. App. 4th 873 (2011) .............19

8
*Precision Pine & Timber, Inc. v. U.S.*, 596 F.3d 817 (Fed. Cir. 2010) ......................................19

9

10
*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) .....................................3

11
*Younger v. Harris*, 401 U.S. 37 (1971)......................................................................................21

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs' Supplemental Memorandum of Points and Authorities in Support of
Motion for Preliminary Injunction, 5:09-MD-02015-JF

## I.   INTRODUCTION

As set forth below, Plaintiffs' evidence demonstrates that (1) Wells Fargo has repeatedly breached core provisions of the Class Action Settlement Agreement in denying Settlement Class Members loan modifications; (2) the Court cannot rely on Wells Fargo's undocumented representations in assessing either its provision of loan modifications to date or the harms to the parties that are at stake; and therefore (3) Wells Fargo should not have unfettered control over the Settlement Agreement's loan modification relief.  Specifically, the evidence shows that:

- Wells Fargo has breached the Settlement by denying thousands of Class Members loan modifications based on non-existent eligibility requirements, impermissibly narrow definitions of "imminent default," inflated and fluctuating property valuations in its "Net Present Value" and "excessive forbearance" calculations, and by offering almost exclusively HAMP modifications that are less beneficial to the class members, rather than MAP2R relief that *does* write down principal in response to Class members' underlying claims that Defendants concealed the negative amortization of their loans;

- Wells Fargo is taking inconsistent positions in its modification analyses in order to deny loan modifications to Settlement Class Members, such as using the principal and interest payment-only as the monthly housing expense when a lower expense figure will prevent a modification, but including insurance, taxes and association dues in the monthly housing expense when a higher expense figure will prohibit a modification;

- Wells Fargo has given this Court aggregate loan modification data that is inconsistent with the reports it gave to Lead Class Counsel as required by the Settlement Agreement, and neither its representations to the Court nor its reports to Lead Class Counsel are consistent with its publicly reported figures (A compilation of discrepancies between Wells Fargo's representations to the Court and its own documents is attached hereto as Exhibit A);

- Lead Class Counsel has been contacted by over ███ Settlement Class Members who have sought loan modifications, but are not on any of the reports provided by Wells Fargo, and Lead Class Counsel's preliminary investigation has already yielded denial letters for 20 of these Settlement Class Members, 5 of which have been foreclosed on or are in foreclosure; and

- Wells Fargo's declarations are contradicted by its own documents and contain errors which demonstrate that it is using flawed post-hoc analyses to try to justify denying loan modifications that it did not fairly analyze when a Class member applied (*id.*)

In light of the foregoing, injunctive relief requiring Lead Class Counsel's expedited review of prior and future loan modification denials is necessary to prevent irreparable harm to Settlement Class members who still own their homes.  Abundant case-specific and statistical evidence demonstrates Plaintiffs' likelihood of success on the merits of their breach of contract

1

claims. The proposed injunction is necessary to protect Class Members from the irreparable harm of losing their homes and/or continuing to incur severe economic harm from the desperate measures they must take (*e.g*., paying bills by credit card, drawing down retirement savings) in order to make their unmodified mortgage payments and keep their homes. The proposed injunction requiring review of their loan modification denials would prevent such harm by affording them the mortgage relief to which they are entitled under the Settlement Agreement.

The balance of hardships and public interest also favor this injunction. Plaintiffs propose a negotiated expedited review process under which:

- priority review would be given to loan modification denials where the Settlement Class Member is in foreclosure or default, with scheduling priority based on foreclosure date;
- a foreclosure would proceed promptly when a denial is deemed proper after review; and
- an expedited dispute resolution procedure would be used when the parties dispute the propriety of a denial.

Since the proposed injunction would postpone (not prohibit) foreclosures where a modification is found to have been properly denied, and would prohibit foreclosure only where a modification must be granted, the balance of hardships and public interest strongly favor this relief.

## II. THE RELEVANT MODIFICATION STATISTICS

The parties have disputed the relevant statistical evidence pertaining to Wells Fargo's administration of the Settlement Agreement's loan modification relief. Wells Fargo has relied upon two Declarations of its employee Michael Dolan (Dkt. Nos. 371-4 and 373) that were generated specifically for this litigation, while Plaintiffs rely upon the data in Wells Fargo's quarterly reports given to Lead Class Counsel pursuant to the Settlement Agreement (§ VI.H)[1] for the period from April 2011 to September 2012. *See* Exhibit B hereto (loan modification denials chart compiled from Wells Fargo quarterly reports previously filed as Dkt. No. 375-1, Ex. AN).[2]

## III. ARGUMENT

---

[1] Citations to "§ __" refer to sections in the Settlement Agreement.
[2] Exhibit B contains accurate figures as Exhibit AN (Dkt. No. 375-1) contained an inadvertent calculation figure.

1

### A.  Preliminary Injunction Standard

2

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

3

the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

4

balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v.*

5

*Nat. Resources Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  In applying these factors, the Ninth

6

Circuit continues to employ a sliding scale inquiry under which "the elements of the preliminary

7

injunction test are balanced, so that a stronger showing of one element may offset a weaker

8

showing of another.  For example, a stronger showing of irreparable harm to plaintiff might

9

offset a weaker showing of likelihood of success on the merits."  *Alliance for the Wild Rockies v.*

10

*Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

11

### B.  Plaintiffs and Settlement Class Members Will Likely Succeed on the Merits of Their Claims for Breach of the Settlement Agreement.

12

13

In its Order denying a temporary restraining order (Dkt. No. 390, "TRO Order"), the

14

Court held that Plaintiffs "must demonstrate a likelihood of success on their claim that

15

Defendants are in breach of the settlement agreement (and thus that [Plaintiffs] are entitled to

16

enforcement of the Settlement Agreement)."  TRO Order at 4.  The Court further found that

17

Plaintiffs' evidence raised "significant questions, as they suggest that class members may have

18

been denied the primary benefit for which they released their claims against Defendants, that is,

19

fair consideration for loan modification under the procedures set forth in the settlement

20

agreement."  *Id.*, at 4-5.  The Court nonetheless denied a TRO because it found that Plaintiffs did

21

not tie this evidence to breaches of specific Settlement Agreement provisions.  *Id.*, at 5.

22

Although statistical evidence alone may not show a specific breach, this evidence

23

combined with Plaintiffs' case-specific evidence of their loan modification denials demonstrates

24

that Wells Fargo has breached four core provisions of the Settlement Agreement in order to

25

avoid making MAP2R modifications that write down the loans' deceptively inflated principal.

26

### 1.  Settlement Agreement § VI.E—Barriers to Settlement Class C Members

27

#### a.  The Operative Standard

28

3

The Settlement Agreement requires Defendants to consider the applications of *all* Settlement Class C Members who apply for loan modifications.  While the Settlement Agreement imposes the additional requirement for ***Settlement Class B*** Members that they be in imminent or actual default when they apply for a modification (§VI.E), this is not separately required for Settlement Class C Members because by definition they already were in default under the Settlement Agreement.  *See* § IV(C) (defining "Settlement Class C" as encompassing borrowers who already "are in default").  The Settlement thus requires Defendants to perform a HAMP and MAP2R analysis for *all* Settlement Class C Members who apply for a modification: "Defendants shall make loan modifications available for . . . Settlement Class C Members in accordance with the following provisions of this Section VI(E)."  § VI(E).

### b.  Wells Fargo's Breach of the Settlement Agreement

Wells Fargo breached the Settlement Agreement by requiring numerous Settlement Class C Members to separately demonstrate either a hardship or imminent default, despite their already being in default when the parties entered into the Settlement.  According to its own records, Wells Fargo has denied loan modifications to at least 176 Settlement Class C Members without performing a HAMP or MAP2R analysis, based solely on their alleged failure to show imminent default or hardship.  *See* Supplemental Declaration of Albert G. Lum ("Lum Supp. Decl.") attached hereto as Exhibit C, ¶ 25 and Ex. 62.  For example, Plaintiff Carrie Rosillo is a Settlement Class C Member who was in default at the time of the Settlement.  *See* Carrie Rosillo Decl. (Dkt. No. 365-5), ¶ 2.  Nevertheless, Wells Fargo denied her applications for loan modification assistance numerous times because she allegedly failed to show imminent threat of default.  *Id.*, ¶ 3.  Thus, instead of considering Ms. Rosillo for a loan modification, Wells Fargo denied her without running her through the HAMP and MAP2R waterfalls.

### c.  The Impact of Wells Fargo's Breach of the Settlement Agreement

Because Wells Fargo refused to evaluate Ms. Rosillo for a loan modification, she had to pay off all arrears to avoid foreclosure, which she could only do by borrowing ███ from her terminally ill father.  *Id.* ¶ 4.  Other Settlement Class C Members to whom Wells Fargo willfully

and improperly denied Settlement relief could not do this.  Of the ███ Class C Members whom Wells Fargo improperly required to show imminent default or hardship, at least 12 have lost their homes through foreclosure, at least 16 more currently are in foreclosure, and another 13 appear to have been forced to sell their homes through a short sale or give Wells Fargo a deed-in-lieu of foreclosure right after Wells Fargo improperly barred them from consideration for loan modifications.  Lum Supp. Decl. ¶¶ 22-24 and Exs. 21-61.

### d.  Settlement Class C Members Are Likely to Succeed on the Merits.

Since the Settlement Agreement does not require Settlement Class C Members who were in default at the time of settlement to make any further showing of imminent or actual default, Wells Fargo has committed flagrant breach by imposing this additional barrier to their ability to obtain a modification and better afford their homes.  Ms. Rosillo and similarly situated Settlement Class Members thus are extremely likely to succeed on the merits of their claims.

### 2.  Settlement Agreement § VI.E—"Imminent Default" for Class B Members

### a.  The Operative Standard

The Settlement Agreement defines when a Settlement Class B Member is in imminent default in accordance with the Treasury Department's HAMP guidance.  § I.1.33.  HAMP sets forth a straightforward process to determine if a borrower is in imminent default.  First, the borrower attests to an initial hardship—such as a reduction or loss of income, a change in household financial circumstances, a recent or upcoming increase in monthly mortgage payment, an increase in other expenses, a lack of sufficient cash reserves to cover mortgage payments and other basic living expenses, excessive monthly debt payments and overextension with creditors, *or* any other explained reason for hardship.  *See* Plaintiffs' Request for Judicial Notice ("RFJN") attached hereto as Exhibit D, Ex. 1 (Making Home Affordable Program Handbook), § 4.1.1.  Once a borrower sets forth a hardship, the lender determines imminent default based upon consideration of all of the following:

> When making an imminent default determination, the servicer must evaluate the borrower's hardship as well as the condition of and circumstances affecting the property securing the mortgage loan.  The servicer must consider the borrower's

financial condition, liquid assets, liabilities, combined monthly income from wages and all other identified sources of income, monthly obligations (including personal debts, revolving accounts, and installment loans), and a reasonable allowance for living expenses such as food, utilities, etc.

*Id.*, § 4.4. HAMP guidance is clear that the purpose of the imminent default determination is to *prevent* default when a borrower expects to be unable to make their payments soon, not as a tool for servicers to withhold modification relief to force borrowers into default and foreclosure:

> **Question**
> Do I need to be behind on my mortgage payments to be eligible for a modification under HAMP?
> **Answer**
> No. Responsible homeowners who are struggling to remain current on their mortgage payments are eligible if they reasonably believe they are likely to default on their mortgage soon (often referred to by servicers as "imminent default").

RFJN, Ex. 2 (U.S. Dept. of Treasury, "What is 'Making Home Affordable' All About?").

### b. Wells Fargo's Breach of the Settlement Agreement

The Settlement Agreement protects Wells Fargo from having to give loan modifications that harm it economically by requiring every potential modification to satisfy its NPV test, § VI.E.6 (*i.e.* the calculation of the net present value of conducting the modification must outweigh the net present value of not conducting the modification (§ I.1.47)). Despite this protection, Wells Fargo has used the imminent default requirement to justify failing to even consider a Class Member who had recently filed bankruptcy for a modification and thereby has denied modifications to the Settlement Class B Members who need them the most. *See* Lum Supp. Decl., ¶ 27, Ex. 88. Thus, as Wells Fargo apparently does not consider a borrower who admittedly cannot pay his outstanding debts to be in imminent default, it is hard to fathom that any borrower who has not actually defaulted could satisfy Wells Fargo that he or she is in imminent default.

That Wells Fargo is using imminent default as an additional barrier to modification is readily borne out by its reporting data. Of the approximately ▮▮▮▮ loan modification applications Wells Fargo says it reviewed for Settlement Class B Members (Supp. Dolan Decl. ¶

5), at least 13% (████) were denied because Wells Fargo concluded that the borrowers were not in imminent threat of default.  *See* Ex. B hereto.  Expressed differently, during this period, the number of loan modifications Wells Fargo denied due to alleged lack of imminent default is nearly *four times the number of MAP2R modifications that it granted* (████).  *Id.*  As this Court noted in the TRO ruling, alarming statistics like these raise troubling questions about Wells Fargo's compliance with the Settlement Agreement.  While Plaintiffs believe that, at a minimum, these figures represent a clear violation of the spirit of the Settlement Agreement, the Court need not so hold, as Wells Fargo itself has admitted its non-compliance with the above test for imminent default.

In its opposition to the TRO, Wells Fargo did not even attempt to show that it engaged in the necessary analysis set forth above.  Instead, its factual submission effectively admits that it did not fully evaluate Settlement Class B Members' hardships as required.  Specifically, Wells Fargo claims that multiple Plaintiffs were not in imminent default because they supposedly "had no loss of income, no medical bills, no death of a co-borrower, no divorce or separation, and no large increases in his taxes and insurance."  *See* Dolan Declaration (Dkt. No. 371-4), ¶¶ 33 (Jeff Cory); 37 (David and Julie Young), 40 (Thomas and Linda Geremia); and 42 (Catherine Marsh and Walter Falkowski).  However, the imminent default hardship standard is not so limited.  As set forth above, in addition to the items listed by Wells Fargo, a hardship can be shown by "a change in household financial circumstances . . . an increase in other [non-monthly payment] expenses, a lack of sufficient cash reserves to maintain mortgage payments and cover other basis living expenses, excessive monthly debt payments and overextension with creditors, *or* any other reason for hardship that the borrower explains."  The Plaintiffs improperly denied by Wells Fargo readily met this standard.  *See* Decl. of Jeff Cory (Dkt. 365-12), ¶ 5 (expenses exceeded income); TRO Reply Decl. of Jeffrey K. Berns ("Berns Reply Decl.") (Dkt. No. 375-1), ¶ 26 (the Youngs' hardship affidavit listed excessive debt, increased expenses, and insufficient cash reserves); Decl. of Thomas Geremia (Dkt. No. 365-24), ¶ 3 (hardship affidavit stated increased expenses, excessive debt payments, and insufficient assets to cover living expenses); Decl. of

1    Catherine Marsh (Dkt. No. 365-6), ¶ 2 (failed business; income reduced 30%).

2         In addition to the foregoing clear breach, Wells Fargo's "analysis" of Plaintiffs' financial

3    hardships is deeply flawed because it ignores "a reasonable allowance for living expenses such

4    as food, utilities, etc.," and income taxes.  For example, Wells Fargo claims that Plaintiff Jeff

5    Cory, after making his monthly housing payment, would have over ███ with which to pay

6    monthly expenses.  *See* Dolan Decl., ¶ 33.  After applying a conservative total income tax rate of

7    25%, however, Mr. Cory has only ███ per month (or $█ per day) to cover living expenses for

8    him and his four children, which is hardly reasonable.  *See* Berns Reply Decl., ¶ 24.[3]

9         The disparity between the foregoing figures is not based solely on Wells Fargo's failure

10   to consider income taxes in its analysis.  Wells Fargo also makes an obvious math error.  Wells

11   Fargo derived its remaining gross income figure by multiplying Mr. Cory's debt-to-income ratio

12   ███) by his gross income (███3).  Dolan Decl., ¶ 33.  This yields the amount of Mr.

13   Cory's gross income allocated to housing debt, *not* the amount that remains after he pays this

14   debt, which is properly expressed as ████%) * ████, which is ████.  Wells

15   Fargo repeats this error for each Plaintiff when it performs this calculation, such that remaining

16   income is overstated for borrowers with DTIs greater than 50%.  This math mistake is not

17   particularly important for each borrower because, as set forth herein, Wells Fargo's calculations

18   are generally meaningless since they ignore taxes and reasonable living expenses.  However, the

19   existence of this mistake provides further, powerful evidence of the overall unreliability of Wells

20   Fargo's "evidence," or worse, demonstrates that Wells Fargo has never engaged in any

21   meaningful imminent default analysis.  Either the records from which Mr. Dolan prepared his

22   ───────────────

23   [3] Similarly, Wells Fargo denied Plaintiffs Omar and Ruth Bishr a loan modification for alleged
24   failure to show imminent default even though their monthly income after housing costs and taxes
      left them only ███ for daily living expenses.  *See* Berns Reply Decl., ¶ 29.  Wells Fargo also
25   denied Plaintiff Jennifer Murphy a loan modification for alleged failure to show imminent
      default even though her monthly income after taxes left her after paying all of her bills with only
26   ███ or ███ per day with which to pay for food, clothing, and other daily living expenses for
      herself and her two children.  *Id.*, ¶ 17.  Wells Fargo also denied Chan Pharn because he was not
27   in imminent threat of default despite only ███ remaining for him to survive after paying his
      mortgage and other monthly expenses.  *Id.*, ¶¶ 8-9.
28

───────────────
8

Plaintiffs' Supplemental Memorandum of Points and Authorities in Support of
Motion for Preliminary Injunction, 5:09-MD-02015-JF

declaration are incorrect, such that Wells Fargo has incorrectly determined the available gross income for all Settlement Class B Members who applied for modifications, or else Wells Fargo never performed this analysis for any Settlement Class B Member and Mr. Dolan (or whomever drafted his declaration) made this error in trying to reverse-engineer a purportedly plausible, after-the-fact basis for Wells Fargo's improper denials.  In either event, Wells Fargo breached the Settlement Agreement by failing to properly determine imminent default for Settlement Class B Members.

### c.  <u>The Impact of Wells Fargo's Breach of the Settlement Agreement</u>

If Wells Fargo had complied with the Settlement Agreement's and applicable HAMP requirements for determining whether a borrower is in imminent default based on consideration of all of his or her financial obligations, including income taxes, and reasonable living expenses, the Plaintiffs identified in the previous section would have been given loan modifications and would not have been forced deeper into debt and closer to the ends of their financial ropes. However, the wrongful loan modification denials have forced Plaintiffs and other Settlement Class Members to take desperate short-term action, with potentially devastating long-term consequences, to avoid foreclosure.  *See e.g.*, Young Decl. (Dkt. No. 365-10) ¶ 5, Geremia Decl. (Dkt. No. 365-24), ¶ 6 (using credit cards to pay other bills); Bishr Decl. (Dkt. No. 365-21), ¶ 5; Rosillo Decl. (Dkt. No. 365-5), ¶ 4, Cory Decl. (Dkt. No. 365-12), ¶ 5 (borrowing from elderly relatives and working excessive hours at the expense of his health and family.)

Other Settlement Class B Members have fared worse, as Wells Fargo's wrongful denials of modifications caused them to lose their homes through foreclosure or forced short sales to avoid foreclosure, or else left them subject to active foreclosure proceedings.  *See* Lum Supp. Decl., ¶¶ 3-12.  Eight Settlement Class Members alone face pending foreclosure sale dates within the next 2 months due to improper imminent default determinations.  *See id.*, Exs. 1-9 (Settlement Class Member declarations).

### d.  <u>Settlement Class B Members Are Likely to Succeed on the Merits.</u>

Wells Fargo has produced no evidence showing that other Settlement Class B Members

were treated any differently or subjected to any different standards than those described above that it used to improperly deny loan modifications to the above-discussed Plaintiffs. These Plaintiffs thus present substantial evidence that they and likely thousands of Settlement Class B Members will prevail on the merits of their claims for breach of the Settlement Agreement's "imminent default" provisions for determining the availability of loan modifications.

Wells Fargo in its opposition to the TRO application did not address this breach claim. Instead, it confused the issue by proceeding as though Plaintiffs' only argument was that imminent default must be found where a Settlement Class B Member's monthly housing debt to income ratio is above 31%. *See* Opposition to Plaintiffs' *Ex Parte* Request (Dkt. No. 371) at 17 ("First, the MDL-SA does not support plaintiffs' apparent theory that a borrower is in 'imminent default' if his or her PITIA exceeds the 'affordable' goal of 31%."). This narrow framing of the issue conveniently allowed Wells Fargo to ignore Plaintiffs' evidence showing how little, if any, money they had left each month for reasonable living expenses after paying income taxes, housing costs and other obligations that the Settlement Agreement and HAMP required Wells Fargo to consider. Although the fact that these Plaintiffs were paying well over 31% of their monthly income towards housing costs certainly was *relevant* to their imminent default claims since a 31% PITIA is the Settlement Agreement's proffered cure for imminent default (§ VI.E.5), it is not and never was Plaintiffs' contention that a 31% PITIA alone demonstrated imminent default. Wells Fargo thus confused and improperly narrowed the imminent default question and thereby avoided addressing most of Plaintiffs' evidence.

Wells Fargo also contends that the HAMP handbook required it to ignore income taxes. *See* Proposed Sur-Reply (Dkt. No. 379-1) at 2 n. 2. Once again, it is confusing the issue. HAMP does use gross income to compute housing-to-income and debt-to-income ratios, but it identifies ***net income*** as the appropriate measure of a borrower's actual ability to pay in determining imminent default. *See* RFJN, Ex. 1 (MHA Handbook) at 177 (sample non-approval notice stating that servicer cannot offer modification because "we have determined that you are not at risk of default because . . . You have sufficient ***net income*** to pay your current mortgage . . .")

Plaintiffs' Supplemental Memorandum of Points and Authorities in Support of
Motion for Preliminary Injunction, 5:09-MD-02015-JF

(emphasis added).  This is just common sense.  It is hard to conceive how a mortgage servicer could fairly evaluate a borrower's ability to pay his or her monthly debt and reasonable living expenses without knowing how much cash is available to the borrower each month.

Based on the foregoing, under a proper application of the Settlement Agreement's and HAMP criteria for determining imminent default, Plaintiffs have amply demonstrated Wells Fargo's breach of § VI.E.1-2 and I.1.33 of the Settlement Agreement in denying loan modification applications so as to establish a likelihood of success on the merits of this claim that warrants the proposed preliminary injunctive relief.

### 3.    Settlement Agreement § VI.E.5 and 6—MAP2R Waterfall and NPV Test

#### a.    The Operative Standard

The key component of the Settlement Agreement—the MAP2R waterfall—is comprised of seven steps that are designed to lower to 31% the ratio of a Settlement Class Member's monthly housing obligations to his or her gross monthly income.  § VI.E.5.  Three of these steps provide for principal forgiveness and/or forbearance, with the opportunity for the forbearance to become forgiveness if the borrower makes the necessary payments after the loan is modified,[4] based on the borrower's loan-to-value ratio.  *Id*.  This forbearance/forgiveness is available down to an LTV of 100%, such that it was designed to be a powerful tool for underwater borrowers to obtain relief.  The Settlement Agreement also requires Wells Fargo to offer a loan modification to qualifying Settlement Class Members where the Settlement's NPV test yields a positive result, § VI.E.6, *i.e.* where the calculation of the net present value of conducting the modification outweighs the net present value of not conducting the modification.  § I.1.47.

To make these determinations, where a key variable is the secured property's value, Wells Fargo must obtain and utilize a reasonable and reliable property valuation.  *See* RFJN, Ex. 1 A, § 6.8 ("Servicers may use either an automated valuation model (AVM), ***provided that the***

---

[4] The MAP2R waterfall is actually eight steps, the last of which is forgiveness of a third of forborne principal the first three anniversary dates if the borrower is current on her modification. Thus, it does not impact the 31% ratio at the time a modification application is evaluated.

*AVM renders a reliable confidence score*, a broker's price opinion BPO) or an appraisal. Confidence scores deemed reasonable by bank examiners are also considered reasonable for purposes of this program.") (emphasis added).

### b.  Wells Fargo's Breach of the Settlement Agreement

Wells Fargo is using highly *unreliable*, wildly varying, and inflated property valuations that skew the waterfall analysis and NPV results against modifications for Plaintiffs and Class Members.  As a result, Wells Fargo has denied loan modifications to over ████ Settlement Class Members who otherwise may have qualified based on property value-driven determinations of excessive forbearance (*i.e.,* the inability to reach the 31% ratio) and negative NPV results between April 2011 and September 2012.  *See* Ex. B.

For example, Wells Fargo used unreliable and inflated property valuations to deny loan modifications to Plaintiffs Michael and Kathy Lerner and Mary and Greg Slade based on allegedly excessive forbearance.  Wells Fargo claims that the Lerners' denial was due to inability to reach the 31% PITIA threshold through the MAP2R waterfall because of an allegedly low loan-to-value ratio where they owed ████ on their loan and Wells Fargo valued their property at over ████ in August 2012.  *See* Dolan Decl. (Dkt. No. 371-4), ¶¶ 48-49.  In fact, the County Assessor valued the Lerners' property just one month earlier at ████ Berns Reply Decl., ¶ 52 and Ex. AF.  Likewise, Wells Fargo denied the Slades a loan modification based on its alleged inability to reach a 31% PITIA payment after it both understated their monthly income and valued their property at ████, when the Slades later had the property appraised at ████.  *See* Berns Reply Decl., ¶ 39.  If Wells Fargo had used reliable valuations of the Lerners' and Slades' secured properties, they would have qualified for loan modifications and would not now be in default or drawing down their life savings to stave off foreclosure.

Wells Fargo also used unreliable and inflated property valuations to deny Richard D'Alessio a loan modification based on an allegedly negative NPV score where its automated valuation program first valued his property at ████ in February 2011 and then, when he contested this, re-valued it five months later in a stable real estate market at ████, shortly

before the property sold after foreclosure for just ████. *See* Richard D'Alessio Decl. (Dkt. No. 365-22), ¶¶ 4-12. Wells Fargo similarly denied Plaintiff Jason Fisher a loan modification in part based on an allegedly negative NPV score where its automated program valued his property at ████, but Mr. Fisher had his own appraisal done that valued the property at just ████. *See* Berns Reply Decl., ¶13, Ex. F. Wells Fargo also denied Plaintiff Nathan Ranger's application for a loan modification based on an allegedly negative NPV score where its automated program valued his property at ████, but Mr. Ranger had his own appraisal done that valued it at just ████. *See* Berns Reply Decl., ¶¶ 61-62, Ex. AK.

### c.   The Impact of Wells Fargo's Breach of the Settlement Agreement

Here, Wells Fargo's use of unreliable valuation methodologies has, not surprisingly, resulted in unreliable, wildly varying, and inflated property valuations that in turn have caused qualifying Plaintiffs and Settlement Class Members to be denied loan modifications in violation of the Settlement Agreement. As set forth above, Mr. D'Alessio lost his home due to Wells Fargo's failure to provide a loan modification because of its substantially inflated valuation of his (now former) home. Plaintiffs Mr. and Mrs. Lerner and Mr. Ranger are in default on their mortgages because of Wells Fargo's improper denial of modifications and foreclosure could occur at any time Wells Fargo sets one. Lerner Decl. (Dkt. No. 365-19), ¶¶ 2-3; Ranger Decl. (Dkt. No. 365-20), ¶¶ 2, 4. Plaintiffs Mr. and Mrs. Slade have had to draw down their retirement savings, leaving them with no savings, and pay other bills with high interest credit cards in order to keep making their unmodified mortgage payments and stave off foreclosure. Slade Decl. (Dkt. No. 365-18), ¶ 6. Plaintiff Fisher is forced to apply virtually all of the money he earns every month as a high school teacher to remain current on his unmodified monthly mortgage payments, leaving him with little if any money for his and his family's other life expenses. Jason Fisher Decl. (Dkt. No. 365-11), ¶¶ 7-8.

### d.   Settlement Class Members Are Likely to Succeed on the Merits.

In its TRO opposition, Wells Fargo again intentionally confused the issue with respect to Plaintiffs' breach claims based on property valuation. Instead of addressing Plaintiffs'

13

arguments about its unreliable and inflated property valuations, Wells Fargo framed the issue as though this were solely a question of whether the Settlement ever permits use of an automated valuation model.  *See* Opposition to *Ex Parte* Request (Dkt. No. 371) at 18 ("Next, plaintiffs claim Defendants have relied on automated appraisals, which lead to denials of loan modification applications due to an erroneous NPV determination.").  Setting aside that it represented to this Court at final approval of the Settlement that it was using full independent appraisals, by narrowing the issue to focus solely on *methodology* rather than *output*, Wells Fargo again swept Plaintiffs' most powerful evidence (the flawed property valuations themselves) under the rug.

Wells Fargo's unreliable property valuations are hardly surprising, since Wells Fargo relies almost exclusively on automated valuation models that federal banking regulators forbid as a primary basis for determining property values in mortgage loan originations.  *See* RFJN, Ex. 3 (GAO Report 12-840T, "Residential Appraisals:  Regulators Should Take actions to Strengthen Appraisal Oversight" (June 28, 2012)) at 7-8 ("Additionally, the federal banking regulators' guidelines state that BPOs and AVMs cannot be used as the primary basis for determining property values for mortgages originated by regulated institutions.").  Indeed, Wells Fargo itself appears to recognize the unreliability of its AVM-based property valuations since it requires any Settlement Class Member who disputes Wells Fargo's valuation to pay Wells Fargo hundreds of dollars to obtain a reliable, independent appraisal.  *See* Lum Supp. Decl., Ex. 15 (Settlement Class Member Auston O'Neill Decl., Ex. C (Wells Fargo's Net Present Value Disclosure)).

Plaintiffs cannot assess the validity of all of Wells Fargo's excessive forbearance and NPV determinations because Wells Fargo does not disclose the inputs used for these calculations (including property valuations) in its reporting to Lead Class Counsel.  Further, for denials based on "excessive forbearance," Wells Fargo does not provide Settlement Class Members with any of the data used for the waterfall calculation and Wells Fargo has taken the position that it need not disclose MAP2R NPV inputs to Class Members because the information is "proprietary."  *See*  Lum Supp. Decl., ¶ 30, Ex. 91 (Wells Fargo's denial letter to George Love).  Nor has Wells Fargo provided any evidence to the Court that would support findings that a) these calculations

Plaintiffs' Supplemental Memorandum of Points and Authorities in Support of
Motion for Preliminary Injunction, 5:09-MD-02015-JF

for other Settlement Class Members are any more reliable than those for the Plaintiffs above, where its determinations inflated property values by hundreds of thousands of dollars and varied wildly when re-calculated; or b) its property valuations are sufficiently reliable in accordance with the HAMP guidelines incorporated in the Settlement Agreement.

Under a proper application of the Settlement Agreement's and the Treasury Department HAMP guidance's requirements of reasonable and reliable determinations of a secured property's fair market value, Plaintiffs and similarly situated Settlement Class Members have amply demonstrated Wells Fargo's breach of Sections VI.E.6, I.1.40, and I.1.42 of the Settlement Agreement in denying them loan modifications based on grossly inflated property valuations and allegedly negative NPV scores, so as to show a likelihood of success on the merits of this claim that warrants preliminary injunctive relief.

### 4.   Settlement Agreement § VI.E.1-2—"MAP2R Modifications"

#### a.   The Operative Standard

A MAP2R modification is undeniably more beneficial to Settlement Class Members because it, unlike a HAMP modification, provides for a more generous permanent write-down of principal in the waterfall.  *See* § VI.E.5.e.3-8.  MAP2R relief thus gives a greater economic benefit to Settlement Class Members, and its principal write-down component is uniquely tailored to the claims in the underlying litigation that Settlement Class Members released based on Defendants' fraudulent concealment of their Pick-a-Payment loans' guaranteed increasing principal balances (negative amortization).  Thus, MAP2R modifications are a critical form of relief that the Settlement Agreement requires Wells Fargo to offer whenever possible:

> Subject to the provisions contained in Section VI(E)(4), Settlement Class B Members in Imminent Default, who later become in Imminent Default, or who later become in Default, and Settlement Class C Members who do not qualify for or elect a HAMP Modification shall be considered for a MAP2R Modification on the terms as outlined in Sections VI(E)(3) and (5) of this Agreement.

§ VI.E.2.

#### b.   Wells Fargo's Breach of the Settlement Agreement

---

15

Wells Fargo is not considering every Settlement Class Member applicant for both a HAMP and a MAP2R modification irrespective of the former's availability, as evidenced by its loan modification denial letters.  For example, the denial letters for Settlement Class Members Frances R. Austin and Michael and Pauline Blake, who declined HAMP modifications, reflect that Wells Fargo did not offer them MAP2R modifications.  Lum Supp. Decl. ¶¶ 28-29, Exs. 89 and 90.  Instead, it appears that Wells Fargo is requiring such Class Members to separately request a MAP2R modification, when the Settlement Agreement provides that Class member applicants "who do not qualify for or elect a HAMP modification **shall be considered for a MAP2R Modification** . . ."  § VI.E.2.  Similarly, the denial letters for Plaintiffs Chan C. Pharn and Paul and Julie McDermed reflect that they were denied HAMP modifications, but there is no indication that they were ever considered for MAP2R modifications.  *See* TRO Reply Declaration of Albert G. Lum (Dkt. No. 377-3), Exs. AA and AG-AI.

The statistical evidence that Wells Fargo is almost exclusively giving HAMP modifications without offering MAP2R relief is stark, laying bare Wells Fargo's apparent motivation in administering the Settlement to minimize at all costs the number of MAP2R modifications that reduce a Settlement Class Member's deceptively inflated principal balance. Wells Fargo's own quarterly reporting on its administration of the Settlement Agreement's loan modification benefit shows that from April 2011 to September 2012, it received ████ applications for loan modifications from Settlement Class Members and granted ████ modifications during this period, of which ██████ were HAMP modifications and only ██████ were MAP2R modifications.  *See* Ex. B hereto.  Although Wells Fargo has tried to dispute some of Plaintiffs' other statistical evidence, it has not and evidently cannot dispute Plaintiffs' demonstration that virtually all of its loan modifications under the Settlement Agreement are HAMP rather than MAP2R modifications, which thus allows Wells Fargo to keep all of a Class Member's deceptively inflated principal.

The vast preponderance of HAMP over MAP2R modifications under the Settlement Agreement is even more striking because *outside of this litigation* Wells Fargo does just the

opposite, relying almost exclusively on its proprietary modification programs instead of HAMP for borrowers with non-Pick-a-Payment, non-negatively amortizing loans.  For the universe of all residential mortgages that it services, Wells Fargo recently reported that out of 803,456 active loan modifications, "[a]pproximately 84 percent of those, or 675,753 modifications, were done through proprietary programs and 127,703 were done through the federal government's Home Affordable Modification Program."  Declaration of Ryan J. Egan ("Egan Decl.") attached hereto as Exhibit E, ¶ 2, Ex. 1 (News Release dated 10/8/2012).  In light of these hundreds of thousands of proprietary loan modifications granted to other mortgage borrowers outside of this litigation, Wells Fargo has no possible explanation for its nearly exclusive reliance on HAMP over MAP2R principal reductions in this Settlement Agreement, except that it is determined to retain and collect as much of the fraudulently inflated principal on Settlement Class Members' Pick-a-Payment loans as it can get away with doing.

### c.   The Impact of Wells Fargo's Breach of the Settlement Agreement

The impact of Wells Fargo's failure to offer MAP2R modifications to Class Members who qualify for HAMP is clear, as three steps of the MAP2R modification provide the potential for principal forgiveness while the HAMP waterfall does not require the same.  Thus, if a Class Member who reaches the 31% threshold under HAMP also could reach this threshold under MAP2R using the waterfall steps that provide principal forgiveness, he or she would plainly be better off under MAP2R, as he or she would not have to repay all or part of the negative amortization incurred as a result of the deceptive conduct that led to the Settlement.

### d.   Settlement Class Members Are Likely to Succeed on the Merits.

Since the Settlement Agreement requires that Wells Fargo consider all Settlement Class Member applicants for MAP2R modifications regardless of HAMP eligibility, it has breached the Settlement Agreement by steering Settlement Class Members almost exclusively towards HAMP modifications that leave in place their fraudulently inflated principal balances.  Plaintiffs and Settlement Class Members thus are likely to succeed on the merits of this breach claim, which further warrants entry of the proposed injunction to provide sorely needed oversight of

Wells Fargo's administration of the Settlement Agreement's loan modification benefit.

**5.    Other Breaches Necessitating Review of Loan Modification Denials**

Wells Fargo has committed other breaches of the Settlement Agreement's express provisions and implied good faith covenant that likewise necessitate the proposed relief requiring review of its loan modification denials to Settlement Class Members who still own their homes.

First, Wells Fargo's communications to Settlement Class Members often provide conflicting and/or incorrect information, making it difficult or impossible for them (or counsel) to determine if Wells Fargo has complied with the Settlement Agreement.  For example, when Settlement Class Member George Love sought further information about his loan modification denials, Wells Fargo sent him a letter stating that (a) it reviewed his application under HAMP and MAP2R on the same day, but used gross monthly income of ███████ for HAMP and ███████ for MAP2R, even though MAP2R incorporates HAMP's gross income definition.[5] Lum Supp. Decl. ¶ 30, Ex. 91.  Similarly, Settlement Class Member Maria Marcantonio received three denial letters in a 6-month period, each of which contained different gross income amounts. Declaration of Marie Marcantonio, ¶ 6 attached hereto as Ex. 10 to Lum Supp. Decl.  Moreover, there are circumstances where Wells Fargo does not give the Class Member any useful information.  *See* Lum Supp. Decl. ¶ 30, Ex. 91 ("The MAP2R was denied due to negative NPV. In the case of a non-HAMP review, the NPV values are not released, as they are considered proprietary").

Further, Wells Fargo is using different measurements of monthly housing expenses for different Settlement Class Members depending on which will result in denial of a MAP2R modification.  The Settlement Agreement requires Wells Fargo to apply the steps of the MAP2R waterfall upon "verification that the Settlement Class Member's [debt to income] ratio is above thirty-one percent (31%)."  § VI.E.2.  For some Settlement Class Members, Wells Fargo's DTI

---

[5] *See* § 1.22 ("'DTI' or 'Debt-to-Income Ratio' means the ratio of the Borrower's first-lien monthly mortgage obligations … ***to the Borrower's gross monthly income, all determined in accordance with HAMP***, as defined in Treasury's Supplemental Directive 9-01: Introduction of the Home Affordable Modification Program, April 6, 2009") (emphasis added).

Plaintiffs' Supplemental Memorandum of Points and Authorities in Support of
Motion for Preliminary Injunction, 5:09-MD-02015-JF

calculation uses only mortgage principal and interest (and not taxes, insurance and association fees), when doing so results in a housing expense below 31% that would preclude any MAP2R modification.  Berns Reply Decl., ¶ 7.  For other Settlement Class Members, however, Wells Fargo adds taxes, insurance and association fees into the DTI calculation where doing so yields a higher monthly housing expense that prevents a modification because the MAP2R Waterfall will not bring the DTI down to 31%.  *Id.*  Wells Fargo's practice of applying the same Settlement provisions differently to different borrowers in order to deny them modifications is a breach of the Settlement Agreement and its good faith covenant "providing that no party to the contract will do anything that would deprive another party of the benefits of the contract."  *Digerati Holdings, LLC v. Young Money Entm't, LLC*, 194 Cal. App. 4th 873, 885 (2011).

Wells Fargo also has breached the Settlement Agreement by denying loan modifications to Settlement Class Members to whom it sent Settlement Class B and C notices because they still have their Pick-a-Payment loans, on the grounds that they actually are Settlement Class A Members based upon their prior receipt of a loan modification.  *See* Berns Reply Decl., ¶ 7.  This bait-and-switch where Wells Fargo sent Class Members notice of Settlement that promised them consideration for loan modifications as an inducement to release their claims through the Settlement, and then deemed them to be categorically excluded from this relief after the Court approved the Settlement likewise is a breach of Section VI.E and its covenant of good faith and fair dealing.  *See, e.g.*, *Precision Pine & Timber, Inc. v. U.S.*, 596 F.3d 817, 829 (Fed. Cir. 2010) ("Cases in which the government has been found to violate the implied duty of good faith and fair dealing typically involve some variation on the old bait-and-switch.").

### 6.   **Wells Fargo's Breaches of the Settlement's Reporting Requirements**

Finally, Wells Fargo has breached the Settlement Agreement by repeatedly failing to give Lead Class Counsel accurate reporting of its loan modification determinations.  The Settlement requires Wells Fargo to give Lead Class Counsel quarterly reports that:

provide the following information:  (1) the number of Settlement Class Members who have requested loan modifications; (2) the number of

19

Settlement Class Members who received HAMP Modifications or MAP2R Modifications; (3) the number of Settlement Class Members denied loan modifications; and (4) the number of Settlement Class members who received HAFA/Short Sale/Deed-in-Lieu of Foreclosure payments.

§ VI(H).  Wells Fargo has not done this.

When Lead Class Counsel told the Court that Wells Fargo received ███ requests for loan modifications pursuant to the Settlement from April 2011 to September 2012, this figure was taken straight from Wells Fargo's reporting.  *See* Berns TRO Decl. (Dkt. No. 365-2), ¶ 8. But Wells Fargo disputed the accuracy of this figure, claiming that it includes individual Settlement Class Members multiple times if they submitted multiple applications, such that the number of individual Settlement Class Members who applied for loan modifications is smaller. *See* Dolan Suppl. Decl. (Dkt. No. 373), ¶¶ 4-7.  Wells Fargo's failure to include that lesser figure in its quarterly reporting is a breach of the Settlement Agreement.

So too may be Wells Fargo's failure to accurately report the total number of loan modifications it has granted pursuant to the Settlement Agreement.  While the Supplemental Dolan Declaration (Dkt. No. 373) states that ███ loan modifications were granted from December 2010 to December 2012 (Suppl. Dolan Decl., ¶ 13), Wells Fargo has reported to the Securities Exchange Commission in its 10Q submissions and Annual Report that it granted 27,700 modifications pursuant to the Settlement Agreement from January 2011 to September 2012.  *See* Egan Decl., ¶ 3, Exs. 2-8.  The latter thus represents a 35% *increase* in the number of modifications allegedly granted during a *shorter* time period.  Wells Fargo's reporting of different numbers of Settlement loan modifications to Lead Class Counsel, the Court, and its regulator demonstrate yet another likely breach of the Settlement Agreement's requirement of accurate reporting.

Of far greater concern, Lead Class Counsel have been contacted by over ███ Settlement Class Members whose names do not appear on any of Wells Fargo's reporting lists, but who state that Wells Fargo denied their applications for loan modifications pursuant to the Settlement Agreement.  Lum Supp. Decl., ¶ 26.  Plaintiffs submit herewith the loan modification denial

20

letters from Wells Fargo to 20 of these unlisted Settlement Class Members (5 of whom have already lost their homes to foreclosure or are currently being foreclosed) that Lead Class Counsel has been able to obtain so far.  *Id.*, Exs. 63-87.  The existence of thousands of unlisted, unreported Settlement Class Members who were or may have been denied loan modifications, of whom Lead Class Counsel would never have been aware but for its efforts to investigate Wells Fargo's improper loan modification denials, thoroughly discredits all of Wells Fargo's reporting to Lead Class Counsel *and to the Court* about its administration and enforcement of the Settlement Agreement's loan modification relief.

Additionally, Wells Fargo claimed that only ████ class members had experienced solely a "fall-out" (Suppl. Dolan Decl., ¶ 11), but Lead Class Counsel has identified ████ class members listed in the "fall-out" reports provided by Wells Fargo who appear to have only experienced a "fall-out."  *See* Egan Decl., ¶ 4.  This number is important because the existence of these thousands of additional exclusive "fall-outs," coupled with the thousands of Class Members who claim they have been denied but are not listed on any report, means that Wells Fargo is substantially understating the number of denials.

In sum, Wells Fargo's repeated failures to give an accurate accounting of its own conduct as required by the Settlement Agreement, when coupled with all of its other repeated breaches of the Settlement demonstrated herein, necessitate the proposed injunction requiring Wells Fargo to submit its loan modification denials to outside review before they can be deemed final.

### 7.   Federal Law Defenses to Settlement Class Members' Breach Claims

The Court correctly held in its TRO Order that federal law does not bar Plaintiffs' claims for provisional or any other relief to remedy Wells Fargo's breach of the Court-approved Class Action Settlement Agreement.  *See* TRO Order at 5-6 n.2 (addressing Home Owners' Loan Act, 12 U.S.C. §§ 1461 *et seq.*, preemption; Anti-Injunction Act, 28 U.S.C. § 2283; and *Rooker-Feldman* doctrine).  Nothing Plaintiffs argue herein supports a contrary conclusion.

The Court also found, however, that the federal court abstention doctrine recognized in *Younger v. Harris*, 401 U.S. 37 (1971), "might be implicated by an injunction that interfered

21

  
with pending judicial foreclosure or eviction actions." TRO Order at 6 n.2.[6] The Court further

found that an injunction could be crafted to avoid interference. *Id.* Plaintiffs respectfully submit

that the Court should not abstain in such cases because *Younger* applies only where pending state

proceedings "afford the federal plaintiff an adequate opportunity to raise [his or her federal

court] claims." *Agriesti v. MGM Grand Hotels, Inc.*, 53 F.3d 1000, 1001 (9th Cir. 1995). Here,

state court foreclosure proceedings would not allow Class Members to raise their breach claims

because the Settlement Agreement vests this Court with "exclusive and continuing jurisdiction

over the Lawsuit, the Parties, Settlement Class Members, and the Settlement Administrator in

order to interpret and enforce the terms, conditions, and obligations under this Agreement." §

XIV. Thus, a state court would not have jurisdiction to decide a Settlement Class Member's

claims or defenses to foreclosure based on the Settlement. Moreover, even if this Court's

jurisdiction were not exclusive, it still would be unlikely that any Class Member not represented

by counsel in a foreclosure action would have the wherewithal to defend by challenging the

validity of the asserted debt based on Wells Fargo's breaches of the Settlement Agreement

shown herein. Thus, the *Younger* abstention doctrine does not bar the proposed injunction.

### C. Plaintiffs and Settlement Class Members Face Irreparable Harm.

The proposed injunction requiring Lead Class Counsel's review of loan modification

denials to Settlement Class Members who still own their homes is necessary to prevent

irreparable harm to them, including both loss of their homes and their continued resort to

desperate measures that are destroying their financial stability in order to keep making their

mortgage payments. *See* Plaintiffs' TRO Reply (Dkt. No. 375) at 20-23.

In denying the TRO, the Court explained that it "would be reluctant to grant the broad

classwide relief requested here" based upon evidence of five individual Plaintiffs who faced

scheduled loss of their homes through foreclosure or short sales. TRO Order at 6. To address

this concern, Plaintiffs file herewith declarations of 20 additional Settlement Class Members

---

[6] To clarify, evictions are not at issue because Plaintiffs seek relief only on behalf of Class
Members who still own their homes.

whose homes were foreclosed, who are in the midst of foreclosure, or who have received foreclosure notices, all due to Wells Fargo's breaches of the Settlement Agreement in denying them loan modifications.  *See* Lum Supp. Decl., Exs. 1-20.

In addition to the irreparable harm from scheduled foreclosures and forced short-sale closings, Plaintiffs have demonstrated that even those who are not now in foreclosure or do not have scheduled short-sales face a significant risk of this occurring, and are struggling to fend off this danger by resorting to desperate measures to make payments on their unmodified mortgages, which also threaten substantial harm to theirs and their families' well-being.  *See* Plaintiffs TRO Brief (Dkt. No. 365-1) at 9-20.  These unsustainable measures threaten to destroy Plaintiffs' credit ratings and long-term economic well-being, which are precisely the types of harms that the Settlement's loan modification relief was meant to prevent by providing affordable payments.

The irreparable harm at stake thus is not just to Settlement Class Members who have pending foreclosures or short-sales.  Every Plaintiff has demonstrated an irreparable harm *either* in the pending loss of their homes or else in their ongoing depletion of finite economic resources. This recurring harm across the families of 20 different Plaintiffs and the 20 additional Settlement Class Members who filed declarations stating that they faced or still face foreclosure because of Wells Fargo's breaches of the Settlement Agreement, does precisely what this Court has held is required to support class-wide injunctive relief, *i.e.* they "show both particularized harm through their affidavits and reason to infer that the harms faced by the declarants are representative of prospective class members generally."  *Angotti v. Rexam*, 2006 WL 1646135, at *15 (N.D. Cal. June 14, 2006) (citing *LaForest v. Clean Air Holding Co.*, 376 F.3d 48, 58 (2d Cir. 2004)).

Plaintiffs also have shown that thousands of other Settlement Class Members likewise were denied loan modifications where Wells Fargo presumably utilized the same impermissible Class C requirement of imminent default or hardship, the same improperly cramped definition of "imminent default" for Class B, the same excessive forbearance and NPV determinations based on unreliable and inflated property valuations, and the same failure to evaluate Class Members for MAP2R relief where lesser HAMP relief was available, all in a concerted attempt to avoid

23

MAP2R modifications writing down principal.  The inference that Plaintiffs' experience of these harms is representative of the Settlement Class's experience thus is more than warranted.  The irreparable harm factor weighs strongly in favor of the proposed injunction requiring Lead Class Counsel's review of denied loan modifications for Class Members who still own their homes.

### D.  The Balance of Equities Favors Issuing the Proposed Injunction.

In light of Plaintiffs' demonstration of the foregoing breaches and irreparable harms to themselves and Settlement Class members, the balance of equities favors issuing the proposed injunction requiring independent review of Wells Fargo's loan modification denials.  In the TRO Order, the Court found that the types of stress and financial hardship Plaintiffs demonstrate "are entitled to substantial weight," but that "shutting down [Defendants'] ability to schedule foreclosures and short sales would have a significant effect on them[,]" so that "the equities do not tip sharply in favor of either side."  TRO Order at 6.

Plaintiffs respectfully submit that the balance of equities favors issuing the proposed injunction because, even if the *types* of economic harms that the Court identified both parties as facing are substantial, the harms suffered by Plaintiffs and Class members are more clearly irreparable.  If an injunction is not granted and Plaintiffs' and Class Members' loan modification denials are not reviewed in the near term, they will continue to lose their homes or face the threat of foreclosure and have to exhaust their resources to make their unmodified mortgage payments, thereby subjecting themselves and their families to long-term economic hardships and damaged credit ratings that will hinder their economic well-being far into the future.

By contrast, Wells Fargo's asserted economic harms would be strictly time-limited at worst.  Wells Fargo has not provided any evidence concerning the number of foreclosure sales that are scheduled in the coming months, such that its claim of substantial harm should be found ineffectual.  Even if this claimed harm were credited, however, Wells Fargo's only possible economic harm—from a postponed foreclosure where a loan modification denial is determined to be proper—is time-limited, and a Class Member would have no incentive to willfully default by not making payments during this time.  To minimize harm to Wells Fargo and expedite relief

to Settlement Class Members, Plaintiffs, as suggested in their TRO papers, believe that counsel for the parties should be given a short window (perhaps a week) to negotiate the parameters of the review process and, if unsuccessful, the parties can promptly submit their areas of agreement and counter-proposals on areas of disagreement to the Court for resolution.  Plaintiffs also envision that the harm to Defendants will be minimized as the process will provide for a priority review (a maximum of 90 days from foreclosure date) and a priority dispute resolution procedure (a maximum of 90 days from when Lead Class Counsel disputes the denial) for loan modification denials where foreclosure dates are set in the order of those dates, and a procedure for reinstituting foreclosures where Lead Class Counsel agrees with the denial or the dispute resolution procedure is resolved in Defendants' favor.  Other components of the procedure should include an attorneys' fee provision for the review of the denial and an expedited dispute resolution procedure where Lead Class Counsel disagrees with the denial (including attorneys' fees based on any savings that result from a successful modification).

Thus, although the types of economic harm that the Court found both parties to face are potentially substantial, the far greater duration and likelihood of permanent harm to Plaintiffs and Settlement Class Members of being subject to loss of their homes and life savings where Wells Fargo improperly denied them mortgage modifications under the Settlement Agreement should be held to weigh in favor of issuing the proposed injunction.

### E.  The Public Interest Favors Issuing the Proposed Injunction.

For the reasons Plaintiffs previously argued (TRO Brief (Dkt. No. 365-1) at 34), the Court correctly found that "the public has a strong interest in the fair, lawful handling of their mortgages by their lenders" (TRO Order at 7), which favors the proposed preliminary injunction.

### IV.    CONCLUSION

For the reasons set forth herein and in the TRO application papers, the Court should issue the proposed preliminary injunction requiring that Lead Class Counsel review all prior denials of loan modifications for Settlement Class Members who still own their homes before any foreclosure is instituted or continued, and of all future denials before they are deemed final.

1

DATED:  January 11, 2013                    **BERNS WEISS LLP**

2

3

By: ____/s/ *Jeffrey K. Berns*____

4

Jeffrey K. Berns (SBN 131351)

5

jberns@law111.com
20700 Ventura Blvd., Suite 140

6

Woodland Hills, CA 91364
Telephone: (818) 961-2000

7

Facsimile: (818) 999-1500

8

—and—

9

Lee A. Weiss (admitted *pro hac vice*)

10

lweiss@law111.com
626 RXR Plaza

11

Uniondale, NY 11556
Telephone: (818) 961-2000

12

Facsimile: (818) 999-1500

13

*Attorneys for Plaintiffs and the Settlement*

14

*Class*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs' Supplemental Memorandum of Points and Authorities in Support of
Motion for Preliminary Injunction, 5:09-MD-02015-JF