Amanda L. Groves (SBN: 187216)
agroves@winston.com
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111-5802
Telephone: (415)    591-1000
Facsimile: (415)    591-1400

T. Thomas Cottingham, III *(admitted pro hac vice)*
tcottingham@winston.com
Stacie C. Knight *(admitted pro hac vice)*
sknight@winston.com
WINSTON & STRAWN LLP
100 North Tryon Street, Suite 2900
Charlotte, NC 28202-1078
Telephone: (704)    350-7700
Facsimile: (704)    350-7800

Mark T. Flewelling (SBN 96465)
mflewelling@afrct.com
Leigh O. Curran (SBN: 173322)
lcurran@afrct.com
Yaw-Jiun (Gene) Wu (SBN: 228240)
gwu@afrct.com
ANGLIN, FLEWELLING, RASMUSSEN, CAMPBELL, AND TRYTTEN, LLP
199 So. Los Robles Ave., #600
Pasadena, CA 91101
Telephone: (626)    535-1900
Facsimile:    (626) 577 -7764

Attorneys for Defendant
WELLS FARGO BANK, N.A.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| IN RE: WACHOVIA CORP. "PICK-A-PAYMENT" MORTGAGE MARKETING AND SALES PRACTICES LITIGATION<br><br>This document relates to:<br><br>*ALL CASES* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No.** M:09-cv-2015-JF<br><br>**DEFENDANT'S SUPPLEMENTAL OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>The Honorable Jeremy Fogel<br><br>Date: January    31, 2013<br>Time: 3:00    p.m.<br>Place:    Courtroom 3 |

**Winston & Strawn LLP**
**101 California Street**
**San Francisco, CA 94111-5802**

93000/HR0710/00567907-1

# TABLE OF CONTENTS

Page

I.     PLAINTIFFS' STATISTICAL REPRESENTATIONS ARE FALSE. .............................2

II.    THE REMAINDER OF PLAINTIFFS' "EVIDENCE" IS UNRELIABLE  AND
       SHEER SPECULATION THAT DOES NOT SUPPORT THEIR CLAIMS....................6

III. ARGUMENT     .................................................................................................9

       A.     Plaintiffs Have Not Demonstrated a Likelihood of Success on Their Imminent
              Default Theory.......................................................................................10

       B.     Plaintiffs' Property Valuation Theory is Contrary to the Express Terms of the
              Settlement Agreement............................................................................15

       C.     Plaintiffs' Other Alleged Violations Are Not Linked to Imminent, Irreparable
              Harm. ...................................................................................................17

       D.     Plaintiffs Have Not Shown Irreparable Harm.........................................23

IV. CONCLUSI     ON.............................................................................................25

Winston & Strawn LLP
101 California Street
San Francisco, CA  94111-5802

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Appling v. Wachovia Mortg., FSB,*
   745 F. Supp. 2d 961 (N.D. Cal. 2010) ..................................................................................17

*Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.,*
   762 F.2d 1374 (9th Cir. 1985) ...........................................................................................24

*Protech Diamond Tools, Inc. v. Liao,*
   No. 08-3684, 2009 WL 1626587 (N.D. Cal. June 8, 2009)....................................................24

*Spears v. Wash. Mut., Inc.,*
   2009 U.S. Dist. LEXIS 21646 (N.D. Cal. Mar. 9, 2009).........................................................17

*Westlands Water Dist. v. United States,*
   337 F.3d 1092 (9th Cir. 2003) ...........................................................................................16

*Zepeda v. Paypal, Inc.,*
   777 F. Supp. 2d 1215 (N.D. Cal. 2011) ..............................................................................16

**STATE CASES**

*Guz v. Bechtel Nat'l Inc.,*
   24 Cal. 4th 317 (2000) ....................................................................................................20

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1  Defendant Wells Fargo Bank, N.A. ("Wells Fargo") by and through its undersigned counsel

2  and pursuant to the Court's December 21, 2012 Order Denying Application for Temporary

3  Restraining Order and Setting Hearing on Motion for Preliminary Injunction ("Dec. 21 Order")

4  (Doc. 390), submits the following Supplemental Opposition to Plaintiffs' Motion for Preliminary

5  Injunction ("Plaintiffs' Motion").

6  After spending two years marshalling flimsy evidence and after dawdling for months, or even

7  years, after Wells Fargo denied the moving Plaintiffs (as well as those submitting supplemental

8  declarations) for loan modifications, Plaintiffs filed their Motion, claiming that they will suffer

9  irreparable harm unless the Court grants the sweeping and wholly impracticable relief they seek.

10  Plaintiffs' delay alone justifies denial of their Motion, without the Court even needing to reach

11  likelihood of success on the merits.

12  When one examines the merits, however, Plaintiffs' Motion appears even more egregious.

13  The centerpiece of Plaintiffs' Motion is the Declarations of their Lead Counsel, Jeffrey K. Berns,

14  which lack credibility for a host of reasons.  First and foremost, Mr. Berns submitted false statistics

15  to this Court—false statistics he now seeks to brush aside with the flippant explanation (**_buried in a_**

16  **_footnote_**) that they resulted from an "inadvertent calculation figure."  Plaintiffs' Supp. Mem. of

17  Points & Auth. ISO Mot. for Prel. Inj. at 2 n.2 ("Plaintiffs' Supp.") (Doc. No. 394).  But those false

18  statistics were the linchpin of the Court's statement in the December 21 Order that "[t]hese figures

19  raise significant questions, as they suggest that class members may have been denied the primary

20  benefit for which they released their claims against Defendants, that is, fair consideration for loan

21  modification under the procedures set forth in the settlement agreement."  Mr. Berns' explanation

22  that these statistics were the result of an "inadvertent calculation figure" is not satisfactory.

23  What's worse, the false statements do not stop there.  In their Supplemental Motion,

24  Plaintiffs claims that Wells Fargo's filings with the Securities and Exchange Commission ("SEC")

25  demonstrate that Wells Fargo has provided false reporting to Lead Counsel **_and to this Court_**.

26  Plaintiffs' Supp. at 20.  But it is Plaintiffs' statements that are inaccurate.  Even a cursory review of

27  the documents upon which their attorney relies to support that statement demonstrates that Wells

28  Fargo does not and has not reported to the SEC the number of loan modifications it has granted

DEFENDANT'S SUPPLEMENTAL OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1    pursuant to the Settlement Agreement in this matter.

2         The other cornerstone of Plaintiffs' Motion is the declarations submitted by moving Plaintiffs

3    and other Settlement Class Members, which set forth a host of disagreements those individuals have

4    with Wells Fargo's loan modification denials, including how Wells Fargo calculated their income,

5    how Wells Fargo valued their properties, and other vague disagreements and complaints.

6    Significantly, the declarations provide very little information at all, instead offering only hearsay,

7    speculation, and implications of "guilt by disagreement."

8         This case concerns a heavily negotiated, Court-approved Settlement Agreement.  After the

9    Court rejected Plaintiffs' first theories in support of their Motion, Plaintiffs changed course, and now

10   seek to greatly expand upon the Settlement Agreement their counsel negotiated and to which Lead

11   Counsel agreed.  Plaintiffs' wild accusations and manufactured theories aside, they offer no credible

12   evidence to support even a hint of the conclusion that Wells Fargo has breached its obligations under

13   the Settlement Agreement.

14        Plaintiffs request a preliminary injunction "requiring that Lead Class review all prior denials

15   of loan modifications for Settlement Class Members who still own their homes before any

16   foreclosure is instituted or continued, and of all future denials before they are deemed final."

17   Plaintiffs' Supp. at 25.  This demand is excessive, wholly impracticable, and unsupported.  There is

18   no basis for a preliminary injunction or for any other relief sought by Plaintiffs.  Plaintiffs' Motion

19   should be denied.

20              **I.    PLAINTIFFS' STATISTICAL REPRESENTATIONS ARE FALSE.**

21        In their original Motion, Plaintiffs claimed that:

22   •    In the eighteen-month period from April 2011 to September 2012, 66,671 Settlement
          Class B and C members have applied for loan modifications.

23
     •    Based on my review of reports provided to me by Defendants, during the period from
24        April 1, 2011 to September 30, 2012, [Wells Fargo] classified over 70% (37,909 out
          of 52,252) Settlement Class B Members and over 25% (3,781 out of 14,419)
25        Settlement Class C Members as "Fall-Outs," which means that Wells Fargo never
          evaluated the loan modification applications of those Settlement Class Members
26        because of their alleged failure to provide all necessary documentation.

27   Declaration of Jeffrey K. Berns ¶¶ 8, 14 ("Berns Dec.") (Doc. No. 365-2).  Those statements are

28

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

false.

First, "[i]n the eighteen-month period from April 2011 to September 2012, 66,671 Settlement Class B and C **Members**" **did not** apply loan modifications.  As Lead Counsel well knows, 66,671 represents every single instance in which a Settlement Class B or C Member contacted Wells Fargo, expressed interest in applying for a loan modification, and was mailed an application packet. Supplemental Declaration of Michael Dolan ("Supp. Dolan Dec.") ¶ 4.[1]  As Lead Counsel also knows—and as is evident from the reports upon which he relies to make the statements set forth above—many Settlement Class Members contact Wells Fargo to enter the loss mitigation process multiple times.  *Id*.  Accordingly, the 66,671 figure sponsored by Plaintiffs does not represent the number of Settlement Class B and C **Members** who have applied for a loan modification—it represents the number of application packets Wells Fargo mailed to Settlement Class B and C Members from April 2011 to September 2012.  *Id*.  Many Settlement Class B and C Members have requested and been mailed application packets on multiple occasions.  *Id*.

From December 16, 2010 to December 12, 2012, the total number of Settlement Class B Members who had requested and been mailed an application packet was **30,836**.  *Id*. ¶ 5.[2]

Accordingly, as of December 12, 2012, **96,282** Settlement Class B Members had **never** requested loan modification evaluation.  *Id*.  During that same time period, **18,417** Settlement Class C Members requested and were mailed application packets, with **19,994** Settlement Class Members **never** requesting loan modification evaluation.

Importantly, from December 16, 2010 to December 12, 2012, Wells Fargo has approved **10,483** Settlement Class C Members and **9,966** Settlement Class B Members—a total of 20,449 of those requesting application packets—for either a HAMP or MAP2R loan modification— **representing an approval rate of 41.5%**.  *Id*. ¶ 13.  Plaintiffs' suggestion that Wells Fargo has

---

[1]     The Supplemental Declaration of Michael Dolan originally was filed with the Court on December 14, 2013.  For the Court's convenience, Wells Fargo submits that declaration again in connection with the instant filing.

[2]     In their Supplemental Motion, Plaintiffs make the remarkable claim that "Wells Fargo's failure to include the lesser figure in its quarterly reporting is a breach of the Settlement Agreement." Plaintiffs' Supp. at 20.  Plaintiffs fail to inform the Court that Wells Fargo provides Lead Counsel with a quarterly report that lists the names and addresses associated with each application.  Lead Counsel can easily "de-dupe" those lists and come to the same figures presented here.

DEFENDANT'S SUPPLEMENTAL OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Winston & Strawn LLP
101 California Street
San Francisco, CA  94111-5802

provided only a comparatively small number of Settlement Class Members with requested loan

modifications does not withstand scrutiny.

Second, it is simply impossible for Wells Fargo to have classified "over 70% (37,909 out of

52,252) Settlement Class B Members and over 25% (3,781 out of 14,419) Settlement Class C

Members as 'Fall-Outs'" as Lead Counsel states.  The "fall-out" reports Wells Fargo has provided to

Lead Counsel contain the following information:

- From the period December 17, 2010 through September 30, 2012, a total of **15,177** applications went to "fall-out."  Borrowers who never return their application packets, or who never supply missing documents are classified as "fall-outs."  Supp. Dolan Dec. ¶ 10.

- Of the 15,177 applications going to fall-out, **2,309** of those applications were duplicate applications—borrowers submitting more than one application during that time period.  January 23, 2013 Declaration of Michael Dolan ("Jan. 23 Dolan Dec.") ¶ _.

- From April 1, 2011 to September 30, 2012, the total number of applications going to fall-out is **13,138 (11,438 unique borrowers)—not 41,690 as Lead Counsel claimed**.  *Id*.

The Court rightly was concerned with Lead Counsel's statement that such a large number of

Settlement Class Members had gone to fall-out.  But, as demonstrated above, those numbers were

significantly overstated, and there simply is no conceivable way the reports provided by Wells Fargo

could have led to those conclusions.  But rather than putting the corrected figures front-and-center,

Plaintiffs chose to bury the explanation in a footnote and brush it aside as an "inadvertent calculation

figure."

What's more, those false statistics were used to support Lead Counsel's statement that

"Wells Fargo ***never*** evaluated the loan modification applications of those [41,690] Settlement Class

Members because of their alleged failure to provide all necessary documentation."  Berns Dec. ¶ 14

(emphasis added).  But, from December 16, 2010 to December 12, 2012, there were **5,077**

Settlement Class B Members and **2,148** Settlement Class C Members whose ***only*** experience had

been a fall-out.  Supp. Dolan Dec. ¶ 11.  Stated differently, only **14.66%** of those requesting an

application packet were never evaluated due to their failure to return the packet and all required

supporting documents.  The rest applied again and were given a full review.  The statement that

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

4

DEFENDANT'S SUPPLEMENTAL OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1   Wells Fargo "never" evaluated these borrowers' modification applications is simply untrue.

2          Shockingly, despite being notified of these significant errors through Wells Fargo's

3   December 14, 2012 filing, the false statements continue. In their supplemental filing, Plaintiffs now

4   claim that Wells Fargo has provided false reporting to Lead Counsel and to this Court. Specifically,

5   Plaintiffs argue that:

6              While the Supplemental Dolan Declaration states that 20,449 loan
               modifications were granted from December 2010 to December 2012, Wells
7              Fargo has reported to the Securities Exchange Commission in its 10Q
               submissions and annual report that it granted 27,700 modifications pursuant to
8              the Settlement Agreement from January 2011 to September 2012. The latter
               thus represents a 35% increase in the number of modifications allegedly
9              granted during a shorter time period. Wells Fargo's reporting of different
               numbers of Settlement loan modifications to Lead Class Counsel, the Court,
10             and its regulator demonstrated yet another likely breach of the Settlement
               Agreement's requirement of accurate reporting.

11  Plaintiffs' Supp. at 20. These statements—like the others—are egregiously untrue.

12         Indeed, just one look at the 10-Qs upon which Plaintiffs rely to support those statements

13  demonstrates their falsity. The 10-Qs make no mention of the Settlement Agreement in this case,

14  nor do they report how many loan modifications Wells Fargo granted "pursuant to the Settlement

15  Agreement from January 2011 to September 2012" as Plaintiffs claim. The 10-Qs report on the total

16  number of Pick-a-Payment loans Wells Fargo modified during that period—which necessarily

17  includes Pick-a-Payment loans that are not part of the Settlement Class in this matter (*i.e.*, loans

18  originated outside the class period and loans not secured by the borrower's primary residence).

19  Plaintiffs' continued presentation of false statistics and figures to this Court is shameful.[3]

20

21

22

23  [3]       Unfortunately, Plaintiffs' false statements do not stop at statistics and figures. For example,
    Plaintiffs claim that "instead of considering [Plaintiff Carrie] Rosillo for a loan modification, Wells
24  Fargo denied her without running her through the HAMP and MAP2R waterfalls." Plaintiffs' Supp.
    at 4. That is simply not true. As is plainly explained in the December 13, 2012 Declaration of
25  Michael Dolan, Wells Fargo evaluated Ms. Rosillo for HAMP and MAP2R modifications, and,
    because she was in default, Wells Fargo did not require her to show that she was in imminent
26  default. … **Wells Fargo denied Ms. Rosillo's December 2011 application because it could not
    modify her loan to reach the 31% housing-to-income ratio, not because she was not in imminent
27  default**." December 13, 2012 Declaration of Michael Dolan ("Dec. 13 Dolan Dec.") ¶ 23 (emphasis
    added).

28
    93000/HR0710/00567907-1                              5
    DEFENDANT'S SUPPLEMENTAL OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

## II.   THE REMAINDER OF PLAINTIFFS' "EVIDENCE" IS UNRELIABLE AND SHEER SPECULATION THAT DOES NOT SUPPORT THEIR CLAIMS.

In addition to the false statistics and figures presented through the declarations of their attorneys, Plaintiffs rely on Class Member declarations and other statements from their lawyers that fail to provide any credible evidence "that a violation of any particular contract provision proximately caused the denial of any loan modification."  December 21 Order at 5.

First, Plaintiffs argue that "Wells Fargo is using highly unreliable, wildly varying, and inflated property valuations to skew the waterfall analysis and NPV calculations against modifications for Plaintiffs and Class Members."  Plaintiffs' Supp. at 12.  The "evidence" in support of this accusation?  Mr. Berns' unsubstantiated and self-serving opinion that "automated valuation models tend to inflate values," Berns Dec. ¶ 11, printouts from two county assessors' websites, and appraisals submitted by a mere **three** borrowers.  Of course, Mr. Berns is not an expert in property valuation, and his opinion is inadmissible.  So too are the unverified printouts from the county assessors' offices submitted by Plaintiffs Lerner and Pharm.  The appraisal submitted by Plaintiff Jason Fisher is dated May 20, 2012—more than a year after the denial about which he complains, and thus is entirely irrelevant to the value of his property at the time of evaluation.  The same is true with respect to Plaintiffs Slade, who complain about a loan modification denial that occurred in May 2011 yet submit an appraisal from January 2012.  Finally, although Mr. Ranger[4] has submitted an April 2012 appraisal to demonstrate that Wells Fargo's valuation of his property was unreliable, nothing in the record supports that accusation except Mr. Berns' inadmissible opinion.

Next, Plaintiffs continue to express their disagreement with Wells Fargo's "imminent default" determinations.  Plaintiffs' self-serving statements aside, the HAMP directives provide that for a borrower to be in imminent default: (1) the lender must determine that the loan will default in the reasonably foreseeable future; (2) there is a ***documented hardship***; and (3) all liquid assets (excluding retirement accounts) must be considered.  Plaintiffs have not presented any credible evidence demonstrating that Wells Fargo did not consider these factors, and their own opinions and

---

[4] In any event, Mr. Ranger's complaints about the value assigned to his property are irrelevant, because Mr. Ranger is a member of Settlement Class A and is not eligible to receive a loan modification pursuant to the express terms of the Settlement Agreement.

DEFENDANT'S SUPPLEMENTAL OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1   beliefs are irrelevant.[5]

2        Plaintiffs also continue to argue that Wells Fargo miscalculated their incomes when

3   evaluating them for loan modifications.  *See, e.g.*, Declarations of Duwarren Gibson,[6] Marie

4   Marcantonio,[7] Mojisola Olagbegi,[8] William Russell Poole, III,[9] Marissa Silva,[10] and Cynthia A.

5   Ziemer.[11]  But, as Lead Counsel well knows, the Settlement Agreement and HAMP ***require*** the use

6   of ***verified gross monthly incomes***—not stated, net income as Plaintiffs insist.  *See generally*

7   Making Home Affordable Program Handbook for Services of Non-GSE Mortgages, v.4.0 ("MHA

8   Handbook") (repeatedly referencing verified gross monthly income and nowhere allowing a lender

9   to use net, or undocumented, income to evaluate a borrower for a loan modification); Settlement

10  Agreement, § 1.22.  Although Plaintiffs admit that "***borrowers are required to send income***

11  ---
    [5]     Wells Fargo addresses Plaintiffs' "imminent default" argument in more detail below.
    [6]     Mr. Gibson received a loan modification in 2009 that wrote off over $███ in principal.
    Jan. 23 Dolan Dec. ¶ 5.  He is not eligible for further loan modifications, but Wells Fargo
    nonetheless has considered him.  *Id.*  Although he disagrees with the gross monthly income figure of
    $███, that is the income Wells Fargo documented using the paystubs Mr. Gibson himself
    submitted.  *Id.*  Mr. Gibson's loan is due for the September 2011 payment, but no foreclosure sale
    has been scheduled.  *Id.* ¶ 6.
    [7]     Marie Marcantonio is yet another Settlement Class Member who received a prior loan
    modification (which wrote off over $███ in principal) and is thus ineligible for further
    modifications under the express terms of the Settlement Agreement, but Wells Fargo has nonetheless
    evaluated her.  Jan. 23 Dolan Dec. ¶¶ 17-18.  Notably, her loan is due for the July 2011 payment;
    nonetheless, Wells Fargo is currently reviewing her for yet another loan modification and her file is
    on hold because Ms. Marcantonio was affected by Super Storm Sandy.  *Id.* ¶ 19.
    [8]     In her declaration, Ms. Olagbegi states—without any explanation—that "[w]e believe that
    Wells Fargo used the wrong income figures."  Olagbegi Dec. ¶ 5.  On her Request for Modification
    Assistance ("RMA"), Ms. Olagbegi claimed gross monthly income of $███.  Wells Fargo actually
    documented gross monthly income of $███ using the documentation Ms. Olagberi herself
    provided—paystubs and a profit and loss statement.  Jan. 23 Dolan Dec. ¶ 25.  Ms. Olagberi's loan is
    due for the January 2010 payment, meaning that she is three years past due.  *Id.*
    [9]     William Russell Poole III and his co-borrower, Nancy G. Poole, received a HAMP
    modification on ***February 15, 2011***, and thus have received all benefits of the Settlement
    Agreement.  Jan. 23 Dolan Dec. ¶ 29.  The Court should reject their allegations outright.
    [10]    Ms. Silva's only complaint, despite two pages of her declaration, is that she "believe[s] Wells
    Fargo … did not consider all of [her] husband's income."  Silva Dec. ¶ 8.  On her RMA, Ms. Silva
    stated that her gross monthly income was $███  Wells Fargo used Mr. Silva's paystubs in
    calculating his monthly income, and the documented gross monthly income was $███  Jan. 23
    Dolan Dec. ¶ 30.
    [11]    The Court should afford no weight to Ms. Ziemer's declaration, who attempted to commit
    fraud in connection with the subject loan.  Attached to the January 23, 2013 Declaration of Michael
    Dolan are multiple documents Ms. Ziemer filed with the County Recorder's office in Santa Barbara
    County and that she submitted to Wells Fargo in an attempt to fraudulently discharge the subject
    mortgage.  Jan. 23 Dolan Dec. Ex. 10.  In any event, Ms. Ziemer significantly overstated her gross
    monthly income on her RMA as $███  Her verified gross monthly income—using paystubs Ms.
    Ziemer provided—demonstrated that her gross monthly income was $███  Jan. 23 Dolan Dec.
    ¶ 35.

    93000/HR0710/00567907-1                      7

    DEFENDANT'S SUPPLEMENTAL OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1    *documentation so that an analysis of their complete financial picture can be done*," Plaintiffs'

2    Reply to Defendants' Opposition to Application for Temporary Restraining Order and Order to

3    Show Cause Re: Preliminary Injunction at 7 (emphasis added) (Doc. No. 377), they continue to

4    allege that Wells Fargo miscalculated their incomes by not accepting the *stated* incomes on their

5    RMAs.  The income figures used to evaluate these Plaintiffs were based on the *documentation*

6    Plaintiffs themselves provided—not the income Plaintiffs *stated* on their RMAs—which in many

7    instances were grossly under- or overstated.[12]

8         The remaining declarations submitted by Plaintiffs are not probative.  Indeed, in their

9    declarations, James Burkett,[13] Thomas Gary,[14] Linda D. Hyde,[15] Diane L. Landry,[16] Sandra Navarro,

10   and Sharon Wallace argue that they had to submit documentation to Wells Fargo on multiple

11   occasions, that they have spoken with "many different home preservation specialists," that they did

12   not receive denial letters,[17] or that they "do not understand the reasons behind Wells Fargo's

13   denials," but *none of them claim they were wrongfully denied for a loan modification, and most of*

14   *them are currently under review*.[18]  The declarations of Steven D. Sloan, Martina W. Stevens,

15   Janice K. Lusch-Neff, Kevin Nolen, Auston E. O'Neill, Jr., and Michael A. Joseph also are not

16   probative.  As demonstrated in the Declaration of Michael Dolan, those borrowers' denials were

17   correct, and their "beliefs" that Wells Fargo made incorrect NPV calculations, fall-out

18

19   [12]   As shown herein, Plaintiffs' reliance on these stated income figures to support their claim of
erroneous income calculations only proves the point.  Indeed, only *three* Plaintiffs have provided
20   this Court with documentation of their income, and that documentation proves Wells Fargo's
calculations were correct.  In fact, Plaintiffs Geremia and Bishr admitted at their depositions that
21   they misstated their incomes and that Wells Fargo's calculations were correct.
[13]   Mr. Burkett's loan is due for the November 2010 payment.  Jan. 23 Dolan Dec. ¶ 2.
22   [14]   Mr. Gary's loan is due for the October 2009 payment.  Jan. 23 Dolan Dec. ¶ 4.
[15]   Ms. Hyde's loan is due for the May 2012 payment.  Jan. 23 Dolan Dec. ¶ 7.
23   [16]   Ms. Landry's own statements demonstrate precisely why her loan is affordable and why she
is not eligible for and does not need a loan modification.  According to Ms. Landry, her monthly
24   income is $███████ per month, and her fully-amortizing monthly mortgage payment is $██████—
resulting in an H11 of ██ Landry Dec. ¶ 5.  A loan modification would not result in a lower
25   payment for Ms. Landry because she is already below the 31% ratio.  Ms. Landry's loan is due for
the January 2012 payment and is thus current.  Jan. 23 Dolan Dec. ¶ 12.
26   [17]   Ms. Hyde and Ms. Landry's claim that they did not receive denial letters is false.  Jan. 23
Dolan Dec. ¶¶ 7, 11 and Exs. 3 and 5.  Moreover, Sharon Wallace is yet another borrower who
27   obtained a prior loan modification (which wrote off over $███0 in principal) and is not eligible for
further modifications under the Settlement Agreement.  *Id.* ¶ 34.
28   [18]   Jan. 23 Dolan Dec. ¶¶ 2, 4, 7, 12, 19, 24, 32 (Burkett, Gary, Hyde, Landry, Marcantonio,
Nolen, and Stevens are all under review).

DEFENDANT'S SUPPLEMENTAL OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

classifications, and the like that resulted in them being wrongly denied for modifications simply are without evidentiary support.

In short, Plaintiffs' reliance on all of this flawed evidence—false statistics and figures, unsubstantiated claims of flawed property values, demonstrably false representations of income, disagreements with imminent default determinations, and "beliefs" that Wells Fargo improperly denied loan modifications in the face of actual evidence showing otherwise—suggests only one thing:  during the long delay before Plaintiffs brought this Motion, they could not unearth any credible evidence to support their claims.

### III.   ARGUMENT

Plaintiffs' theories have changed since the filing of their Motion just over a month ago.  In their original filing, Plaintiffs argued that Wells Fargo breached the Settlement Agreement in the following ways:

- [F]or many borrowers who have documented financial hardship and a monthly PITIA above 31%, thus demonstrating threat of imminent default because they do not have "affordable" PITIAs, [Wells Fargo] ha[s] nonetheless denied modification requests for purported failure to show imminent threat of default.  Plaintiffs' Motion for Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction ("Plaintiffs' Motion") at 7 (Doc. No. 365).

- [Wells Fargo] ha[s] … us[ed] inflated property valuation numbers derived from automated valuation models, instead of using independent appraisals, which has resulted in the skewing of [Wells Fargo's] "Net Present Value" determinations on whether to grant or deny a modification.  *Id*. at 8.

- [Wells Fargo] ha[s] failed to implement any meaningful procedures to minimize document requests.  *Id*. at 20.

- [Wells Fargo] ha[s] frequently switched Settlement Class Members' points of contact multiple times during the application process and assigned multiple points of contact, which has resulted in applicants receiving incorrect and contradictory information about the application process.  *Id*. at 21.

- [Wells Fargo] ha[s] repeatedly failed to provide timely, if any notification denials[19] and ha[s] given cursory explanations such as "not in imminent threat" that do not meaningfully inform borrowers as to why they were deemed not to qualify.  *Id*.

- [Wells Fargo] ha[s] initiated a tier-2 review only 12 times out of the 66,671 loan modification applications they have received.  *Id*. at 21-22.[20]

---

[19]    Wells Fargo submitted copies of denial letters for the moving Plaintiffs who claimed not to have received denial letters, forcing Plaintiffs to abandon this theory in their latest filing.

[20]    This allegation also is false, as demonstrated by Wells Fargo's prior submissions.  Plaintiffs

DEFENDANT'S SUPPLEMENTAL OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

In its December 21 Order, the Court rejected these arguments, finding that "the record evidence does not tie the aggregate numbers to express contractual provisions or show that [Wells Fargo] ha[s] breached any actual terms of the [Settlement] [A]greement.  Nor have Movants presented evidence that a violation of any particular contract provision proximately caused the denial of any loan modification."  December 21 Order at 5.

Now that the Court has rejected Plaintiffs' previous theories, they have changed course, but none of their new arguments withstands scrutiny.

**A.**     **Plaintiffs Have Not Demonstrated a Likelihood of Success on Their Imminent Default Theory.**

Because the Court rejected their 31% PITIA argument, Plaintiffs now argue that Wells Fargo breached the Settlement Agreement by (1) "incorrectly determin[ing] the available gross income for all Settlement Class B Members who applied for modifications," (2) "not fully evaluat[ing] Settlement Class B Members' hardships as required," (3) "ignor[ing] a reasonable allowance for living expenses such as food, utilities, etc. and income taxes," and (4) making erroneous debt-to-income ratio calculations.  Plaintiffs' Supp. at 7-9.  None of these arguments has merit.

First, as demonstrated above and in Wells Fargo's previous filings, Plaintiffs have not presented a single instance of an erroneous calculation of gross monthly income.  Indeed, Wells Fargo has demonstrated multiple instances in which Plaintiffs significantly under- or overstated their gross monthly income—proven by Plaintiffs' own income documentation (paystubs, profit and loss statements, and the like).

Second, Plaintiffs have not presented any evidence that Wells Fargo did not fully evaluate Settlement Class B Members' hardships.  The Settlement Agreement provides, in pertinent part, that "imminent default" means "a Borrower … who [Wells Fargo] ha[s] determined, in accordance with applicable HAMP guidance, as necessary, ***that default by the Borrower in making scheduled payments on his or her Pick-a-Payment mortgage loan is reasonably foreseeable***."  Settlement Agreement, § 1.33 (emphasis added).

---

abandoned this theory in their latest filing, but did not bother to correct this egregiously false statement.

Next, one must turn to applicable HAMP guidance, which provides:

> A borrower that is current or has only one payment due and unpaid by the end of the month in which it is due and who contacts the servicer to request HAMP consideration must be evaluated to determine if he or she is at risk of imminent default.  Each servicer must have written standards for determining imminent default that are consistent with applicable contractual agreements and accounting standards and must apply the standards equally to all borrowers.  When making an imminent default determination, the servicer must evaluate the borrower's hardship as well as the condition of and circumstances affecting the property securing the mortgage loan. *The servicer must consider the borrower's financial condition, liquid assets, liabilities, combined monthly income from wages and all other identified sources of income, monthly obligations (including personal debts, revolving accounts, and installment loans), and a reasonable allowance for living expenses such as food, utilities, etc.*  ***The hardship and financial condition of the borrower must be verified through documentation***.

MHA Handbook § 4.4 (emphasis added).   Finally, HAMP Supplemental Directive 09-01 provides additional guidance in determining imminent default.  It states:

> Reasonably Foreseeable (Imminent) Default
>
> A borrower that is current or less than 60 days delinquent who contacts the servicer for a modification, appears potentially eligible for a modification, and claims a hardship must be screened for imminent default.  The servicer must make a determination as to whether a payment default is imminent based on the servicer's standards for imminent default and consistent with applicable contractual agreements and accounting standards.   If the servicer determines that default is imminent, the servicer must apply the Net Present Value test.  In the process of m    aking its im   minent default determ   ination, the servicer ***must evaluate the borrower's financia l condition in light of the borrower's hardship as well as in quire as to the condition of and circumstances affecting the prop erty securing the  mortgage loan. The servicer must consider the borrower's financial condition, liquid assets, liabilities, co  mbined mont hly income from wages and all other identified sources  of income,  monthly obligations (including personal debts, revolving accounts,   and installment loans), and a reasonable allowance for living expens es such as food, utilities, etc. The hardship and fin   ancial con dition o f the borrower shall be verified through documentation***.
>
> **Documenting the Reason for and Timing of Imminent Default**
>
> A servicer must document in its servicing system the basis for its determination that a payment default is imminent and retain all documentation used to reach its conclusion. The servicer's documentation must also include information on the borrower's financial condition as well as the condition and circumstances of the property securing the mortgage loan.

(emphasis added).  Thus, HAMP directives provide that for a borrower to be in imminent default: (1) the lender must determine that the loan will default in the reasonably foreseeable future; (2) there is

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

DEFENDANT'S SUPPLEMENTAL OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

a ***documented hardship***; and (3) all liquid assets (excluding retirement accounts) must be considered.

Using this proper test, it is abundantly clear that none of the moving Plaintiffs was in "imminent default," and their exclusive focus on what they ***stated*** in their hardship affidavits, Plaintiffs' Supp. at 7, rather than what they ***documented***, is erroneous.  As a glaring example, Plaintiffs Omar and Ruth Bishr submitted a declaration to this Court in which they claimed their monthly mortgage payment was nearly 40% of their monthly income, and Lead Counsel filed a declaration in which he represented that their gross monthly income was █████  Bishr Dec. ¶ 4; Berns Reply Dec. ¶ 29 (Doc. No. 375-1).  At his deposition, Mr. Bishr confirmed that these statements were false because his actual gross monthly income was over █████  and his monthly PITIA payment was only █████ of his gross monthly income.  Jan. 22, 2013 Deposition of Omar ("Bishr Dep."), 10:20-14:17, 44:11-46:6.[21]

Thomas Geremia's testimony was likewise damning.  To support Plaintiffs' Motion, Lead Counsel submitted a declaration in which he claimed that the Geremias' gross monthly income was $████.  Berns Reply Dec. ¶ 27.  At his deposition, Mr. Geremia confirmed that this statement was inaccurate, and that Wells Fargo's calculation of their gross monthly income as $██████ was correct.  Jan. 22, 2013 Deposition of Thomas Geremia ("Geremia Dep.), 17:11-18:5.  Mr. Geremia also confirmed that, contrary to what he stated in his declaration, Geremia Dec. ¶ 3, his monthly mortgage expenses were not more than █████ because that calculation was based on incorrect income and expense figures.  Geremia Dep., 41:25-42:19.  Finally, Mr. Geremia confirmed that his claimed hardships—a temporary loss of employment ***five years before*** his modification application and allegedly rising interest rate on his loan—were not true.  Indeed, after Mr. Geremia was terminated from his employment in 2006, he filed a grievance, was reinstated, and received full back pay and benefits.  Geremia Dep., 8:1-9:8, 55:9-11 and Dep. Ex. 205.[22]  As to the allegedly rising interest

---

[21]     The depositions of Omar Bishr, Thomas Geremia, and Sherri Goldfinch occurred on January 22, 2013 and official transcripts from Mr. Bishr and Mr. Geremia's depositions are not yet available. Wells Fargo is submitting the "rough" portions of those transcripts, and will submit the official transcripts as soon as they are available.

[22]     It is quite telling that Mr. Bishr claims this temporary loss of employment caused him a hardship five years later, but when he obtained his Pick-a-Payment loan on February 26, 2006, he had already lost his job, and his loan application lists no such hardship or loss of income, nor does it

DEFENDANT'S SUPPLEMENTAL OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1    rates that the Geremias used to support their claim of a hardship, Geremia Dep., 22:10-23:21, when

2    confronted with his loan documentation, Mr. Geremia admitted that the interest rate had actually

3    decreased since loan origination.  Geremia Dep., 57:18-59:25 and Dep. Ex. 217.

4         Nor is there any merit to Plaintiffs' argument that Wells Fargo's "analysis of Plaintiffs'

5    financial hardships is deeply flawed because it ignores a 'reasonable allowance for living expenses

6    such as food, utilities, etc.' and income taxes."  Plaintiffs' Supp. at 8.[23]  Tellingly, Plaintiffs quote

7    the MHA Handbook for the provisions relating to food and utilities, ***but the quote stops there***.  Just

8    as they have done with other provisions of the Settlement Agreement, the "income taxes" language

9    is of Plaintiffs' own making.  Neither the MHA Handbook nor the Settlement Agreement makes any

10   mention of calculating or estimating income taxes when evaluating a borrower for a loan

11   modification.  Indeed, the opposite is true:  ***All*** income calculations—including the evaluation of a

12   borrower's ability to pay his current mortgage payment—must be done on a gross basis.  MHA

13   Handbook, § 5; Settlement Agreement, § 1.22.  That is why non-taxable income such as Social

14   Security benefits must be "grossed up" by 1.25% to estimate the gross monthly income.  MHA

15   Handbook, § 6.1.1.  Against these repeated instructions in HAMP and the Settlement Agreement,

16   Plaintiffs' resort to a single reference in a model denial letter to net income (which is more properly

17   viewed as referring to a borrower's ability to pay his mortgage after deducting gross monthly

18   expenses (minus the mortgage payment)) does not hold water.

19        Viewed against this backdrop, Plaintiffs' allegation that Wells Fargo failed to make a

20   reasonable allowance for reasonable living expenses (using Plaintiffs Cory, Bishr, Murphy, and

21   Pharn[24] as examples) is flawed.  Plaintiffs' submissions make clear that the alleged amounts left over

22   for living expenses are calculated after deducting 25% for estimated income taxes.  Berns Reply

23   Dec. ¶¶ 17, 24, 29 (deducting 25% for income taxes for each Plaintiff).[25]  Because this argument

---

indicate that he had been terminated.

[23]    Although Plaintiffs claim that Wells Fargo did not account for reasonable living expenses in its imminent default determinations (a claim that is untrue), a close examination of Plaintiffs' filing reveals that this entire argument hinges on Plaintiffs' claim that Wells Fargo should have accounted for income taxes.  Plaintiffs' Supp. at 8-9.

[24]    As explained in Wells Fargo's previous submissions, Mr. Pharn was not in imminent default because he failed the loan-to-value test set out in the Class B Notice's definition of "imminent default."  Dec. 13 Dolan Dec. ¶ 46.

[25]    Tellingly, Plaintiffs submit no evidence as to these borrowers' actual tax rates.

DEFENDANT'S SUPPLEMENTAL OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1   hinges entirely on Plaintiffs' "income tax" theory—which is contrary to the plain language of

2   HAMP and the Settlement Agreement—it fails.[26]

3        Nor is there any credence to Plaintiffs' argument that Wells Fargo miscalculated borrowers'

4   debt-to-income ratios.  A borrower's debt-to-income ratio is the ratio of the borrower's ***gross***

5   ***monthly expenses*** divided by the borrowers' ***gross monthly income***.  MHA Handbook, § 6.7.

6   "Gross monthly expenses" includes, among other things, (1) the monthly mortgage payment; (2) the

7   monthly mortgage payment on any rental property; (3) monthly payments on all closed-end

8   subordinate mortgages; (4) car lease payments; (5) monthly payments on revolving or open-end

9   accounts; (6) payments on all installment debts with more than ten months of payments remaining;

10  and (7) monthly payments on home equity lines of credit.  *Id.*, § 5.4.  These amounts must be

11  verified using a credit report, tax returns, or other verifying information.  *Id.*  With respect to Mr.

12  Cory, whom Plaintiffs use as their example of an erroneous debt-to-income ratio calculation, the

13  total of his monthly mortgage payment, subordinate mortgage payment, credit cards, and installment

14  accounts resulted in an overall debt-to-income ratio of ████.  Dec. 13 Dolan Dec. ¶ 33.  Plaintiffs'

15  argument to the contrary is nonsensical, and they have not provided any actual evidence that Wells

16  Fargo miscalculated these figures for any borrower.

17       In the absence of any credible evidence to dispute Wells Fargo's imminent default

18  determinations, Plaintiffs resort to statistics, speculation, and conjecture.  According to Plaintiffs,

19  Wells Fargo denied 13% of Settlement Class B Members' loan applications for lack of imminent

20  default.  Plaintiffs' Supp. at 7.  But, stated conversely, 87% of Settlement Class B Members'

21  applications were denied for other reasons.  In the face of that statistic, Plaintiffs' claim that Wells

22  Fargo has used the imminent default test as a "barrier to modification," *id*. at 6, rings untrue.

23       Finally, Plaintiffs also claim that "[i]f Wells Fargo had complied with the Settlement

24  Agreement's and applicable HAMP requirements for determining whether a borrower is in imminent

25  default … the Plaintiffs identified in the previous section would have been given loan modifications"

26  and that "[o]ther Settlement Class B Members have fared worse, as Wells Fargo's wrongful denials

27  ────────────
28  [26]      It should also be noted that a significant portion of a typical borrower's monthly expenses, mortgage interest, local property taxes, and state income taxes (if any) are deductible from their federal taxes, further negating Plaintiffs' position.

DEFENDANT'S SUPPLEMENTAL OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

of modifications caused them to lose their homes through foreclosure or forced short sales to avoid foreclosure, or else left them subject to active foreclosure proceedings." *Id*. at 9. Those statements are based on nothing but speculation and conjecture and the Court should reject them.[27]

**B.** **Plaintiffs' Property Valuation Theory is Contrary to the Express Terms of the Settlement Agreement.**

Because the Court rejected Plaintiffs' claim that the use of automated valuation models ("AVMs") violates the Settlement Agreement, Plaintiffs have now change course, arguing that Wells Fargo's AVMs fail to meet the accuracy standards set forth in the HAMP guidelines. Plaintiffs' Supp. at 11-12 (quoting MHA Handbook, § 6.8). As explained above, however, Plaintiffs have not submitted any admissible or credible evidence to support this contention. Rather, they present three self-commissioned appraisals and simply conclude that theirs must be more accurate. Plaintiffs' Supp. at 12-13. Plaintiffs offer no expert testimony critiquing Wells Fargo's valuations, nor any expert testimony establishing the accuracy of their values. As the Court previously held in this case, "conclusory affidavits are insufficient." January 20, 2009 Order at 4.

More importantly, if Lead Counsel believed automated valuation models were unreliable, he should not have expressly agreed to the following provision:

> "Market Value" shall mean the value of the residential property that secures the Pick-a-Payment mortgage loan as determined by [Wells Fargo] in reliance on an appraisal report prepared not more than one hundred eighty (180) calendar days before the date of determination, broker price opinion prepared not more than one hundred twenty days (120) calendar days before the date of determination, or automated valuation model prepared not more than ninety (90) calendar days before the date of determination. Notwithstanding the foregoing, for purposes of [the loan modification program], [Wells Fargo] may rely on the most recent value available in its system of record for determining the value of the residential property.

Settlement Agreement, § 1.40. Tellingly, Plaintiffs do not argue that Wells Fargo has ever used an

---

[27] The Court should also reject Plaintiffs' unsubstantiated claim that Wells Fargo "is taking inconsistent positions in its modification analysis in order to deny loan modifications to Settlement Class Members, such as using the principal and interest payment only as the monthly housing expense when a lower expense figure will prevent a modification, but including insurance, taxes, and association dues in the monthly housing expense when a higher expense figure will prohibit a modification." Plaintiffs' Supp. at 1. Plaintiffs offer no evidence whatsoever that this is occurring, and it is indeed a false statement. Because Plaintiffs have not substantiated this allegation, Wells Fargo does not address it here, but will do so to the extent the Court wishes to entertain it, whether by supplemental briefing or at the January 31 hearing.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1    appraisal more than 180 calendar days old, a broker price opinion more than 120 calendar days old,

2    or an AVM more than 90 calendar days old—which are the ***only*** restrictions placed upon Wells

3    Fargo pursuant to the Settlement Agreement.

4          Plaintiffs attempt to distract the Court from this plain language by arguing that under HAMP,

5    the AVM must "render a reliable confidence score," that "federal banking regulations forbid

6    [AVMs] as a primary basis for determining property values in mortgage loan originations" and that

7    "Wells Fargo itself appears to recognize the unreliability of its AVM-based property valuations since

8    it requires any Settlement Class Member who disputes Wells Fargo's valuation to pay Wells Fargo

9    hundreds to obtain a reliable, independent appraisal." Plaintiffs' Supp. at 14. These arguments are

10   red herrings.

11         First, the Settlement Agreement plainly allows the use of various forms of valuation, subject

12   only to time restrictions. The accuracy standard advanced by Plaintiffs is from the HAMP

13   guidelines, not the Settlement Agreement. Unlike the Settlement Agreement's definition of

14   "imminent default," which expressly incorporates the HAMP guidance, Settlement Agreement, §

15   1.33, the "Market Value" definition makes no reference to HAMP and simply cannot be inserted by

16   Plaintiffs. *Westlands Water Dist. v. United States*, 337 F.3d 1092, 1103 (9th Cir. 2003). "If

17   contractual language is clear and explicit, it governs." *Zepeda v. Paypal, Inc.*, 777 F. Supp. 2d 1215,

18   1219 (N.D. Cal. 2011) (J. Fogel).[28]

19         Whether AVMs can be used in loan origination also is entirely irrelevant here, where both

20   the Settlement Agreement and HAMP expressly ***allow*** AVMs as a primary basis for determining

21   property values in the modification analysis. Again, if Lead Counsel had wished to limit Wells

22   Fargo's use of AVMs, he could have negotiated for such a provision in the Settlement Agreement.

23         Finally, Plaintiffs' complaint that Wells Fargo "requires any Settlement Class Member who

24   disputes Wells Fargo's valuation to pay Wells Fargo hundreds to obtain a reliable, independent

25   appraisal" falls on deaf ears, as this is the exact dispute procedure set forth by HAMP:

26       [28]   In any event, Plaintiffs acknowledge—as they must—that under HAMP, "[c]onfidence

27   scores deemed reliable by bank examiners are also considered reasonable for purposes of [HAMP]." Plaintiffs' Supp. at 12 (quoting MHA Handbook, § 6.8). ***Wells Fargo's confidence scores have***

28   ***been deemed reliable by bank examiners***, Jan. 23 Dolan Dec. ¶ 39, foreclosing Plaintiffs' argument to the contrary.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

93000/HR0710/00567907-1

16

DEFENDANT'S SUPPLEMENTAL OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

> When a borrower is not approved for [HAMP] because the transaction is NPV negative and the borrower believes that the property value input used by the servicer in the NPV evaluation differs from the fair market value of the property as of the NPV Date, the borrower may request an NPV re-evaluation. [ ]
>
> If the preliminary re-evaluation performed by the servicer produces a positive NPV result, the servicer must offer the borrower the opportunity to request an appraisal … If an appraisal is obtained, the appraisal will establish the fair market value of the property as of the NPV Date and will be utilized to complete the final NPV re-evaluation. ***The borrower must, no later than 15 calendar days from the date of notification that the preliminary NPV result is positive, remit a $200 deposit against the full cost of the appraisal in a manner acceptable to the servicer. The balance of the actual appraisal cost will be added to the borrower's total arrearage under the loan***.

MHA Handbook, § 2.3.4 (emphasis added).  Plaintiffs certainly do not mean to suggest that a procedure expressly allowed under HAMP is unreasonable.[29]

Because Plaintiffs' new theories are completely detached from the Settlement Agreement, any effort challenge the accuracy of Wells Fargo's property valuations is HOLA preempted.  *Spears v. Wash. Mut., Inc.*, 2009 U.S. Dist. LEXIS 21646, at *17 (N.D. Cal. Mar. 9, 2009) (J. Whyte) (claims arising from allegedly inflated appraisals preempted under HOLA).  Plaintiffs' self-serving—and false—description of their new theory as a breach of contract does not preclude preemption under HOLA's "as applied" test.  *Appling v. Wachovia Mortg., FSB*, 745 F. Supp. 2d 961, 972 (N.D. Cal. 2010) (J. Koh) ("What matters for purposes of Defendant's preemption defense, however, is not the label Plaintiff affixed to his claim, but whether Plaintiff's allegations, however styled, fall within the scope of the OTS preemption regulations.").

## C.   Plaintiffs' Other Alleged Violations Are Not Linked to Imminent, Irreparable Harm.

Plaintiffs' supplemental filing claims two types of irreparable injury: (1) foreclosure and (2) the use of "desperate measures" (e.g., paying bills by credit card, drawing down retirement savings …") to pay expenses.  Plaintiffs' Supp. at 2.  As to the second form, the alleged injury is financial in nature and not "irreparable."  In other words, if Plaintiffs were to ultimately prevail, an award of

---

[29]      Plaintiffs also do not point the Court to any provision of the Settlement Agreement that Wells Fargo breaches by requiring a borrower to submit an appraisal to support his valuation dispute.  Nor can they, because there is no such provision in the Settlement Agreement.  The Court should reject Plaintiffs' continued attempts to rewrite the Settlement Agreement.

DEFENDANT'S SUPPLEMENTAL OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1    damages (adjusted for interest expenses and tax liability) would make Plaintiffs whole.

2          As to foreclosure, as the Court previously held in denying Plaintiffs' very first request for a

3    preliminary injunction, "whether a particular foreclosure constitutes irreparable harm turns in part on

4    the reasons for foreclosure. … Plaintiffs ***must link*** the allegedly deceptive loan documents at issue in

5    this case to the likelihood that they will default and suffer foreclosure." Jan. 20, 2009 Order at 4

6    (emphasis added). Thus, Plaintiffs must link the alleged breach of the Settlement Agreement to an

7    imminent foreclosure.[30] Plaintiffs' remaining purported breaches of the Settlement Agreement

8    simply do not provide that link. Tellingly, Plaintiffs do not present a single ***concrete*** example of a

9    borrower going to foreclosure for ***any*** alleged breach of the Settlement Agreement.

10          First, Plaintiffs argue that Wells Fargo has breached the Settlement Agreement by "almost

11   exclusively giving HAMP modifications without offering MAP2R relief" and that the "impact" of

12   this breach is that borrowers "would plainly be better off under MAP2R" because HAMP "allows

13   Wells Fargo to keep all of a Class Member's deceptively inflated principal. *Id.* at 16. *See also id.* at

14   17 ("HAMP modifications … leave in place [borrowers'] fraudulently inflated principal

15   balances.").[31] Plaintiffs' Supp. at 16. According to Plaintiffs, Wells Fargo is required to consider

16   every borrower for both HAMP and MAP2R. *Id.* Not so. The operative language of the Settlement

17   Agreement provides:

18          Loan Modifications To Be Considered. Subject to the provisions contained in
            Section VI(E)(4)[32] and consistent with federal requirements, each Settlement
19          Class B Member in Imminent Default, who later becomes in Imminent
            Default, or who later becomes in Default, and all Settlement Class C Members
20          ***first shall be considered for a HAMP Modification***. Subject to the provisions
            contained in Section VI(E)(4), Settlement Class B Members in Imminent
21          Default, who later become in Imminent Default, or who later become in
            Default, and Settlement Class C Members ***who do not qualify for or elect not***
22          ***to accept a HAMP Modification*** shall be considered for a MAP2R

23   _____

24   [30]    As the Court has found, none of the original movants face irreparable harm. December 21
            Order at 6.
25   [31]    Here again, if Lead Counsel did not think HAMP benefited borrowers and wished to make
            MAP2R the sole modification program available under the Settlement Agreement, he could have
26          negotiated for that. He did not.
     [32]    Section VI(E)(4) provides: "Borrowers With Prior Modifications. Settlement Class Members
27   who have received earlier loan modifications not pursuant to this Agreement will not be eligible to
     be considered for new loan modifications under this Agreement." As explained below, Plaintiffs
28   ask the Court to ignore this language and essentially strike it from the Settlement Agreement—
     something the Court cannot do.

     93000/HR0710/00567907-1                          18
     _____
     DEFENDANT'S SUPPLEMENTAL OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Modification on the terms as outlined in Sections VI(E)(2), (3), and (5) of this Agreement.

Settlement Agreement, § VI(E)(1) (emphasis added). In other words, under the plain language of the Settlement Agreement, Wells Fargo is required to first consider borrowers for HAMP. If the borrower qualifies and accepts the HAMP modification, then Wells Fargo has met its obligations under the Settlement Agreement. It is only when the borrower "does not qualify" for HAMP or "elect[s] not to accept a HAMP Modification," that Wells Fargo must consider the borrower for a MAP2R modification.[33]

Perhaps acknowledging that their argument cannot be squared with the plain language of the Settlement Agreement, Plaintiffs once again attempt to rewrite their contract, this time by arguing that a HAMP modification "allows Wells Fargo to keep all of a Class Member's deceptively inflated principal." Plaintiff's Supp. at 16. Not so. Wells Fargo participates in HAMP's Principal Reduction Alternative ("PRA"), which requires Wells Fargo to evaluate borrowers for and offer principal reductions in connection with its HAMP modifications. Lead Counsel is well aware that Wells Fargo participates in the PRA, because its participation in the PRA is the reason Step 5 of the MAP2R waterfall requires principal forbearance to 115% of the loan-to-value ratio rather than 125%. Settlement Agreement, § VI(E)(5)(e). Plaintiffs' statements the contrary are false, and the Court should reject them.[34]

In any event, HAMP and MAP2R both "solve" to the 31% target payment ratio. Thus, regardless of whether a borrower is given a HAMP modification or a MAP2R modification, his required monthly payment will be the same—31% of his gross monthly income. Thus, it is simply nonsensical for Plaintiffs to argue that a borrower who obtained a HAMP modification rather than a MAP2R modification went into foreclosure as a result. If the borrower cannot afford the modified

---

[33] Plaintiffs claim that "denial letters for Settlement Class Members Francis R. Austin and Michael and Pauline Blake, who declined HAMP modifications, reflect that Wells Fargo did not offer them MAP2R modifications." Plaintiffs' Supp. at 16. Ms. Austin would not allow for the modified loan to be escrowed, thus, Wells Fargo could not consider her for either HAMP or MAP2R. Jan. 23 Dolan Dec. ¶ 38(b). The Blakes declined their 2011 modification offer. *Id.* ¶ 38(d). In October 2012, the Blakes received a permanent HAMP modification. *Id.*

[34] Under HAMP, borrowers who make timely payments also can receive up to $1,000 in "pay-for-performance" incentives for up to five years. Those incentive payments go straight toward reducing the principal balance on the loan. These incentive payments are not available under MAP2R.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1  payment under HAMP, he also cannot afford the modified payment under MAP2R, and not

2  receiving a MAP2R modification could not have caused any default or subsequent foreclosure.

3        Next, Plaintiffs argue that a small number of Settlement Class Members received both Class

4  A and Class B notices in error[35] and that Wells Fargo represented it would review these borrowers if

5  they applied.  Berns Reply Dec. ¶ 34.  However, it is undisputed that these borrowers received prior

6  loan modifications:

- Sherri Goldfinch received not one but two loan modifications prior to the Settlement Agreement—a modification in 2009 that reduced her principal balance from ▮▮▮▮▮ to ▮▮▮▮▮ and eliminated the "Pick-a-Payment" feature of her loan, and a HAMP modification in 2010.  Dec. 13 Dolan Dec. ¶¶ 17-18.

- Nathan Ranger received a modification in 2009 that reduced his principal balance from ▮▮▮▮▮ to ▮▮▮▮▮ and eliminated the "Pick-a-Payment" feature of his loan.  *Id.* ¶ 14.

- Julie and Paul McDermed received a modification in 2009 that reduced their principal balance from $▮▮▮▮ to $▮▮▮▮ and eliminated the "Pick-a-Payment" feature of their loan.  *Id.* ¶ 39.

- Duwarren Gibson received a loan modification in 2009 that wrote off over $▮▮▮ in principal and eliminated the "Pick-a-Payment" feature of his loan.  Jan. 23 Dolan Dec. ¶ 5.

- Marie Marcantonio received a loan modification in 2009 that wrote off over $▮▮▮ in principal and eliminated the "Pick-a-Payment" feature of her loan.  *Id.* ¶ 17.

- Francisca Ejale received a loan modification in 2009 that wrote off *over $▮▮▮* in principal and eliminated the "Pick-a-Payment" feature of her loan.  *Id.* ¶ 3.

It is also undisputed that the Settlement Agreement expressly provides:

> Borrowers With Prior Modifications. Settlement Class Members who have received earlier loan modifications not pursuant to this Agreement **will not be eligible to be considered for new loan modifications under this Agreement**.

Settlement Agreement, § VI(E)(4) (emphasis added).  Subsequent communications cannot amend

the Settlement Agreement.  *Id.* § XVII(A) ("This Agreement may not be changed, modified, or

amended except in writing signed by all Parties, subject to Court approval.").  Nor can Plaintiffs use

the implied covenant of good faith and fair dealing to "*impose substantive duties or limits on the*

*contracting parties beyond those incorporated in the specific terms of the agreement.*"  *Guz v.*

---

[35]      With a class involving over 500,000 members, it is not surprising, and indeed expected, that some administrative errors would occur in the notice process.

DEFENDANT'S SUPPLEMENTAL OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

*Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 349-50 (2000) (quotations and citation omitted; emphasis added).

In any event, this claim falls on deaf ears, because although it was plainly not required to do so, Wells Fargo nonetheless considered these borrowers for further loan modifications—*a fact these borrowers admit in their declarations*.

Sherri Goldfinch's testimony proves the point.  Consistent with Mr. Dolan's December 13 declaration (¶¶ 17-18 & Exs. 9 & 10 thereto), Ms. Goldfinch confirms that her 2006 loan from World Savings Bank was modified twice, each time with significant principal reduction and a lower interest rate, as follows:

| Date | Initial Interest Rate | Principal Balance |
|---|---|---|
| July 11, 2006 (Original Loan) | ██████ | $█████ |
| March 13, 2009 (1st Modification)(Non-HAMP) | ██████ | ██████ |
| August 25, 2010 (2nd Modification)(HAMP) | ██████ | ██████ |

Goldfinch Dep. (Ex. 1 to Wu Dec.), 21:06-23:11 (initial loan); 36:03-43:17 (first modification); 48:15-51:19 (second modification); 51:20-53:05 (summary exhibit) and Goldfinch Dep. Exs. 7, 10, 12 (Exhibits 2-4 to Wu Dec.).

Although she references her lower loan balance as modified (Goldfinch Dec., ¶ 4) ("In September 2012, … I owed $136,000…), Ms. Goldfinch's prior two loan modifications on generous terms[36] were not mentioned in her declaration, drafted by her attorney.  Goldfinch Dep., 54:15-19. Either Plaintiffs' counsel were attempting to hide Ms. Goldfinch's prior modifications from the Court or did an inadequate job screening out clearly unmeritorious plaintiffs.  Plaintiffs' reliance on Ms. Goldfinch's receipt of both Class A and B Notices, extra-contractual in nature, was only advanced after Wells Fargo pointed out her contractual disqualification.  Berns Reply Dec. ¶¶ 34, 35. Tellingly, Ms. Goldfinch could not articulate how Wells Fargo breached the Settlement Agreement. Goldfinch Dep., 57:20-58:22.[37]

---

[36]    Despite two modifications, Ms. Goldfinch continued to have trouble making her mortgage payments, possibly because Ms. Goldfinch misrepresented her income and employment history when she applied for the loan in 2006.  When counsel attempted to question Ms. Goldfinch on that subject, in order to establish the equitable defense of unclean hands, plaintiffs' counsel instructed Ms. Goldfinch not to answer.  Goldfinch Dep., 62:21-67:15).  Ms. Goldfinch had earlier testified that her last paying job was in 1994 and that she has been unable to work since 2004. *Id.*, 13:02-14:03.

[37]    Refuting Plaintiffs' argument that their own valuation estimates are more accurate than Wells

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

DEFENDANT'S SUPPLEMENTAL OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1    Moreover, refuting Plaintiffs' argument that their own valuation estimates are more accurate

2   than Wells Fargo's, Ms. Goldfinch's declaration in support of the preliminary injunction stated that

3   Wells Fargo denied her a loan modification because it valued her property at $136,000 instead of her

4   estimate of $110,000, forcing her to agree to a short sale.  Goldfinch Dec. ¶¶ 4, 5.  Ms. Goldfinch's

5   declaration omitted the fact that the short sale price was $125,000 which was closer to Wells Fargo's

6   estimated value.  Goldfinch Dep., 60:17-61:16.

7    Plaintiffs' next argument is that Wells Fargo improperly denied loan modifications to

8   Settlement Class C Members because they did not demonstrate a hardship or were not in imminent

9   default.  Plaintiffs' Supp. at 4.  Tellingly, Plaintiffs provide absolutely no details about any of these

10   supposed Settlement Class C Members—perhaps because the actual facts do not support their

11   claims.  For example, at the time they applied, Mitchell Amador, Patrick Midiere, Pilgracia Luisis,

12   and William Mayer all had monthly payments at or below 31% of their gross monthly income—thus,

13   they had the financial means to make their payments *a loan modification would not have lowered

14   their payments*.[38]  Jan. 23 Dolan Dec. ¶ 37.  Plaintiffs' claim that Wells Fargo wrongfully denied

15   these borrowers' applications is rank speculation, and the Court should reject it.

16    In a last ditch effort to support their request for an indefinite moratorium on foreclosures,

17   Plaintiffs claim that Wells Fargo's communications with Class Members are "confusing, incomplete,

18   or inaccurate," and that Wells Fargo reported false and inaccurate information to Lead Counsel and

19   the Court.  Plaintiffs' Supp. at 18-21.  Neither argument supports the sweeping relief Plaintiffs seek.

20    First, as outlined above, Plaintiffs' claim that Wells Fargo reported false information to Lead

21   Counsel and to this Court is simply untrue.  Indeed, it is Plaintiffs and their counsel who have

22   provided false and misleading statistics and figures to this Court.

---

24   Fargo's, Ms. Goldfinch's declaration in support of the preliminary injunction stated that Wells Fargo
    denied her a loan modification because it valued her property at $136,000 instead of her estimate of
25   $110,000, forcing her to agree to a short sale.  Goldfinch Dec. ¶¶ 4, 5.  Ms. Goldfinch's declaration
    omitted the fact that the short sale price was $125,000 which was closer to Wells Fargo's estimated
26   value.  (Exh. 1 to Wu Decl., p. 55:23-56:21).

27   [38]    These borrowers are the perfect example of borrowers who "strategically default."  A
    strategic default is the decision by the borrower to stop making payments on his mortgage loan
28   despite having the financial ability to pay.  Because borrowers who strategically default on their
    loans can afford to pay their mortgages, they do not need and do not qualify for a loan modification.

DEFENDANT'S SUPPLEMENTAL OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1    Plaintiffs' claims of confusing communications and that "over 2,000 Settlement Class

2    Members whose names do not appear on any of Wells Fargo's reporting lists, but who state that

3    Wells Fargo denied their applications," Plaintiffs' Supp. at 20,  likewise have no traction.  Michael

4    Dolan's January 23, 2013 Declaration explains the circumstances of the 20 borrowers Plaintiffs

5    claim do not appear on the reports Wells Fargo provides to Lead Counsel—including borrowers who

6    were denied or went to fall-out in the fourth quarter of 2012 and who will appear on the reports

7    Wells Fargo will provide in February 2013, and borrowers who never formally applied for loan

8    modifications.  Jan. 23 Dolan Dec. ¶ 38.  In any event, Plaintiffs have not shown that any alleged

9    failure to provide a borrower on a report to Lead Counsel or a "confusing" communication to a Class

10   Member "proximately caused the denial of any loan modification" to which the borrower otherwise

11   would have been entitled.  December 21 Order at 5.

12        **D.        Plaintiffs Have Not Shown Irreparable Harm.**

13        Plaintiffs filed their Motion for Preliminary Injunction on December 7, 2012:  (1) over a year

14   after the property securing Richard D'Alessio's loan went to foreclosure sale; (2) almost two years

15   after Cynthia and George Biggs were denied in February 2011 and over a year after their August

16   2011 short sale; (3) almost a year after Wells Fargo denied Nathan Ranger's February 2012

17   application; (4) three months after Wells Fargo denied John and Diana Burkett's application in

18   September 2012 and after Wells Fargo had obtained a foreclosure judgment against them; (5) six

19   months after Wells Fargo denied Jennifer Murphy's June 2012 application; (6) two years after Wells

20   Fargo denied Carrie Rosillo's first application, and eighteen months after it denied her last

21   application (7) nineteen months after Wells Fargo denied Joseph Midgette's May 2011 application;

22   (8) eighteen months after Wells Fargo denied Greg and Mary Slade in June 2011; (9) almost two

23   years after Wells Fargo denied Jason Fisher's February 2011 application; (10) almost two years after

24   Wells Fargo denied Jose Cruz's January 2011 application; (11) almost two years after Wells Fargo

25   denied Jeff Cory's February 2011 application; (12) seventeen months after Wells Fargo denied Omar

26   and Ruth Bishrs' application in July 2011; (13) almost a year after Wells Fargo denied Julie and

27   David Young's January 2012 application; (14) nineteen months after Wells Fargo denied Thomas

28   and Linda Geremia in March 2011; (15) almost two years after Wells Fargo denied Catherine Marsh

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

DEFENDANT'S SUPPLEMENTAL OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

and Walter Falkowski's February 2011 application; (16) twenty months after Wells Fargo denied

Christina Zako's application in April 2011; (17) over a year after Wells Fargo denied Chan Pharn's

November 2011 application; and (18) four months after Wells Fargo denied Michael and Kathy

Lerner's application.  Plaintiffs offer no explanation for their extremely lengthy delay.

"[U]ndue delay, standing alone, constitutes grounds for rejecting a motion for preliminary

injunction."  *Protech Diamond Tools, Inc. v. Liao*, No. 08-3684, 2009 WL 1626587, at *6 (N.D. Cal.

June 8, 2009).  *See also Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1377-78

(9th Cir. 1985) (affirming denial of preliminary injunction based on delay alone, without reaching

likelihood of success on the merits).  Plaintiffs waited no less than three months, and up to two

years, before filing this Motion—in which they make the remarkable claim that they face irreparable

harm.  When contrasted with their unexplained and substantial delay, Plaintiffs' claim of irreparable

harm falls flat.[39]

Moreover, what the evidence actually shows is not a "rush" to foreclosure by Wells Fargo as

Plaintiffs suggest.  Indeed, almost all the borrowers submitting declarations in connection with

Plaintiffs' supplemental filing are past due on their loans—***some going as far back as 2009***.  Of the

"new" borrowers who actually claim to have a foreclosure sale scheduled,[40] none has shown that

they were wrongfully denied a loan modification.  Further, Mr. Burkett, Mr. Gary, Ms. Hyde, Mr.

Nolen are all under review.  *See* p. 9 n.18.  Mr. Sloan's foreclosure sale date has been canceled and

not rescheduled because he wants to pursue a short sale.  Jan. 23 Dolan Dec. ¶ 16.  Mr. Poole

received a HAMP modification in February 2011 and thus received all benefits to which he was

entitled under the Settlement Agreement.  *Id*. ¶ 29.  Finally, Marissa Silva's loan could not be

modified to reach the 31% payment ratio.  *Id*. ¶ 31.  Stated differently, these borrowers cannot "tie"

---

[39]     Although the Court invited them to do so, the Biggs and Ms. Goldfinch did not seek injunctive relief with respect to the specific proceedings affecting their homes.  This failure also cuts against a finding of irreparable harm.

[40]     Francisca Ejale states that she received a notice of intent to foreclose in May 2012.  Ejale Dec. ¶ 1.  Tellingly, eight months have now gone by and Ms. Ejale does not have a sale date scheduled.  The same is true with respect to Diane L. Landry, who says she received a notice of intent to foreclose in May 2012, Landry Dec. ¶ 1, but still does not have a sale date scheduled. Likewise, Mojasola Olagbegi attached to her declaration a request for entry of default that is almost two years old—yet her property still is not scheduled for foreclosure sale.

93000/HR0710/00567907-1

24

DEFENDANT'S SUPPLEMENTAL OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

any wrongful conduct by Wells Fargo to the fact that they are facing foreclosure.[41]

## IV.   CONCLUSION

Plaintiffs' Motion is a motion that never should have been filed.  Plaintiffs' claims are stale and suffer fatal flaws.  Moreover, Plaintiffs' theories rely on faulty analysis, speculation, conjecture, vague accusations, and false information.  Plaintiffs' Motion falls woefully short of meeting the strict requirements for issuance of a preliminary injunction, and the Court should deny Plaintiffs' Motion in its entirety.

 Respectf                                          ully submitted,

Dated:  January 23, 2013                WINSTON & STRAWN, LLP

By:   /s/ Stacie C. Knight_____
T. Thomas Cottingham, III *(admitted pro hac vice)*
tcottingham@winston.com
Stacie C. Knight *(admitted pro hac vice)*
sknight@winston.com
WINSTON & STRAWN llp
100 North Tryon Street, Suite 2900
Charlotte, NC 28202-1078
Telephone:     +1 704 350 7700
Facsimile:     +1 704 350 7800
AND

ANGLIN, FLEWELLING, RASMUSSEN,
   CAMPBELL, AND TRYTTEN, LLP

By:  /s/ Yaw-Jiun (Gene) Wu_____ ___
Mark T. Flewelling (SBN 96465)
mflewelling@afrct.com
Yaw-Jiun (Gene) (SBN: 228240)
gwu@afrct.com
199 So. Los Robles Ave., #600
Pasadena, CA  91101
Telephone:     +1 626 535 1900
Facsimile:     +1 626 577 7764

Attorneys for Defendants WACHOVIA MORTGAGE,
FSB, WACHOVIA BANK, FSB, AND GOLDEN
WEST FINANCIAL CORPORATION

Winston & Strawn LLP
101 California Street
San Francisco, CA  94111-5802

---

[41]     In fact, Mr. Gary, Mr. Nolen, and Ms. Silva's defaults date back to 2009 and 2010, and Wells Fargo could have foreclosed on their properties well before the settlement in this matter.  The fact that they have been permitted to continue residing in their properties despite their failure to make their required payments for such a long period of time demonstrates precisely why Plaintiffs cannot make the requisite "link" between any foreclosure and the conduct they allege.

93000/HR0710/00567907-1                                        25

**CERTIFICATE OF SERVICE**

I, the undersigned, declare that I am over the age of 18 and am not a party to this action. I am employed in the City of Pasadena, California; my business address is Anglin, Flewelling, Rasmussen, Campbell & Trytten LLP, 199 S. Los Robles Avenue, Suite 600, Pasadena, California 91101-2459.

On the date below, I served a copy of the foregoing document entitled:

**DEFENDANT'S SUPPLEMENTAL OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

on the interested parties in said case as follows:

**Served Electronically Via the Court's CM/ECF System**

*Attorneys for Plaintiffs and the Settlement Class*

| | |
|---|---|
| BERNS WEISS LLP | BERNS WEISS LLP |
| Jeffrey K. Berns | Lee A. Weiss |
| 20700 Ventura Blvd. Suite 140 | 626 RXR Plaza |
| Woodland Hills, CA 91364 | Uniondale, NY 11556 |
| | |
| jberns@bernsweiss.com | lweiss@bernsweiss.com |
| Tel: (818) 961-2000 | Tel: (516) 222-2900 |
| Fax: (818) 999-1500 | Fax: (818) 999-1500 |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made.  This declaration is executed in Pasadena, California on January 23, 2013.

| | |
|---|---|
| Nancy J. Peters | */s/  Nancy J. Peters* |
| (Type or Print Name) | (Signature of Declarant) |

*Winston & Strawn LLP*
*101 California Street*
*San Francisco, CA 94111-5802*