**BERNS WEISS LLP**
Jeffrey K. Berns (SBN 131351)
jberns@law111.com
20700 Ventura Blvd., Suite 140
Woodland Hills, CA 91364
Telephone: (818) 961-2000
Facsimile: (818) 999-1500

Lee A. Weiss (admitted *pro hac vice*)
lweiss@law111.com
585 Stewart Avenue, Suite L-20
Garden City, NY 11530
Telephone: (516) 222-2900
Facsimile: (818) 999-1500

*Attorneys for Plaintiffs and the Settlement Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| IN RE: WACHOVIA CORP. "PICK-A-PAYMENT" MORTGAGE MARKETING AND SALES PRACTICES LITIGATION<br><br>_____<br><br>*This Document Relates to*:<br><br>ALL INCLUDED ACTIONS | **CASE NO. 5:09-MD-02015-JF**<br><br>[*Assigned to the Hon. Jeremy Fogel*]<br><br>**PLAINTIFFS' REPLY TO DEFENDANTS' SUPPLEMENTAL OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date: January 31, 2012<br>Time: 3:00 p.m.<br>Place: 5th Fl.—Courtroom 3<br>Judge: Hon. Jeremy Fogel |

**TABLE OF CONTENTS**

**PAGE**

I. INTRODUCTION ...........................................................................................................1

II. ARGUMENT .................................................................................................................2

    A. Wells' Undocumented Statistics Are Inherently Unreliable................................2

    B. Wells Improperly Requires Class C Members to Show Imminent Default..........4

    C. Wells' Imminent Default Practices Violate the Settlement Agreement and HAMP ..................................................................................................................5

    D. Wells' Unreliable Property Valuations Have Caused Improper Denials..............8

    E. Wells Has Failed to Consider Class Members for MAP2R Modifications ........10

    F. Wells Refuses to Consider Certain Class Members Who Received the Class B and C Notices for Loan Modifications .....................................................10

    G. Plaintiffs Have Shown Irreparable Harm Warranting the Proposed Injunction ..........................................................................................................12

    H. The Equities Strongly Favor Plaintiffs ...............................................................15

III. CONCLUSION.............................................................................................................15

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                                                         **PAGE**

*Chang v. Wachovia Mortg., FSB*,
    No. C–11–1951 SC, 2001 WL 2940717 (N.D. Cal. July 21, 2011) .................................9

*Kilgore v. Wells Fargo Home Mortg.*,
    No. 1:12-CV899 AWI SMS, 2012 WL 2553622 (E.D. Cal. June 29, 2012)....................3

*Securities and Exchange Comm'n v. G.C. George Sec's, Inc.*,
    637 F.2d 685 (9th Cir. 1981) .......................................................................................15

*W. Alton Jones Found. v. Chevron U.S.A., Inc.*,
    97 F.3d 29 (2d Cir. 1996)..............................................................................................11

*Watkins v. Wells Fargo Bank*,
    No. 3:10–1004, 2011 WL 777895 (S.D. W. Va. Feb. 28, 2011) ......................................9

**STATE CASES**

*State Farm Mut. Auto Ins. Co. v. Super. Ct.*,
    114 Cal. App. 4th 434 (2003) ........................................................................................9

**STATUTES**

28 U.S.C. § 1651................................................................................................................15

## I. INTRODUCTION

After nearly two months of briefing, it is crystal clear that there are massive problems with Wells Fargo's compliance with and reporting of the loan modification relief approved by this Court as part of the MDL settlement. It is equally certain that, absent Court intervention, Wells has no intention of changing its practices, regardless of the harm that its breaches of the Settlement Agreement will continue to cause to Plaintiffs and Settlement Class Members.

Without any discovery or meaningful cooperation from Wells, Plaintiffs have provided the Court with overwhelming and unmistakable evidence that Wells is not complying with the Settlement Agreement. Wells makes little attempt to rebut Plaintiffs' evidence with actual documentation from its loan modification denials, which is in its exclusive possession. Instead, its submissions and arguments are based almost entirely on the unsubstantiated and increasingly implausible or false assertions of its ubiquitous declarant-employee, Michael Dolan.

Despite its minuscule evidentiary showing, Wells argues that the Court should find that everything is fine and should allow Wells to continue administering the loan modification program with no oversight whatsoever. This position is untenable, as the arguments in Wells' Supplemental Opposition ("SO") reflect that its true positions are that it need not comply with the Settlement Agreement and/or that the Agreement should be construed in implausible ways that prevent scores of Class Members from receiving loan modifications that would help them keep their homes. Specifically, Wells urges the Court to hold that:

- The Settlement Agreement allows Wells to determine a Class Member's ability to pay his or her mortgage based on pre-income tax money that the Class Member does not have (SO at 13-14);

- The Settlement Agreement allows Wells to use inflated, unreliable property valuations to deny modifications based on flawed Net Present Value (NPV) or excessive forbearance calculations (SO at 16);

- Wells need not offer MAP2R relief that writes down principal to Class Members who reject HAMP relief, unless the Class Members request it, despite the Settlement Agreement's express requirement that Wells do so (SO at 18);

- Class Members who, based upon records Wells gave to the Settlement Administrator, received Class B and C Notices stating they were eligible for loan modifications in fact are not eligible if they had a pre-Settlement modification, and the Notice's promise is irrelevant (SO at 20); and that

- Even though the Settlement Agreement does not require Class C Members to demonstrate hardship or imminent default as a prerequisite to modification, and Wells admits that at least 176 Class C Members were denied modifications solely on these grounds, Wells has no duty to reevaluate those Class Members' modification applications (SO at 22).

Further, the balance of the equities strongly favors Plaintiffs. While Plaintiffs and Class Members are at risk of losing their homes and/or must endanger their financial health to avoid foreclosure, Wells has provided no concrete evidence of any harm it might suffer if foreclosures are delayed for a short review period to determine if denied Class Members in fact qualify for loan modifications. Any such harm would likely be de minimus in view of the size of Wells, and Wells voluntarily assumed that risk of harm by breaching the Settlement Agreement.

For the reasons set forth herein, the Court should reject Wells' baseless fact assertions and implausible legal arguments, and hold that the evidence of its breaches of the Settlement Agreement's loan modification provisions and the resulting harms to Class Members, combined with the clear balance of equities in Plaintiffs' favor, necessitates the proposed injunction requiring review of its loan modification denials.

## II.     ARGUMENT

### A. Wells' Undocumented Statistics Are Inherently Unreliable

Wells boldly claims that Plaintiffs are wrong as to all application, approval, denial and fall-out statistics and that the Court, without any documentary evidence, should adopt its figures as grounds to deny relief. SO at 2-5. The sole basis for this contention is the December 14, 2012 Supplemental Declaration of Michael Dolan ("Supp. Dolan Decl." (Dkt. 373)). Although all relevant documentation is in Wells' possession, Mr. Dolan did not provide a single document to support his statements on the application, approval, denial and fall-out data. *Id.* ¶¶ 4-16. Mr. Dolan's January 23, 2013 declaration ("Jan. 23 Dolan Decl." (Dkt. No. 400-1)) does not remedy

this evidentiary failing.[1]

This failure to provide documentary evidence alone warrants rejection of Wells' arguments and entry of injunctive relief. *See Kilgore v. Wells Fargo Home Mortg.*, No. 1:12-CV899 AWI SMS, 2012 WL 2553622, at *2 (E.D. Cal. June 29, 2012) (finding Wells' declaration of Michael Dolan with no documentation insufficient, entering injunction against foreclosure pending a substantiated evidentiary showing). Here, the lack of documentation is particularly troubling in light of Mr. Dolan's at-best disingenuous attempt to explain how Lead Class Counsel was contacted by over 2,000 Settlement Class Members who do not appear on any Wells denial reports, but who state that Wells denied them modifications. *See* Plts' Supp. Memo (Dkt. 394) at 20-21. Plaintiffs identified a sampling of 20 of these Class Members. Lum Supp. Decl. (Dkt. 394-3) ¶¶ 26(a)-(t). Mr. Dolan does not claim that Lead Class Counsel is wrong or that these Class Members are on Wells' reports. Instead, he offers justifications for these omissions that range from inexcusable to unbelievable to just plain false:

- **Bankruptcy**– Mr. Dolan admits that Wells did not provide (and still has not provided) any data concerning loan modification denials for individuals in bankruptcy, and blames Lead Class Counsel for not raising the issue sooner. Jan. 23 Dolan Decl. ¶ 38(a). But, there was no way Lead Class Counsel could have known of these omissions;

- **Multiple Applications/Inquiries**– Mr. Dolan states that "Wells Fargo's system would only allow us to provide a report on the borrower's last experience." *Id.* ¶ 38(c). As an example, he claims that Settlement Class Member John Becker does not appear on any denial list because his last interaction with Wells was a phone call where he inquired about a modification, but did not request an application. *Id.* Mr. Dolan's explanation is patently false, as Mr. Becker had applied for and was denied modifications in other quarters before his alleged "non-application" (*see, e.g.*, Supp. Lum Decl., Ex. 68), yet his name never appeared on denial lists for any of those quarters either.[2] Regardless, even if

---

[1] Wells claims that it was Lead Class Counsel's burden to "de-dupe" the number of modification requests. SO at 3 n.2. But Wells never produced lists of names of Class Members requesting applications. January 28 Declaration of Jeffrey K. Berns ("Jan. 28 Berns Decl.") ¶ 3.

[2] This confirms the implausibility of Mr. Dolan's contention. As Wells provides denial reports every quarter, if a borrower was denied a modification in one quarter and then had a different experience in another quarter (e.g., fall-out, non-application, etc.), the latter could not possibly prevent the earlier denial or fall-out from appearing on the report in the quarter in which it occurred. Moreover, Wells' quarterly denial reports contain multiple entries for the same Class Members. *See e.g.* Jan. 28 Declaration of Albert G. Lum ("Jan. 28 Lum Decl.") ¶ 17, Ex. P at

Mr. Dolan were being truthful, ***this would confirm that Wells is underreporting denials***;

- **Manual Tracking Error**—Mr. Dolan claims that one of the 20 loans Plaintiffs identified was not on the fall-out reports due to "manual tracking on this particular loan." Jan. 23 Dolan Decl. ¶ 38(k). Plaintiffs have no idea what this means, but it suggests that Wells may not be properly tracking numerous Class Member modification applications;

- **Failure to Return Application Packet**—Mr. Dolan states that this borrower "never returned her application packet, so she was neither denied nor considered a fall-out and accordingly is not included on those reports to Lead Counsel." *Id.* ¶ 38(l). Yet, in his December 14, 2012 declaration, Mr. Dolan stated that "[b]orrowers who never return their application packets . . . are classified as 'fall-outs.'" Supp. Dolan Decl. ¶ 10. Thus, Mr. Dolan has directly contradicted himself and misled the Court. Accordingly, his fall-out statistics and Wells' fall-out reports are demonstrably unreliable.

The foregoing demonstrates that Mr. Dolan's claim that 41.4% of applicants received loan modifications is false because he significantly undercounts the numbers of applicants and denials, and that his assertions on Wells' administration generally likewise have no credibility.

**B. Wells Improperly Requires Class C Members to Show Imminent Default**

Wells has never disputed that it is a breach of the Settlement Agreement to require Class C Members to show hardship or imminent default when the Settlement has no such requirement. More importantly, Wells' response with respect to Settlement Class C Members whom it has denied on these grounds illustrates precisely why review by Lead Class Counsel is necessary and Wells cannot be the sole arbiter of the modification program.

Plaintiffs' TRO application demonstrated that Wells was improperly denying Settlement Class C Members for these reasons. *See* TRO Memo at 12-13 (Rosillo); 14 (Fisher). Plaintiffs' evidence showed that Carrie Rosillo was a Class C Member denied for not being in Imminent Default. Dkt. No. 375-1, Ex. AQ. Wells could not dispute that its own records reflect that evidence. Instead, it claimed in its after-the-fact briefing and Dolan declarations that it denied her on other grounds (*see* SO at 5 n.3, citing Dkt. No. 371-4 ¶ 23). Wells further responded,

---

190 (Fourth Quarter 2011 denial report reflecting that Thomas Michael was denied twice for excessive forbearance and twice for negative NPV in the same quarter). Similarly, Wells' quarterly fall-out reports list Class Members multiple times. *Id.* ¶ 19, Ex. R at 12 (Dec. 17, 2010-June 30, 2012 fall-out report listing Guadalupe Balcazar and Saghar Bakhtiari multiple times).

again through Mr. Dolan, that it has not denied modifications to Class C Members for lack of hardship or imminent default. SO at 22. Then, Plaintiffs showed the Court that Mr. Dolan's representations were false, as Wells' own denial reports show that it denied at least 176 Class C Members for these reasons. Lum Supp. Decl. ¶ 25, Ex. 62. Mr. Dolan again offered unsubstantiated post-hoc rationalizations for the denials that are contradicted by Wells' denial reports. *Compare* Jan. 28 Lum Decl. ¶ 18, Ex. Q at 93 (Mitchell Amador denied for failure to document a hardship) *with* Jan. 23 Dolan Decl. ¶ 37(b) (Mitchell Amador denied because HTI less than 31%), *and* Jan. 28 Lum Decl., Ex. Q at 50 (Karen Fanicchi denied for not being in imminent threat of default) *with* Jan. 23 Dolan Decl. ¶ 37(c) (Karen Fanicchi denied for HTI less than 31%). Further damaging Mr. Dolan's credibility is his claim that Wells Fargo has never held a mortgage on 328 De Anza Avenue (*Id.* ¶ 37(a)), when Wells' quarterly report lists this as the address for Class C Member Arnoldo Diaz, who was improperly denied for lack of imminent default. *See* Jan. 28 Lum Decl., Ex. Q at 50.

Denying modifications to Class C Members because they did not document a hardship is a clear breach of the Settlement Agreement, and one that Plaintiffs showed has already caused Class Members to lose their homes through foreclosure and placed others at risk of the same. *See* Lum Supp. Decl. ¶¶ 22-24. Yet, even after making clear misrepresentations to the Court, Wells now claims that its improper denials should stand unless Plaintiffs can prove, *without access to Wells' documents*, their entitlement to modifications. As Lead Class Counsel has already spent thousands of hours and hundreds of thousands of dollars in expenses to uncover Wells' clear breaches of the Settlement Agreement, and as Class Members have lost (and others are coming closer to losing) their homes and are taking unnecessary financial risks each day, there must be a procedure in place to prevent Wells' continued abuse of its role as judge, jury and executioner for all loan modification decisions.

**C. Wells' Imminent Default Practices Violate the Settlement Agreement and HAMP**

Wells persists with its nonsensical position that the Settlement Agreement and HAMP guidelines require it to evaluate a borrower's ability to pay his or her mortgage based on the

5

borrowers' gross income, and thus ignore local, state and federal income taxes. SO at 13. Wells never explains how it can determine whether a borrower has sufficient funds to pay her monthly expenses without knowing how much money she actually has each month. Instead, Wells intentionally conflates the test for determining a borrower's housing-to-income ratio with the imminent default factors. For example, Wells cites to § 1.22 of the Settlement Agreement, but that is merely the definition of HTI. SO at 7-8. Wells makes no connection between HTI and imminent default. Nor could it, since it previously argued that HTI is not relevant to imminent default.[3] Opp. to TRO Memo at 7-8. Wells also cites to § 5 of the HAMP Handbook, but this too has no relevance, as imminent default is not mentioned once in that section. *See* Second Request for Judicial Notice ("Second RFJN"), Ex. A hereto at § 5. Moreover, the imminent default section of the Handbook (§4.4) likewise does not mention gross income even once. *Id*.

In addition to finding no support in the Settlement Agreement or HAMP Handbook, Wells' position makes no sense. As Wells acknowledges, the purpose of the imminent default test is to determine if default is "reasonably foreseeable." The only way to predict if a borrower will or will not be able to pay her mortgage is by determining how much money she will have available each month and comparing that to her monthly expenses. Yet, this is not what Wells has done, and it continues to claim it need not do this.

Although it cites the imminent default standard, Wells does not even try to explain how this can properly be applied without considering income taxes.[4] For example, Wells recognizes that the HAMP materials on which it purports to rely require it to consider a borrower's

---

[3] Wells has taken inconsistent positions to try to justify the otherwise unjustifiable—Wells has argued in each of its briefs that the HTI test is irrelevant to determining imminent default; yet here, it uses the HTI test in a futile attempt to support its flawed imminent default methodology.
[4] Wells blatantly tries to mislead this Court as to the income tax issue by focusing on HAMP's debt-to-income ratio, which compares gross income to gross (housing and non-housing) monthly expenses. SO at 14. The only purpose of this calculation is to determine if a borrower is required to obtain HUD-approved counseling as a condition to obtaining a modification—a borrower with a DTI of over 55% must do this. *See* HAMP Handbook, § 6.7. HAMP guidance does not say, as Wells falsely implies, that this ratio has any relevance to imminent default.

"liabilities" (SO at 11), yet it admittedly ignores income tax payments that are one of the biggest (if not *the* biggest) liabilities for any borrower. Similarly, Wells agrees that it must consider a borrower's non-mortgage "monthly obligations (including personal debts, revolving accounts, and installment loans), and a reasonable allowance for living expenses such as food, utilities, etc." SO at 11. As none of these can be paid for with *pre-tax* dollars, any comparison of them to gross income is meaningless, if the aim is to determine the borrower's ability to pay.[5]

Wells admits that its argument against finding breach based on imminent default for Plaintiffs Cory, Bishr, Murphy and Pharn depend on its flawed "gross income" argument. SO at 13. Wells also claims that the Bishrs were not eligible for a modification because its eleventh-hour deposition of Mr. Bishr purportedly shows that "his monthly PITIA payment was only 26% of his gross monthly income." SO at 12. To arrive at a 26% HTI, Wells used monthly income of ▓▓▓▓ that correctly calculated Mrs. Bishr's bi-weekly pay by multiplying it by 26 and dividing by 12 (*see* Jan. 28 Lum Decl., Ex. W (Bishr Dep.) at 14:18-15:23), but *then it miscalculated the Bishrs' monthly mortgage payment by doubling their bi-weekly payment instead of doing the same 26/12 calculation. Id.* at 30:23-31:2, 54:23-55:22. Wells then omitted the Bishrs' ▓▓ monthly HOA fee altogether (*id.* at 33:12-15) from their PITIA. *Id.* at 54:23-55:22.

This lays bare one of the fundamental problems with the absence of review of Wells' loan modification determinations—if a Class Member's application has an error that favors a modification (like the Bishrs' stated income figure), Wells immediately fixes it; but if a Class Member's error *disfavors* a modification (like the Bishrs' stated mortgage payment), Wells accepts it. If Wells had done an accurate calculation for the Bishrs (which its counsel most

---

[5] Although it is undisputed that Wells ignored income taxes in determining imminent default, Wells now claims that it is Plaintiffs' burden to show their actual tax rates, rather than using an illustrative 25% tax rate. SO at 13 n.25. Not so. Wells breached the Settlement Agreement by failing to properly apply the imminent default test. Thus, Plaintiffs are likely to succeed on that breach claim. Moreover, Wells does not dispute that 25% is a conservative estimated tax rate.

certainly did not), it would have done the 26/12 calculation for their ▮ bi-weekly mortgage payment (Jan. 28 Lum Decl., Ex. Y), which is ▮, and added the ▮ monthly HOA fee for a ▮ PITIA, which is over 31% of their ▮ income and thus entitled them to relief.[6]

Wells' admitted failure to consider income taxes has caused it to determine that multiple Plaintiffs who do not have sufficient funds with which to pay their monthly obligations are not in imminent default, and thus, never run them through the waterfall to evaluate whether their mortgage payments could be lowered. *See, e.g.,* Berns Reply Decl. (Dkt. 375-1) ¶ 17 (Plaintiff Jennifer Murphy denied for failure to show imminent default where her monthly income after taxes left her after paying all of her bills with only ▮ or ▮ per day with which to pay for food, clothing, and other daily living expenses for herself and her two children), ¶¶ 8-9 (Plaintiff Chan Pharn denied because he was not in imminent threat of default despite only ▮ remaining after paying his mortgage and other monthly expenses).[7] As Wells does not dispute any of these calculations, it is imperative that Lead Class Counsel have the opportunity to review the loan modification applications, as these struggling borrowers may be entitled to more affordable mortgage payments and principal forgiveness under the Settlement Agreement.

**D. Wells' Unreliable Property Valuations Have Caused Improper Denials**

Wells argues that the Settlement Agreement does not require it to use reliable valuations, pursuant to HAMP or otherwise, in applying the NPV test and calculating forbearance for requested loan modifications. SO at 16. Wells is wrong. The Settlement Agreement

---

[6] Wells appears to be correct that Plaintiffs Thomas and Linda Geremia were not eligible for a modification because their HTI was below 31%. SO at 12-13. But, Wells denied the Geremias' application for lack of imminent default. Dec. 18, 2012 Declaration of Albert G. Lum (Dkt. No. 377-3), Ex. V. This inaccurate denial reason, which violates § VI(E)(8)(d) of the Settlement Agreement, harmed the Geremias because Mr. Geremia had been advised by his doctor to consider early retirement due to job stress. Jan. 28 Lum Decl., Ex. X at 38:18-24. Had Mr. Geremia known that he could have been eligible for a modification if his income was lowered, he could have made a fully informed decision concerning early retirement. *Id.* at 38:12.
[7] Wells claims that Mr. Pharn was not in imminent default because his LTV was slightly below 80%. SO at 13 n.24. But, as set forth below, Wells' property valuations are unreliable.

1  incorporates both federal requirements generally and HAMP's specifically (*see* §§ VI.E.1,
2  VI.E.4), which require that any AVM used by Wells be reliable. Second RFJN, Ex. A at § 6.8.
3  Moreover, even if the Settlement Agreement did not explicitly require reliable property
4  valuations, its covenant of good faith and fair dealing does. *See*, *e.g.*, *State Farm Mut. Auto Ins.*
5  *Co. v. Super. Ct.*, 114 Cal. App. 4th 434, 453 (2003) ("The doctrine of good faith then requires
6  that the party vested with contractual discretion exercise that discretion reasonably and with
7  proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable
8  expectation of the parties.") (applying Illinois law, citation omitted).[8]
9     Failing in its effort to avoid having to use reliable property valuations, Wells meekly
10 attacks Plaintiffs' evidence. It claims that Plaintiffs rely on "three self-commissioned appraisals
11 and simply conclude that theirs must be more accurate." SO at 15. But Wells ignores the
12 evidence showing that *its own valuations* of Richard D'Alessio's property fluctuated by over
13 ▮▮▮▮ in a five-month period, and that the lower of these *still* overvalued his property by
14 nearly another ▮▮▮▮ compared with its sale price three months later at foreclosure. *See* Dkt.
15 No. 365-22 ¶¶ 4-12. Likewise, other than a general attack on use of government records (SO at
16 6), Wells also ignores the evidence showing that its valuation of Plaintiffs Michael and Kathy
17 Lerner's home at over ▮▮▮▮ (Dkt. No. 371-4 ¶¶ 48-49) was *more than 50% higher* than
18 their county assessor's valuation (▮▮▮▮) just one month earlier (Dkt. No. 375-1 ¶ 52 and Ex.
19 AF). Both Mr. D'Alessio (denied for negative NPV) and the Lerners (denied for excessive
20 forbearance) would have qualified for modifications and lower monthly payments if Wells had
21 used a reliable valuation method. *See* Berns Reply Decl. ¶¶ 51-53 (Lerners), 55-59 (D'Alessio).
22     As Wells has made no showing that its valuations are reliable, and Plaintiffs' evidence

---

[8] Wells' reassertion of its federal preemption argument (SO at 17) that the Court already rejected in its TRO Order (Dkt. No. 390 at 5 n.2) fails again here for the same reasons, *i.e.* now-superseded federal savings and loan regulations do not and never did allow banks to evade the express and implied good faith obligations of voluntary settlement agreements. *See*, *e.g.*, *Watkins v. Wells Fargo Bank*, 2011 WL 777895, at *12 (S.D. W. Va. Feb. 28, 2011) (claim to enforce settlement agreement not preempted); *Chang v. Wachovia Mortg., FSB*, 2001 WL 2940717, at *5 (N.D. Cal. July 21, 2011) (good faith and fair dealing claim not preempted).

demonstrates that its inflated valuations have prevented them from obtaining modifications to which they were entitled, there needs to be a procedure for review of the denials based on property value-driven determinations of excessive forbearance (*i.e.,* the inability to reach the 31% HTI ratio) and negative NPV results. There were over 6,000 such denials between April 2011 and September 2012. *See* Plts' Supp. Memo at 2, Ex. B.

### E. Wells Has Failed to Consider Class Members for MAP2R Modifications

Wells' does not dispute that its quarterly reporting shows that only 1,746 Class Members have received MAP2R modifications that write down their outstanding debt. *Id.* That means that almost 90% of the modifications Wells has granted are HAMP. Plts' Supp. Memo at 16. This is because Wells is trying to minimize MAP2R relief under the Settlement Agreement.

Plaintiffs showed that Class Members Frances Austin and Michael and Pauline Blake rejected HAMP modifications and Wells did not offer them MAP2R relief. *Id*. at 16. Wells admits that the Settlement Agreement requires that when a Class Member "'elect[s] not to accept a HAMP modification,' that Wells Fargo must consider the borrower for a MAP2R modification." SO at 19 (quoting § VI.E.1). Wells also admits that it did not consider or offer MAP2R relief to Ms. Austin or the Blakes. *Id.* Instead, it contends that the Blakes later received a permanent HAMP modification. SO at 19 n.33. But of course, this does not excuse Wells' failure to offer MAP2R relief, and its potentially more valuable principal forgiveness component, to the Blakes when they rejected the initial HAMP modification. With respect to Ms. Austin, Wells' contention that she rejected a HAMP modification because she did not want her loan to be escrowed (*id.*) again does not excuse its failure to offer MAP2R relief because she might well have found escrowing more acceptable in light of the added benefit of MAP2R principal reduction. Wells' implicit assumption that Ms. Austin knew about and would have rejected MAP2R relief is not warranted, as the record shows that Class Members do not necessarily know what MAP2R relief is. *See* Jan. 28 Lum Decl., Ex. W (Bishr dep.) at 11:20-22 (Q. Do you know what a MAP2R loan modification is? A. No.). By denying these Class Members the *choice* to accept MAP2R relief, Wells breached Section VI.E.1 of the Settlement Agreement.

### F. Wells Refuses to Consider Certain Class Members Who Received the Class B and C Notices for Loan Modifications

There are hundreds of Class Members on the lists provided by Wells to the Settlement Administrator who are categorized as Members of both Settlement Classes A and B or Settlement Classes A and C. After the notices were sent out, the Administrator notified counsel for the parties that these Class Members had received both notices (one providing for a cash payment only and one providing for a cash payment and the ability to apply for a loan modification in accordance with the Settlement Agreement) and some were quite confused. *See* Declaration of Amy Lake ("Lake Decl.") ¶ 4. Since, at that time, Settlement Class Members were determining whether to opt out or be bound by the Settlement Agreement based upon the notices that they had received, the Administrator proposed and ***both parties agreed*** that these Class Members would be eligible for loan modifications as provided in the Class B or C notices that they had received. *Id.*; *see also* Jan. 28 Berns Decl. ¶ 2, Ex. A (emails approving proposal).

Wells now seeks to deny loan modifications to those Class Members (such as Plaintiff Sherri Goldfinch who was forced into a short sale to avoid foreclosure), who were promised eligibility for modifications, by disavowing both the terms of the notice it sent them and its own agreement to offer this relief. Wells urges the Court to ignore those facts by cavalierly claiming that "[s]ubsequent communications cannot amend the Settlement Agreement." SO at 20. Wells is wrong again. In *W. Alton Jones Found. v. Chevron U.S.A., Inc.*, 97 F.3d 29 (2d Cir. 1996), the court addressed a similarly misleading class notice that the settling defendant claimed was contrary to a class action settlement, and squarely rejected the argument that the class member should not have relied on the notice. *Id.* at 37 ("Where documents giving notice of settlement of a class action are prepared in such a way as to mislead a potential class member into believing that it is not a class member, and therefore has no need to opt out of the class in order to preserve an independent lawsuit, ***the recipient will not be required to scour all other potentially pertinent documents in an effort to discover whether the reassuring documents sent to it were accurate.***") (emphasis added).

The same principle should apply here. Since the Class Notice that Wells approved to send to these Class Members promised them eligibility for loan modifications as an inducement to stay in the Settlement and release their claims, and Wells *expressly agreed to provide this relief*, Wells should not now be allowed to renege on its promise.

**G. Plaintiffs Have Shown Irreparable Harm Warranting the Proposed Injunction**

In response to the Court's TRO Order expressing concern that only 5 Plaintiffs faced immediate loss of their homes (Dkt. 390 at 6), Plaintiffs produced declarations of 20 more Class Members whose foreclosures are pending. Plts' Supp. Memo at 22-23. Wells responds by submitting yet another Dolan Declaration with unsubstantiated allegations about these Class Members (*see* Jan. 23 Dolan Decl. ¶¶ 2-37), many of which Lead Class Counsel could not verify or refute since he relies on documents that are in Wells' exclusive possession, but which Wells has not produced to Plaintiffs or this Court. Even so, Mr. Dolan's assertions about these Class Members facing foreclosure are highly problematic and demonstrate the need for the injunction.

A glaring example is Wells' treatment of Class Members Francis Ejale and Marissa Silva. Ms. Ejale, who has received notice that Wells has begun foreclosure proceedings on her home (Jan. 28 Lum Decl. ¶ 9, Ex. H)**,** was denied a loan modification because the proposed monthly payment would supposedly have been less than 25% of her gross monthly income. *Id*., Ex. I. To arrive at this conclusion, Mr. Dolan states that Wells determined Ms. Ejale's income to be ▓▓▓▓▓ (Jan. 23 Dolan Decl. ¶ 3), which is the average of the paychecks submitted by her that *included overtime pay.* Jan. 28 Lum Decl. ¶ 11, Ex. J.

For Ms. Silva, whose home foreclosure sale date is February 19, 2013, Mr. Dolan states that Wells denied her a modification because the waterfall could not give her an affordable HTI of 31%. SO at 24; Jan. 23 Dolan Decl. ¶ 31. In so concluding, ***Wells refused to consider her husband's overtime pay***, even though he had worked overtime on five of the six paychecks that Ms. Silva submitted. Jan. 28 Lum Decl. ¶ 13, Ex. L. If Wells had counted this overtime pay (like it did in denying Ms. Ejale's application), the Silvas' gross monthly income would have been ▓▓▓▓▓▓▓▓▓▓▓▓▓. Mr. Dolan states, again with no documentation, that

1  Wells used ▮▮▮ as their income, and that the PITIA payment of a modification would be

2  ▮▮▮▮. However, the monthly principal and interest payment on a ▮▮▮ loan at

3  ▮ for ▮ months, as Mr. Dolan used, is ▮▮▮. Jan. 28 Lum Decl. ¶ 27. Adding to that Ms.

4  Silva's ▮ homeowners insurance, ▮ property taxes, and ▮ HOA dues, would result in a

5  PITIA payment of ▮▮▮ which is well within the 31% target.

The available information on other declarants facing foreclosure further demonstrates the need for an injunction requiring review of Wells' loan modification denials:

- Thomas Gary (2/11/13 foreclosure): Began modification process in February 2011, has been assigned six different home preservation specialists, applied for modification four times, and faxed documents 38 times to Wells Fargo (Lum Supp. Decl., Ex. 3 at ¶¶ 4-6); Mr. Dolan says Mr. Gary's file is still *under review* (Jan. 23 Dolan Decl. ¶ 4) when his foreclosure date is less than three weeks away;

- Ernestine Jones (judicial foreclosure commenced Sept. 2012): Wells does not dispute that her housing payment is ▮▮▮ (▮ HTI), which is not affordable, yet she was denied for not being in imminent threat of default; Mr. Dolan now asserts that she was denied for negative NPV, but provides no documentation, even though this was not the stated ground for her denial. *See* Lum Supp. Decl., Ex. 6(A-B) ("loan does not meet imminent threat criteria," and no financial hardship);

- Class Members Burkett (3/6/13 foreclosure date), Gary (2/11/13 foreclosure), Hyde (2/14/13 foreclosure), Landry (foreclosure commenced), Navarro (11/2/12 Notice of Default), and Wallace (1/24/13 foreclosure): Wells claims no wrongful denial is alleged, but each of these borrowers responded to multiple document requests and received a rejection or no-decision due to the supposed failure to provide the requested documents (Lum Supp. Decl. ¶¶ 2 (Burkett), 4 (Gary), 6 (Hyde), 9 (Landry), 12 (Navarro), 20 (Wallace)), none of which Wells even tries to justify;

- DuWarren Gibson (foreclosure conference scheduled for February 13, 2013): Received two settlement notices, one stating he is eligible for modification relief; Wells ignored this notice and denied him based on prior modification (Lum Supp. Decl., Ex. 4 at ¶ 8); Wells now contends that it considered him for a MAP2R modification (Jan. 23 Dolan Decl. ¶ 5), but its 9/14/12 letter refutes this, as it states that he was not eligible because of a purported MAP2R modification in 2009 (*before MAP2R even existed*) (Lum Supp. Decl., Ex. 4(J)).

Despite having multiple opportunities to demonstrate its compliance with the Settlement

13

Agreement, Wells has utterly failed to provide documentation to support its denial decisions. Meanwhile, its declarations have become less and less credible, and its justifications for its denials fly in the face of common sense and the Settlement Agreement's plain language. If the Court allows Wells to retain unfettered control over modifications with no oversight, then the June 30, 2013 expiration of this critical form of relief will pass with many Class Members having been wrongfully denied and remaining at risk of losing their homes.

As its final attempt to avoid any repercussions for its own actions, Wells argues that the Court cannot find irreparable harm because Plaintiffs allegedly waited too long to seek relief. SO at 24. This argument has two fundamental flaws. First, it assumes that Class Members are able to determine the basis for their denials and analyze Wells' conclusions. However, the denial letters Wells sent to Class Members list only the reason for the denial, with no explanation or back-up data. Assuming that Wells even provides the correct reason, these letters are far from sufficient to alert Class Members that their denials may have been wrongful.

Second, Wells pretends that the filing of Plaintiffs' TRO application in December 2012 was the first attempt to obtain relief, rather than a last-resort measure taken only after Wells rejected Lead Class Counsel's efforts to obtain review of its denials. These efforts started over a year earlier, when counsel, after speaking with hundreds of Class Members and reviewing their documents, first contacted Wells about evidence of improper denials. *See* Jan. 28 Berns Decl. ¶ 3, Ex. B (10/10/2011 email). After Wells failed to give meaningful answers, Lead Class Counsel sent letters to 232,837 Settlement Class B and C Members about Wells' handling of loan modifications under the Settlement Agreement, as this was the only way to gather evidence to enable counsel to evaluate Wells' denials. *Id.* ¶ 4. When Wells learned of these communications to Class Members, it initially threatened to stop its reporting of Settlement modifications altogether. *Id.* Thereafter, Wells requested a meeting with Lead Class Counsel in July 2012, at which it agreed to provide files of approximately 50 Class Members for counsel's review. *Id.* ¶ 5, Ex. D. Wells never provided these files, forcing counsel to conclude that Plaintiffs who were wrongfully denied loan modifications had no alternative but to seek relief through litigation. *Id.*

¶ 6, Ex. E. Thus, as Wells knows, the "delay" between its loan modification denials and the filing of the TRO application was marked by repeated efforts to review and remediate these denials without litigation.

The Court thus should reject Wells' delay argument and should find that injunctive relief is warranted based on Plaintiffs' demonstration of irreparable harm and/or pursuant to the Court's authority under the All Writs Act, 28 U.S.C. § 1651(a), to issue an injunction in aid of its jurisdiction to enforce and effectuate the Settlement Agreement. *See*, *e.g.*, *Securities and Exchange Comm'n v. G.C. George Sec's, Inc.*, 637 F.2d 685, 688 (9th Cir. 1981) ("Based on its retained continuing jurisdiction over this case and its authority under § 1651, we are satisfied that the district court had jurisdiction to consider Pennaluna's request for injunctive relief . . . .").[9]

### H. The Equities Strongly Favor Plaintiffs

In its meager attempts to balance the equities in its favor, Wells has shown no evidence whatsoever of how many Class Member foreclosures it has scheduled in the coming months. Thus, it gives the Court no basis to weigh any alleged harm to Wells from the proposed review process, in comparison to the demonstrated irreparable harms to Plaintiffs and Class Members. Moreover, there is no reason to believe that Wells will suffer significant financial harm if the review process delays some foreclosures where the modification denials are later found to be valid – a small price to pay to insure that Plaintiffs and Class Members do not lose their homes due to Wells' improper denials based on its non-compliance with the Settlement Agreement.

### III. CONCLUSION

For the reasons set forth herein, in Plaintiffs' supplemental brief, and in their TRO application papers, the Court should issue the proposed preliminary injunction requiring that Lead Class Counsel review all prior denials of loan modifications for Settlement Class Members who still own their homes, and of all future denials before they are deemed final.

---

[9] Since Wells does not address or provide any evidence addressing the balance of equities or public interest considerations for preliminary injunctive relief in its Opposition, Plaintiffs rest on their arguments in their Supplemental Brief (Dkt. No. 394 at 24-25).

DATED: January 28, 2013                                **BERNS WEISS LLP**

By:   /s/ *Jeffrey K. Berns*
Jeffrey K. Berns (SBN 131351)
jberns@law111.com
20700 Ventura Blvd., Suite 140
Woodland Hills, CA 91364
Telephone: (818) 961-2000
Facsimile: (818) 999-1500

Lee A. Weiss (admitted *pro hac vice*)
lweiss@law111.com
585 Stewart Avenue, Suite L-20
Garden City, NY 11530
Telephone: (516) 222-2900
Facsimile: (818) 999-1500

*Attorneys for Plaintiffs and the Settlement Class*