**BERNS WEISS LLP**
Jeffrey K. Berns (SBN 131351)
jberns@law111.com
20700 Ventura Blvd., Suite 140
Woodland Hills, CA 91364
Telephone: (818) 961-2000
Facsimile: (818) 999-1500

Lee A. Weiss (admitted *pro hac vice*)
lweiss@law111.com
585 Stewart Avenue, Suite L-20
Garden City, NY 11530
Telephone: (516) 222-2900
Facsimile: (818) 999-1500

*Attorneys for Plaintiffs and the Settlement Class*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| IN RE: WACHOVIA CORP. "PICK-A-PAYMENT" MORTGAGE MARKETING AND SALES PRACTICES LITIGATION<br><br>_____<br><br>*This Document Relates to*:<br><br>ALL INCLUDED ACTIONS | **CASE NO. 5:09-MD-02015-JF**<br><br>[*Assigned to the Hon. Jeremy Fogel*]<br><br>**PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFFS' REQUEST FOR TELEPHONIC CASE MANAGEMENT CONFERENCE**<br><br>Judge:    Hon. Jeremy Fogel |

Plaintiffs Jennifer Murphy, *et al.* respectfully submit this reply to Defendants' response to Plaintiffs' request for the Court to set a telephonic Case Management Conference at its earliest convenience during the week of April 1, 2013.

I.     **INTRODUCTION**

Defendants' submission only serves to underscore both the need for further discovery and proceedings concerning Wells Fargo's failure to comply with the Class Action Settlement Agreement and that Plaintiffs are entitled to sanctions for the hours and expenses they have been compelled to invest to address Wells Fargo's noncompliance and constantly changing "factual" statements.

Incredibly, Defendants have now filed a fifth sworn declaration from their in-house professional declarant/deponent, Michael Dolan, concerning Wells Fargo's loan modification application statistics (Dkt. No. 428). As in the past, this Declaration unabashedly contradicts several of Mr. Dolan's other sworn declarations, as well as the sworn testimony he gave at his recent deposition. Without swift action from the Court, in the form of an order for discovery and supplemental briefing, and sanctions, this cycle is just going to continue unabated.

Each time Plaintiffs prove, without even having the benefit of discovery, that Defendants are not being truthful in their reporting to Lead Class Counsel and this Court, Defendants file a new declaration from Mr. Dolan that, without any evidentiary support, changes Defendants' positions and makes corrections, and then swears that the information he is providing is finally correct. Remarkably, it has now been nearly four months since Plaintiffs were compelled to file their preliminary injunction application, yet Defendants still cannot get their story straight. This Court should not allow this conduct to continue, as it is preventing meaningful review of Defendants' loan modification denial decisions and the calendar is moving inexorably to the June 30, 2013 expiration of the Settlement Agreement's MAP2R loan modification program.

Plaintiffs recognize that this Court's resources are precious and therefore, to avoid

burdening this Court, they have filed three separate class action cases[1] that have been related or are stipulated to be related in front of Judge Illston seeking relief for Defendants' specific breaches of the Settlement Agreement's loan modification provisions.  However, Defendants' failure to provide accurate and complete modification reporting information, and many of their other failures to comply with the Settlement Agreement, can only be addressed through a motion to enforce the Settlement Agreement, which Plaintiffs intend to file shortly.  Thus, Plaintiffs respectfully request that the Court conduct a telephone Case Management Conference to discuss further proceedings in this action.[2]

## II. DEFENDANTS HAVE STILL FAILED TO ACCOUNT FOR TENS OF THOUSANDS OF LOAN MODIFICATION APPLICATIONS

At the January 31, 2013 hearing on Plaintiffs' preliminary injunction motion, the Court indicated that it was necessary for the parties and the Court to work from a common set of data in order for the Court to evaluate Plaintiffs' evidence of Defendants' noncompliance with the Settlement Agreement.  (Declaration of Albert G. Lum ("Lum Decl."), filed concurrently to this Reply, Exhibit A, Transcript of January 31, 2013 Hearing at 8:15-24.)  Although Plaintiffs have not been permitted to obtain any discovery other than the deposition of Mr. Dolan, they have been able to confirm that Wells Fargo has not provided information concerning approximately ▮▮▮▮▮ fully submitted modification applications and countless other Settlement Class Members who sought loan modifications, but were told by Wells Fargo customer service representatives that there was no reason to apply for a loan modification as they would not qualify.  (See Exhibit B attached to the Request for Telephonic Case Management (Doc 424-1), Transcript of March

---

[1] *Murphy v. Wells Fargo Home Mortgage*, Case No. C 12-06228 SI, *D'Alessio v. Wells Fargo Home Mortgage*, Case No. C 13-0999 SI, and *McDermed v. Wells Fargo Home Mortgage*, Case No. C 13-1407 JSC.

[2] Much of Defendants' response seeks to deflect attention from Mr. Dolan's ever-changing testimony by making unsupported statements that Lead Class Counsel, Jeffrey Berns is aware of certain facts that somehow remedy Defendants' transgressions.  Because that is beside the point, and in the interest of keeping this response as brief as possible, Plaintiffs will not specifically address these irrelevant contentions.  As with Mr. Dolan's declarations, most of these statements are simply untrue.

14, 2013 Deposition of Michael Dolan ("Dolan Tr.") at 147:22-148:9; 20:20-21:4.) Wells Fargo claims, in bold type no less, that it "is able to track each application to its conclusion." (Defendant's Response to Plaintiffs' Request for Telephonic Case Management Conference ("Response") (Dkt. No. 427), at 8.) Yet, rather than submit information indicating the conclusion of each application (approved, denied or fall-out), Wells continues to just offer convoluted explanations as to why that information is not important and why it is perfectly fine that Mr. Dolan has made countless misrepresentations in his declarations and at his deposition.

At his deposition, Mr. Dolan was asked to authenticate and confirm the accuracy of the Quarterly Summary reports Wells Fargo has provided to Lead Class Counsel, which he did. For the period from December 18, 2010 through December 31, 2012, Mr. Dolan confirmed that Wells Fargo had mailed ▮▮▮▮ loan modification applications to Settlement Class Members. (Lum Decl., Ex. B, Dolan Tr. at 146:1).[3] Mr. Dolan also confirmed that those reports stated that (1) ▮▮▮▮ modification applications were approved, of which only ▮▮▮▮ were MAP2R modifications (Lum Decl., Ex. B, Dolan Tr. at 146:7; See Lum Decl., Exhibits C to F; Exhibit C to the Request for Telephonic CMC), (2) ▮▮▮▮ modification applications were denied under MAP2R (Lum Decl., Ex. B, Dolan Tr. at 146:13), and (3) ▮▮▮▮ modification applications were denied under HAMP (Lum Decl., Ex. B, Dolan Tr. at 146:6). Mr. Dolan further acknowledged, in accordance with his prior declarations, that the total number of applications under review as of December 12, 2012 was ▮▮▮▮ (Lum Decl., Ex. B, Dolan Tr. at 147:9), and that the total number of applications that went to "fall-out" for the period from December 16, 2010 to December 12, 2012 was 15,177 (Lum Decl., Ex. B, Dolan Tr. at 147:12). Then, Mr. Dolan admitted that after deducting all approved, denied, under review and fall-out applications from the total number of applications mailed to Settlement Class Members by Wells Fargo, there were ▮▮▮▮

---

[3] Mr. Dolan testified that even though the reports state that this is the number of "modifications requested," that heading is inaccurate, as the statistic does not include the Settlement Class Members who requested loan modifications, but to whom Wells Fargo unilaterally decided not to send modification applications. He was unable to quantify this category of denied Class Members.

unaccounted for applications.[4] (Lum Decl., Ex. B, Dolan Tr. at 147:21.) Now, after admitting that tens of thousands of applications are unaccounted for, Defendants have submitted yet another declaration from Mr. Dolan that appears to contend that the 15,177 fall-out figure, which Mr. Dolan's prior sworn declarations and his sworn deposition testimony stated was the total number of applications that went to fall-out, does not include multiple applications that went to fall-out for the same Settlement Class Members. Supplemental Declaration of Michael Dolan Regarding Statistics ("3/29/2013 Dolan Decl.") (Dkt. No. 428), ¶16. According to Mr. Dolan, the 15,177 figure covers multiple fall-out applications for over 2,300 Settlement Class Members, but that is not nearly the universe of duplicate fall-out applications. 3/29/2013 Dolan Decl., ¶10. As usual, Mr. Dolan offers no support for his new theory or any explanation as to why he was incorrect in both his prior declarations and at his deposition. Instead, Mr. Dolan appears to think that he need not offer any explanation as to why he reported 15,177 fall-out applications when he now appears to contend that the real number is nearly 50,000. Importantly, when this Court was concerned about Lead Class Counsel's contention that over 40,000 applications had fallen out, Defendants claimed Lead Class Counsel was way off. Now with Defendants' ever changing explanations, it would seem that they are saying well more than half of all applications have gone to "fall-out"!

Mr. Dolan's failure to justify his drastic change in position is particularly troubling because, at his deposition, he dismissed the idea that the multiple fall-out issue would have significantly impacted the statistics he had previously reported to the Court:

> Q. Do you have any idea what the difference in number is between the gross fallouts and the net fallouts?
> A. No.
> Q. Do you have any reason to think it's a large number?
> A. I don't think it would be a large number.

---

[4] Mr. Dolan agreed that there were ▇▇▇ unaccounted for applications. (Ex. B to the Request for Telephonic CMC (Dkt. 424-1), Dolan Tr. at 147:22-148:9.) However, he later clarified that the quarterly reports provided to Plaintiffs did not cover modifications that had been approved, but not completed at the time of the reports (*id.* at 153:13-17), which, if the figures in Mr. Dolan's Supplemental Declaration are to be believed – an increasingly dubious proposition – would account for approximately ▇▇▇ applications. Thus, at a minimum, there are approximately ▇▇▇ unaccounted for loan modification applications.

(Lum Decl., Ex. B, Dolan Tr. at 95:12-18). As if that were not enough, Mr. Dolan then stated that he had reviewed every application that went to fall-out to confirm that the 15,177 figure contained all applications, including where multiple applications went to fall-out for a single Settlement Class Member:

> Q. What -- what did you do to insert the 15,177 figure that's in paragraph 40?
> A. I looked at all the applications that went to fallout during the time period in question.
> . . .
> Q. So is 15,177, that's the total of separate applications that have gone to fallout between December 16th and December 12th, 2012?
> A. I believe so, yes.
> . . .
> Q. Now, earlier you mentioned an issue with duplicates not being on the reports. **Would those duplicates similarly not be in that 15,177 figure**?
> A. **No. They -- they -- within the 15,177 there were 2,309 with the same loan number but different application numbers**.
> Q. **Now, does that cover all of the duplicate fallouts, to your knowledge**?
> A. **Yes, sir**.

(Lum Decl., Ex. B, Dolan Tr. at 96:22-98:2).

### III. PLAINTIFFS CONTINUE TO UNCOVER MISREPRESENTATIONS BY MR. DOLAN AND OTHER INCONSISTENCIES IN DEFENDANTS' REPORTING TO THIS COURT

#### A. The Number of Settlement Class Members Eligible for Loan Modifications

Plaintiffs have recently determined, again without the benefit of discovery, that Mr. Dolan has grossly understated the number of Settlement Class B and Settlement Class C Members. This, of course, has allowed Wells Fargo to significantly overstate the percentage of Settlement Class Members they claim have received loan modifications. Mr. Dolan's chart that seeks to, but clearly does not, account for all Settlement Class Members, states there are 127,118 Settlement Class B Members and 38,411 Settlement Class C Members. 3/29/2013 Dolan Decl., ¶27. Yet, after "opt-outs" the claims administrator reported to Lead Class Counsel that there were 177,981 Settlement Class B Members and 54,855 Settlement Class C Members, for a total difference of 67,307. These over 67,000 class members are not included in Mr. Dolan's totals, and are not included on any reporting to Lead Class Counsel. Thousands of these class members have sought modifications only to be turned away, and all of it hidden from Lead Class Counsel

and this Court.

B. <u>**The Value of the Approved Loan Modifications**</u>

For the period from December 18, 2010 through March 31, 2011 (roughly the period from preliminary approval of the Settlement Agreement through the Final Approval Hearing), out of ▮▮▮ loan modifications requested by Settlement Class B Members (which, according to Defendants, likely means applications mailed), Wells Fargo approved ▮▮ HAMP modifications and ▮ MAP2R modifications (Lum Decl., Exhibit C). In that same period, out of ▮▮▮ modifications requested by Settlement Class C Members, Wells Fargo approved ▮▮ HAMP modifications and ▮ MAP2R modifications (Lum Decl., Exhibit D). In connection with the Final Approval Hearing, Defendants submitted a declaration that those modifications accounted for $806 million dollars in benefits to the Settlement Class Members. (Supplemental Declaration of Michael J. Dolan in Support of Final Approval of Settlement, dated April 25, 2011 (Dkt. No. 180), ¶6.)

In their response to Plaintiffs' request for a Case Management Conference, Defendants' claim that the total loan modification benefit to the Settlement Class is $1.7 billion. (Response, at 2; 3/29/2013 Dolan Decl., ¶4.) Defendants do not explain how the ▮▮▮ modifications prior to March 31, 2011 yielded $806 million in benefits to Settlement Class Members, while the ▮▮▮▮ modifications since then (more than 4 times the number of modifications) have only provided $894 million in benefits. (See Lum Decl., Exhibits C to F; Exhibit C to the Request for Telephonic CMC.) Nor do Defendants attempt to explain why the ratio of MAP2R to HAMP modifications was 25% before March 31, 2011, but only 12% thereafter. (See Lum Decl., Exhibits C and D; and Exhibit C attached to the Request for Telephonic Case Management (Doc 424-1)). Finally, it is uncontroverted that, from December 18, 2010 through December 31, 2012, out of ▮▮▮ modifications requested (which, again, is materially understated), Wells Fargo has approved only ▮▮ MAP2R modifications, which is less than 3%. (See Lum Decl., Exhibits C to F; Exhibit C to the Request for Telephonic CMC.) These unexplained statistics require further investigation through discovery.

## IV. DEFENDANTS' ATTACK ON LEAD CLASS COUNSEL'S MOTIVES IS DISGRACEFUL

Although their star witness has been forced to change his sworn testimony numerous times, and still is unable to provide clear information to Lead Class Counsel and this Court, Defendants show no contrition. Instead, they try to shift the focus of this proceeding from their clear noncompliance with virtually every facet of the Settlement Agreement's loan modification component to the conduct of Lead Class Counsel.

Here, there can be no doubt that Lead Class Counsel has gone above and beyond the call of duty, and well beyond anything required by this Court, to assist Settlement Class Members in obtaining the loan modifications to which they are entitled. Due to the massive volume of complaints by Settlement Class Members about Wells Fargo's handling of the loan modification process since the Settlement Agreement became effective, Lead Class Counsel has had to maintain a minimum of four full-time paralegals and one attorney to work with Settlement Class Members who are trying to secure loan modifications to stave off foreclosures and save their homes, but whose efforts have been frustrated by Wells Fargo.

When it began to become apparent that Wells Fargo was not complying with the Settlement Agreement, Lead Class Counsel did not rush to judgment and seek this Court's intervention. Instead, Lead Class Counsel expended over $100,000 in direct mailing and website costs to determine if the information Lead Class Counsel was receiving represented outliers or whether the problems were more systemic. Lead Class Counsel also met with Defendants' counsel in the hope of resolving its concerns and reached (or so it thought) an agreement for Defendants' counsel to provide sample loan modification files so that Lead Class Counsel could continue its informal investigation, without the need to involve the Court. "See Declaration of Jeffrey K. Berns, dated December 16, 2012 (Dkt. No. 375-1), ¶¶4-5.) It was only after Defendants' counsel reneged on its agreement, and the information from Settlement Class Members overwhelmingly reflected misconduct by Wells Fargo, that Lead Class Counsel believed that it had no choice but to seek relief from this Court.

## V. CONCLUSION

Based on the foregoing, it is clearer than ever that Wells Fargo's declarations and other submissions to this Court should not be taken at face value. Thus, Plaintiffs respectfully request that the Court schedule a Case Management Conference to discuss discovery and additional proceedings in this action, along with a motion for sanctions based on the time and expenses Lead Class Counsel has been required to expend as a result of Defendants' failure to report correct information to Lead Class Counsel and this Court.

DATED: April 1, 2013

**BERNS WEISS LLP**

By: /s/ Jeffrey K. Berns
Jeffrey K. Berns (SBN 131351)
jberns@law111.com
20700 Ventura Blvd., Suite 140
Woodland Hills, CA 91364
Telephone: (818) 961-2000
Facsimile: (818) 999-1500

Lee A. Weiss (admitted *pro hac vice*)
lweiss@law111.com
585 Stewart Avenue, Suite L-20
Garden City, NY 11530
Telephone: (516) 222-2900
Facsimile: (818) 999-1500

*Attorneys for Plaintiffs and the Settlement Class*