IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE: WACHOVIA CORP. "PICK-A-PAYMENT" MORTGAGE MARKETING AND SALES PRACTICES LITIGATION. | Case No. 5:09-md-02015-JF (PSG)<br><br>**REPORT AND RECOMMENDATION**<br><br>(Docket Nos. 432, 468) |

Well-known is the aphorism attributed alternatively to Mark Twain and Benjamin Disraeli: "There are lies, damned lies and statistics." Less well-known is the observation on the same topic by the great Vin Scully: "Statistics are used much like a drunk uses a lamppost: for support, not illumination." Although the undersigned cannot say for sure, perhaps it is this shortcoming that explains the statistical heap left for the district judge in this matter to clean up.

On April 3, 2013, United States District Judge Jeremy Fogel issued a referral order pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), directing the undersigned to issue a Report and Recommendation addressing the reliability of Defendant's statistics regarding loan modifications requested by and granted to class members.[1] Having reviewed the papers and considered the arguments of counsel, the undersigned reports and recommends as follows.

---

[1] *See* Referral Order, Docket No. 432.

# I. BACKGROUND

On May 17, 2011, Judge Fogel granted final approval[2] of a settlement agreement that resolved multi-district litigation concerning "Pick-a-Payment" home mortgage loans issued by Defendant Wells Fargo Bank, N.A. ("Wells Fargo").[3] While many class members received a cash award of $178.04,[4] an amount that can only be described as modest given the loan amounts at issue, the settlement agreement's primary benefit to class members was a set of detailed procedures regulating Wells Fargo's consideration of class members for loan modification under the federal government's "HAMP" program and Wells Fargo's "MAP2R" program.[5] The settlement agreement contains safeguards to ensure Wells Fargo's compliance with those procedures, including Wells Fargo's obligation to report certain information to Class Counsel and the Court's retention of continuing jurisdiction to interpret and enforce the settlement agreement.[6] Section VI.E.8.d of the settlement agreement requires Wells Fargo to provide what the parties refer to as "Quarterly Denial Reports." Specifically, Wells Fargo must:

> Provide Settlement Class Members who do not qualify for HAMP or MAP2R Modifications, within thirty (30) calendar days of the Defendants' receipt of all required documentation from the Settlement Class member, with a written explanation. *Defendants shall provide Lead Counsel information about who did not qualify and the reasons for the denial.*[7]

---

[2] *See* Final Approval Order, Docket No. 207.

[3] Originally, World Savings Bank, FSB was the named defendant in this action. "On or about December 31, 2007, World Savings changed its name to Wachovia Mortgage, FSB." *Abuda v. Cal-Western Reconveyance Corp.*, No. 2:11-CV-01823-KJD-(GWF), 2012 WL 2564791, at *1 (D. Nev. June 29, 2012). Wachovia Mortgage, FSB subsequently merged with and into Wells Fargo Bank, N.A. *Caovilla v. Wells Fargo Bank, N.A.*, No. 13-cv-1003 JSC, 2013 WL 2153855, at *1 (N.D. Cal. May 16, 2013). For ease of reference, the defendant banks are referred to herein collectively as "Well Fargo."

[4] *See* Order Re Motions, Docket No. 361.

[5] *See* Order Den. Appl. for TRO at 4-5, Docket No. 390. "HAMP" refers to the Home Affordable Mortgage Program, a federal program whereby the federal government provides banks with incentives to enter into residential mortgage modifications. *See Nevada v. Bank of America Corp.*, 672 F.3d 661, 665 n.1 (9th Cir. 2012). "MAP2R" refers to Wells Fargo's in-house Mortgage Assistance Program 2.

[6] *See* Settlement Agreement §§ VI.E.8.d, VI.H, XIV, Docket No. 464-2.

[7] *Id.* § VI.E.8.d (emphasis added).

Section VI.H of the settlement agreement requires Wells Fargo to provide what the parties refer to as "Quarterly Summary Reports":

> The Defendants shall designate an employee as the Compliance Officer responsible for this Agreement. The Compliance Officer will be responsible for providing Lead Class Counsel quarterly reports, through June 30, 2013, which will be provided within forty-five (45) calendar days after the end of each quarter. The quarterly reports will provide the following information: (1) the number of Settlement Class Members who have requested loan modifications; (2) the number of Settlement Class Members who received HAMP Modifications or MAP2R Modifications; (3) the number of Settlement Class Members denied loan modifications; and (4) the number of Settlement Class Members who received HAFA/Short Sale/Deed-in-Lieu of Foreclosure payments.[8]

Class Counsel assumed that Wells Fargo's reporting under these requirements would capture all class members who requested loan modification.[9] Indeed, upon reading § VI.H and setting aside the fourth category, the undersigned likewise assumed that the total number of class members who requested loan modification would be equal to the sum of those who received modification and those who were denied modification. However, as is discussed below, that turned out not to be the case.

Each of the Quarterly Summary Reports that Wells Fargo produced consisted of a single sheet of paper disclosing figures for several categories, including "Number of modifications requested," "Number of HAMP modifications completed," "Number of MAP2R modifications completed," "Total HAMP Denied Records," and "Total MAP2R Denied Records."[10] At some point Class Counsel realized that the total "modifications requested" was far greater than the sum of the modifications granted and denied.[11] Additionally, by early 2012, Class Counsel had been contacted by hundreds of class members who stated that their loan modification applications had not been granted, but who did not appear on any of the Quarterly Denial Lists.[12] On July 18, 2012,

---

[8] *Id.* § VI.H.

[9] *See* Pls.' Br. at 2-3, Docket No. 464.

[10] *See* Weiss Decl. Ex. 2, Docket No. 464-2.

[11] *See* Hr'g Tr. 4:23-5:9, Docket No. 482.

[12] *See* Berns Decl. ¶ 3, Docket No. 407-1.

Case No. 5:09-cv-02015-JF (PSG)
REPORT AND RECOMMENDATION

Class Counsel, Wells Fargo's counsel, and Wells Fargo's § VI.H Compliance Officer, Michael Dolan ("Dolan"), met to discuss these issues.[13] At that meeting, Wells Fargo disclosed *for the first time* that it unilaterally had created a separate category of class members called "fall-outs" that were *not included* in any of the reports provided to Class Counsel under the settlement agreement.[14]

It is unclear precisely which class members come within Wells Fargo's unilaterally created "fall-out" category. Dolan has submitted five different declarations in this matter, several of which are contradictory.[15] Additionally, his deposition was taken on March 14, 2013, and on April 12, 2013 he submitted an "acknowledgment" making twenty-two substantive "corrections" to his deposition testimony. On one occasion, Dolan defined "fall-outs" as "[b]orrowers who never return their application packets, or who never supply . . . missing documents."[16] However, on another occasion he explained that a particular borrower "never returned her application packet, so she was neither denied nor considered a fall-out and accordingly not included in those reports to Lead Counsel."[17] On yet another occasion, Dolan defined "fall-out" quite broadly, stating that "[a]n application is classified as a 'fall out' when: (i) a borrower does not return any documents, including the RMA[18]; (ii) a borrower does not timely submit all of the required documents for a particular application; (iii) a borrower is approved for a modification but defaults on his or her HAMP TPP[19]; (iv) a borrower declines the modification offered by Wells Fargo; or (v) the borrower cancels the process at any point."[20]

---

[13] *See* Berns Decl. ¶ 2, Docket No. 464-3.

[14] *Id*.

[15] Dolan has submitted declarations dated December 12, 2012; December 14, 2012; January 23, 2013; March 19, 2013; and March 29, 2013.

[16] 12/14/2012 Dolan Decl. ¶ 10, Docket No. 400-2.

[17] 1/23/2013 Dolan Decl. ¶ 38 (l).

[18] Request for Modification Assistance package. *See* 3/29/2013 Dolan Decl. ¶ 6, Docket No. 428.

[19] Trial Plan Period. *See* 3/29/2013 Dolan Decl. ¶ 4, Docket No. 428.

[20] *See* 3/29/2013 Dolan Decl. ¶ 8, Docket No. 428.

4

Case No. 5:09-cv-02015-JF (PSG)
REPORT AND RECOMMENDATION

While the parameters of the term "fall-out" remain unclear to this day, it is apparent that under Wells Fargo's unilaterally created and undisclosed lexicon, numerous applications that would be considered "denied" under any ordinary use of that term – for example, for failure to submit all necessary documentation – were not counted as "denied" or otherwise accounted for in the Summary Quarterly Reports given to Class Counsel pursuant to the settlement agreement; instead, those applications were deemed "withdrawn."[21]

Class counsel requested that Wells Fargo provide them with reports containing the names and addresses of class members who were considered to be fall-outs along with the dates they fell out.[22] Wells Fargo acquiesced, and sent Class Counsel a fall-out report for the period December 16, 2010 through June 30, 2012.[23] Wells Fargo also agreed to provide Quarterly Fall-Out Reports going forward, and it did provide them for the second and third quarters of 2012.[24] However, Wells Fargo later notified Class Counsel by email that Wells Fargo would no longer provide Quarterly Fall-Out Reports because Plaintiffs had "misused" the fall-out lists.[25]

On December 7, 2012, a group of class members represented by Class Counsel ("Plaintiffs") sought a temporary restraining order ("TRO") and a preliminary injunction ("PI") based upon Wells Fargo's asserted failure to comply with the loan modification procedures mandated by the settlement agreement.[26] Specifically, Plaintiffs sought to enjoin Wells Fargo from foreclosing upon or selling class members' homes pending Class Counsel's review of all loan modification denials.[27] Judge Fogel denied the application for a TRO, requested additional briefing on the motion for a PI,

---

[21] *See* 12/14/2012 Dolan Decl. ¶ 9.

[22] *See* Berns Decl. ¶ 2, Docket No. 464-3.

[23] *See id.* ¶ 3.

[24] *See id.* ¶ 4.

[25] *See id.* ¶ 5 and Ex. 1.

[26] *See* Appl. for TRO and PI, Docket No. 365.

[27] *See id.*

5

Case No. 5:09-cv-02015-JF (PSG)
REPORT AND RECOMMENDATION

and set a hearing date of January 31, 2013.[28]

At the hearing, Judge Fogel noted that the parties had presented conflicting statistical evidence relating to loan modification: Plaintiffs' figures suggested that the approval rate was shockingly low while Wells Fargo's figures suggested that the approval rate was about what Judge Fogel would have expected it to be.[29] Judge Fogel concluded that he could not resolve the discrepancies in the parties' statistics based upon the record before him.[30] He deferred consideration of the motion for a PI pending completion of a three-step process: first, Plaintiffs were to depose Wells Fargo's Compliance Officer, Dolan, who had provided the statistics upon which Wells Fargo relied in opposing injunctive relief; second, Plaintiffs were to submit supplemental declarations from their declarants, describing what the declarants believed their loan modification files should contain; and third, within ten days after receiving those supplemental declarations, Wells Fargo was to submit the declarants' mortgage loan modification files to the Court for *in camera* review.[31]

After taking Dolan's deposition, Class Counsel requested that Judge Fogel set a telephonic case management conference ("CMC") to address asserted discrepancies in Dolan's declaration statements and deposition testimony.[32] Judge Fogel held the requested telephonic CMC on April 3, 2013.[33] Later that same day, he issued an order referring the following issue to the undersigned for disposition by Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b):

> whether the figures provided by Defendant with respect to the number of loan modification applications requested by class members, the number of such applications actually mailed to class members, and the outcomes of those applications, are sufficiently reliable that this Court should continue with the three-

---

[28] *See* Order Den. Appl. for TRO at 7, Docket No. 390.

[29] *See* Hr'g Tr. at 4-5, Docket No. 418.

[30] *See id.* at 5.

[31] *See* Order Deferring Disp. of Mot. for PI at 1, Docket No. 416.

[32] *See* Req. for CMC, Docket No. 424.

[33] *See* Docket No. 440.

step process outlined at the hearing on the motion for preliminary injunction.[34] Judge Fogel subsequently clarified that he wished the parties to present evidence as to "what happened to each application" for loan modification, that is, to present "per-application" data rather than "per-borrower" data.[35]

Both sides indicated that they wished to submit supplemental briefing.[36] The undersigned directed the parties to submit an agreed-upon briefing schedule, but they were unable to do so.[37] Plaintiffs were then directed to file an opening brief and Wells Fargo was directed to file a responding brief; no reply brief was permitted.[38] After an adjustment to the original briefing schedule,[39] Plaintiffs filed their opening brief on May 7, 2013[40] and Wells Fargo filed its response brief on May 21, 2013.[41]

On May 20, 2013, almost two weeks after filing their opening brief, and one day before Wells Fargo's response brief was due, Plaintiffs filed an application for leave to submit newly discovered evidence.[42] Wells Fargo filed opposition to the application on May 22, 2013.[43] The undersigned held a hearing on May 28, 2013.[44] On May 29, 2013, Plaintiffs filed a reply to the opposition to their application for leave to submit newly discovered evidence.[45] Wells Fargo

---

[34] Referral Order at 2, Docket No. 432.

[35] Order Clarifying Referral at 2, Docket No. 448.

[36] *See* Referral Order at 2, Docket No. 432.

[37] *See* Order Re Briefing Schedule at 1, Docket No. 451.

[38] *See id.* at 2.

[39] *See* Order Granting Pls.'s Mot. to Compel at 5, Docket No. 459.

[40] *See* Docket No. 464.

[41] *See* Docket No. 471.

[42] *See* Docket No. 468.

[43] *See* Docket No. 472.

[44] *See* Docket No. 476.

[45] *See* Docket No. 477.

thereafter filed a sur-reply,[46] and Plaintiffs filed a response to the sur-reply.[47]

## II. DISCUSSION

**A.     Plaintiffs' Motion to Submit Newly Discovered Evidence**

Plaintiffs' opening brief asserts *inter alia* that Wells Fargo has failed to comply with the settlement agreement's reporting requirements. Following submission of that brief, Plaintiffs filed a motion seeking to submit newly discovered evidence of Wells Fargo's asserted noncompliance. Specifically, Plaintiffs wish to submit a recording of a television broadcast on MSNBC, *All-In with Chris Hayes: Death by Foreclosure: This Week's Real Scandal*.[48] The broadcast tells the story of Larry Delassus, who died in a courtroom while contesting the foreclosure of his home following Wells Fargo's denial of his request for modification of his Pick-a-Payment mortgage loan.[49] In response to MSNBC's request for a comment, Wells Fargo stated that Mr. Delassus' loan was reviewed for modification but that Wells Fargo was unable to find an option that would allow him to keep his home.[50] Plaintiffs proffer the declaration of Amy Lake ("Lake"), a senior project administrator for Rust Consulting, Inc. ("Rust Consulting"), the class action administrator in this case.[51] Lake states that Rust Consulting's records indicate that Larry Delassus is a class member.[52] Finally, Plaintiffs proffer the declaration of Class Counsel Jeffrey Berns, who represents that he has reviewed every denial report and fall-out report provided by Wells Fargo, and Mr. Delassus does not appear on any of them.[53]

In opposition to Plaintiffs' motion to submit newly discovered evidence, Wells Fargo

---

[46] *See* Docket No. 478

[47] *See* Docket No. 479.

[48] *See* Berns Decl. ¶ 2, Docket No. 468-1.

[49] *See id.*

[50] *See id.*

[51] *See* Lake Decl., Docket No. 468-1.

[52] *See id.* at 4.

[53] *See* Berns Decl. at ¶ 4, Docket No. 468-1.

1  presents evidence that it considered Delassus for loan modification between May 2009 and October
2  2010.[54] The settlement agreement in this case was not executed until December 2010.[55] The
3  settlement agreement obligates Wells Fargo to consider class members for loan modification
4  between December 18, 2010 and June 30, 2013.[56] The settlement agreement further obligates Wells
5  Fargo to report on loan modifications requested under the terms of the settlement agreement.[57]
6  Wells Fargo argues that because it considered Mr. Delassus for loan modification prior to execution
7  of the settlement agreement and prior to the time period for which Wells Fargo is obligated to
8  report, the fact that his name does not appear on Wells Fargo's reports to Class Counsel does not
9  constitute evidence of Wells Fargo's failure to comply with its reporting obligations.

10  As noted above, the parties filed several additional briefs addressing this issue after
11  conclusion of the hearing on this matter.[58] Those post-hearing filings were unauthorized and
12  inappropriate. Although Plaintiffs' application for leave to submit additional evidence was styled as
13  an *ex parte* motion pursuant to Civil Local Rule 7-10, it did not meet the definition of a motion
14  under that section, that is, "a motion filed without notice to opposing party."[59] Plaintiffs'
15  application properly should have been presented as a motion for administrative relief pursuant to
16  Civil Local Rule 7-11, which covers requests for orders on "miscellaneous administrative matters,
17  not otherwise governed by federal statute, Federal or local rule or standing order."[60] Rule 7-11
18  provides that a motion for administrative relief is deemed submitted on the day after the opposition
19  is due; the rule does not make provision for the filing of a reply, sur-reply, or response to sur-reply.
20  Accordingly, the Court declines to consider the parties' post-hearing filings.

---

[54] *See* Docket No. 472-1.

[55] *See* Settlement Agreement at 62, Docket No. 464-2.

[56] *See id.* § VI.E.

[57] *See id.* §§ VI.E.8.d, VI.H.

[58] *See* Docket Nos. 477-79.

[59] Civ. L.R. 7-10.

[60] Civ. L.R. 7-11.

9

Case No. 5:09-cv-02015-JF (PSG)
REPORT AND RECOMMENDATION

The purpose of Plaintiffs' proposed submission is to demonstrate that Wells Fargo's reporting under the settlement agreement is unreliable. Because the Court concludes that Wells Fargo's reporting is unreliable based upon other evidence, Plaintiffs' proposed submission of new evidence would not add to the Court's analysis. For this reason, and in light of the Court's determination that the bulk of the briefing regarding the proposed new evidence is unauthorized, Plaintiffs' motion to submit newly discovered evidence is DENIED.

**B.     Quarterly Reports**

As discussed above, the settlement agreement obligates Wells Fargo to provide Class Counsel with Quarterly Denial Reports and Quarterly Summary Reports. After Wells Fargo disclosed that those reports do not capture all class members who request loan modification, Wells Fargo also provided Class Counsel with Quarterly Fall-Out Reports (although Wells Fargo later refused to continue providing fall-out information on the ground that Class Counsel had "misused" the fall-out reports). The Court considers each category of reports in turn.

**1.     Quarterly Summary Reports**

As discussed above, Class Counsel initially construed the "Number of modifications requested" heading on the Quarterly Summary Reports to mean the number of *class members* who had requested loan modification from Wells Fargo. That construction tracked the settlement agreement's express requirement that the Quarterly Summary Reports disclose "the number of Settlement Class Members who have requested loan modifications."[61] Class Counsel was concerned, because as Class Counsel read the quarterly reports, thousands more class members had requested loan modification than had been granted or denied modification.[62] It appeared to Class Counsel that the Quarterly Summary Reports simply failed to account for tens of thousands of class members who had applied for loan modification.[63]

Wells Fargo's Compliance Officer, Dolan, explained the discrepancy by stating that the

---

[61] Settlement Agreement § VI.H, Docket No. 464-2.

[62] *See* 12/7/2012 Berns Decl. ¶ 14, Docket No. 365-2.

[63] *See id.*

10

Case No. 5:09-cv-02015-JF (PSG)
REPORT AND RECOMMENDATION

"Number of modifications requested" represents "*the number of application packets* Wells Fargo mailed to Settlement Class B and C Members," *not* the number of class members who had requested loan modification.[64] Dolan pointed out that it is common for a class member to contact Wells Fargo multiple times to begin the loan modification process.[65] He also noted that many class members decide not to return the packet after it is received.[66] Dolan purported to provide fall-out figures that "de-duped," or accounted for factors that might give rise to duplicate counting of the same application.[67] The resulting fall-out figures that Dolan provided appear far more reasonable than the figures Plaintiffs came up with based upon an assumption that the "Number of modifications requested" represented class members rather than application packets.[68]

Plaintiffs questioned Dolan at his deposition about the meaning of the "Number of modifications requested" heading on the Quarterly Summary Reports.[69] Dolan confirmed that that heading "represents the number of . . . modification packets that were mailed."[70] He stated expressly that if a borrower were mailed two packets during the same period, it would count as two "modifications requested" on the applicable Quarterly Summary Report.[71] Plaintiffs relied upon Dolan's representations when briefing the pending motion for preliminary injunction and the matter that has been referred to the undersigned.[72]

Wells Fargo now concedes (in a footnote in its response brief) that Dolan's representations

---

[64] *See* 12/14/2012 Dolan Decl. ¶ 4 (emphasis added), Docket No. 400-2.

[65] *See id.*

[66] *See id.* ¶ 8.

[67] *See id.* ¶¶ 11-16.

[68] *See id.*

[69] *See* Dolan Dep. 65:10-15, Docket No. 464-2.

[70] *Id.*

[71] *See id.* 65:16-24.

[72] *See* Docket Nos. 394, 464.

11

Case No. 5:09-cv-02015-JF (PSG)
REPORT AND RECOMMENDATION

as to the meaning of the headings on the Quarterly Summary Reports simply were not true.[73] Wells Fargo submits the declaration of a different employee, Pamela McKone ("McKone"), to correct Dolan's misstatements.[74] Most importantly for purposes of the present discussion, McKone states that the "Number of modifications requested" does *not* represent the number of packets mailed to class members as represented by Dolan.[75] McKone explains that there are three departments at Wells Fargo that interact with borrowers: home preservation, customer service, and collections.[76] When a borrower calls the home preservation department to request loan modification, the home preservation employee enters the borrower's loan number into the computer, and *if* the computer indicates that the loan is eligible for loan modification, the home preservation employee opens a "working queue" on that loan.[77] A working queue is opened before the borrower is interviewed to assess eligibility for HAMP, and regardless of whether a loan modification application packet is mailed to the borrower.[78] However, when a borrower calls the customer service department to request loan modification, the borrower is transferred to the collections department.[79] When a borrower calls or is transferred to the collections department to request loan modification, the collections department employee who takes the call screens the borrower by asking certain questions regarding the borrower's residency, income, and willingness to establish an escrow account.[80] *If* the collections department employee determines from the borrower's answers that he or she is eligible for loan modification, the employee will open a working queue on that borrower.[81]

---

[73] *See* Def.'s Br. at 3 n.5, Docket No. 471.

[74] *See* McKone Decl., Docket No. 471-2.

[75] *See id.* ¶ 34.

[76] *See id.* ¶ 14.

[77] *See id.* ¶ 24.

[78] *See id.* ¶ 25.

[79] *See id.* ¶ 29.

[80] *See id.* ¶¶ 30-31.

[81] *See id.* ¶ 31.

12

1    Whether or not a working queue is opened, the borrower's loan will have an "ER Contact"
2    associated with the call.[82]

3    And so when Wells Fargo creates its Quarterly Summary Reports, the "Number of
4    modifications requested" represents the number of *loans* that have working queues or ER
5    Contacts.[83] Wells Fargo eliminates duplicate working queues and ER contacts so that the "Number
6    of modifications requested" reflects the number of *loans* as to which a class member has called or
7    otherwise requested loan modification.[84] However, Wells Fargo concedes in its brief that "[w]hen a
8    particular loan is not eligible for any loan modification product, which is determined solely by the
9    computer system based upon the borrower's loan number and inherent loan characteristics, that loan
10   will not be included in the 'Number of modifications requested.'"[85] Wells Fargo states that it
11   "attempted, but was unable, to keep track of this metric."[86]

12   Wells Fargo's practice of screening class members may well violate the settlement
13   agreement, and its failure to at least account for all class members who are screened out during their
14   initial contact renders the Quarterly Summary Reports meaningless, as the "Number of
15   modifications requested" is incomplete. At a minimum, Wells Fargo's screening practices render
16   unreliable both its reporting and the accuracy of the picture it presents. For example, taking the
17   figures set forth in the Quarterly Summary Reports at face value, it appears that between December
18   16, 2010 and March 31, 2011, there were 11,067 modifications requested with respect to loans held
19   by class B members, of which 735 (6.6%) were granted.[87] While a loan modification rate of 6.6% is
20   not particularly robust, it may be that had *all* class members who called Wells Fargo about loan
21   modification been counted, the loan modification rate would be even smaller.

---

[82] *See id.*

[83] *See id.* ¶ 34.

[84] *See id.* ¶ 35.

[85] Def.'s Br. at 2 n.2, Docket No. 471.

[86] *See id.*

[87] *See* Weiss Decl. Ex. 2, Docket No. 464-2.

13

Case No. 5:09-cv-02015-JF (PSG)
REPORT AND RECOMMENDATION

### 2. Quarterly Fall-Out Reports

Plaintiffs' initial application for TRO and PI asserted that more than 40,000 (62%) of the "Number of modifications requested" on the Quarterly Summary Reports for the period April 1, 2011 to September 30, 2012 had gone to fall-out. Plaintiffs derived this number by subtracting the modifications completed and denied from the total number of modifications requested. Dolan stated in his third declaration that for the period April 1, 2011 to September 30, 2012, only 13,138 applications had gone to fall-out, and that this figure represented only 11,438 unique borrowers.[88] Dolan did not explain what had happened to the rest of the "Number of modifications requested" that were unaccounted for by the approvals and denials listed on the reports.

At Dolan's deposition, Class Counsel focused on the period December 16, 2010 through December 31, 2012. The Quarterly Summary Reports for that period reflected a total of 92,038 "modifications requested," 19,240 modifications completed, and 19,598 modifications denied.[89] Class Counsel subtracted the modifications completed and denied from the total modifications requested, and concluded that 53,200 requests had gone to fall-out. Class Counsel questioned Dolan about the fall-out figure at his deposition, but Dolan insisted that during the period in question[90] only 15,177 applications had gone to fall-out, and that 2,309 of those were duplicates, meaning that they were for borrowers that had more than one application.[91] Class counsel asked what had happened to the remaining modification requests, and Dolan was unable to provide an explanation.[92]

Wells Fargo asserts without explanation that the fall-out lists "will never match up to the

---

[88] *See* 1/23/2013 Dolan Decl. ¶ 41, Docket No. 400-1.

[89] *See* Docket No. 464-2.

[90] Dolan actually stated that his fall-out figures were for the period December 16, 2010 through December 12, 2012 rather than through December 31, 2012. *See* Dolan Dep. 97:9-12. He drew those figures from his declaration of January 23, 2013. *See id.* 95:23-97:11. He later corrected the January 23 declaration to clarify that the correct period was December 16, 2011 through December 12, 2012. *See* 3/19/2013 Dolan Decl. ¶ 6, Docket No. 423. Shortly thereafter, he filed yet another declaration clarifying that the correct period was December 17, 2010 to September 30, 2012. *See* 3/29/13 Dolan Decl. ¶ 11, Docket No. 428.

[91] *See* Dolan Dep. 97:5-18, Docket No. 464-2.

[92] *See id.* 145:19-148:20.

14

Case No. 5:09-cv-02015-JF (PSG)
REPORT AND RECOMMENDATION

Quarterly Summary Reports," and implies that Class Counsel badgered Dolan about the missing "modifications requested" without good reason.[93] However, the undersigned is at as much of a loss as Plaintiffs to understand what happened to the "Number of modifications requested" that are left over after subtracting the modifications completed, the modifications denied, and the fall-outs conceded by Dolan. By any reasonable calculation, there are still some tens of thousands of modification requests unaccounted for.

Additionally, there are significant discrepancies between two sets of fall-out data that Wells Fargo provided for the period April 1, 2012 through June 30, 2012. Wells Fargo included fall-out data for that period in a six-quarter fall-out report provided to Class Counsel in July 2012, and again in a separate fall-out report covering only the second quarter of 2012.[94] The former report lists 770 class members that are not on the latter report, and the latter report lists 186 class members that are not on the former report, for the exact same period of time.[95] These results render the fall-out reports unreliable.

### 3. Quarterly Denial Reports

The Quarterly Denial Reports appear to list fewer denials than the Quarterly Summary Reports.[96] Wells Fargo explains the discrepancy by asserting that "the Detail Denial Reports about which Plaintiffs complain were never intended to provide an application-by-application listing of denials, and that is why those reports do not match the figures contained on the Quarterly Summary Reports."[97] Wells Fargo's explanation does not make sense. As discussed above, the "Number of modifications requested" heading on the Quarterly Summary Reports reflects the number of *loans* as to which modification has been requested, not the number of *applications* submitted. Accordingly it would seem that the Quarterly Denial Reports, which list class members who were denied loan

---

[93] *See* Def.'s Br. at 15, Docket No. 471.

[94] *See* Fall-Out reports, Docket No. 464-2.

[95] *See* Neubauer Decl. ¶ 4.

[96] *See* Weiss Decl. ¶¶ 4, 17, Docket No. 464-1.

[97] Def.'s Br. at 22, Docket No. 471.

15

Case No. 5:09-cv-02015-JF (PSG)
REPORT AND RECOMMENDATION

modification, should line up more (not less) closely with the Quarterly Summary Reports, which tabulates loans as to which modification was denied. Once again, the reports tendered by Wells Fargo do not appear reliable.

## C.     Wells Fargo's New Reports Created By McKone

In response to Judge Fogel's expressed desire to understand what happened to each application for loan modification, Wells Fargo has compiled and submitted an entirely new report created by McKone and supported by her declaration. That report indicates that for the 81,370 loan modification requests received between December 16, 2010 and December 31, 2012, 19% resulted in completed modifications; 9% were terminated when the class member declined to go forward; 35% went to fall-out; 30% were denied; 2% resulted in modifications that are still in process; and 6% involve bankruptcies.[98] For the 13,654 loan modification requests pending as of December 16, 2010, 44% resulted in completed modifications; 2% were terminated when the class member declined the offered modification; 22% went to fall-out; 27% were denied; 0% resulted in modifications that are still in process; and 5% involve bankruptcies.[99]

Wells Fargo presents the opinion of an outside consultant, Michael Wei ("Wei"), who opines that Wells Fargo's Quarterly Summary Reports and new per-application report are reasonably accurate and reliable.[100] Wei also opines that Wells Fargo's HAMP approval rate for Pick-a-Payment loans is higher than Wells Fargo's HAMP approval rate for other loans, and is higher than the HAMP approval rate of the banking industry as a whole.[101]

Because McKone's reports and Mr. Wei's opinion were presented in connection with Wells Fargo's responsive brief, Plaintiffs has not had an opportunity to challenge any of the figures contained therein. But even if these new reports are above reproach, they confirm that Wells Fargo does not appear to be tracking all class representatives who call for a modification but are deemed

---

[98] *See* McKone Decl. ¶ 42, Docket No. 471-2.

[99] *See id.* ¶ 51.

[100] *See* Wei Report, Docket No. 471-1.

[101] *See id.* at ¶ 45.

1 unqualified even to receive a loan modification packet.

## III. CONCLUSION

The undersigned concludes that Wells Fargo's reports to Class Counsel pursuant to the settlement agreement, as well as its statistics submitted to the Court in opposition to Plaintiffs' request for injunctive relief, are misleading and unreliable. As an initial matter, Dolan appears to have been, to put it mildly, ill-suited to the task at hand. His misrepresentations – intentional or not – regarding the meaning of "Number of modifications requested," the total number of fall-outs, and other data, have muddled and multiplied this litigation. At the hearing, Wells Fargo attempted to gloss over the mess by stating that there had been some "confusion" about terminology.[102] However, Dolan's misstatements went far beyond one or two isolated incidents that (perhaps) could be excused on such a ground. Moreover, he is the *Compliance Officer* designated by Wells Fargo to ensure that Class Counsel received the reports required under the settlement agreement. Given this role, his inability to provide accurate information is troubling, to say the least.

Even more troubling is Wells Fargo's apparent disregard of the purpose of the reporting requirement. As noted above, the cash portion of the settlement amounted to less than $200 per eligible class member. The settlement agreement's real benefit to class members was supposed to be a sort of "Lexus" loan modification program that was more favorable to borrowers than programs available to the general public. The reporting requirements, while inartfully drafted, clearly were intended to provide a degree of transparency sufficient to satisfy Class Counsel and the Court that class members were getting the consideration for which they bargained. Rather than complying with the letter and spirit of the reporting requirements, Wells Fargo unilaterally created a category of borrowers that were not granted loan modification but that were not considered to have been denied loan modification either. Wells Fargo did not inform Class Counsel of this "fall-out" category for more than a year after final approval of the settlement. The existence of the unreported "fall-outs" rendered the reports that were provided to Class Counsel meaningless, because Class Counsel was not aware that significant numbers of class members were not accounted for by those reports.

---

[102] *See* Hr'g Tr. 35:8-16.

17

Case No. 5:09-cv-02015-JF (PSG)
REPORT AND RECOMMENDATION

The new reports prepared by McKone, as supported by her declaration and by Wei's expert report, suggest that in fact class members are reaping the benefits of the "Lexus" loan modification program for which they bargained. The undersigned is reluctant to rely upon McKone's reports too heavily, however, because Plaintiffs have not had an opportunity to challenge them. Moreover, McKone's figures are undermined by the fact that Wells Fargo is conducting telephonic pre-screening of applicants for loan modification, and declining to send loan modification application packets to an unknown number of class members who request them. This practice may constitute a further violation of the settlement agreement, which appears to contemplate that any class member who wishes to apply for loan modification may at least obtain an application packet. While Wells Fargo perhaps could make an argument that there are legitimate reasons for declining to send a packet to every borrower who asks, any such argument would be hopelessly undermined by Wells Fargo's failure to at least track all requests for application packets.

Dated: July 2, 2013

_____
PAUL S. GREWAL
United States Magistrate Judge