**BERNS WEISS LLP**
Jeffrey K. Berns (SBN 131351)
jberns@law111.com
20700 Ventura Blvd., Suite 140
Woodland Hills, CA 91364
Telephone: (818) 961-2000
Facsimile: (818) 999-1500

Lee A. Weiss (SBN 297834)
lweiss@law111.com
585 Stewart Avenue, Suite L-20
Garden City, NY 11530
Telephone: (516) 222-2900
Facsimile: (818) 999-1500

*Attorneys for Movants Jason Fisher, Francis Matijevich, Robert Raby, Omar and Ruth Bishr, Eleanor Green, Paul Lettich, Kenneth R. Henry, Katherine Palko, Marvin J. Landes and the Settlement Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: WACHOVIA CORP. "PICK-A-PAYMENT" MORTGAGE MARKETING AND SALES PRACTICES LITIGATION<br><br>_____<br><br>*This Document Relates to*:<br><br>ALL INCLUDED ACTIONS | **CASE NO. 3:09-MD-02015-RS-KAW**<br><br>[*Assigned to the Hon. Richard Seeborg*]<br><br>**MOVANTS JASON FISHER, FRANCIS MATIJEVICH, ROBERT RABY, OMAR AND RUTH BISHR, ELEANOR GREEN, PAUL LETTICH, KENNETH R. HENRY, KATHERINE PALKO, AND MARVIN J. LANDES'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION, AND MOTION TO ENFORCE CLASS ACTION SETTLEMENT AGREEMENT**<br><br>Hearing Date: TBD<br>Time: TBD<br>Place: 17th Fl. – Courtroom 3<br>Judge: Hon. Richard Seeborg |

# TABLE OF CONTENTS

PAGE

I.   INTRODUCTION ...............................................................................................1

II.  RELEVANT FACTS AND PROCEDURAL HISTORY .......................................3

   A.  The Class Action Settlement Agreement ...................................................3

      1.  The Relevant Settlement Classes ...................................................3

      2.  The Imminent Default Provisions..................................................3

   B.  Wells Fargo's Shifting Description of Its Imminent Default Standards.........................5

      1.  The "Money Left Over" Standard ..................................................5

      2.  The Examples in the Class B Notice Standard ...............................5

      3.  The Unidentified "Other Factors" Standard ...................................6

   C.  The Court's Multiple Holdings That Wells Fargo's Imminent Default Analysis Must Comply with the HAMP Guidance............................6

   D.  The Court's Holding That Further Discovery Was Necessary in Order for It to Determine if Wells Fargo Has Complied with the Settlement Agreement and That The Motion to Enforce Should be Renewed After That Discovery................................7

   E.  Wells Fargo's Woefully Inadequate Imminent Default Test ...........................................8

III. ARGUMENT ...................................................................................................9

   A.  Wells Fargo Violated the Settlement Agreement's Imminent Default Standards and the HAMP Guidance by Failing to Consider Any Non-PITIA Expenses...................9

      1.  Despite Collecting the Necessary Information, Wells Fargo Failed to Consider Many of the Expenses Enumerated in HAMP ............................................9

      2.  Wells Fargo Violated the Settlement Agreement and HAMP by Failing to Provide a Reasonable Living Expense Allowance ...................................10

   B.  Wells Fargo Violated the Settlement Agreement by Understating Borrowers' DTIs When Evaluating Modification Applications under MAP2R .......................................10

   C.  Wells Fargo Violated the Settlement Agreement by Failing to Evaluate Whether a Borrower Had a Positive NPV ........................................11

   D.  Wells Fargo Failed to Comply with Its Own, Flawed Imminent Default Test..............12

i

# TABLE OF CONTENTS (cont'd)

PAGE

1.  Francis Matijevich Met All Elements of the Imminent Default Test, but Wells Fargo Denied His Application for Lack of Imminent Default.................................12

2.  Robert Raby Met All Elements of the Imminent Default Test, but Wells Fargo Wrongfully Denied His Application for Lack of Imminent Default .......................13

3.  Wells Fargo Did Not Implement the Major Change in Circumstances Test in Accordance with Its Own Policies...........................................................................15

4.  Wells Fargo Violated Its Policies by Using Automated Valuation Models and Was Unable to Provide Any Proof of the Existence of the AVM upon which It Supposedly Relied to Deny Jason Fisher's Application ..........................................16

E.  The Court Has the Power to, and Should, Compel Wells Fargo to Comply with the Settlement Agreement.....................................................................................................16

1.  The Court Should Direct the Parties to Promptly Propose a Uniform Methodology for Wells Fargo to Comply with the Settlement Agreement.............16

F.  The Relevant Standards for Granting a Classwide Temporary Restraining Order and Preliminary Injunction .................................................................................................18

1.  Movants Have a Strong Likelihood of Success on the Merits of Their Motion to Enforce Settlement Agreement's Imminent Default Standards................................19

2.  Class Members Will Experience Irreparable Harm If Preliminary Relief Is Denied ...................................................................................................................19

3.  The Balance of Hardships Overwhelmingly Favors Movants..................................23

4.  A Preliminary Injunction Is in The Public Interest ..................................................24

IV.  THIS COURT SHOULD DISPENSE WITH THE BOND REQUIREMENT ...................25

V.  CONCLUSION.................................................................................................................25

**TABLE OF AUTHORITIES**

**CASES**                                                                                                                **PAGE**

*Alliance for the Wild Rockies v. Cottrell*
    632 F.3d 1127 (9th Cir. 2011) ............................................................... 18

*Bank of Am. Nat'l Trust & Sav. Ass'n v. United States*
    23 F.3d 380 (Fed. Cir. 1994)................................................................. 24

*Barahona–Gomez v. Reno*
    167 F.3d 1228 (9th Cir. 1999) ............................................................. 25

*Bianchi v. Perry*
    140 F.3d 1294 (9th Cir. 1998) ............................................................. 24

*Bitker v. Suntrust Mortgage, Inc.*
    No. 13CV656-CAB WMC, 2013 WL 2450587 (S.D. Cal. Mar. 29, 2013) .................... 21

*Bland v. Carone Family Trust*
    2007 WL 951344 (S.D. Cal. Mar. 19, 2007 ) ................................................. 19

*Callie v. Near*
    829 F.2d 888 (9th Cir. 1987) ............................................................... 16

*Doctor's Assoc., Inc. v. Stuart*
    85 F.3d 975 (2d Cir. 1996).................................................................. 25

*Gilmore v. Wells Fargo Bank N.A.*
    No. C 14-2389 CW, 2014 WL 3749984 (N.D. Cal. July 29, 2014) ........................ 20

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*
    415 U.S. 423 (1974)........................................................................19

*In re City Equities Anaheim, Ltd.*
    22 F.3d 954 (9th Cir. 1994) ............................................................... 16

*In re Wachovia Corp.*
    No. 5:09-MD-02015, 2013 WL 5423604 (N.D. Cal. Sept. 25, 2013) ...................... 24

*Johnson v. U.S. Dept. of Agriculture*
    734 F.2d 774 (11th Cir. 1984) ..............................................................21

*Lane v. CitiMortgage, Inc.*
    No. 2:14-CV-02295-KJM, 2014 WL 6670648 (E.D. Cal. Nov. 21, 2014) ................... 18

*Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.*
    887 F. Supp. 1320 (N.D. Cal. 1995) ........................................................18

*Lopez v. Brewer*
    680 F.3d 1068 (9th Cir. 2012) ............................................................. 18

**TABLE OF AUTHORITIES (cont'd)**

**CASES**                                                           **PAGE**

*Osorio v. Wells Fargo Bank*
    No. C 12-02645 RS, 2012 WL 1909335 (N.D. Cal. May 24, 2012) ................................ 19

*Paik v. Wells Fargo Bank, N.A.*
    No. C 10-04016 WHA, 2011 WL 109482 (N.D. Cal. Jan. 13, 2011)................................ 24

*Reed v. Wells Fargo Bank*
    No. C 11-00194 JSW, 2011 WL 1793340 (N.D. Cal. May 11, 2011).............................. 21

*Rendish v. City of Tacoma*
    123 F.3d 1216 (9th Cir. 1997) ..................................................................................... 18

*Rivera v. BAC Home Loans Servicing, L.P.*
    2010 WL 2280044 (N.D. Cal. June 7, 2010)................................................................. 25

*Sharma v. Provident Funding Associates, LP*
    No. C 09-5968 VRW, 2010 WL 143473 (N.D. Cal. Jan. 8, 2010)................................. 21

*Sundance Land Corp. v. Cmty. First Fed. Sav. & Loan Ass'n*
    840 F.2d 653 (9th Cir. 1988) ....................................................................................... 22

*Tamburri v. Suntrust Mortgage, Inc.*
    No. C-11-2899 EMC, 2011 WL 2654093 (N.D. Cal. July 6, 2011).......................... 23, 24

*Textile Unlimited, Inc. v. A.BMH & Co., Inc.*
    240 F.3d 781 (9th Cir. 2001) ....................................................................................... 18

*Winter v. Natural Res. Def. Council, Inc.*
    555 U.S. 7 (2008)........................................................................................................ 18

*Yue v. Conseco Life Ins. Co.*
    282 F.R.D. 469 (C.D. Cal. 2012).................................................................................. 18


**STATUTES & REGULATIONS**

28 U.S.C. § 1651(a) ............................................................................................................. 24

12 CFR § 1024.41(g) ........................................................................................................... 20

12 CFR § 1024.41(g)(1)-(3).................................................................................................. 20

Cal. Civ. Code § 2923.4(a) .................................................................................................. 20

Cal. Civ. Code § 2923.6(c) .................................................................................................. 20

MPA iso *Ex Parte* Mot. for TRO, OSC re: Preliminary Injunction and Motion to Enforce
3:09-MD-02015-RS-KAW

# I.      INTRODUCTION

Two years ago, several Class Members filed a preliminary injunction motion to stop Wells Fargo from pursuing foreclosure activity because, among other things, Wells Fargo was not properly evaluating borrowers for imminent threat of default under either the federal government's Home Affordable Modification Program (HAMP) or the Settlement Agreement that had received final approval from this Court.  Thereafter, Wells Fargo did everything in its power to prevent the Court and Class Counsel from learning the truth about its woefully deficient imminent default policies.  Wells Fargo resisted all efforts by Class Counsel to obtain discovery on this issue and also went to great lengths to insure that no Wells Fargo employee ever went on record to this Court to describe the imminent default procedures that Wells Fargo had actually employed.  Instead, Wells Fargo's counsel employed a constantly shifting description of the imminent default methodology.  This duplicitous conduct was not lost on this Court.  Last year, in ordering document and deposition discovery regarding Wells Fargo's imminent default policies, the Court stated:  "The fact that defendant continues to equivocate on its process for complying with the terms of a settlement agreement entered by the parties more than three and a half years ago is, however, troubling."  Order Denying Motion for Relief and to Enforce Settlement, Ordering Defendant to Provide Further Discovery, and Setting Further Case Management Conference ("6/26/14 Order") (Dkt. 644), at 6.

Now that Wells Fargo has finally provided the limited discovery ordered by the Court, the reason for its prior obfuscation is obvious – Wells Fargo has made virtually no effort to comply with HAMP or the Settlement Agreement.  Instead, as demonstrated below, Wells Fargo has employed procedures that bear virtually no relationship to the relevant imminent default HAMP guidance that is expressly incorporated in the Settlement Agreement.  By virtue of its improper imminent default test, and its dilatory tactics in this proceeding, Wells Fargo has undoubtedly foreclosed on (and then evicted) many struggling borrowers who were entitled to reduced monthly mortgage payments under the Settlement Agreement.  While those Class Members possess substantial damages claims, this request for emergency relief and motion to

enforce concerns current Wells Fargo borrowers who are suffering (or will suffer) from Wells Fargo's blatant disregard of its obligations under the Settlement Agreement.  Movants, Jason Fisher, Francis Matijevich, Robert Raby, Omar and Ruth Bishr, Eleanor Green, Paul Lettich, Kenneth R. Henry, Katherine Palko, and Marvin J. Landes, were all denied loan modifications when Wells Fargo was using an imminent default standard that did not comply with the Settlement Agreement and HAMP, and each of them (other than Fisher, Matijevich and Raby – the sample borrowers who, as discussed below, demonstrate that Wells Fargo has violated the Settlement Agreement, HAMP, and its own procedures) is currently in foreclosure or has received notice of Wells Fargo's intent to commence foreclosure proceedings.  In the absence of action by this Court to stop to these proceedings until there can be a re-review of the modification applications of Movants and similarly situated Class Members (or a procedure for the review of new applications) under an imminent default standard that complies with the Settlement Agreement and HAMP, these borrowers will be irreparably harmed if they lose their homes because they will be unable to benefit from any relief ordered by this Court.

For the reasons discussed below, the Court should order Wells Fargo to comply with the Settlement Agreement.  Additionally, the elements necessary for the Court to issue a TRO and preliminary injunction are readily present here – 1) Movants are likely to succeed on the merits, as Wells Fargo has unquestionably failed to comply with HAMP and the Settlement Agreement, 2) Movants and other similarly situated Class Members will suffer irreparable harm if they lose their homes without having been properly evaluated for loan modifications in accordance with HAMP and the Settlement Agreement, 3) the balance of equities is strongly in favor of Movants and other similarly situated Class Members, as they have been victimized by Wells Fargo's despicable conduct, which was without justification, and 4) an injunction is undoubtedly in the public's interest.  Thus, as Wells Fargo's actions call into question each and every one of its imminent default determinations, this Court should not permit Wells Fargo to pursue foreclosure activity against any Class Member whose modification application was denied for lack of imminent default until it conducts a hearing on Movants' request for a preliminary injunction.

## II.     RELEVANT FACTS AND PROCEDURAL HISTORY

### A.  The Class Action Settlement Agreement

On December 10, 2010, the Parties executed the Settlement Agreement, resolving all of the loan origination-based claims of the Settlement Class against Wells Fargo.  Judge Fogel granted final approval of the Settlement Agreement on May 17, 2011.  *See* Dkt. 207.

### 1.  The Relevant Settlement Classes

The Settlement Agreement provided for certification of three Settlement Classes, two of which were eligible for loan modifications.  Settlement Class B members are borrowers who were not in default on their loans at the time the Court preliminarily approved the Settlement Agreement and Settlement Class C members are borrowers who were in default at the time the Court preliminarily approved the Settlement Agreement. SA, § IV.

### 2.  The Imminent Default Provisions

The Settlement Agreement did not require a Class B Member to default on making his or her mortgage payments, and ruin his or her credit rating, in order to be considered for a loan modification.  Instead, if a Class B Member was in "Imminent Default" at any time between December 16, 2010 and June 30, 2013, the Settlement Agreement required Wells Fargo to evaluate that borrower's application for a loan modification. SA, § VI.E.

The Settlement Agreement defines Imminent Default as

a Borrower (as defined in Section 1.7) who the Defendants have determined, *in accordance with applicable HAMP guidance*, as necessary, that default by the Borrower in making scheduled payments on his or her Pick-a-Payment mortgage loan is reasonably foreseeable. In assessing whether a Borrower is facing Imminent Default, the Defendants will not consider funds held in a 401K, 457, 401(a), or 503 retirement account, an IRA, SEP IRA, Simple IRA, or Roth IRA. Additionally, the fact that a Borrower is projected to Recast to a fully amortizing payment under the terms of the Pick-a-Payment mortgage loan within the upcoming four (4) contractual Monthly Payments (as defined in Section 1.41 hereafter) using the current applicable interest rate as determined under the terms of the note, and the resulting increase, if any, to the respective Borrower's DTI[1] (as defined in Section 1.22), shall be considered as a factor in the determination of Imminent Default.

---

[1] "DTI" is defined as "the ratio of the Borrower's first-lien monthly mortgage obligations (including monthly amounts for principal, interest, property taxes, hazard insurance, flood insurance, condominium association fees, and homeowners' association fees, as applicable, regardless of whether any of the foregoing are included in the Borrower's Monthly Payment . . ., and including any escrow payment shortage amounts subject to a repayment plan) to the

SA, § I.1.33 (emphasis added).  The "applicable HAMP guidance" referenced in the Imminent

Default definition was set forth in the Making Home Affordable Program, Handbook for

Servicers of Non-GSE Mortgages, Version 2.0 (the "HAMP Handbook").  *See* accompanying

Request for Judicial Notice ("RFJN"), Ex. 1.  The HAMP Handbook provided the following

guidance regarding the imminent default analysis:

> When making an imminent default determination, the servicer must evaluate the
> borrower's hardship as well as the condition of and circumstances affecting the property
> securing the mortgage loan. The servicer must consider the borrower's financial
> condition, liquid assets, liabilities, combined monthly income from wages and all other
> identified sources of income, monthly obligations (including personal debts, revolving
> accounts, and installment loans), and a reasonable allowance for living expenses such as
> food, utilities, etc. The hardship and financial condition of the borrower must be verified
> through documentation

HAMP Handbook, § 4.4.

In order to provide Class B Members with some representative examples[2] of the

circumstances that Wells Fargo would consider as imminent default under the HAMP guidance,

the Settlement Class B Notice stated:

> Generally, the current test for "Imminent Default" is as follows:
>
> 1. Long Term Hardship, meaning a borrower that is having difficulty making his or her
>    mortgage payments and the duration of that difficulty is expected to be greater than
>    12 months; and
>
> 2. Financial Hardship, defined as one of the following that currently exists or occurs
>    prior to June 30, 2013:
>
>    a. Death of a borrower;
>
>    b. Long-term or permanent disability or illness of a borrower or dependent
>       family member;
>
>    c. Legally-documented divorce or separation of the borrower and co-borrower;
>
>    d. Separation of borrowers unrelated by marriage, civil union, or similar civil
>       domestic partnership under applicable law;

---

Borrower's gross monthly income, all determined in accordance with HAMP, as defined in
Treasury's Supplemental Directive 9-01: Introduction of the Home Affordable Modification
Program, April 6, 2009." SA, § I.1.22.  Internally, Wells Fargo typically used the term Housing-
to-Income ratio or "HTI" for this calculation.  *See* Berns Decl., Ex. 2 (Transcript of the
November 5, 2014 Deposition of Claire Paris ("Paris Dep.")), at 35:5-8. Thus, this motion uses
the term HTI when it refers to this ratio.

[2] *See* Berns Decl., Ex. 3 (November 29, 2010 email to Class Counsel from Terry Krapfl,
Managing Counsel of Wells Fargo Law Department) ("we can use some of the details that are
currently in the SA definition as examples in the notice").

    e.  A combination of reduction of income and increase in housing expenses (principal and interest only) that exceeds 10% of current income. The comparison period shall be approximately 12 months prior to the date modification is sought; however, a greater period may be used if the condition has been consistent; and

3. Cash reserves of less than $25,000, excluding retirement accounts; and

4. The property is occupied by the borrower as his or her principal residence; and

5. The borrower's loan-to-value ratio must exceed 80%, or the loan must have a positive "Net Present Value."

Berns Decl., Ex. 4 (Settlement Class B Notice, § 11).

## B. Wells Fargo's Shifting Description of Its Imminent Default Standards

### 1. The "Money Left Over" Standard

In December 2012, certain Class Members, as part of an Application for a TRO and motion for a Preliminary Injunction, claimed that Wells Fargo was not complying with the Settlement Agreement's imminent default definition. *See* Dkt. 365, at 4; Dkt. 365-1, at 7. In response, Wells Fargo filed a declaration from the employee that it had appointed as the Compliance Officer pursuant to the Settlement Agreement, Michael Dolan, wherein he attempted to explain Wells Fargo's imminent default determinations. According to Mr. Dolan, Wells Fargo had determined that the movants-Class Members were not in imminent default by calculating the difference between their gross monthly incomes and all of the expenses (both housing and non-housing) listed on their modification applications in order to determine whether they had a sufficient amount of money "left over each month after paying for housing and other debts." *See* Berns Decl., Ex. 20 (Declaration of Michael Dolan filed December 12, 2012 ("12/12/12 Dolan Decl.") (Dkt. 371-4)), ¶¶12, 16, 20, 33, 36, 37, 40, 42, and 44.

### 2. The Examples in the Class B Notice Standard

Several Class Members also filed a separate action, *Murphy v. Wells Fargo*, No. C 12-6228 SI (N.D. Cal.) ("*Murphy*"), alleging that Wells Fargo had denied modification applications based on incorrect imminent default and financial hardship criteria. In a Motion to Dismiss, Wells Fargo claimed that it only considered a Class Member to be in imminent default if he or she satisfied the circumstances in the Settlement Class B Notice that Wells Fargo's Managing

Counsel had previously identified as "examples" that could comply with the Settlement Agreement's imminent default standards. Berns Decl., Ex. 5 (*Murphy*, Defendants' Motion to Dismiss Amended Class Action Complaint, or, Alternatively, to Strike Class Allegations (Dkt. 29)), at 5-6. Wells Fargo also stated that even though the HAMP imminent default guidance was expressly incorporated into the Settlement Agreement, the Court should ignore it. *Id.*, at 4 n.3.

### 3. The Unidentified "Other Factors" Standard

On January 20, 2014, Class Representative filed a Motion to Enforce the Settlement Agreement (Dkt. 604), contending, among other things, that Wells Fargo had violated the Settlement Agreement by not considering tax liability and other payroll withholdings in its imminent default evaluations, even though the HAMP Handbook required consideration of a borrower's complete financial condition, including all "liabilities" and "monthly obligations." Wells Fargo's opposition (Dkt. 614) did not reference the standard identified by Mr. Dolan or the examples in the Class B Notice. Instead, it claimed that Wells Fargo performed the required imminent default financial condition analysis by calculating a borrower's HTI, and if the borrower's HTI is in excess of 31%,[3] "Wells Fargo looks at other factors." Dkt. 614, at 12. Wells Fargo did not offer any detail as to what those "other factors" were.

### C. The Court's Multiple Holdings That Wells Fargo's Imminent Default Analysis Must Comply with the HAMP Guidance

On May 8, 2014, the Court denied Class Representative's Motion to Enforce. Order Granting in Part and Denying in Part Motion to Enforce Settlement ("May 8, 2014 Order") (Dkt. 634). Although it rejected the contention that Wells Fargo was required to consider a borrower's income taxes and other withholding items as part of the imminent default analysis, the Court did not approve any of the imminent default tests suggested by Wells Fargo's counsel (or Mr. Dolan). Instead, consistent with the Settlement Agreement's express incorporation of HAMP

---

[3] The HTI calculation has no impact on the imminent default analysis. Under HAMP and MAP2R, the goal of the loan modification waterfall is to reduce a borrower's HTI to 31%. *See* HAMP Handbook, § 6.3; SA, § VI.E.5. Thus, if a borrower's HTI is already at or below 31%, Wells Fargo denied his or her loan modification application and did not need to perform an imminent default review. *See* Berns Decl., Ex. 20 (12/12/12 Dolan Decl.), ¶¶12, 16, 36, 40, 44.

guidance, the Court held that Sections 4.4 and 5.4 of the HAMP guidance governed the imminent default analysis and that taxes and other withholding items were not part of the imminent default analysis because they were not expressly referenced in Section 5.4 of the HAMP Handbook, which "extensively details the monthly expenses to be accounted for by servicers, including mortgage-related expenses for the property, alimony and child support, car lease payments, monthly credit payments, net negative rental income, second home mortgage expenses, payments on installment debts, and HELOC payments." May 8, 2014 Order at 8.

On May 22, 2014, Class Representative filed a Motion for Relief from the Court's May 8, 2014 Order, arguing, among other things, that the list of expenses in Section 5.4 of HAMP was not meant to serve as a complete list of the "liabilities" referenced in Section 4.4 of HAMP.[4] Although it denied the motion, the Court again emphasized that Wells Fargo was required to take into account all of the expenses and liabilities identified in HAMP. *See* June 26, 2014 Order at 5 (paragraphs 4.4 and 5.4 of the HAMP Handbook "detail[] various liabilities and obligations a service [sic] *is required* to document and take into account in the loan modification process.").[5]

### D. The Court's Holding That Further Discovery Was Necessary in Order for It to Determine if Wells Fargo Has Complied with the Settlement Agreement and That The Motion to Enforce Should be Renewed After That Discovery

Class Representative's May 22, 2014 motion also sought to enforce the Settlement Agreement because Wells Fargo was not complying with the HAMP imminent default guidance relied upon by the Court in the May 8, 2014 Order or the most recent imminent default standard that Wells Fargo's counsel had claimed Wells Fargo was employing (using the Settlement Class B Notice examples as the sole circumstances for establishing imminent default). *See* Dkt. 636, at 13-16.  The motion provided examples of three Class Members (Movants Fisher, Matijevich and Raby) whose loan modification applications were denied for lack of imminent default, even though they had met the requirements in the Settlement Class B Notice.  The Court found that

---

[4] Dkt. 636, at 12.

[5] Class Representative has appealed that ruling and the Court's ruling on imminent default in the May 8, 2014 Order. Dkt. 647.

MPA iso *Ex Parte* Mot. for TRO, OSC re: Preliminary Injunction and Motion to Enforce
3:09-MD-02015-RS-KAW

there were issues of fact that it could not resolve as to whether Wells Fargo had properly denied

the loan modification applications of the three borrowers, Dkt. 644, at 7 ("it cannot be said a

material dispute of fact is absent as to whether those borrowers were denied loan modifications

in violation of the settlement agreement"). Thus, the Court granted Class Representative leave to

renew her motion after Wells Fargo provided deposition and document discovery regarding

Wells Fargo's policies governing the evaluation of imminent default and financial hardship

because "[t]he fact that defendant continues to equivocate on its process for complying with the

terms of a settlement agreement entered by the parties more than three and a half years ago is,

however, troubling." Dkt. 644, at 6-7. Subsequently, over Wells Fargo's strenuous objection, the

Court ordered Wells Fargo to produce the complete loan modification files for the three Class

Members and a corporate representative to testify about the files. Dkt. 653, at 2.

### E. Wells Fargo's Woefully Inadequate Imminent Default Test

After being ordered to do so by the Court, Wells Fargo finally produced the policies

setting forth the imminent default test that it had purportedly applied. The test, as per those

policies, appears to mirror the examples produced in the Settlement Class B notice.

Berns Decl., Ex. 6 (HAMP – Credit Policy –

Home Affordable Modification Program Policies for Non-GSE Loans dated January 26, 2011

("January 26, 2011 Policy")).

. *Id.*

1 ███████████████████████████████████████████

2 ████████████████████████████████ Berns Decl., Ex. 6.[6]

Although this test does not come close to complying with the Court's prior ruling as to the proper imminent default test under the Settlement Agreement, Wells Fargo has now admitted that it did not even bother to follow its own deficient test.

## III.   ARGUMENT

### A.   Wells Fargo Violated the Settlement Agreement's Imminent Default Standards and the HAMP Guidance by Failing to Consider Any Non-PITIA Expenses.

#### 1.   Despite Collecting the Necessary Information, Wells Fargo Failed to Consider Many of the Expenses Enumerated in HAMP.

Wells Fargo collected information from a borrower seeking a loan modification through a form entitled "Request for Modification Assistance" ("RMA"). Paris Dep., at 101:18-102:25; 105:4-8. The RMA required the borrower to list the following "Monthly Household Expenses/Debt": First Mortgage Payment; Second Mortgage Payment; Insurance; Property Taxes; Credit Card/Installment Loan(s) (total minimum payment per month); Alimony, child support payments; Net Rental Expenses; HOA/Condo Fees/Property Maintenance; Car Payments; and Other. *See, e.g.,* Berns Decl., Ex. 11 (RMA for Francis Matijevich, at 2). The Court has previously held that HAMP required that Wells Fargo's imminent default analysis consider all of those monthly expenses and obligations. *See* Dkt. 634, at 8, citing HAMP Handbook, §§ 4.4, 5.4. Yet, ***Ms. Paris expressly acknowledged that Wells Fargo does not consider any of these items, including a borrower's monthly payments for student loans, auto loans, medical expenses, or any other monthly obligations that are not part of the PITIA payment***. Paris Dep., at 41:8-43:14; 101:10-14.[7]

---

[6] This was the only imminent default test used by Wells Fargo throughout the entire relevant period for both HAMP and MAP2R modification applications. Berns Decl., Ex. 2 (Paris Dep.), at 29:12-31:23; 64:16-66:16; 69:7-10; 70:1-72:2; 72:3-25.

[7] Wells Fargo's imminent default policies also fail to mention any of these items. *See* Berns Decl., Ex. 6 (January 26, 2011 Policy); Ex. 7 (WFHM-CON 4800.4.5 Proprietary Modifications (WFHM-SA)).

### 2.   Wells Fargo Violated the Settlement Agreement and HAMP by Failing to Provide a Reasonable Living Expense Allowance.

HAMP requires that Wells Fargo's imminent default analysis consider "a reasonable allowance for living expenses such as food, utilities, etc." HAMP Handbook, § 4.4.  Wells Fargo's imminent default policies parrot this language, but, as set forth above, the actual tests in those policies provide no such allowance. *See* Berns Decl., Ex. 6 (January 26, 2011 Policy, at 6).  According to Ms. Paris, Wells Fargo takes into account a reasonable allowance for living expenses such as food, utilities, etc. by looking "at the housing-to-income ratio, the standard of 31%; and the remaining 69 percent would be considered reasonable."  Paris Dep., at 34:8-15.  The HTI test does no such thing.  Instead, it merely compares a borrower's gross monthly income to the PITIA payment.  Thus, the only expenses in the HTI test are those in the PITIA payment. Stated differently, the HTI test had no bearing on the required HAMP evaluation -- whether a Class Member has sufficient funds to cover the PITIA payment, all other monthly expenses and liabilities, and a reasonable allowance for living expenses, such that it was not reasonably foreseeable that they would default on their monthly mortgage payments.

### B.   Wells Fargo Violated the Settlement Agreement by Understating Borrowers' DTIs When Evaluating Modification Applications under MAP2R

The Settlement Agreement defines DTI (HTI) as follows:

> the ratio of the Borrower's first-lien monthly mortgage obligations (including monthly amounts for principal, interest, property taxes, hazard insurance, flood insurance, condominium association fees, and homeowners' association fees, as applicable, ***regardless of whether any of the foregoing are included in the Borrower's Monthly Payment*** (defined in Section 1.41 hereafter), and including any escrow payment shortage amounts subject to a repayment plan) to the Borrower's gross monthly income, all determined in accordance with HAMP, as defined in Treasury's Supplement Directive 9-01: Introduction of the Home Affordable Modification Program, April 6, 2009.

SA, § I.1.22 (emphasis added). Ms. Paris confirmed this supposed "fact," (Paris Dep., at 45:2-14) ("So the Pick-a-Pay has the payment options; so you would be looking at the full principal and interest, taxes, insurance [for calculating the HTI].").  However, Wells Fargo's own documents establish that it used the minimum (not fully amortizing) principal and interest payment to determine, under MAP2R, if a borrower's HTI exceeded the 31% threshold (i.e., it improperly decreased the numerator of the HTI ratio in order to deny applications under MAP2R).  For

example, Wells Fargo's "Loss Mitigation Worksheets" for Mr. Matijevich reflect a HAMP and MAP2R HTIs of ███ and ████, respectively.  Berns Decl., Exs. 12, 14.  Wells Fargo's documents for Mr. Fisher reflect a similar HTI disparity between HAMP and MAP2R (████ and ████.  *See* Berns Decl.,¶22 and Exs. 17, 18, and 19.  For each of the borrowers, the different HTIs for HAMP and MAP2R occurred by virtue of Wells Fargo using the fully amortizing monthly payment for HAMP and the minimum monthly payment for MAP2R.  As the same HTI test applies to both HAMP and MAP2R, the understated MAP2R HTIs clearly violate the Settlement Agreement.[8]

Additionally, both the Settlement Agreement and HAMP require that the "'monthly mortgage payment' include[] the monthly payment of principal, interest, property taxes, hazard insurance, flood insurance, condominium association fees and homeowner's association fees, as applicable (including any escrow payment shortage amounts subject to a repayment plan)."  SA, § I.1.22; RFJN, Ex. 2 (Home Affordable Modification Program Supplemental Directive 09-01), at 6.  Yet, Mr. Dolan's declaration demonstrates that Wells Fargo often failed to include property taxes, insurance, and association fees in its HTI calculations.  *See* Berns Decl., ¶27 (failing to consider homeowners' association dues for Class Members Omar and Ruth Bishr); Berns Decl., ¶31 (failing to consider taxes and insurance for Class Members Cynthia and George Biggs).[9]

### C.  Wells Fargo Violated the Settlement Agreement by Failing to Evaluate Whether a Borrower Had a Positive NPV

A borrower satisfies the last element for imminent default if either his or her "loan-to-value ratio [exceeds] 80%, *or the loan [has] a positive 'Net Present Value.'*"  Berns Decl., Ex. 4 (Settlement Class B Notice, § 11) (emphasis added).  Wells Fargo, however, does not consider

---

[8] A declaration submitted by Mr. Dolan also demonstrates a calculation error by Wells Fargo that caused it to understate the HTI for borrowers who paid their mortgage on a bi-weekly basis.  *See* Berns Decl., ¶27.

[9] Based on Wells Fargo's reporting, it denied the MAP2R modification applications of over ███ Class Members because their HTIs were supposedly less than 31%.  *See* Berns Decl., Ex. 26 (Mandrigues Class Action B and C Settlement Reporting ("Quarterly Summary Reports")).  The multiple improprieties in Wells Fargo's HTI calculations demonstrate that many of these denials were likely inaccurate.

this second factor.  Instead, it only looks at the LTV and does not evaluate NPV.  Berns Decl., Ex. 6 at 8; *see also* Paris Dep., at 161:13-14 ("So I'm going to start by saying that for imminent default, **we've never used NPV**.").

### D.  Wells Fargo Failed to Comply with Its Own, Flawed Imminent Default Test.

As set forth above, Wells Fargo's imminent default test provided that an existing long-term or permanent disability or illness of the borrower, co-borrower or a dependent, or the divorce or separation of the borrower and co-borrower were sufficient financial hardships.  Nevertheless, Wells Fargo denied the applications of borrowers who have experienced one of these conditions for lack of financial hardship and it does not consider the hardship information on the RMA.  *See* Paris Dep., at 117:21-118:5 ("Q. Is the information in the hardship section of the RMA used with respect to the imminent default analysis in any way? . . . A.  No.").[10]

### 1.  Francis Matijevich Met All Elements of the Imminent Default Test, but Wells Fargo Denied His Application for Lack of Imminent Default.

Francis Matijevich's RMA and supporting documents demonstrated that: 1) his HTI was ███████ (Berns Decl., Ex. 14); 2) he was disabled (*see* Berns Decl., Ex. 11 (March 28, 2011 letter submitted with his RMA); 3) he had cash reserves less than $25,000 (Berns Decl., Ex. 15); 4) he occupied the mortgaged premises as his principal residence (Berns Decl., Ex. 11 at 1); and 5) his LTV was ███████ Berns Decl., Ex. 15.

Despite meeting all elements of Wells Fargo's test, Wells Fargo's denied Mr. Matijevich's loan modification application for lack of financial hardship because he failed the so-called "Major Change in Circumstance" test created by Wells Fargo (it appears nowhere in HAMP), ████████████████████████████████████████████████ ████████████████████████████████████████████ Paris Dep. at 106:23-107:4; Berns Decl., Ex. 6 (January 26, 2011 Policy, at 7). However, as set forth above, Wells Fargo's policies are clear that ███████████████████████████████████ ███████████████████████████████████████. *See, e.g.,*

---

[10] This is a clear violation of HAMP, which requires that "[w]hen making an imminent default determination, the servicer must evaluate the borrower's hardship."  HAMP Handbook, § 4.4.

Berns Decl., Ex. 6 (January 26, 2011 Policy, at 6-7). *See also* Paris Dep. at 79:20-24; Berns Decl., Ex. 9 (Imminent Default Test 3 - Pass/Fail Reference Matrix). When questioned as to why Wells Fargo denied Mr. Matijevich's application, even though he met all elements of the imminent default test, Ms. Paris claimed that Wells Fargo expects the hardships to be recent, Paris Dep., at 59:2-9.  However, she then gutted that testimony by admitting that Wells Fargo's imminent default "decisioning tool" (*i.e.,* the computer program that purportedly determines imminent default using uniform data for each Class Member) does not take the timeframe of the hardship into account. Paris Dep. at 59:10-17; 60:15-61:1.

### 2. Robert Raby Met All Elements of the Imminent Default Test, but Wells Fargo Wrongfully Denied His Application for Lack of Imminent Default.

Robert Raby's RMA and supporting documents demonstrated that: 1) his HTI was ███████ (Berns Decl., Ex. 27 at 2); 2) he was divorced (Berns Decl., Ex. 28 (Mr. Raby's divorce papers submitted to Wells Fargo); 3) he had cash reserves of less than $25,000 (Berns Decl., Ex. 28 at 2; 4) he occupied the mortgaged premises as his primary residence (*Id.* at 1)); and 5) his loan-to-value ratio was ██████% (Berns Decl., Ex. 27 (Loss Mitigation Worksheet) at 2).

Although Mr. Raby's documented divorce from co-borrower Janine Raby was a financial hardship under Wells Fargo's imminent default policies, Wells Fargo sent him a denial letter stating that he had "not documented a financial hardship." Berns Decl., Ex. 29 (March 31, 2011 letter). After reviewing Mr. Raby's file, Ms. Paris concluded that Mr. Raby had a financial hardship.  Nevertheless, she claimed that Mr. Raby's application was denied because he did not satisfy the long-term hardship component of Wells Fargo's imminent default test (*i.e.,* he did not demonstrate that he was having difficulty making his payments and that the difficulty was going to last for more than 12 months).  Paris Dep., at 135:9-136:10.  Unlike the other portions of the imminent default evaluation, which were performed by an underwriter after Class Members had provided Wells Fargo with all of the data that Wells Fargo deemed necessary for the evaluation,[11] the long-term hardship determination was made by a Wells Fargo Home

---

[11] Paris Dep., at 46:1-47:9.

Preservation Specialist ("HPS") at the time of the initial interview with the borrower, based solely on the HPS's impression of the borrower's oral answers to the HPS's questions. Paris Dep., at 50:11-18; 59:18-60:4; 103:1-21.

The transcript of the HPS's initial interview of Mr. Raby demonstrates that Wells Fargo's imminent default process was massively flawed. During that interview, Mr. Raby indicated that he was divorced and was now solely responsible for making the mortgage payments for the loan he had taken out jointly with his ex-wife, that it was a "struggle" to pay the mortgage each month, that his mortgage payment would be affordable if it was reduced by about 25%, and that he was nervous and did not want to wreck his credit by defaulting on his mortgage payment.[12] Obviously, the foregoing facts easily establish that Mr. Raby was having difficulty making his mortgage payments and that the difficulty was going to continue for the foreseeable future. Yet, according to Ms. Paris, even though Mr. Raby had "demonstrated a financial hardship" (Paris Dep., at 134:17-135:11) and Wells Fargo had "recognized the divorce" (Paris Dep., at 143:12-17; 144:7-14), Wells Fargo properly concluded that Mr. Raby was not suffering from a long-term hardship based solely on the following question and answer during the interview: "KAREN: Okay. Let's see here. And do you anticipate any hardship? ROBERT RABY: No, no. It's just a struggle monthly." Raby Tr. at 8:18-21; Paris Dep., at 143:18-22.

Wells Fargo's position is absurd for multiple reasons. ***First***, the HPS asked Mr. Raby whether he anticipated any future hardship, when Wells Fargo policies required her to ask, ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*See* Berns Decl., Ex. 8 (Business Requirements Document, WA #6749-MAP2R, dated October 4, 2010). As set forth above, Mr. Raby provided a substantial amount of information during the interview demonstrating that he was having difficulty making his mortgage payments. However, the HPS never asked if Mr. Raby expected his existing hardship to last more than 12 months, as she was required to do. ***Second***, this is the only time that the HPS uses the word "hardship." She

---

[12] Berns Decl., Ex. 30 (certified transcript of audio recording of initial interview) ("Raby Tr.").

does not explain what a hardship is at any time before or after asking the question, including later in the interview when Mr. Raby stated that he was divorced from his co-borrower, which is a hardship according to Wells Fargo's test. **Third**, even though Mr. Raby indicated in response to the hardship question that "[i]t's just a struggle monthly" (i.e., he was having difficulty paying his mortgage each month), the HPS did not ask a single follow up question. **Fourth**, Mr. Raby provided Wells Fargo with a copy of his final judgment of divorce and he checked the boxes on the RMA indicating that he had a reduction in household income, excessive monthly debt payments, and insufficient cash reserves. Berns Decl., Ex. 28 (Mr. Raby's Request for Modification and Affidavit, and divorce documents).

### 3. Wells Fargo Did Not Implement the Major Change in Circumstances Test in Accordance with Its Own Policies.

As set forth above, the Major Change in Circumstances test created by Wells Fargo seeks to measure the net change in a borrower's income and principal and interest payment. Although Wells Fargo has never produced documents reflecting how it calculated "the change in income," Ms. Paris stated that Wells Fargo calculates the difference between income at loan origination and income at the time of the modification evaluation. Paris Dep., at 107:8-9. However, even though Mr. Matijevich's monthly income at origination was ▮▮▮▮▮ (Berns Decl., Ex. 16), Wells Fargo used a prior monthly income figure of ▮▮▮▮▮[13] Berns Decl., Ex. 15. Moreover, Ms. Paris's description of Wells Fargo's methodology conflicts with the Settlement Class B Notice, which provides, "[t]he comparison period shall be approximately 12 months prior to the date modification is sought; however, a greater period may be used if the condition has been consistent." Berns Decl., Ex. 4.

With respect to the change in the principal and interest payment, Wells Fargo's policies provides that the change is measured ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Berns Decl., Ex. 6

---

[13] This figure is the exact combined amount of Mr. Matijevich's monthly pension of ▮▮▮ and monthly social security after Medicare deductions of ▮▮▮ which information was provided by Mr. Matijevich in his initial interview. Berns Decl., Ex. 16 (Wells Fargo's Comments, at entry on 03/10/2011 05:07:49 PM).

(January 26, 2011 Policy, at 7).  However, Ms. Paris stated that, in practice, Wells Fargo

compares the amount that the borrower has actually been paying each month on the loan to the

fully amortizing payment.  Paris Dep. at 57:12-58:23.

#### 4. Wells Fargo Violated Its Policies by Using Automated Valuation Models and Was Unable to Provide Any Proof of the Existence of the AVM upon which It Supposedly Relied to Deny Jason Fisher's Application.

Wells Fargo's policies prohibited the use of ███████████████████████████████

████████████████████████████████.  Berns Decl., Ex. 10; Paris Dep.,

at 92:21-95:19.  Nevertheless, Wells Fargo relied on an AVM to deny Jason Fisher's application

because his LTV was supposedly ████%, which was slightly below the 80% minimum. *Id.*, at

153:13-154:8. Despite being directed by this Court to provide the complete loan modification file

for Mr. Fisher, Wells Fargo has been unable to produce a copy of the AVM for Mr. Fisher's

home.  Berns Decl., ¶23.  The failure to produce the AVM is extremely suspect because Wells

Fargo's records reflect that a full appraisal of Mr. Fisher's home on March 30, 2010 yielded a

value of $████████ while the AVM, which was supposedly performed less than nine months

later, provided a value of ████████ Berns Decl., Ex. 18 at 1.  There is no explanation as to how

the value of Mr. Fisher's home could skyrocket by over 15% in a declining housing market.

#### E. The Court Has the Power to, and Should, Compel Wells Fargo to Comply with the Settlement Agreement.

"It is well settled that a district court has the equitable power to enforce summarily an

agreement to settle a case pending before it." *Callie v. Near*, 829 F.2d 888, 890 (9th Cir. 1987);

*see also In re City Equities Anaheim, Ltd.*, 22 F.3d 954, 957 (9th Cir. 1994) ("This circuit also

recognizes a trial court's inherent enforcement power."). As part of the Settlement, the parties

agreed that "the Court shall retain *exclusive* and continuing *jurisdiction* over the Lawsuit, the

Parties, Class Members, and the Settlement Administrator *in order to interpret and enforce the

terms, conditions, and obligations under this Agreement*."  SA, § XIV.B (emphasis added).

Judge Fogel adopted this provision in the Final Approval Order. Dkt. 207, at 4.

#### 1. The Court Should Direct the Parties to Promptly Propose a Uniform Methodology for Wells Fargo to Comply with the Settlement Agreement.

Wells Fargo has previously acknowledged that HAMP requires it to employ a uniform imminent default methodology.  Dkt. 614, at 14 ("Wells Fargo must apply the same Imminent Default standard 'equally to all borrowers' or run afoul of HAMP").  That is precisely what the Court should direct it to do.  To move that process as quickly as possible, Movants propose that counsel for the parties file a joint compliance proposal with the Court within one week and that if they are unable to do so, each party submits its own proposal within that timeframe for review by the Court (or another judicial officer selected by the Court). In the event that the Court prefers to order a compliance methodology as part of its ruling on this motion, Movants present the following uniform methods for addressing the foregoing breaches of the Settlement Agreement:

- **Failure to consider non-PITIA expenses enumerated in HAMP and reasonable allowance for living expenses.**  Wells Fargo can add the monthly PITIA expenses, non-PITIA expenses, and the current national living expense amounts used by the IRS (RFJN, Ex. 3) and calculate the ratio of that figure to gross monthly income.  Then, if that ratio is over a certain percentage, a borrower will be considered in imminent default.

- **Failure to properly calculate HTI for MAP2R.**  Wells Fargo should calculate HTI in accordance with HAMP, including by using the fully amortizing PITIA payment.

- **Failure to consider the example hardships enumerated in the Settlement Class B Notice and Wells Fargo's internal policies.**  Wells Fargo should consider a borrower in imminent default if he or she satisfies any of the enumerated financial hardships.

- **Failure to properly apply the Major Change in Circumstances Test.**  For the change in income, Wells Fargo should use the prior monthly income from 12 months prior to the evaluation or a longer period if the condition has been consistent, as per the Settlement Class B Notice example.  For the change in the monthly principal and interest payment, Wells Fargo should apply the test in its policies, as explained by Ms. Paris.

- **Failure to use reliable appraisal methods.**  Wells Fargo should be required to use only the appraisal methods permitted by its own internal policies.

Any of the foregoing uniform methods can be applied retroactively (*i.e.*, based on the information submitted by the borrower in connection with the modification application Wells Fargo denied when it was using an imminent default test that breached the Settlement Agreement) or prospectively (*i.e.,* if Wells Fargo allows Class Members whose modification applications it denied when it was using an imminent default test that breached the Settlement Agreement to reapply for the Settlement Agreement's modification relief).

### F.  The Relevant Standards for Granting a Classwide Temporary Restraining Order and Preliminary Injunction

"The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction." *Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.*, 887 F. Supp. 1320, 1323 (N.D. Cal. 1995). "A preliminary injunction is not a preliminary adjudication on the merits, but a device for preserving the status quo and preventing the irreparable loss of rights before judgment." *Textile Unlimited, Inc. v. A.BMH & Co., Inc.*, 240 F.3d 781, 786 (9th Cir. 2001).  The decision whether to enter a preliminary injunction is within the broad discretion of a district court.  *Rendish v. City of Tacoma*, 123 F.3d 1216, 1219 (9th Cir. 1997).

A party seeking preliminary injunctive relief must establish the following four factors: (1) that she is likely to succeed on the merits, (2) that she is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in her favor, and (4) that an injunction is in the public interest.  *Yue v. Conseco Life Ins. Co.*, 282 F.R.D. 469, 480 (C.D. Cal. 2012) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  "'Serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

> Under the "serious questions" approach to a preliminary injunction, "[t]he elements of the preliminary injunction test must be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). Irrespective of its approach, a court must balance the competing alleged harms while considering the effects on the parties of the granting or withholding of the injunctive relief. *Winter*, 555 U.S. at 24. In exercising that discretion, a court must also consider the public consequences of the extraordinary remedy. *Id.*

*Lane v. CitiMortgage, Inc.*, No. 2:14-CV-02295-KJM, 2014 WL 6670648, at *3 (E.D. Cal. Nov. 21, 2014).

In this case, as explained below, each relevant factor weighs in favor of enjoining Wells Fargo from foreclosing on the homes of the Class Members who were denied for either failure

to meet imminent default criteria or failure to document a financial hardship until Wells Fargo complies with the terms of the Settlement Agreement.

### 1. Movants Have a Strong Likelihood of Success on the Merits of Their Motion to Enforce Settlement Agreement's Imminent Default Standards.

As discussed above, Wells Fargo has violated the terms of the Settlement Agreement's imminent default standards in numerous ways. Wells Fargo also failed to comply with its own imminent default policies. As such, Movants easily establish this factor.

### 2. Class Members Will Experience Irreparable Harm If Preliminary Relief Is Denied.

The purpose of a TRO is to "preserv[e] the status quo and prevent[] irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974). If temporary injunctive relief is denied, any foreclosure sales or evictions that occur will cause Movants and other similarly situated Class Members irreparable harm. It is well-settled that losing one's home through foreclosure can constitute irreparable harm. *See, e.g., Osorio v. Wells Fargo Bank*, No. C 12-02645 RS, 2012 WL 1909335, at *3 (N.D. Cal. May 24, 2012) ("Many courts have recognized that losing one's home through foreclosure constitutes irreparable harm"); *Bland v. Carone Family Trust*, 2007 WL 951344, at *3 (S.D. Cal. Mar. 19, 2007 ) ("The Court finds irreparable harm if plaintiffs' residence is sold prior to determining the merits of plaintiffs' claims."). That harm would be particularly egregious here, because if the Court orders Wells Fargo to comply with the Settlement Agreement, but does not enjoin Wells Fargo from continuing or commencing foreclosure activity, then it will effectively be putting its imprimatur on "dual-tracking" (*i.e.*, foreclosure activity while a borrower is being evaluated for a modification). This will increase the likelihood that a Class Member will lose his or her home before being properly evaluated for a modification in accordance with the Settlement Agreement.

The Federal Consumer Financial Protection Bureau's regulations specifically prohibit foreclosures when a complete loss mitigation application is received at least 37 days before a

foreclosure sale unless certain specific conditions are satisfied.[14] 12 CFR § 1024.41(g). In California, the Homeowner's Bill of Rights ensures that homeowners "who may qualify for a foreclosure alternative are considered for, and have a meaningful opportunity to obtain, available loss mitigation options . . . such as loan modifications or other alternatives to foreclosure" (Cal. Civ. Code § 2923.4(a)), by, among other things,  prohibiting a mortgage servicer or authorized agent from recording a notice of default, recording a notice of sale, or proceeding to foreclosure while review of a complete loan modification application is pending. Cal. Civ. Code § 2923.6(c). Wells Fargo is well familiar with dual-tracking, as it agreed in 2012 to a dual-tracking ban as part of the National Mortgage Settlement.[15]

Here, if the Court directs Wells Fargo to comply with the Settlement Agreement by re-reviewing modification applications (or allowing for a new application period), but does not prevent Wells Fargo from commencing or continuing foreclosure or eviction activity, Class Members will suffer irreparable harm because they could lose the ability to be considered for a loan modification.  This was precisely the basis for a recent preliminary injunction ordered by Judge Wilken in *Gilmore v. Wells Fargo Bank N.A.*, No. C 14-2389 CW, 2014 WL 3749984 (N.D. Cal. July 29, 2014).  There, the court, in granting a borrower's motion to enjoin foreclosure proceedings, recognized that the irreparable harm included not just the loss of real property, but also the "depriv[ation] of a meaningful opportunity to be considered for available loss mitigation options, which is his right under the HBOR. This situation is exactly the sort of harm that the HBOR was intended to prevent -- borrowers unable to achieve a meaningful and

---

[14] A servicer shall not move for foreclosure judgment or order of sale, or conduct a foreclosure sale, unless: (1) the servicer informs the borrower that the borrower is not eligible for any loss mitigation option (and any appeal has been exhausted); (2) the borrower rejects all loss mitigation offers; or (3) the borrower fails to comply with the terms of a loss mitigation option such as a trial modification. 12 C.F.R. § 1024.41(g)(1)-(3).

[15] The National Mortgage Settlement prohibits Wells Fargo from proceeding with a foreclosure sale for borrowers who have submitted a complete loan modification application 37 days before the scheduled sale date, and from referring to foreclosure a borrower who has submitted a complete loan modification application within 120 days of delinquency.  *See* RFJN, Ex. 4 (*U.S. v. Bank of America*, No. 1:12-cv-00361-RMC (D.D.C.), Consent Judgment filed April 4, 2012, Exhibit A (Settlement Term Sheet), at A17-A21).

---

MPA iso *Ex Parte* Mot. for TRO, OSC re: Preliminary Injunction and Motion to Enforce
3:09-MD-02015-RS-KAW

clear review of their loan modification applications." *Id*. at \*5. *See also Reed v. Wells Fargo Bank*, No. C 11-00194 JSW, 2011 WL 1793340, at \*6 (N.D. Cal. May 11, 2011) ("Plaintiffs have applied for modification of the Home loan which would be rendered moot if Plaintiffs lose the Home to foreclosure while the loan modification application is still pending.").

Here, Wells Fargo denied loan modification applications submitted by each of the Movants when it was using an imminent default test that did not comply with the Settlement Agreement and it has now begun foreclosure proceedings, or provided notice of its intent to begin foreclosure proceedings, against most of them. Berns Decl., Exs. 23, 24, 31-36; RFJN, Exs. 5, 6.  Moreover, there are thousands of other Class Members whose modification applications were denied when Wells Fargo was using an imminent default test that did not comply with the Settlement Agreement, as between December 16, 2010 and June 30, 2013, Wells Fargo denied a total of ███ loan modification requests based on failure to meet imminent default criteria and failure to document a financial hardship.[16]  *See* Berns Decl., Ex. 26 (Quarterly Summary Reports). If Wells Fargo is permitted to continue with (or commence) foreclosure and eviction proceedings against Movants and other similarly situated Class Members, despite its clear breach of the Settlement Agreement's imminent default standards, any of those borrowers could be deprived of the ability to benefit from any actions the Court takes to remedy Wells Fargo's use of an improper imminent default test.  Moreover, compensatory damages are legally inadequate here based upon the unique value of real property.  *See Sharma v. Provident Funding Associates, LP,* No. C 09-5968 VRW, 2010 WL 143473, \*1 (N.D. Cal. Jan. 8, 2010) ("Property is considered unique, and therefore the court finds that plaintiffs' remedy at law, damages, would be inadequate."); *Bitker v. Suntrust Mortgage, Inc.,* No. 13CV656-CAB WMC, 2013 WL 2450587, at \*2 (S.D. Cal. Mar. 29, 2013) (quoting *Johnson v. U.S. Dept. of Agriculture*, 734 F.2d 774, 789 (11th Cir. 1984)

---

[16] As set forth above, Wells Fargo denied the modification applications ███ Class Members because their HTIs were below 31% (*i.e.,* they supposedly failed the first step of the imminent default analysis).  As Wells Fargo was not calculating HTIs in the manner required by HAMP for MAP2R modifications, all of these denials are also questionable.

MPA iso *Ex Parte* Mot. for TRO, OSC re: Preliminary Injunction and Motion to Enforce
3:09-MD-02015-RS-KAW

("'Real property and especially a home is unique' and '[i]rreparable injury is suffered when one is wrongfully ejected from his home'"); *Sundance Land Corp. v. Cmty. First Fed. Sav. & Loan Ass'n*, 840 F.2d 653, 661 (9th Cir. 1988) ("Since the property at issue is unique, Sundance's legal remedy—i.e., damages—is inadequate").

Movant Katherine Palko is a prime example of a Class Member who is imminent danger of being displaced from her home even though her modification application was not properly evaluated by Wells Fargo in accordance with the Settlement Agreement's imminent default provisions.  In June 2011, Ms. Palko applied for a loan modification at a time when she was suffering from reduced income due to a decrease in demand for her services as a psychologist and increased expenses, both of which hardships were set forth on her RMA.  Berns Decl., Ex. 38.  Additionally, her RMA reflected gross monthly income of [REDACTED] and monthly housing and other debt payments of $[REDACTED]  Berns Decl., Ex. 38.  This left her with only $[REDACTED] per month to pay all of her other living expenses, including the living expenses for which Wells Fargo was supposed to include a "reasonable allowance" in its imminent default analysis.  This is below the IRS's National Standards: Food, Clothing and Other Items guidelines' allowance for reasonable living expenses of $583 for one person.  RFJN, Ex. 3.

Despite the foregoing facts, Wells Fargo improperly denied Ms. Palko's application under HAMP because she purportedly had sufficient "net income" to make her mortgage payments and under MAP2R because she did not meet imminent default criteria.   Berns Decl., Ex. 39.  Of course, the denial for sufficient "net income" was improper and ironic, as Wells Fargo has consistently told this Court that it cannot possibly evaluate imminent default using net income. *See, e.g.,* Dkt. 614 at 16. Moreover, the denial for failure to meet imminent default criteria was also improper, as Wells Fargo did not consider all of Ms. Palko's monthly expenses and a reasonable allowance for living expenses, both of which this Court has held are required by the HAMP guidance incorporated into the Settlement Agreement that applies to MAP2R evaluations.  Dkt. 634 at 8; Dkt. 644 at 4-5.

Subsequent to Wells Fargo's improper HAMP and MAP2R imminent default denials,

Ms. Palko defaulted in making her mortgage payments and Wells Fargo commenced foreclosure proceedings.  RFJN, Ex. 7.  Her house, which she has lived in for over ten years, was sold at a foreclosure sale on January 29, 2015 and Wells Fargo has the right to evict Ms. Palko and her husband any time.  Berns Decl., ¶46.  If Ms. Palko is removed from her home (or makes arrangements with Wells Fargo to voluntarily vacate their home to avoid the embarrassment of eviction), and this Court orders equitable relief for Class Members who were denied loan modification applications during the time when Wells Fargo was violating the Settlement Agreement, she will have lost the opportunity to save her home without Wells Fargo ever having determined if she was eligible for reduced monthly mortgage payment under the terms of the Settlement Agreement.  Thus, a TRO is necessary to prevent this irreparable harm.

Based on the foregoing, the irreparable harm factor weighs strongly in favor of the Court's issuance of a temporary restraining order here.

### 3.   The Balance of Hardships Overwhelmingly Favors Movants.

The balance of hardships strongly favors issuing a TRO to preserve the status quo until a hearing can be held regarding the request for a preliminary injunction.  If a TRO is not granted, Class Members will continue to lose their homes or face the threat of foreclosure and have to exhaust their resources to make their unmodified mortgage payments, thereby subjecting themselves and their families to long-term economic hardships and damaged credit ratings.

By contrast, Wells Fargo's only possible economic harm -- from a delayed foreclosure where a loan modification denial is determined to be proper under the correct imminent default standard that Wells Fargo willfully failed to employ -- is time-limited.  However, as set forth above, Wells Fargo is already subject to multiple dual-tracking bans.  Finally, Wells Fargo will still have a security interest in the Class Member's property.  *See Tamburri v. Suntrust Mortgage, Inc.*, No. C-11-2899 EMC, 2011 WL 2654093, at *2 (N.D. Cal. July 6, 2011) ("it is hard to conceive of a serious hardship to Suntrust specifically or even Defendants generally because any security they have in the real property would still remain").

Thus, the balance of hardships weighs in favor of issuing a TRO.[17]

### 4. A Preliminary Injunction Is in The Public Interest.

The public interest weighs strongly in favor of issuing a temporary restraining order here. First, the fact that the contract whose breach is at issue is a court-approved settlement agreement raises a strong public interest in its enforcement. *See*, *e.g.*, *Bianchi v. Perry*, 140 F.3d 1294, 1297 (9th Cir. 1998) ("We share the Federal Circuit's concern that 'there is a compelling public interest in upholding and enforcing settlement agreements voluntarily entered into.'") (quoting *Bank of Am. Nat'l Trust & Sav. Ass'n v. United States*, 23 F.3d 380, 383 (Fed. Cir. 1994)). Second, the public has a strong interest in the issuance of an injunction that may prevent improper foreclosures where Class Members may have had contractual rights to modification of their mortgages. *See Tamburri*, 2011 WL 2654093, at *5 ("Numerous courts have indicated that it is in the public interest to allow homeowners an opportunity to pursue what appear to be valid claims before being displaced from their homes.") (citations omitted); *Paik v. Wells Fargo Bank, N.A.*, No. C 10-04016 WHA, 2011 WL 109482, at *5 (N.D. Cal. Jan. 13, 2011) ("If in fact defendants did not comply with their obligations and we had not granted preliminary relief, we would have turned plaintiff out—potentially without recourse. This would not be the first time that a bank shirked its legal responsibilities to aid a struggling borrower trying to pay back her loan. It is in the public interest to allow such borrowers a full and fair opportunity to show that they were not given all the benefits that the law afforded when they make a preliminary showing that something was amiss.").

The public interests implicated thus weigh strongly in favor of issuing the proposed TRO.[18]

---

[17] Movants are proposing an expedited briefing schedule in order to minimize the time in which the TRO will be in effect. As the parties have briefed the imminent default issues numerous times (albeit before Wells Fargo provided discovery), there is no reason for a lengthy briefing schedule.

[18] The Court also has the power to enjoin judicial foreclosure proceedings under the all Writs Act. 28 U.S.C. § 1651(a) (Court have the authority to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law"); *In re Wachovia Corp.*, No. 5:09-MD-02015, 2013 WL 5423604, at *1 (N.D. Cal. Sept. 25, 2013) (federal courts may "enjoin state court proceedings that 'interfere, derogate, or conflict with federal judgments, orders, or settlements'").

1    **IV.**    **THIS COURT SHOULD DISPENSE WITH THE BOND REQUIREMENT**

2       A district court may dispense with the filing of a bond when it concludes there is no

3 realistic likelihood of harm to the defendant from enjoining his or her conduct, as Rule 65(c)

4 invests the district court "with discretion as to the amount of security required, if any." *See*

5 *Barahona–Gomez v. Reno,* 167 F.3d 1228, 1237 (9th Cir. 1999) (citing *Doctor's Assoc., Inc. v.*

6 *Stuart,* 85 F.3d 975, 985 (2d Cir. 1996); *see also Rivera v. BAC Home Loans Servicing, L.P.*,

7 2010 WL 2280044, at *2 (N.D. Cal. June 7, 2010) (refusing to impose a security bond since

8 "defendants face no realistic likelihood of harm from temporary restraint of the foreclosure

9 proceedings."). Here, a bond is not necessary because Wells Fargo faces no likelihood of any

10 substantial harm, or minimal injury if any, if enjoined from foreclosing on Class Members'

11 homes during the brief period of time until a hearing on Movants' request for preliminary

12 injunction can be had. Any bond required here should be nominal.

13    **V.**    **CONCLUSION**

14       For the foregoing reasons, the Court should issue a temporary restraining order to enjoin

15 Wells Fargo from foreclosing, selling, or attempting to sell through public sale or otherwise, or

16 seeking to evict Class Members (or their families) from, any mortgaged premises owned by a

17 Settlement Class B or C Member whose loan modification application was denied during the

18 relevant period for either failure to meet imminent default criteria or failure to document a

19 financial hardship until Movants' request for a preliminary injunction can be heard, and order

20 expedited briefing on that application. Thereafter, the Court should grant the motion to enforce

21 and enjoin the foregoing conduct until Wells Fargo complies with the Settlement Agreement.

22

23   DATED: March 3, 2015          **BERNS WEISS LLP**

24              By:   <u>/s/ *Jeffrey K. Berns*</u>

25                 Jeffrey K. Berns (SBN 131351)
                jberns@law111.com

26                 20700 Ventura Blvd., Suite 140
                Woodland Hills, CA 91364

27                 Telephone: (818) 961-2000
                Facsimile: (818) 999-1500

28                 Lee A. Weiss (SBN 297834)

MPA iso *Ex Parte* Mot. for TRO, OSC re: Preliminary Injunction and Motion to Enforce
3:09-MD-02015-RS-KAW

lweiss@law111.com
585 Stewart Avenue, Suite L-20
Garden City, NY 11530
Telephone: (516) 222-2900
Facsimile: (818) 999-1500

*Attorneys for Movants Jason Fisher, Francis Matijevich, Robert Raby, Omar and Ruth Bishr, Eleanor Green, Paul Lettich, Kenneth R. Henry, Katherine Palko, Marvin J. Landes and the Settlement Class*

MPA iso *Ex Parte* Mot. for TRO, OSC re: Preliminary Injunction and Motion to Enforce
3:09-MD-02015-RS-KAW