**BERNS WEISS LLP**
Jeffrey K. Berns (SBN 131351)
jberns@law111.com
20700 Ventura Blvd., Suite 140
Woodland Hills, CA 91364
Telephone: (818) 961-2000
Facsimile: (818) 999-1500

Lee A. Weiss (SBN 297834)
lweiss@law111.com
585 Stewart Avenue, Suite L-20
Garden City, NY 11530
Telephone: (516) 222-2900
Facsimile: (818) 999-1500

*Attorneys for Class Representative*
*Dolores Mandrigues and the Settlement Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: WACHOVIA CORP. "PICK-A-PAYMENT" MORTGAGE MARKETING AND SALES PRACTICES LITIGATION<br><br>_____<br><br>*This Document Relates to*:<br><br>ALL INCLUDED ACTIONS | CASE NO. 3:09-MD-02015-RS<br><br>[*Assigned to the Hon. Richard Seeborg*]<br><br>**CLASS REPRESENTATIVE'S NOTICE OF APPEAL AND NINTH CIRCUIT RULE 3-2 REPRESENTATION STATEMENT** |

NOTICE IS HEREBY GIVEN that Class Representative Dolores Mandrigues hereby appeals to the United States Court of Appeals for the Ninth Circuit from portions of the Order on Motion to Enforce Settlement of the United States District Court for the Northern District of California, the Honorable Richard Seeborg, United States District Judge, presiding, entered on April 15, 2015 (Dkt. No. 682), relating to 1) the District Court's determination that the Settlement Agreement only required Wells Fargo to comply with HAMP imminent default guidance where the Settlement Agreement was silent as to an issue covered by that guidance, 2) the District Court's determination that "despite Wells Fargo's apparent failure to comply with mandatory HAMP guidance, plaintiffs have not demonstrated that they are entitled to any relief," and 3) the District Court's determination that the notice of the settlement set forth the only hardship factors that Wells Fargo was required to consider in its imminent default analyses.

A copy of the Order is attached hereto as Exhibit A.


DATED:  May 15, 2015                    Respectfully submitted,

                                        **BERNS WEISS LLP**

                          By:    /s/ Jeffrey K. Berns
                               Jeffrey K. Berns (SBN 131351)
                               jberns@law111.com
                               20700 Ventura Blvd., Suite 140
                               Woodland Hills, CA 91364
                               Telephone:  (818) 961-2000
                               Facsimile:   (818) 999-1500

                               —and—

                               Lee A. Weiss (SBN 297834)
                               lweiss@law111.com
                               585 Stewart Avenue, Suite L-20
                               Garden City, NY 11530
                               Telephone:  (516) 222-2900
                               Facsimile:   (818) 999-1500

                               *Attorneys for Class Representative Dolores*
                               *Mandrigues and the Settlement Class*

## Ninth Circuit Rule 3-2 Representation Statement

Class Representative Dolores Mandrigues is represented by:

> **BERNS WEISS LLP**
> Jeffrey K. Berns (SBN 131351)
> jberns@law111.com
> 20700 Ventura Blvd., Suite 140
> Woodland Hills, CA  91364
> Telephone:      (818) 961-2000
> Facsimile:      (818) 999-1500
>
>              -and-
>
> **BERNS WEISS LLP**
> Lee A. Weiss (SBN 297834)
> lweiss@law111.com
> 585 Stewart Avenue, Suite L-20
> Garden City, NY  11530
> Telephone:      (516) 222-2900
> Facsimile:      (818) 999-1500

Defendant Wells Fargo Bank, N.A. is represented by:

> **LOCKE LORD LLP**
> Regina J. McClendon (CA SBN 184669)
> rmcclendon@lockelord.com
> 44 Montgomery Street, Suite 4100
> San Francisco, CA 94104
> Telephone:      415-318-8810
> Fax:              415-676-5816
>
> **LOCKE LORD LLP**
> Robert T. Mowrey (pro hac vice)
> rmowrey@lockelord.com
> Jason L. Sanders (CA SBN 230245)
> jsanders@lockelord.com
> 2200 Ross Avenue, Suite 2200
> Dallas, TX 75201
> Telephone:      214-740-8000
> Fax:              214-740-8800
>
> **ANGLIN, FLEWELLING, RASMUSSEN,**
> **CAMPBELL & TRYTTEN LLP**
> Mark T. Flewelling (CA SBN 96465)
> mflewelling@afrct.com

Yaw-Jiun (Gene) Wu (CA SBN 228240)
gwu@afrct.com
Leigh O. Curran (CA SBN 173322)
lcurran@afrct.com
199 So. Los Robles Ave., Suite 600
Pasadena, CA 91101
Telephone:      626-535-1900
Fax:               626-577-7764

**WINSTON & STRAWN LLP**
Amanda L. Groves (CA SBN 187216)
agroves@winston.com
101 California Street
San Francisco, CA 94111-5802
Telephone:      (415) 591-1000
Facsimile:      (415) 591-1400

**WINSTON & STRAWN LLP**
T. Thomas Cottingham, III (admitted *pro hac vice*)
tcottingham@winston.com
Stacie C. Knight (admitted *pro hac vice*)
sknight@winston.com
100 North Tryon Street, Suite 2900
Charlotte, NC 28202-1078
Telephone:      (704) 350-7700
Facsimile:      (704) 350-7800

DATED:  May 15, 2015                    Respectfully submitted,

                                    **BERNS WEISS LLP**

                              By:   _/s/ Jeffrey K. Berns_
                                    Jeffrey K. Berns (SBN 131351)
                                    jberns@law111.com
                                    20700 Ventura Blvd., Suite 140
                                    Woodland Hills, CA 91364
                                    Telephone:  (818) 961-2000
                                    Facsimile:   (818) 999-1500

                                    —and—

                                    Lee A. Weiss (SBN 297834)
                                    lweiss@law111.com
                                    585 Stewart Avenue, Suite L-20
                                    Garden City, NY 11530
                                    Telephone:  (516) 222-2900
                                    Facsimile:   (818) 999-1500

*Attorneys for Class Representative Dolores
Mandrigues and the Settlement Class*

Exhibit A

1
2
3
4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6
7   IN RE: WACHOVIA CORP. "PICK-A-
    PAYMENT" MORTGAGE MARKETING          Case No.  09-md-02015-RS
8   AND SALES PRACTICES LITIGATION

9                                        **ORDER ON MOTION TO ENFORCE**
                                         **SETTLEMENT**
10
11
12
13                          I.      INTRODUCTION

14          In a battle seemingly without end, plaintiffs, representatives of the Pick-a-Payment

15   ("PAP") mortgage settlement class, move for an order finding that defendant Wells Fargo

16   breached the parties' 2011 agreement resolving the underlying litigation.  They contend Wells

17   Fargo employs an inconsistent and improper standard to deny applications for loan modification

18   on the grounds that class members are not at imminent risk of default.  Wells Fargo counters that it

19   is invested with substantial discretion to develop and implement imminent default standards and

20   claims its policies are fully compliant with the agreement.

21          While the agreement affords Wells Fargo some flexibility in crafting and applying its

22   imminent default standards, its discretion is limited by the plain terms of the settlement and

23   federal loan modification guidelines incorporated therein.  As explained in more detail below,

24   Wells Fargo failed to develop and implement imminent default procedures consistent with the

25   settlement agreement.  The parties shall meet and confer to develop a joint proposal for

26   remediation of Wells Fargo's violations.  Further, Wells Fargo shall file a supplemental brief

27   explaining its financial hardship policies in greater detail.

28

United States District Court
Northern District of California

## II.   BACKGROUND

On December 10, 2010, the parties executed a settlement agreement ("the agreement") to resolve claims arising out of the origination of PAP mortgage loans.  Among other benefits, Wells Fargo promised to make two loan modification programs available to qualifying settlement class members with outstanding PAP loans:  the federal government's Home Affordable Mortgage Program ("HAMP") and a proprietary Wells Fargo program called MAP2R.

The agreement divides the settlement class into three groups.  Relevant for the purposes of the instant dispute, Class B members are defined as borrowers who still had a PAP loan at the time of the settlement and were not then in default and Class C members are defined as borrowers already in default.  Agreement § IV(B)-(C).  Because of their existing default status, Class C members were immediately eligible for loan modification review.  Pursuant to the agreement, Class B members were also prospectively entitled to loan modification if they later defaulted on their loans or could demonstrate they were at imminent risk of default at any time during the period from December 18, 2010 until June 30, 2013.[1]  Agreement § VI(E).

This court retained jurisdiction to enforce the terms of the settlement, which is governed by California law.  *Id.* §§ XIV(B), XVII(B).  In their present motion to enforce the settlement, plaintiffs contend that Wells Fargo breached the agreement by crafting an unduly restrictive imminent default evaluation process and improperly applied the standards it did develop.  This is not the first time plaintiffs have identified alleged deficiencies in Wells Fargo's imminent default procedures.  In two prior orders—one issued on May 8, 2014 ("May Order") and the other on June 26, 2014 ("June Order")—this court addressed related claims brought by plaintiffs.

As a consequence of their previous motions, plaintiffs were granted limited discovery:  Wells Fargo's written policies governing imminent default and a deposition of a witness

---

[1] Although the loan modification period specified in the agreement closed almost two years ago, in light of the need to define the parties' prospective rights and responsibilities in connection with future remediation, this order generally refers to Wells Fargo's imminent default obligations in the present tense.

knowledgeable about the bank's methodology.  Over the ensuing months, Wells Fargo ultimately provided the required discovery materials and produced Claire Paris (an executive familiar with the bank's imminent default procedures) for deposition.   After receiving this discovery, plaintiffs renewed their motion, contending once again that Wells Fargo's imminent default procedures do not comply with the requirements of the agreement.[2]  At the hearing on plaintiffs' motion, the parties did little to crystallize the issues presented in their moving papers.  Accordingly, they were ordered to submit a joint supplemental brief.

### III.   LEGAL STANDARD

"The construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally."  *O'Neil v. Bunge Corp.*, 365 F.3d 820, 822 (9th Cir. 2004) (internal citations and quotation marks omitted).  In construing a contract under California law, "the trial court gives effect to the mutual intention of the parties as it existed at the time the contract was executed."  *Cachil Dehe Band of Wintun Indians v. California*, 618 F.3d 1066, 1073 (9th Cir. 2010) (quoting Cal. Civ. Code § 1639) (internal quotation marks omitted).

"Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms."  *Id.*  (internal citation and quotation marks omitted).  "Any contract must be construed as a whole, with the various individual provisions interpreted together so as to give effect to all, if reasonably possible or practicable."  *People v. Doolin*, 45 Cal. 4th 390, 413 n. 17 (2009) (citing Cal. Civ. Code § 1641).

---

[2] Plaintiffs initially sought a temporary restraining order (which was denied) and a preliminary injunction.  At the preliminary injunction hearing, however, plaintiffs set aside their request for immediate injunctive relief and characterized their filing instead as a simple motion to enforce the settlement agreement.

United States District Court
Northern District of California

United States District Court
Northern District of California

IV.     DISCUSSION

A.     <u>Wells Fargo's Imminent Default Obligations</u>

     1.     *The Agreement*

       Contract interpretation is aimed at discerning the "mutual intention of the parties," gleaned from the plain language of disputed provisions "construed in the context of the agreement as a whole." *Pardee Const. Co. v. Ins. Co. of the West*, 77 Cal. App. 4th 1340, 1352 (2000).  The settlement agreement in this case, in addition to providing pecuniary relief, creates an affirmative obligation to "make loan modifications available for Settlement Class B Members in Imminent Default [or] who later become in Imminent Default."  Agreement § VI(E).  The agreement defines the term "imminent default" as:

> [A] Borrower (as defined in Section 1.7) who the Defendants have determined, in accordance with applicable HAMP guidance, as necessary, that default by the Borrower in making scheduled payments on his or her Pick-a-Payment mortgage loan is reasonably foreseeable.   In assessing whether a Borrower is facing Imminent Default, the Defendants will not consider funds held in a 401K, 457, 401(a), or 503 retirement account, an IRA, SEP IRA, Simple IRA, or Roth IRA. Additionally, the fact that a Borrower is projected to Recast to a fully amortizing payment under the terms of the Pick-a-Payment mortgage loan within the upcoming four (4) contractual Monthly Payments (as defined in Section 1.41 hereafter) using the current applicable interest rate as determined under the terms of the note, and the resulting increase, if any, to the respective Borrower's DTI (as defined in Section 1.22) shall be considered as a factor in the determination of Imminent Default. [Agreement § I, 1.33]

       Before wading into the parties' dispute as to the ultimate import of this definition, a few basic observations must be made.  First, it is clear that the agreement imposes a discretionary responsibility on Wells Fargo.  As loan servicer, it is affirmatively obligated by the agreement to evaluate loan modification applicants to determine whether they are at imminent risk of default.  At the same time, Wells Fargo is empowered by the agreement to discriminate among prospective candidates for loan modification, offering benefits to some borrowers but not others.  *Id.* (loan modification must be made available to borrowers "*the Defendants have determined*" to be at imminent risk of default) (emphasis added).   Finally, Wells Fargo's discretion in this regard is limited:  it is required to make imminent default determinations "in accordance with applicable HAMP guidance, as necessary."  *Id.*

The Class B Notice ("notice"), negotiated by the parties and expressly incorporated into the terms of the agreement, gives further contours to Wells Fargo's imminent default responsibilities:

Imminent Default describes a borrower who meets a test to show the borrower is reasonably likely to default on his or her Pick-a-Payment mortgage because of financial hardship or other changed circumstances. Generally, the current test for "Imminent Default" is as follows:

1. Long Term Hardship, meaning a borrower that is having difficulty making his or her mortgage payments and the duration of that difficulty is expected to be greater than 12 months; and

2. Financial Hardship, defined as one of the following that currently exists or occurs prior to June 30, 2013:

   a. Death of a borrower;

   b. Long-term or permanent disability or illness of a borrower or dependent family member;

   c. Legally-documented divorce or separation of the borrower and coborrower;

   d. Separation of borrowers unrelated by marriage, civil union, or similar civil domestic partnership under applicable law;

   e. A combination of reduction of income and increase in housing expenses (principal and interest only) that exceeds 10% of current income. The comparison period shall be approximately 12 months prior to the date modification is sought; however, a greater period may be used if the condition has been consistent; and

3. Cash reserves of less than $25,000, excluding retirement accounts; and

4. The property is occupied by the borrower as his or her principal residence; and

5. The borrower's loan-to-value ratio must exceed 80%, or the loan must have a positive "Net Present Value."

The enumerated financial hardships found in the notice are expressly incorporated into the agreement's definition of imminent default. *See* May Order at 6.

United States District Court
Northern District of California

2.    *Prior Orders*

Like other post-settlement skirmishes, much of the instant dispute focuses on whether Wells Fargo's imminent default policies are "in accordance with applicable HAMP guidance, as necessary."   Neither the May nor June Order delineates the precise extent to which HAMP guidance[3] must bear on Wells Fargo's imminent default analysis.   Instead, as those Orders make clear, while the agreement's definition of imminent default clearly contemplates reference to federal loan modification guidelines, other provisions limit the degree to which Wells Fargo is required to rely on HAMP guidance.

The May Order addressed two questions regarding Wells Fargo's imminent default obligations under the agreement.  First, it rejected plaintiffs' argument that Wells Fargo improperly limited its financial hardship analysis to the five factors listed in the class notice rather than more expansive HAMP guidance issued by the federal government.  As the Order determined, the agreement provides "for loan modification only upon a finding that the borrower has experienced one of the five grounds for financial hardship specified in the class notice."  In addition, the May Order denied plaintiffs' claim that the agreement requires an accounting of tax liabilities in assessing imminent default.   In so holding, the Order observed that while HAMP imminent default guidelines contain no reference to tax liabilities, they do, in contrast, require servicers to consider various other enumerated expenses.

The June Order dealt with plaintiffs' renewed motion to enforce the settlement, predicated again on the argument that Wells Fargo's imminent default test does not comply with the agreement.  As the June Order observed, Wells Fargo advanced "various articulations of its imminent default analysis" in post-settlement proceedings.  At the hearing on plaintiffs' renewed motion, Wells Fargo described its imminent default analysis as entailing six distinct steps, largely mirroring the terms of the notice.  While this "latest articulation" of the test did not "necessarily

---

[3] The "HAMP guidance" in effect at the time of the settlement was the Making Home Affordable Program Handbook for Servicers of Non-GSE Mortgages, Version 2.0 (September 22, 2010) ("HAMP Handbook," "guidelines," or "guidance").

contradict the terms of the settlement agreement," this court found "troubling" Wells Fargo's

continued equivocation "on its process for complying with the terms of a settlement agreement

entered by the parties more than three and a half years ago."[4]

Although the foregoing orders touch on Wells Fargo's obligations under the HAMP

guidelines, neither one expressly defines the boundaries of the lender's responsibilities.  Given the

parties' present dispute, unequivocal instruction is now required.  The phrase "in accordance with

applicable HAMP guidance, as necessary" must be interpreted as it relates to Wells Fargo's

obligation to consider non-mortgage obligations and living expenses in its imminent default

analysis.

> 3.      *"HAMP Guidance, As Necessary"*

Despite the plain language of the agreement and the direction provided by prior orders,

there remains a wide gulf between the parties' views on the extent to which Wells Fargo was

required to incorporate HAMP guidance into its imminent default procedures.  The parties seem to

have almost no idea what, exactly, they agreed to more than four years ago.   Despite the

expenditure of considerable rhetorical resources, neither has proposed a sensible interpretation of

the phrase "in accordance with applicable HAMP guidance, as necessary."

According to plaintiffs, the settlement agreement establishes the following framework:  (1)

any class member who meets the criteria enumerated in the notice must be deemed by Wells Fargo

to be at imminent risk of default; and (2) if a class member does not satisfy the test in the notice,

Wells Fargo is then required to consider separately whether the applicant's default was reasonably

foreseeable under the HAMP guidelines.  This interpretation finds no support in the language of

the agreement.  Further, plaintiffs' vision of a two-step imminent default process is in direct

conflict with the law of this case.  In no uncertain terms, the May Order determined that the parties

had, in the notice, agreed upon a narrower test for financial hardship than that found in the HAMP

---

[4] As evidenced by the above language, contrary to Wells Fargo's characterizations, this court has
not affirmatively "approved" the servicer's imminent default test in its entirety.

United States District Court
Northern District of California

1    guidelines.  The HAMP hardship criteria discussed in that Order are not incorporated into the

2    agreement, which provides "for loan modification *only upon* a finding that the borrower has

3    experienced one of the five grounds for financial hardship specified in the class notice" (emphasis

4    added).   Yet, per the interpretation now advanced by plaintiffs, if an applicant does not satisfy

5    these criteria, Wells Fargo is nevertheless required to conduct a separate imminent default analysis

6    under the framework of the broader HAMP guidelines.  Their proposal is foreclosed by the plain

7    language of the May Order.

8             Plaintiffs' interpretation is crystalline, however, when compared to Wells Fargo's opaque

9    and internally contradictory construction.  The lender first suggests that the agreement gives it "the

10   right to determine when, and to what extent, it [is] 'necessary' to refer to HAMP guidance."

11   According to Wells Fargo, this discretion is limited only by (1) terms of the notice, which requires

12   that the test "always be 'generally' the same as the then-'current' test," and (2) general principles

13   of contract law.  Inconsistently, Wells Fargo later concedes that the agreement requires an

14   accounting of non-mortgage monthly expenses, thus obviating its claim of the right to determine

15   when reference to HAMP guidance is "necessary."

16            It is true that the generous terms of the agreement ("the *Defendants* have *determined*")

17   imbue Wells Fargo with discretion to develop the exact contours of its imminent default test.   But,

18   again, its discretion is clearly cabined by the requirement that it arrive at standards "in accordance

19   with applicable HAMP guidance, as necessary."  That language does not confer upon Wells Fargo

20   license to choose when reliance on HAMP guidance is necessary and, when necessary, the degree

21   of such reliance.

22            Instead, reasonably construed, the phrase "in accordance with applicable HAMP guidance,

23   as necessary" embodies an intent that gaps in the agreement's broad definition of imminent default

24   be filled by the terms of specific and mandatory obligations created by federal program guidelines.

25   This portion of the agreement did not, of course, prevent the parties from contracting out of the

26   HAMP guidelines and into more specific imminent default criteria, as they did in agreeing upon

27   the limited financial hardship criteria listed in the notice.  Where, however, the agreement is silent,

28

United States District Court
Northern District of California

United States District Court
Northern District of California

it incorporates mandatory imminent default guidance found in the HAMP handbook into its imminent default procedures. Wells Fargo is not permitted to determine unilaterally when reliance on HAMP guidance is "necessary"; the bounds of necessity are supplied by the terms of the federal guidelines themselves.

    4. *Non-Mortgage "Monthly Obligations" and "Living Expenses"*

    With these principles in place, it is evident that Wells Fargo is required under the agreement to consider "monthly obligations (including personal debts, revolving accounts, and installment loans), and a reasonable allowance for living expenses" in determining whether a class member is in imminent default and thus entitled to loan modification. The HAMP guidelines provide:

> When making an imminent default determination, the servicer must evaluate the borrower's hardship as well as the condition of and circumstances affecting the property securing the mortgage loan. The servicer *must* consider the borrower's financial condition, liquid assets, liabilities, combined monthly income from wages and all other identified sources of income, *monthly obligations (including personal debts, revolving accounts, and installment loans), and a reasonable allowance for living expenses such as food, utilities, etc.* The hardship and financial condition of the borrower must be verified through documentation. [HAMP Handbook ¶4.4 (emphasis added)].

The above language is specific and mandatory; it is incorporated by reference into the agreement. As Wells Fargo correctly observes, however, the HAMP guidelines do not specify *how* a servicer is required to account for non-mortgage expenses. Conceding that it has an affirmative obligation to consider non-mortgage expenses, Wells Fargo claims it does consider such expenses, in two ways.

    First, it contends, the threshold Debt-to-Income ("DTI")[5] requirement contained in its imminent default test implicitly embodies the principle that "if a borrower's payment is below

---

[5] In keeping with their inability to agree on much of anything, the parties have interchangeably used the terms "DTI" and "HTI" (Housing-to-Income) in moving papers. Because "DTI" is expressly defined by the agreement, that term is used throughout this order.

United States District Court
Northern District of California

31%, then he has sufficient income for other liabilities, obligations, and living expenses." This argument finds no support in the agreement or HAMP guidance. As both parties agree, a threshold requirement to loan modification under the agreement and the HAMP guidelines is that an applicant must have a DTI in excess of 31%. DTI, however, is calculated solely by reference to *mortgage* expenses; other liabilities and expenses are irrelevant to the math. Agreement § I, 1.22. Per HAMP guidance, a servicer "must" also consider non-mortgage expenses in determining whether default is imminent. The guidelines contemplate that the servicer will analyze specific obligations, such as "personal debts, revolving accounts, and installment loans." HAMP Handbook ¶ 4.4. If such consideration were implicitly embedded in the threshold DTI requirement, the guidelines' mandate that a lender consider particular non-mortgage expenses would be wholly redundant. *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 574 (1995) (textual interpretation must "avoid a reading which renders some words altogether redundant"). Wells Fargo's calculation of borrowers' DTI does not satisfy its further obligation to determine whether additional "monthly obligations" suggest default is imminent.

Wells Fargo also contends that it accounts for a borrower's monthly expenses by considering whether the applicant qualifies for one of the five financial hardships enumerated in the notice. This claim would seem to be supported (at least in part) by Wells Fargo's written imminent default policies. Yet plaintiffs contend, and Wells Fargo does not specifically refute, that although the servicer collects documentation of non-mortgage expenses from loan modification applicants, it does not actually rely on that information in making imminent default decisions. The deposition testimony of Claire Paris further appears to confirm that, apart from calculating DTI, Wells Fargo's imminent default process does not account for non-mortgage expenses.

Finally, Wells Fargo asserts that non-mortgage expenses are actually analyzed in connection with the "long-term hardship" prong of its imminent default framework. According to Wells Fargo, an accounting of non-mortgage obligations occurred when, "in assessing their own situation, borrowers were free to conclude that their non-housing debt levels, food and clothing

1    expenses, and dependent care expenses were making their housing payment unaffordable." While

2    creative, this theory neglects the plain language of the HAMP guidelines, which affirmatively

3    requires a *servicer* actively to consider *specific* non-mortgage obligations and living expenses. *See*

4    *People v. Stephen*, 182 Cal. App. 3d Supp. 14, 18 (1986) ("words such as 'must' and 'shall'"

5    convey a "mandatory or an imperative connotation in the obligatory sense"). There is no evidence

6    that Wells Fargo's long-term hardship test entails any affirmative analysis of a borrower's specific

7    obligations and expenses.

8        Yet, despite Wells Fargo's apparent failure to comply with mandatory HAMP guidance,

9    plaintiffs have not demonstrated that they are entitled to any relief. As determined in the May

10   Order, the agreement provides for loan modification "only upon a finding that the borrower has

11   experienced one of the five grounds for financial hardship specified in the class notice."

12   Accordingly, the law of the case prevents plaintiffs from creating, out of whole cloth, a novel

13   financial hardship criteria based on non-mortgage obligations and living expenses.

14       If Wells Fargo's consideration of the enumerated financial hardships also entails some

15   individualized analysis of a borrower's expenses, HAMP guidance requires that non-mortgage

16   obligations and living expenses be included in that calculus. If, on the other hand, Wells Fargo

17   applied its limited criteria in a lenient fashion throughout the modification period, by concluding,

18   for example, that disabled class members satisfied the financial hardship prong of the test without

19   analyzing any specific expenses, further consideration of non-mortgage obligations and living

20   expenses would only serve to impose additional barriers to loan modification for otherwise

21   qualified class members. As detailed below, despite two rounds of briefing, the exact contours of

22   Wells Fargo's financial hardship test remain inscrutable. Upon receiving the additional briefing

23   ordered herein, the court will finally determine whether plaintiffs are entitled to any relief based

24   on Wells Fargo's apparent failure to consider specific non-mortgage expenses in accordance with

25   HAMP guidance.

26

27

28

United States District Court
Northern District of California

B.     Major Change in Circumstances Test

Plaintiffs also contend that Wells Fargo uses obscure and shifting standards to evaluate whether borrowers meet the final financial hardship category listed in the notice (termed "major change in circumstances" by the parties).   As stated above, in addition to divorce, death, and other intervening events, the notice provides that a borrower can qualify for imminent default by demonstrating:  "A combination of reduction of income and increase in housing expenses (principal and interest only) that exceeds 10% of current income. The comparison period shall be approximately 12 months prior to the date modification is sought; however, a greater period may be used if the condition has been consistent."

In her deposition and again in a declaration submitted in support of defendant's opposition, Paris explained that Wells Fargo's criteria for determining reduction in income went through two different iterations.  For the period from December 18, 2010 to April 25, 2011, it calculated the reduction by measuring the difference between a borrower's verified current monthly gross income and his prior stated monthly gross income.  On April 26, 2011, these criteria changed and the reduction in income was subsequently measured by the difference between the borrower's verified current monthly gross income and his monthly gross income at origination.

Wells Fargo admits that the second iteration of its test does not mirror the description found in the notice.  Instead, it contends that because the language found in the notice only "generally" represented the "current" test, it had discretion to tinker with its "major change of circumstances" criteria.  Yet, while some flexibility is permitted by the broad language found in the agreement, the HAMP guidelines squarely demand that once "written standards for imminent default" have been developed, a servicer is required to apply those standards "equally to all borrowers."  HAMP Handbook, ¶ 4.4.  Indeed, Wells Fargo has previously acknowledged to this court that it "must apply the same Imminent Default standard 'equally to all borrowers' or run afoul of HAMP."  Dkt. 614 at 14.  This obligation cannot be satisfied by fluctuating policies.

It is of little significance that the notice indicates its terms only "[g]enerally" constitute the "current" test.  That vague language did not give Wells Fargo discretion to fiddle with its

1   imminent default test during the settlement period, administering certain standards to some class

2   members and changing the loan modification calculus applicable to others, particularly where

3   more specific HAMP guidance requires that written standards be applied equally across the class.

4   *See* Cal. Civ. Proc. Code § 1859.  Moreover, plaintiffs contend—and Wells Fargo apparently does

5   not refute—that it lacks written policies documenting certain key contours of its major change in

6   circumstances test.

7           The notice defines Wells Fargo's major change in circumstances test as entailing a

8   comparison period of "approximately 12 months prior to the date modification is sought."[6]  That

9   definition, expressly incorporated into the agreement, must form the foundation of the servicer's

10  major change in circumstances test.  Wells Fargo is required to apply that standard equally across

11  the settlement class.  By employing evolving and perhaps ill-defined standards which did not

12  always mirror the test described in the notice, Wells Fargo breached the settlement agreement.

13  C.      Evaluation of Financial Hardship Criteria

14          Next, plaintiffs contend that Wells Fargo failed to apply the other financial hardship

15  criteria—death, long-term disability, divorce, separation—consistently and in accordance with the

16  terms of the agreement.  Again, the notice allows class members to qualify for imminent default

17  by demonstrating a reasonable likelihood of default "because of financial hardship or other

18  changed circumstances."  Financial hardship is defined as "one of" five conditions "that currently

19  exists or occurs prior to June 30, 2013."

20          Despite two attempts, the parties have done very little to frame this issue meaningfully for

21  judicial review.  At bottom, Wells Fargo seeks a nebulous ruling that the financial hardship

22  element required proof of an occurrence which "actually affect[ed] a borrower's ability to pay."  It

23  does not explain, however, the manner in which it determines whether one of the enumerated

24  hardships affects a class member's ability to pay.  Plaintiffs, in contrast, request a holding that

25

26  _____

27  [6] Neither party seems to think the notice's statement that "a greater period may be used if the
    condition has been consistent" has much relevance to Wells Fargo's obligations.

28

1  Wells Fargo must "consider a borrower in imminent default if he or she satisfies any of the

2  enumerated financial hardships."  Neither of these expansive standards is adequate.

3          Some guidance, however, can be provided to the parties.  Plaintiffs interpret the agreement

4  to mean that any class member who was deceased, disabled, or divorced at *any time* "prior to June

5  30, 2013"—even if the hardship occurred many years before loan origination—may qualify for

6  imminent default.  This reading is inconsistent with the plain language of the notice, which defines

7  a "financial hardship" as interchangeable with "other changed circumstances."  That terminology

8  indicates that only a *post-origination* change in circumstances renders a borrower eligible for loan

9  modification.  A borrower divorced or disabled prior to origination cannot reasonably be deemed

10 to have experienced any "changed circumstances" relevant to his or her relationship with Wells

11 Fargo.  Accordingly, applicants such as Francis Matijevich, who had a disability predating the

12 origination of his PAP loan by decades, did not qualify for financial hardship on that basis alone.

13 This interpretation does not, contrary to plaintiffs' rhetoric, amount to "adding language" to the

14 contract.  Rather, it is consistent with the fundamental principle that "language must be read in

15 context since a phrase gathers meaning from the words around it."  *Hibbs v. Winn*, 542 U.S. 88,

16 101 (2004).

17         This does not, however, fully resolve the parties' dispute.  Throughout its briefing, Wells

18 Fargo fails to explain satisfactorily how it considers the timing of a class member's financial

19 hardship, if at all.  The cryptic explanations offered by Paris are suggestive of further

20 indeterminacy in Wells Fargo's imminent default standards, potentially constituting additional

21 violations of the agreement and HAMP guidance.[7]  Plaintiffs also maintain that, instead of finding

22

23 ───────────────

24 [7] Robert Raby, one of the class members discussed in plaintiffs' motion, was denied loan
   modification on uncertain grounds.  Wells Fargo determined that he had not suffered a financial
   hardship because his divorce had occurred more than three years prior to his loan modification
25 application.  At the time he was approved for the loan, however, he was married.  It is unclear
   from Paris' testimony whether he was denied loan modification because he failed to represent that
26 he had a long-term hardship, or whether Wells Fargo deemed his three-year-old divorce too
   temporally distant to warrant a finding of imminent default.  The latter rationale would be highly
27 questionable.

28

United States District Court
Northern District of California

1 class members eligible for imminent default if they satisfy "any of" the financial hardship criteria,

2 Wells Fargo actually applies the major change of circumstances test to all borrowers regardless of

3 whether, for example, they have also experienced death or divorce.  If true, this might very well

4 constitute another violation of the settlement agreement, which requires a finding of imminent

5 default if "any" of the financial hardship criteria are satisfied.  Wells Fargo refutes this point, but

6 only by conclusory reference to the muddled Paris testimony.

7         Before the parties can be extricated from their self-made morass, Wells Fargo must provide

8 additional clarity.  No later than one week from the date of this order, it shall submit a

9 supplemental brief (of no more than five pages) specifically addressing the following questions,

10 with accompanying citations to the Paris deposition transcript and Wells Fargo's written imminent

11 default policies:

12
       •   Do Wells Fargo's imminent default policies account for the timing of applicants'
13         financial hardships?  Provide a yes or no answer.  If yes, in what manner and
          pursuant to which specific policies?
14
       •   Do Wells Fargo's imminent default policies allow an applicant to satisfy the
15         financial hardship prong of the imminent default test *solely* by providing
          documentation of death, long-term disability, divorce, or separation?  If not, what
16         *specific* further analysis do the policies undertake to determine whether such
          applicants are entitled to a finding of imminent default?
17
       •   If an applicant was recently divorced, disabled, separated, or deceased, do Wells
18         Fargo's imminent default policies consider the impact that divorce, disability,
          separation, or death had on the class member's income and expenses?  If so, how
19         and pursuant to which policies?  Does such consideration take into account non-
          mortgage obligations and living expenses?  If so, how?
20
   D.    Calculation of MAP2R DTI
21
          Finally, plaintiffs claim that Wells Fargo breached the agreement because, in analyzing
22
   imminent default in connection with the MAP2R program, its policies calculate a borrower's DTI
23
   by reference to his "minimum, required payment" instead of his fully amortizing payment.   As
24
   plaintiffs emphasize, the agreement defines DTI with specific reference to the borrower's fully-
25
   amortizing payment, including "first-lien monthly mortgage obligations (including monthly
26
   amounts for principal, interest [and other expenses]) . . . *regardless of whether any of the*
27

28

1  *foregoing are included in the Borrower's Monthly Payment.*"   Agreement § I, 1.22 (emphasis

2  added).

3       Wells Fargo agrees that the agreement's definition of DTI refers to the fully amortizing

4  payment and not the minimum required payment and further acknowledges that its policies

5  employ the minimum required payment to calculate DTI in the context of determining whether

6  MAP2R applicants are at risk of imminent default.[8]   It contends, however, that the definition of

7  DTI quoted by plaintiffs is only applicable in the context of loan modification waterfalls (i.e., the

8  process of decreasing the monthly payments of borrowers already approved for loan

9  modification).  In the context of determining whether particular borrowers are entitled to a finding

10  of imminent default, Wells Fargo contends, it is free to use the minimum monthly payment to

11  calculate DTI.[9]

12       The agreement, it is true, does not specifically define imminent default by reference to

13  DTI.  As the May Order observed, however, the threshold DTI inquiry is an uncontroversial

14  component of the imminent default test because "the objective of both HAMP and MAP2R is to

15  reduce a borrower's DTI to no great than 31%.  A borrower whose DTI is already 31% or less

16  would not benefit from either modification program."  This settled understanding of the DTI

17  threshold is derived from the HAMP guidelines, which define DTI based on a borrower's fully-

18  amortizing payment, "regardless of whether these expenses are included in the borrower's current

19  mortgage payment."  HAMP Handbook ¶¶ 1.1, 6.1.2.  Wells Fargo previously confirmed this

20  rationale for the threshold DTI inquiry contained in its imminent default analysis.  Dkt. 640 at 12

21

22  [8]  According to plaintiffs,  Wells Fargo's DTI formula differs depending on whether a particular
    loan modification applicant qualifies for HAMP or, instead, for MAP2R.  Plaintiffs claim that
23  Wells Fargo uses the fully-amortizing monthly payment to calculate DTI in determining whether
    HAMP applicants are at imminent risk of default but the minimum monthly payment to calculate
24  DTI for MAP2R in addressing the same question.  Wells Fargo does not address this discrepancy.

25  [9] Wells Fargo also observes that, in defining imminent default, the agreement refers to the term
    "scheduled payments," as opposed to the "fully-amortizing payment."  This is not persuasive
26  evidence that Wells Fargo had authority to create a redundant analytical framework for evaluating
    MAP2R imminent default applicants.  Nor does this theory explain why, in contrast, fully-
27  amortizing DTI was used to evaluate HAMP applicants.

28

United States District Court
Northern District of California

1    (Step 1 of the imminent default test, "calculating the borrower's DTI, looks at whether the

2    borrower's DTI is in excess of the federal government's affordable 31% 'target'"); Dkt. 614 at 8-

3    9.  Finally, section VI(E)(2) of the agreement, which generally governs eligibility for the MAP2R

4    program, reflects this understanding:

5           Settlement Class B Members *in Imminent Default, [or] who later become in*
           *Imminent Default* . . . shall be considered for a MAP2R Modification on the terms
6           as outlined in Sections VI(E)(3) and (5) of this Agreement.  The following process
           shall commence upon . . . *verification that the Settlement Class Member's DTI is*
7           *above thirty-one percent (31%).*  (Emphasis added).

8    Once again, the use of the term "DTI" in the above provision requires consideration of a

9    borrower's fully-amortizing payment.  Agreement § I, 1.22.

10          Notwithstanding this background, and despite the fact that it apparently uses a fully-

11   amortizing DTI threshold to analyze imminent default for HAMP applicants, Wells Fargo

12   contends that the agreement leaves it free to apply a different formula in the MAP2R imminent

13   default context.  This argument has two fatal flaws.   First, if the MAP2R imminent default

14   framework Wells Fargo describes had been countenanced by the agreement, the DTI threshold

15   found at section VI(E)(2) would have been largely superfluous.  A borrower's fully-amortizing

16   DTI will always be greater than or equal to that borrower's monthly minimum DTI measured at

17   the same point in time.  Consequently, any imminent default applicant with a monthly minimum

18   DTI of greater than 31% would also have a fully-amortizing DTI above the threshold, eliminating

19   the need for Wells Fargo to conduct the "verification" specified in section VI(E)(2).  *See, e.g.,*

20   *Crosby v. HLC Properties, Ltd.*, 223 Cal. App. 4th 597, 604 (2014) ("when interpreting a contract,

21   we strive to interpret the parties' agreement to give effect to all of a contract's terms, and to avoid

22   interpretations that render any portion superfluous").   Second, by articulating a unitary definition

23   of the term "imminent default"—which is then used in provisions defining eligibility for HAMP

24   and MAP2R—the agreement precludes Wells Fargo from developing separate imminent default

25

26

27

28

United States District Court
Northern District of California

standards for the two programs.  Accordingly, Wells Fargo breached the agreement by subjecting

MAP2R applicants to an unwarranted additional hurdle not contemplated by the parties' bargain.[10]

IV.        CONCLUSION

Wells Fargo breached the settlement agreement in at least two ways.  First, it violated the

agreement by failing to establish and apply equally across the class uniform written standards for

its "major change of circumstances" test.  Second, it breached the agreement by applying a DTI

threshold based on borrowers' monthly minimum payments in evaluating MAP2R applicants for

imminent default.

The parties shall promptly meet and confer to develop a joint proposal for remediation of

the violations described above.  If agreement proves impossible, the parties must submit

competing proposals.  In either case, the parties' proposed remedial approach must comply with

the following parameters:  (1) relief shall be prospective, allowing class members whose

applications were denied for lack of imminent default to reapply, based on their current situations;

(2) borrowers will not be permitted retroactive relief (i.e., based on information submitted in

connection with a previously-denied modification application); (3) Wells Fargo must consider

class members for  prospective HAMP and MAP2R loan modification based on the "major change

of circumstances" test articulated in the Class B notice, calculating prior monthly income from

approximately 12 months prior to the evaluation or a longer period if the condition has been

consistent; and (4) Wells Fargo must consider class members for prospective MAP2R loan

modification based on an imminent default DTI threshold that accounts for a borrower's fully-

amortizing payment.  The parties shall file their proposal or proposals no later than <u>two weeks</u>

from the date of this order.

No later than <u>one week</u> from the date of this order, Wells Fargo shall file a supplemental

brief describing its financial hardship policies in more detail, as specified herein.  Upon receiving

---

[10] In their initial motion, plaintiffs also asserted that Wells Fargo has violated the agreement by
failing to consider whether an imminent default applicant's loan has a positive net present value.
They have apparently abandoned this argument in their portion of the supplemental brief.

United States District Court<br/>Northern District of California

ORDER ON MOTION TO ENFORCE SETTLEMENT
CASE No. 09-md-02015-RS

18

1   Wells Fargo's supplemental brief, a further order will issue setting forth additional remediation, if

2   any, which may be required.

3         **IT IS SO ORDERED**.

4

5   Dated:  April 15, 2015

6

7                                                    _____
                                                     RICHARD SEEBORG
8                                                    United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28